# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
### SPECIAL EDUCATION

In the Matter RE:      **Shelton. Derrick vs. Maya Angelou PCS  & DCPS**

Case Information:      Hearing Dates: **03/12/2007**
Held at: **District of Columbia Public Schools Headquarters**
**825 N. Capitol Street, N.E.**
**Washington, D.C. 20002**
Student Identification Number:  **9013653**
Student's Date of Birth:  **03/08/1988**
Attending School: **Maya Angelou PCS**
Managing School:
Hearing Request Date(s): **12/12/2006**

## CERTIFICATION OF RECORD

I, **Shawnta Maddox**, **Legal Assistant of the Student Hearing Office**,

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting  of all letters, pleadings, orders,

exhibits and depositions.

I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this Thursday, August 30, 2007.

**LEGAL ASSISTANT**
**STUDENT HEARING OFFICE**

1

(In the Matter of DS   HOD: April 4, 2007)

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## *State Enforcement and Investigation Division*
### CONFIDENTIAL
### Coles B. Ruff, Jr., Due Process Hearing Officer

| | | |
|---|---|---|
| In the Matter of D▇▇ S▇▇ | ) | **IMPARTIAL DUE PROCESS** |
| Date of Birth: March 8, 1988 | ) | |
| ("Student") | ) | **HEARING OFFICER'S DECISION** |
| | ) | |
| Petitioner, | ) | Hearing Date: March 12, 2007 |
| | ) | Record Closed: March 20, 2007 |
| v. | ) | Held at: 825 North Capitol St. NE |
| | ) | Washington, DC |
| Maya Angelou Public Charter School | ) | |
| (MAPCS) and | ) | |
| | ) | |
| District of Columbia Public Schools | ) | |
| ("DCPS" or "District") | ) | |
| School: Cardozo SHS | ) | |
| | ) | |
| Respondents. | ) | |

Counsel for Student:            Roberta Gambale, Esq.
                                1220 L Street, NW #565
                                Washington, DC 20001

Counsel for Maya Angelou PCS    Jessica M. Smith, Esq.
                                1008 Pendleton Street
                                Alexandria, Virginia 22314

Counsel for DCPS:               Aaron E. Price, Sr., Esq.
                                Office of General Counsel
                                825 North Capitol St. NE
                                Washington, DC 20002

## JURISDICATION:

A Due Process Hearing was convened on March 12, 2007, at the headquarters of the District of Columbia Public Schools, 825 North Capitol Street, NE, Washington, DC 20002, in response to a due process complaint submitted by counsel for the student and parent filed January 12, 2007. The hearing was conducted and this decision was written pursuant to the *Individuals with Disabilities Act* (I.D.E.A.), P.L. 101-476, as amended by P.L. 105-17 and the *Individuals with Disabilities Education Improvement Act of 2004* (I.D.E.I.A.), the Rules of the Board of Education of the District of Columbia and the DC Appropriations Act, Section 145, effective October 21, 1998.

1

(In the Matter of DS  HOD: April 4, 2007)

**DUE PROCESS RIGHTS:**

The student's counsel waived a formal reading of the due process rights.

**SUMMARY OF THE RELEVANT EVIDENCE:**

The Hearing Officer considered the representations made on the record by each counsel, the testimony of the witness(es) and the documents submitted in the parties' disclosures (DS 1-30, MAPCS 1-15) which were admitted into the record. The record was closed with the submission by the parties of post hearing briefs on March 20, 2007.

**FINDINGS OF FACT** [1]**:**

1. The student has been determined to be eligible for special education and related services with a disability classification of learning disabled (LD). The student attends Maya Angelou Public Charter School (MAPCS). (MAPCS 3)

2. The student's most recent individualized educational program (IEP) was developed March 16, 2006, at MAPCS and prescribes the following weekly services: 90 minutes of counseling, 1 hour of special education consultation, 1 hour and 55 minutes of "advisory" services.[2] (MAPCS 3)

3. The student performed well academically during the first quarter of school year (SY) 2006-07. However, the student was suspended and/or sent home early on a number of occasions the first quarter because of his behavior. (Student's testimony, DS 23)

4. On November 17, 2006, the student was engaged in an altercation and struck another student.[3] He was suspended from MAPCS as of the date of this incident. (Student's testimony, DS 24)

5. Prior to the student's November 17, 2006, suspension he was suspended for a total of four days: two days in September 2006 for being disrespectful to a teacher and for two other incidents for one day each. (Mr. Luseni's testimony)

6. Following the November 17, 2006, suspension, the student father instructed him to return to school because he had not been provided any documentation of the suspension. The student was not allowed to attend school and his father accompanied him to school a day or two later. The father was told by the school staff that the person responsible for sending out the suspension documentation was

---

[1] The evidence that is the source of the finding of fact is noted within a parenthesis following the finding.

[2] Mr. Luseni, MAPCS' special education coordinator testified that he provided the student consultation services and the "advisory" services were assistance from a special education teacher in an inclusion setting within general education classes. (Mr. Luseni's testimony)

[3] Based on testimony from a number of witnesses it appears the other student was his girlfriend.

not at school but would send the documentation upon her return. The student was not allowed to return to school. (Father's testimony)

7. On November 22, 2006, MAPCS' Dean of Student Affairs, Ms. Melanie Cobb, sent a letter to the student's parents indicating the student had been suspended with the intent to expel him from the school. The letter indicated that the schools' special education coordinator would be scheduling a manifestation determination review (MDR) meeting as soon a possible. (DS 17)

8. On Monday, November 27, 2006, the student and his father came to MAPCS and met with Mr. Michael Luseni, the special education coordinator. Mr. Luseni indicated that a MDR meeting needed to be held but he could not say if the student would be expelled. (Mr. Luseni's testimony)

9. The father requested to speak with the principal and Mr. Luseni arranged for the father to come the next day, November 28, 2006, and speak with the principal, Mr. Pinkard. The father requested that the student have a lesser punishment than expulsion and that the MDR meeting be delayed. Because the father seemed distraught about the possibility of having to find another school for his son Mr. Luseni did not press the father about setting a date to convene the MDR meeting and asked the father to call him about scheduling the meeting. The father did not call to schedule the meeting, however. (Mr. Luseni's testimony)

10. Because Mr. Pinkard and Mr. Luseni indicated to the father the student would not be allowed to return to the school and should go to his neighborhood school the parent retained counsel. (Father's testimony)

11. On December 4, 2006, the student's counsel sent a letter to MAPCS. The letter requested a MDR meeting and proposed dates for the meeting. The letter also advised the school the student should continue to be provided services under IDEIA §1515(k)(1), that an IEP team should be convened to discuss a possible alternative placement and that a functional behavior assessment (FBA) should be conducted. (DS 11)

12. The student's counsel filed a due process complaint on behalf of the parent and the student against MAPCS. That complaint was later amended to include the student only because he is over the age of eighteen. (DS 3)

13. On December 12, 2006, Mr. Luseni sent the parents a letter scheduling a combined MDR and resolution meeting for December 20, 2006, one of the dates proposed by the student's counsel. However, MAPCS later issued a notification scheduling the meetings for December 19, 2006. The MDR meeting was scheduled at 10:00 am; the resolution meeting was scheduled at 2:00 pm. (DS 19, 25)

14. MAPCS convened the multidisciplinary team (MDT)/MDR meeting on December 19, 2006. The student, his parents and his educational advocate, Mr. Corey

3

Hamilton, attended the meeting. The MAPCS participants of the MDT included, Ms. Corey Bellamy, counselor, Ms. Nakita West, Algebra teacher, Quentin Graham, PhD., psychologist, and Mr. Luseni, the special education coordinator. (DS 22)

15. The MDT determined the student's behavior was not a manifestation of his disability. Despite the fact that the student had been previously suspended the MDT thought the assault on the student that led to the suspension was an aberration. During the meeting Mr. Hamilton expressed a desire to review the student's IEP at a later date. The MDT did not discuss a placement for the student and there was no discussion of the services the student would be provided for the time he was not attending school. The decision to expel the student was not made at the MDR meeting. (Mr. Hamilton's testimony, Dr. Graham's testimony, DS 22)

16. On December 19, 2006, following the MDR meeting Mr. Hamilton sent a letter to Mr. Luseni, disputing the notes MAPCS had prepared from the MDR meeting. Mr. Hamilton pointed out that while the student's current disability classification was LD, the student and his parents believed the IEP did not reflect his true disability and if it did the behavior would have been a manifestation of that disability. (DS 10)

17. Mr. Hamilton indicated that he hoped the defects in the IEP would be addressed at the next MDT meeting. Mr. Hamilton believed the MDT had agreed at the MDR meeting to reconvene in January 2007 to discuss the issues related the student's IEP. (Mr. Hamilton's testimony, DS 10)

18. Mr. Hamilton also indicated in the letter to Mr. Luseni the student and his parents wanted to challenge the student's expulsion in a hearing.[4] (DS 10)

19. On December 19, 2006, following to the MDR meeting MAPCS' principal sent a letter to the student indicating that he had been expelled as of December 19, 2006. The letter indicated that MAPCS would provide the student tutoring for the time he was out of school after the tenth day of suspension. The letter directed the student to register at his neighborhood school as soon as possible and that his transcript and other records would be forwarded to DCPS. The letter did not indicate how the student could appeal the suspension. (DS 20)

20. Despite the letter from the MAPCS' principal indicating the student was expelled the student and his parents were under the impression the student was still enrolled at MAPCS until the due process hearing was complete. Consequently, they took no action to register the student in any other school. (Student's testimony, Mother's testimony)

---

[4] MAPCS Parent and Student Handbook sets forth a procedure for appealing expulsion decisions. The handbook states appeals are to be filed within three business days of the expulsion and directed to the principal of the school. (MAPCS  )

4

21. Immediately following the MDR meeting MAPCS held the resolution meeting. The student's counsel attended the resolution meeting. There was a brief discussion of interim services for the student. Ms. Luseni offered to provide the student tutoring services; however, there was no agreement as to the amount of tutoring. Counsel indicated she wanted the student readmitted. MAPCS did not agree to readmit the student and the meeting ended. (Mr. Luseni's testimony)

22. Following the resolution meeting Mr. Luseni telephoned the student's counsel and left a message offering three hours of tutoring per week. Mr. Luseni then arranged for a tutor to provide the student services. (Mr. Luseni's testimony)

23. Mr. Luseni thereafter telephoned Dr. Peggy Peagler the schools DCPS liaison and informed her of the student's expulsion. Dr. Peagler stated that because of the limited number of specialized instruction hours in the student's IEP the student could go to the neighborhood school. Mr. Luseni then went to Cardozo Senior High School (Cardozo) and provided Cardozo's special education coordinator the student's records. Dr. Peagler informed Mr. Luseni no MDT/placement meeting was required for the student to enroll at his neighborhood school. (MAPCS 8)

24. On January 12, 2007, the student's counsel filed the amended due process complaint. (DS 3)

25. On January 18, 2007, Mr. Hamilton sent another letter to MAPCS proposing dates to reconvene the MDT to discuss the student's IEP. (Mr. Hamilton's testimony)

26. Mr. Luseni made three attempts to call the parent's counsel and was unable to leave a message regarding convening the resolution meeting. (Mr. Luseni's testimony, MAPCS 9, 12)

27. The student believed MAPCS began providing him tutoring on January 17, 2007. Prior to the tutoring starting MAPCS provided the student no services following his suspension. The student's Math teacher Ms. Nakita West provided the tutoring. The student went to tutoring once per week at MAPCS on Wednesdays when most other students were out of the school attending internships. The student has not been provided any related services following his suspension.[5] (Student's testimony)

28. The school's tutor had resigned and Mr. Luseni indicated the three hours would be provided on retroactive basis. On December 22, 2006, Ms. West began providing

---

1.  [5] The student also testified the tutoring was inconsistent and he primarily received tutoring in Math and only received work in other subjects on one or two occasions. The parties submitted post hearing affidavits and there is a tutoring log in MAPCS' disclosures. In addition, Mr. Luseni testified that because the school's prior tutor had resigned tutoring was to be provided to the student retroactively. In review of this evidence there is disagreement as to when the tutoring began, the quantity of tutoring delivered, the subjects covered in the tutoring and the student's availability for tutoring.

(In the Matter of DS  HOD: April 4, 2007)

tutoring and she maintained a log of when she provided tutoring.  (Mr. Luseni's testimony)

29. On February 8, 2007, the student's counsel sent a letter to Mr. Luseni regarding the tutoring MAPCS was providing.  The letter indicated that there had only been four tutoring sessions and only in Math.  Counsel requested the student receive additional tutoring so that he would not fall behind in his graduation requirements. (DS 13)

30. On February 22, 2006, the student's counsel sent Mr. Luseni another letter indicating the student was not being provided the tutoring services consistently. The letter stated the student had invoked his right to "stay put" under IDEIA and should be allowed to return to MAPCS until a due process hearing was held. Counsel asked to be advised when the student would be allowed to return to school or when FAPE would be made available.  (DS 14)

31. On March 2, 2007, MAPCS' counsel sent a letter to parent's counsel proposing dates for a resolution meeting on the amended complaint.  A second resolution meeting was convened but the complaint was not resolved. (MAPCS 12)

## ISSUE(S): [6]

Did DCPS deny the student FAPE by:

1. Failing to follow the disciplinary procedures under IDEA by failing to timely convene a MDR?
2. Failing to conduct a functional behavior assessment (FBA) and implement a behavior intervention plan (BIP) following the student's suspension?
3. Failing to provide the student an alternative placement and or continue to provide services following the student's suspension/expulsion?

## CONTENTIONS OF THE PARTIES: [7]

The student's counsel asserted the following:

1. The MDR was not convened until December 19, 2006, outside the required ten day period.
2. MAPCS conducted no FBA and did not provide the student an alternative placement and/or sufficient services during his suspension.

---

[6] The alleged violation(s) and/or issue(s) raised in the complaint may or may/not directly correspond to the issue(s) outlined here.  However, the issue(s) listed here were reviewed during the hearing and clarified and agreed to by the parties as the issue(s) to be adjudicated.

[7] The contentions are the arguments made by opposing counsel and do not reflect any findings or conclusions made by the Hearing Officer.

6

3. Tutoring services were not put in place until after the student was expelled and outside the statutory period when services were to be provided.
4. There was a unilateral determination by MAPCS as to the amount of tutoring and that the student would be returned to his neighborhood school.
5. There was no placement meeting ever convened.
6. A suspension of more than ten days constitutes a change of placement and a placement meeting should have been convened.
7. Stay put protections were asserted.
8. The advocate requested a MDT meeting to review the student's IEP which was never convened.

MAPCS counsel asserted the following:

1. MAPCS sent a letter to the parents on November 22, 2006, indicating a MDR would be convened.
2. MAPCS made attempts to convene the MDR within the required ten day period.
3. The parent requested the MDR be postponed at the meetings with Mr. Luseni.
4. Nonetheless, any delay in convening the meeting does not rise to the level of a denial of FAPE.
5. A FBA is only required if the behavior is deemed to be a manifestation of the student's disability. Or if removed for more than 10 days for a violation of code of conduct. (42 CFR 300.530 (d)(1), (c) and (f)).
6. MAPCS made provisions for services to continue through tutoring for a reasonable time until another placement was secured.
7. A request for more tutoring hours was not made for two months after the tutoring began and after another placement at DCPS was offered.
8. The student was informed he should report to his neighborhood school and his records were transferred to Cardozo.
9. The student was informed of his right to appeal the expulsion but the proper appeal procedures were not followed thus his expulsion is final.
10. The student has not availed himself of the full tutoring services that were provided.
11. IDEIA provides that during the pendency of the due process proceeding the student is to remain in the current educational placement.
12. After the MDR the parties agreed the tutoring provided by MAPCS would be the alternative placement.
13. There was no requirement for a placement meeting as the student was provided an alternative placement.
14. There was no unilateral placement to Cardozo; MAPCS did not and cannot issue a notice of placement to a DCPS school.
15. Once the student's new location (Cardozo) was determined the student should have enrolled there and challenged the location if he so chose.
16. The post hearing documents submitted by student's counsel should be excluded.

(In the Matter of DS  HOD: April 4, 2007)

## CONCLUSIONS OF LAW:

Pursuant to IDEIA Sec. 1415 (f)(3)(E)(i) a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education (FAPE).

Pursuant to IDEIA § 1415 (f)(3)(E)(ii) in matters alleging a procedural violation a hearing officer may find that a child did not receive FAPE only if the procedural inadequacies impeded the child's right to FAPE, significantly impeded the parent's opportunity to participate in the decision making process regarding provision of FAPE, or caused the child a deprivation of educational benefits.

Pursuant to 5 DCMR 3030.3 the burden of proof is the responsibility of the party seeking relief. [8] In this case the student is seeking relief and has the burden of proof that the action and /or inaction or proposed placement is inadequate or adequate to provide the student with FAPE.

1. Did DCPS deny the student FAPE by failing to follow the disciplinary procedures under IDEA by failing to timely convene a MDR?  Conclusion: The student's counsel did not sustain the burden of proof.

Pursuant to 42 CFR 300.530(e) [9] MAPCS was to convene a manifestation determination within 10 school days of the student's suspension of more than ten school days.  The student had been suspended a total of four school days prior to the November 17, 2006, suspension.  Therefore, as of the sixth school day following the November 17, 2006, suspension a MDR meeting was to have occurred.  This would have been on or before November 28, 2007.  Mr. Luseni testified that he met with the student and his father on November 27, 2007, and reiterated the need to convene a MDR meeting within ten school days as was mentioned in MAPCS' November 22, 2006, letter to the student's parents.

Mr. Luseni credibly testified that the father wanted to delay the meeting and once the student retained counsel the MDR was convened on a date proposed by his counsel. Although MAPCS convened the MDR meeting nearly fifteen school days beyond the date it should have occurred, the meeting was convened on a date the parent's counsel suggested.  MAPCS offered to provide the student compensation in the form of tutoring

---

[8] Based solely upon the evidence presented at the hearing, an impartial hearing officer shall determine whether the party seeking relief presented sufficient evidence to meet the burden of proof that the action and /or inaction or proposed placement is inadequate or adequate to provide the student with FAPE.

[9] 42 CFR 300.530 (e) Manifestation determination. (1) Within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the LEA, the parent, and relevant members of the child's IEP Team (as determined by the parent and the LEA) must review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine – (1) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability, (ii) If the conduct in question was the direct result of the LEA's failure to implement the IEP.

8

(In the Matter of DS  HOD: April 4, 2007)

for the days he was out of school beyond that time frame. The Hearing Officer concludes that despite the fact that the MDR did not occur within the required time, under these circumstances, the delay was justified and did rise to the level of a denial of FAPE.

2. Did DCPS deny the student FAPE by failing to conduct FBA and implement a BIP? Conclusion: The student's counsel sustained the burden of proof.

Once the MDR meeting was convened the MDT determined the student's behavior, that was the basis for the suspension, was not a manifestation of his disability. Although Mr. Hamilton testified that at the MDR meeting he raised concerns that the student's IEP was inappropriate and later indicated in his letter that the IEP did not reflect the student's true disability classification, the student's disability classification was not challenged in the complaint and there was no evidence presented that the student's disability classification was other than LD. In addition, there was no evidence that the MDT determination that the student's behavior was not a manifestation of the student's disability was erroneous. Consequently, the Hearing Officer concludes that the student's behavior for which he was suspended on November 17, 2007, was not a manifestation of his disability.

Pursuant to 42 CFR 200.530(d)(i)[10] if the behavior for which the student was removed from MAPCS was determined to not be a manifestation of his disability, the student was to have received, as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications, designed to address the behavior violation so that it did not recur.

There was no dispute that a FBA and BIP were not developed and or implemented. Although there was testimony from Mr. Luseni and Dr. Graham that the MDT discussed the student's behavior and found it to be an aberration, their testimony was not sufficient evidence that a FBA and/or BIP, designed to address the student's behavior violation so that it did not recur, was inappropriate or unwarranted.

Therefore, the Hearing Officer concludes MAPCS should have conducted a FBA and BIP following the MDR meeting. The student was suspended because of his behavior on three occasions prior to the November 17, 2006, suspension. In addition, there was some indication the student may not haven taking full advantage of the tutoring that had been put in place following the suspension. The number of suspensions and the student's behavior seemed to have warranted some intervention to ensure the student would not continue to engage in behavior disruptive to his education. The fact that the FBA was not

---

[10] 42 CFR 300.530 (d) Services (1) a child with a disability who is removed from the child's current placement pursuant to paragraphs (c), or (g) of this section must (i) continue to receive educational services, as provided in 300.100(a), so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP; and (ii) receive, as appropriate, a functional behavioral assessment, and behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur. (2) The services required in paragraph (d)(1)...may be provided in an interim alternative setting... (5) If the removal is a change of placement under §300.536, the child's IEP Team determines appropriate services under paragraph (d)(1) of this section.

conducted and a BIP was not implemented caused the student a deprivation of educational benefits and was a denial of FAPE.

3. Did DCPS deny the student FAPE by failing to provide the student an alternative placement and/or continue to provide services following the student's suspension/expulsion?  Conclusion: The student's counsel sustained the burden of proof.

Pursuant to 42 CFR 300.530(b)[11] and 300.536[12] once MAPCS removed the student from school for a total of ten school days in SY 2006-07, any further removal from school constituted a change of placement.  The student had been suspended a total of four school days prior to the November 17, 2006, suspension.  Therefore, as of the sixth school day following the November 17, 2006, suspension the student was considered to have had a change of placement.

Pursuant to 42 CFR 300.530 (d)(i) MAPCS was to have continued to provide educational services to the student so as to enable him to participate in the general education curriculum, although in another setting and to progress toward meeting the goals set out in the student's IEP.

Pursuant 42 CFR 300.530(g)[13] MAPCS was authorized to remove the student to an interim alternative educational setting for not more than 45 school days regardless of whether the student's behavior was a manifestation of his disability.  And pursuant to 42

---

[11] 42 CFR 300.530(b)(1) - school personnel under this section may remove a child with a disability who violates a code of student conduct from his or her current placement to an appropriate interim alternative educational setting, another setting or suspension for not more than 10 consecutive school days (to the extent those alternatives are applied to children without disabilities), and for additional removals of not more than 10 consecutive school days in that same school year for separate incidents of misconduct (as long as those removals do not constitute a change of placement. (2) After a child with a disability has been removed from his or her current placement for 10 school days in the same school year, during any subsequent days of removal the public agency must provide services to the extend required under paragraph (d) of this section.

[12] 42 CFR 300.536 - Change of placement because of disciplinary removals. (a) For purposes of removals of a child with a disability from the child's current educational placement under 300.530 through 300.535, a change of placement occurs if (1) the removal is for more than 10 consecutive school days; or (2) the child has been subjected to a series of removals that constitute a pattern, - (i) because the series of removals total more than 10 school days in a school year; because the child's behavior is substantially similar to the child's behavior in previous incidents that resulted in the series of removals and (iii) because of such additional factors as the length of each removal, the total amount of time the child has been removed, and the proximity of the removals to one another.
(b)(1) The public agency decides on a case by case basis whether a pattern of removals constitutes a change of placement.

[13] 42 CFR 300.530(g) - school personnel may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability if the child …(3) has inflicted serious bodily injury upon another person while at school, on school premises or at a school function under the jurisdiction of an SEA or an LEA.

(In the Matter of DS  HOD: April 4, 2007)

CFR 330.531 the student's IEP team was to determine the interim alternative educational setting for services under 300.530(d) and (g).

Dr. Graham credibly testified there was no discussion during the MDR meeting of what services would be provided to the student following the MDR meeting or for the time the student had already been out of school. Dr. Graham also testified there was no discussion at the MDR meeting as to a placement for the student. At the resolution meeting that followed the MDR meeting the evidence seems to indicate the full MDT, save the student's educational advocate, remained and participated in the resolution meeting. The educational advocate was replaced by the student's counsel.

Mr. Luseni testified that there was a discussion of what services would be provided the student; however, there was no agreement among the team as to the services that would be provided. There seemed to be a general agreement the student would be provided tutoring but there was no agreement as to the details of the tutoring and the amount. Beyond the discussion of tutoring there was no discussion as to the student's placement. Mr. Luseni unilaterally decided the amount of the tutoring after the resolution meeting. He stated that amount was his first offer and the student's counsel did not request any more tutoring prior to the due process complaint being filed.

Dr. Graham testified the decision to expel the student from MAPCS was not made at the MDR meeting by the MDT. The decision was apparently made by the MAPCS' principal since he signed the letter notifying the student of the expulsion. The expulsion also constituted a change of placement. Although MAPCS apparently has no authority to place a student in another school including a DCPS school, MAPCS was still obligated as an LEA to fulfill the requirement of 42 CFR 300.531 and ensure an IEP team determined the student's interim alternative placement. [14]

MAPCS' counsel asserted that the tutoring provided the student constituted the interim alternative placement. However, this assertion is not consistent with the notification to the student by the principal that he should register at his neighborhood school, and is not consistent with Mr. Luseni's testimony about his conversations with DCPS and carrying the student's records to Cardozo. The Hearing Officer concludes that the decision to provide the student tutoring was not a decision made by the student's IEP team. [15] The Hearing Officer concludes there was no interim alternative placement decided by the IEP team and that failure impeded the student's right to FAPE and caused the student a deprivation of educational benefits.

Although during the hearing there was no specific discussion of "stay put" rights, the Hearing Officer concludes that even if the tutoring was considered to be the student's

---

[14] Whether the student's removal from MAPCS was a suspension or an expulsion it remained a removal from the student's current educational setting that required a placement decision by an IEP team.

[15] Although MAPCS' counsel provided an affidavit from Ms. West in which she stated that in her view the tutoring was an appropriate interim alternative placement for the student, there was no supporting testimony that the MDT came to that conclusion.

11

interim alternative placement, pursuant to 42 CFR 300.530(g) the tutoring was to have been in place no longer than 45 school days, and the student would have returned to his regular classes at MAPCS.[16]  MAPCS has posited apparently conflicting assertions, one that the student's alternative interim placement was the MAPCS tutoring and two, that the student's placement was changed to Cardozo and no placement meeting by a MDT/IEP team was necessary.  The Hearing Officer concludes that under either assertion the student was denied FAPE.  He has not been allowed to return to MAPCS and he has not been provided a MDT/IEP meeting in which is placement could be determined.

## ORDER:

1.  MAPCS shall within ten (10) school days of the issuance of this Order, convene a multi-disciplinary team/individualized educational program (MDT/IEP) meeting to develop a FBA and BIP for the student, discuss if any additional evaluations are warranted, review and/or revise the student's IEP as appropriate, discuss and determine the student's placement, and discuss compensatory education and develop a compensatory education plan for the time student had not been provided an alternative interim placement decided by the IEP team.

2.  MAPCS shall ensure that a representative of DCPS participates in the MDT/IEP meeting.

3.  MAPCS shall either allow the student to reenroll at MAPCS or DCPS shall issue a prior notice of placement within five (5) school days of the MDT/IEP meeting if the recommended placement is public and thirty (30) calendar days if the recommended placement is private.

4.  Scheduling of the MDT/IEP meeting is to be arranged through parent's counsel.

5.  MAPCS and DCPS will be given a day for a day extension of any of the prescribed time frames in this Order for any delay caused by the student, the parent and/or their representative(s).

6.  If there is not agreement by the parties as to the compensatory education plan for the student pursuant to this Order either party may petition this Hearing Officer for an expedited hearing on this issue.

---

[16] Even if the tutoring was considered to be the interim alternative placement the evidence was not clear from the evidence as to whether the full amount of tutoring was delivered.

(In the Matter of DS   HOD: April 4, 2007)

**APPEAL PROCESS:**

This is the final administrative decision in this matter. Appeals on legal grounds may be made to a court of competent jurisdiction within 90 days of the rendering of this decision.

**Coles B. Ruff, Esq.**
**Hearing Officer**
**Date: April 4, 2007**

Issued: _____4/5/07_____

14

### In the MATTER OF Derrick Shelton V. DCPS

### INDEX OF EXHIBITS

| EXHIBIT # | IDENTIFICATION | ADMITTED |
|---|---|---|
| DS 1-30 | Parent's Disclosures | Yes |
| MAPCS 1-15 | MAPCS Disclosures | Yes |
| | | |
| | | |
| | | |
| | | |
| | | |
| | * A detailed list of the documents disclosed is contained in the parties' disclosure notices | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

14

(In the Matter of DS  HOD: April 4, 2007)

**In the MATTER OF Derrick Shelton V. DCPS**

**RECORD OF PROCEEDING**

| DATE | DESCRIPTION |
|---|---|
| 1/12/07 | Request for Due Process |
|  | Notice of Pre-Hearing Conference (as applicable) |
| 2/21/07 | Notice of Due Process Hearing |
|  | SETS Disposition Form |
|  | Transcripts or audio tapes of hearing |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

15

16

(In the Matter of DS   HOD: April 4, 2007)

# INDEX OF NAMES

## In the MATTER OF Derrick Shelton V. DCPS

| | |
|---|---|
| Assistant Superintendent, Special Education (or Director) | |
| Maya Angelou PCS Special Education Coordinator | Mr. Michael Luseni |
| Maya Angelou PCS Psychologist | Quentin Graham, Ph.D. |
| Regular Education Teacher | |
| | |
| Speech/Language Therapist | |
| Occupational Therapist | |
| Physical Therapist | |
| Private Psychologist | |
| Child and Child's DCPS ID # or SSN (insert ID # or Case Number on each page of the HOD vs. child's name) | Mr. D███████ S██████ |
| Child's Parent(s) (specific relationship) | Ms. Rachelle Bobo (Mother) |
| Child/Parent's Representative | Roberta Gambale, Esq. |
| DCPS Representative | Aaron E. Price, Sr., Esq. |
| Parent's Educational Advocate | Mr. Corey Hamilton |
| Maya Angelou PCS Representative | Jessica M. Smith, Esq. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

16

**ATTENDANCE SHEET**

STUDENT'S NAME: _Derrick Shelton_

SCHOOL OF ATTENDANCE: _Maya Angelou PCS_

D.O.B: _3/8/88_

HEARING DATE: _3/12/07_    ROOM: _8/42_    TIME: _3:10_ / _2:14_    A.M. (P.M.)

| PARTICIPANT NAME: | ON BEHALF OF DCPS OR STUDENT: | TITLE: |
|---|---|---|
| Roberta L. Gambale | Student | ~~Parents~~ Student Attorney |
| ~~Derrick Shelton~~ | | Student |
| Rachelle Bobo | | mother |
| Corey Hamilton | student | Advocate |
| Aaron E. Price, Sr., Esa | DCPS | Attorney-Advisor |
| Quentin Graham, Ph.D. | MAPCS | Psychologist |
| Michael Lusemi | MAPCS | Dir of Special Education |
| Jessica M. Smith | MAPCS | attorney |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

_____
Impartial Hearing Officer

Revised 10/17/2006

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)**
**SPECIAL EDUCATION PROGRAMS**

| | |
|---|---|
| D███ S███, DOB: 3/8/88 ) | |
| ) | |
| v. ) | |
| ) | **Hearing Officer Coles R. Ruff, Jr.** |
| District of Columbia Public Schools ("DCPS") ) | |
| ) | |
| and ) | |
| ) | |
| Maya Angelou Public Charter School ("MAPCS") ) | |
| ———————————————————————— ) | |

## MAYA ANGELOU PCS'S CLOSING ARGUMENT

COMES NOW, MAPCS, by and through counsel, and hereby submits its Closing

Argument, pursuant to the Hearing Officer's request at the March 12, 2007 due process hearing.

**I.**    **OBJECTIONS TO PETITIONER'S SUBMISSIONS**

Prior to getting into the substance of MAPCS's Closing Argument, counsel for MAPCS

objects to the submissions that Petitioner included with his Closing Statement. At the due

process hearing, the Hearing Officer instructed the parties, and the parties agreed, to submit no

later than Wednesday, March 14, 2007 affidavits regarding the individualized tutoring provided

to the Petitioner by MAPCS. On March 14, 2007, MAPCS submitted the Affidavit of Nakita

West. No affidavits were filed by the Petitioner on March 14, 2007. On March 16, 2007, when

Petitioner submitted his Closing Statement, attached thereto was an Affidavit of D███ S███,

Jr. MAPCS objects to the filing of this Affidavit as untimely and requests that it be stricken from

the record. Rather than file simultaneous affidavits, as agreed to at the hearing, the Petitioner

waited to receive MAPCS's affidavit, and then submitted his two days later in an effort to rebut

MAPCS's timely filed Affidavit of Ms. West. Additionally, Mr. D███ S███ Jr. was called

as witness in the Petitioner's case in chief, in which the statements made in his Affidavit were not elicited from Mr. S███████ during direct examination. Simply because Mr. S██████ testimony was insufficient to prove Petitioner's case, the Petitioner's counsel cannot now try to supplement her case in chief by providing an untimely filed affidavit.

MACPS also objects to the copy of the law which the Petitioner attached to his Closing Statement because it is covered in handwritten notes from the Petitioner's attorney. Additionally, MAPCS objects to the "Chapter VII" which Petitioner attached to his Closing Statement. There is no citation attached to this document, and thus it is unclear where this document came from and what authority, if any, it holds. Additionally, the document refers to the IDEA '97 and is dated 5/29/01 on each page. The document is clearly outdated and should not be taken into consideration by the Hearing Officer.

MAPCS requests that the above mentioned documents be stricken from the record.

## II.    CLOSING ARGUMENT

Pursuant to IDEIA, MAPCS must provide a free appropriate public education ("FAPE"). In this case, MAPCS has done just that. The evidence and testimony has shown that the Petitioner did not meet his burden in proving that MAPCS failed to provide FAPE.

### A.    MAPCS Did Not Fail to Convene a Manifestation Determination Review.

The Petitioner did not meet his burden in proving the first allegation that MAPCS failed to convene a manifestation determination review ("MDR"). MAPCS convened the MDR on December 19, 2007. *See* MAPCS-05. While the incident occurred on or around November 17, 2007, the evidence revealed that MAPCS was making efforts to schedule the MDR within the mandated 10 day period. The Petitioner's allegation that MAPCS did not make efforts to

2

schedule the MDR until the Petitioner retained counsel is absolutely false.

MAPCS sent a letter to the Petitioner on November 22, 2006 indicating the need to convene an MDR. *See* DS-17. The testimony of the Petitioner's father revealed that shortly after the incident, he and the Petitioner went to MAPCS on more than one occasion (the dates of which he could not recall) to meet with Mr. Luseni, the Director of Special Education, and Mr. Pinkard, the Principal, at which time they all discussed the need to convene an MDR within 10 days. Mr. Luseni testified that he met with the Petitioner and his father on November 27, 2006 and again on November 28, 2006. Mr. Luseni testified that at these meetings, he informed the Petitioner of the need to convene the MDR within 10 days. Mr. Luseni testified that the Petitioner and his father asked for the MDR to be postponed until a new placement could be located. When the Petitioner's father did not recall attending these meetings on November 27, 2006 and November 28, 2006, counsel for MAPCS introduced the meeting notes as evidence. *See* MAPCS- 16 and MAPCS-17 (attached hereto).[1]

A letter for invitation for the MDR was sent out on December 12, 2006. *See* DS-19. While it is true that the MDR did not take place within the 10 day period, the evidence is clear that MAPCS was making efforts to convene the MDR and work with the Petitioner. Furthermore, a mere procedural violation such as convening the MDR a few days outside of the 10 day time period does not rise to a violation of IDEIA or a failure to provide FAPE. *See Shaw v. D.C.*, 238 F. Supp. 2d 127, 135-36 (D.D.C. 2002). In order for procedural inadequacies to amount to a violation of IDEIA, the Petitioner must prove that the inadequacy impeded the

---

[1]    MAPCS-16 and MAPCS-17 were not included in the 5-day disclosure, but rather were used for impeachment purposes at the hearing.

3

Petitioner's right to FAPE or caused some educational harm. *See* 34 C.F.R. § 300.513(a)(2). In the instant case, the Petitioner has provided no evidence of educational harm or that his right to FAPE was impeded by the short delay in convening the MDR.

The Petitioner has failed to meet his burden on this issue, and therefore the relief requested should be denied.

**B.    MAPCS Did Not Fail to Provide FAPE by Not Conducting an FBA.**

The Petitioner did not meet his burden in proving that MAPCS denied FAPE by not conducting a Functional Behavior Assessment ("FBA"). The Petitioner argues, "Upon suspension of a student with a disability, the [IEP] team is required to conduct a [FBA] and implement a Behavior Plan for the student as soon as possible following the incident." Pet's Closing Statement at 3. The Petitioner, however, fails to cite any legal authority in support of this argument. The section of IDEIA that Petitioner cites to, 20 U.S.C. § 1415(k)(1)(g), makes no reference to any requirement to conduct an FBA.[2]

---

[2]        The section of IDEIA relied on by the Petitioner states:

Special circumstances. School personnel may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability, in cases where a child--

    (i) carries or possesses a weapon to or at school, on school premises, or to or at a school function under the jurisdiction of a State or local educational agency;

    (ii) knowingly possesses or uses illegal drugs, or sells or solicits the sale of a controlled substance, while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency; or

    (iii) has inflicted serious bodily injury upon another person while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency.

20 U.S.C. § 1415(k)(1)(G)

4

The law requires the IEP team to conduct an FBA, "If the local educational agency, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability. . . ." 20 U.S.C. § 1415(k)(1)(F); 30 C.F.R. §300.530(f). Additionally, a student who is removed from his current placement for more than 10 days due to a violation of the school's code of conduct must "receive, *as appropriate*, a functional behavior assessment. . . ." 20 U.S.C. § 1415(k)(1)(D)(ii); 30 C.F.R. § 300.530(d)(1)(ii) (emphasis added).

In the instant case, the student assaulted his ex-girlfriend in the hallway at MAPCS. The student was seen shoving the ex-girlfriend, choking her, and hitting her with an open fist. The evidence revealed that when the MDR convened, all parties were in agreement that such behavior was *not* a manifestation of the student's learning disability. The educational advocate, Mr. Hamilton, admitted during cross examination that, based on the student's current IEP (MAPCS-03), which calls for approximately 4.5 hours of specialized instruction and counseling per week and classifies the student as learning disabled, the behavior was not a manifestation of the student's disability.[3] Therefore, the IEP team was not required to conduct an FBA and was permitted to treat the student the same as a general education student for purposes of discipline. *See* 30 C.F.R. § 300.530(c).

Once the disciplinary decision to expel the student was made and the student was removed from his placement at MAPCS, the student must continue to receive educational services and "receive, *as appropriate*, a functional behavior assessment." 30 C.F.R. §

---

[3]    Petitioner would like the Hearing Officer to believe the IEP was inappropriate and thus the MDR decision was incorrect. However, the appropriateness of the IEP is not at issue in the instant complaint and should not be considered by the Hearing Officer.

5

300.530(d)(1)(ii) (emphasis added). The unrebutted testimony of both Dr. Graham and Mr. Luseni revealed that an FBA was not appropriate for this student. The evidence presented clearly showed that the incident in question, assault on an ex-girlfriend, was an isolated incident resulting from issues in a personal relationship. The evidence revealed that the student was not a behavior problem at school. He had a few prior incidences of speaking disrespectfully to a teacher, which is not uncommon for teenagers, but nothing that rose to the level of warranting an FBA or behavior plan for the student. The Petitioner presented no evidence supporting his argument that an FBA was warranted or appropriate.

Since the incident was not a manifestation of the student's disability and an FBA was not appropriate for this student, MAPCS was under no legal requirement to conduct an FBA for the Petitioner. Thus, the Petitioner has failed to meet his burden in proving that MAPCS denied FAPE by not conducting an FBA.

### C.    MAPCS Continued to Provide Appropriate Services to the Petitioner after Removal from MAPCS.

The Petitioner did not meet his burden in proving that MAPCS denied Petitioner FAPE by not continuing to provide services after removal from his placement at MAPCS. Pursuant to IDEIA, a student who is removed from his placement after a determination that the behavior was not a manifestation of the student's disability must continue to receive educational services "so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP." 30 C.F.R. § 300.530(d)(1)(I).

6

The evidence and testimony have shown that MAPCS met with the parent following the MDR and a determination was made that the student would continue to receive three hours of individualized tutoring per week for a reasonable period of time until another placement was secured. Mr. Luseni testified that on December 19, 2006, MAPCS was prepared to provide 3 hours of tutoring per week to D███ and that the parents and student were in agreement with this. It was not until almost two months later, February 8, 2007, that the Petitioner, through counsel, sent a letter to MAPCS requesting more tutoring hours. *See* DS-13. By that time, the Petitioner had already been offered another placement by DCPS. Additionally, such request was made *after* the filing of the Complaint, and thus is outside the scope of issues presented in the instant Complaint.

Contrary to the Petitioner's argument that MAPCS had "pre-determined" the decision to expel, MAPCS issued a letter indicating that the student was being suspended with the possibility of expulsion, but that an MDR needed to be convened. *See* DS-17. It was not until after the MDR, that the expulsion decision was made. *See* MAPCS-06. The evidence and testimony have further shown that after the expulsion, MAPCS contacted DCPS to inform them that the student was in need of a placement. Mr. Luseni testified that he spoke with Dr. Peggy Peagler, DCPS Placement Specialist assigned to MAPCS, and that she indicated that the student's neighborhood school could implement his IEP, and thus he should attend his neighborhood school, Cardozo Senior High School. MAPCS informed the Petitioner that he should enroll in his neighborhood school, in order to avoid any gaps in educational services. *See* MAPCS-06. MAPCS then delivered the Petitioner's educational record to Cardozo SHS. *See* MAPCS-08. The Petitioner was informed of his right to appeal the expulsion decision, however a proper appeal of the

7

expulsion was not received by MAPCS. Therefore, the student's expulsion was final and the student was to enroll in his neighborhood school. If the Petitioner had a problem with the change in location of the services, the Petitioner must challenge that decision with DCPS, not MAPCS.

In the interim, until the student enrolled in another school, MAPCS continued to provide appropriate educational services. Petitioner tries to distort the testimony of Dr. Graham and Mr. Luseni by stating, "Neither [Mr. Luseni or Dr. Graham] denied . . . that tutoring services began on or about January 17, 2007." Pet's Closing Statement at 2. However, neither Dr. Graham nor Mr. Luseni testified to any such statement and did not agree that tutoring began on January 17, 2007. In fact, the student's mother, Ms. Bobo, testified that she received a phone call on December 22, 2006 from Ms. West for tutoring services to begin.

The Affidavit of Ms. Nakita West indicates that tutoring was available starting on December 22, 2006 until the present time. MAPCS had the tutor available since December 22, 2006 and on every Wednesday since then. Ms. West's testimony reveals that on numerous occasions, the student did not show up for tutoring. MAPCS cannot be held accountable for the student not coming to the tutoring and availing himself of the services offered. Ms. West's tutoring log and her unrebutted testimony show that tutoring was provided and available for 3 hours per week in the subject areas of math, English, and history. *See* MAPCS-10; Affidavit of Nakita West. Ms. West testified that the tutoring hours were appropriate, based on the student's IEP. Ms. West also testified that the tutoring enabled the student to participate in the general education curriculum and make progress toward his IEP goals.

8

The Petitioner claims that he invoked Stay Put and thus had to be readmitted to MAPCS. However, the IDEIA provides that during the pendency of the proceedings, the student remains in the current educational placement, "unless the State or local agency and the parents of the child agree otherwise." 34 C.F.R. § 300.518(a). After the MDR, the Petitioner and MAPCS agreed that the student would receive three hours of individualized tutoring per week as an interim alternative placement. Thus, for purposes of Stay Put, the placement was the tutoring, which has been offered by MAPCS since December 22, 2006 through the present.

The Petitioner has failed to show that MAPCS did not offer and provide appropriate services to the student after he was removed from MAPCS. The Petitioner has failed to meet his burden in proving that MAPCS denied FAPE and thus the relief requested should be denied.

**D.    Petitioner is Barred from Arguing Issues Not Raised in the Complaint.**

The Petitioner has not met his burden with respect to the issues presented in the due process complaint notice, and thus attempts to raise other issues outside the scope of the complaint. The Petitioner is bound by the four corners of the complaint and cannot bring up issues that were not raised in the complaint. The only issues raised in the complaint are 1) failure to schedule an MDR; 2) failure to conduct an FBA; and 3) failure to provide educational services after the expulsion. As outlined above, the Petitioner has failed to meet his burden on proving all of these issues.

The Petitioner would like for the Hearing Officer to consider whether the IEP was appropriate, whether Cardozo was an appropriate placement, and whether a placement meeting should have been convened. These issues, however, were not raised in the complaint and thus

9

are outside the scope of the Hearing Officer's jurisdiction.

The Petitioner argues that the IEP hours were reduced and that the current IEP is not appropriate. In an attempt to inflame the Hearing Officer and obscure the real issues, the Petitioner alleges that the student had 15 hours on his IEP and thus MAPCS's providing of 3 hours of tutoring per week was insufficient. *See* DS-03, Complaint at 3. The Petitioner then included in his five-day disclosure the IEP from 2004 which indicates 15 hours of specialized instruction. *See* DS-28. However, the *current* IEP indicates just under 4.5 hours of specialized instruction and counseling per week. *See* MAPCS-03. Thus, any reference to the 2004 IEP or any reduction in IEP hours is an attempt to distort the real issues at hand and should not be considered by the Hearing Officer.

The Petitioner argues that he requested an IEP meeting to discuss increasing the hours on the IEP, but that MAPCS never responded to such request. First, Mr. Luseni testified and MAPCS's phone logs revealed that several calls were made to the Petitioner's counsel in an effort to schedule a meeting, however MAPCS never received a return call. *See* MAPCS-09. More importantly, the instant complaint was filed on January 12, 2007. *See* DS-03. The request to convene another IEP occurred *after* the complaint was filed and is thus outside the scope of the instant complaint. *See* DS-12. The Petitioner cannot argue issues that occurred after the complaint was filed.

The Petitioner argues that MAPCS, specifically Mr. Luseni, "unilaterally took it upon himself to determine that the student should be placed in his neighborhood school." Pet's Closing Statement at 2. The Petitioner also argues that the student should be allowed to return to

10

28

MAPCS because "The services offered by MAPCS were not services that would be available in the student's neighborhood school. Concern was expressed over the size of the student population at Cardozo and their ability to address vocational needs, particularly in light of the reduction of services." *Id.*

The evidence has shown that DCPS was informed of the student's need for placement and that DCPS indicated that the student should attend Cardozo. At no time did Mr. Luseni, or anyone at MAPCS, "unilaterally" place the student at Cardozo. The Petitioner may not think that the services offered at Cardozo are appropriate and he has every right to challenge that placement location. However, this is not the forum in which to do so. MAPCS, as an LEA, cannot and does not issue Notices of Placement to other schools, which is why DCPS was informed of the student's need for a new placement location. More importantly, the Complaint at hand does not challenge the appropriateness of the services offered at Cardozo, and thus the Hearing Officer cannot consider any arguments in regard to that issue.

The Petitioner argues that MAPCS unilaterally changed the student's placement without convening a placement meeting. If MAPCS comes to the determination that a student needs more services than what MAPCS can provide, then MAPCS will convene an IEP meeting to increase the level of services on the IEP, appeal to DCPS as the SEA, and convene a placement meeting to determine an appropriate placement. This, however, was not the case in the instant matter. In the instant case, it was not that MAPCS could not meet the needs of the student. Quite the contrary, in fact the student was making A's and B's and is seeking readmission as a form of relief. Rather in the instant case, the student was expelled, following a proper MDR, for violating the code of conduct. There was no change of services on the student's IEP. Rather, the

11

IEP services remained the same, however the *location* of services was changing due to the student violating MAPCS's code of conduct. Therefore, there was no requirement for MAPCS to convene a placement meeting. There is nothing in the IDEIA which requires MAPCS to convene a placement meeting after issuing an expulsion. *See White v. Ascension Parish Sch. Bd.,* 343 F.3d 373, 379 (5th Cir.2003) (stating that "'Educational placement', as used in the IDEA, means educational program-not the particular institution where that program is implemented."); *see also Letter to Fisher,* 21 IDELR 992 (U.S. Dep't of Educ., Off. Of Special Educ. Programs 1994)(stating that a change in location of services does not trigger the notice of change of placement requirements or the maintenance of placement provision, as long as the student receives the same educational program and opportunities for interaction with non-disabled students at the new location).

MAPCS complied with IDEIA by convening the team to determine the proper interim alternative placement - three hours of tutoring per week - until a new location for services was determined. Once a new location was determined, the Petitioner should have enrolled there, and then challenged that location if he so chose. However, again, that issue is outside the scope of the instant complaint.

Finally, the Petitioner alleges academic failure in the complaint. *See DS-03.* However, during the hearing and in the Closing Statement, the Petitioner conceded that he was making A's and B's and on the honor roll. *See Pet's Closing Statement at 5.* This is yet another tactic by the Petitioner to inflame the Hearing Officer by alleging that MAPCS was allowing this student to flounder without any assistance from MAPCS, which is clearly incorrect. *See MAPCS-04.*

12

III.    **CONCLUSION**

The evidence has clearly shown that MAPCS has not failed to provide FAPE to the Petitioner. To the contrary, MAPCS has continued to provide FAPE, even after the expulsion and a new location for services was determined. The Petitioner concedes that the services provided at MAPCS were appropriate, such that he is seeking to be readmitted as a form of relief. If the Petitioner was intent on challenging the decision to expel or the decision of the MDR, then he should have appealed the expulsion or raised the appropriateness of the MDR decision in the complaint. However, the Petitioner has not challenged the decision of the MDR. The Petitioner has failed to prove that any minor procedural violations that may have occurred have resulted in educational harm to him. Thus, any minor procedural inadequacies have not risen to a level such that FAPE was denied.

The Petitioner has failed to meet his burden in proving the issues presented the complaint and in proving that MAPCS failed to provide FAPE.

WHEREFORE, MAPCS respectfully requests that the Hearing Officer strike the Affidavit of D███ S███, Jr. and the other documents attached to the Petitioner's Closing Statement from the record.

WHEREFORE, MAPCS respectfully requests that the Hearing Officer issue judgment in favor of MAPCS and deny the relief requested by the Petitioner.

13

DATE:      March 19, 2007                    Respectfully Submitted,

                                             _Jessica M. Smith_
                                             Jessica M. Smith, Esq.
                                             Counsel for MAPCS
                                             Dalton, Dalton, & Houston, P.C.
                                             1008 Pendleton Street
                                             Alexandria, Virginia 22314
                                             703-739-4300
                                             703-642-2323 – fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document was served on counsel for the parent, Roberta Gambale, Esq., at fax 202-742-2098, and Aaron Price, Esq. in the Office of General Counsel at fax 202-442-5098/5097 on this 19th day of March, 2007.

                    _Jessica M. Smith_
                    Jessica M. Smith, Esq.
                    Counsel for MAPCS

14

**FAX TRANSMISSION COVER SHEET**
**Dalton, Dalton & Houston P.C.**
**Attorneys at Law**
**1008 Pendleton Street**
**Alexandria, Virginia 22314**
**(703) 739-4300**
**FAX (703) 739-2323**

DATE:        March 19, 2007

TO:          Hearing Officer Ruff

AT FAX:      202-442-5556

FROM:        Jessica M. Smith, Esq.

RE:          D████S████ v. DCPS & MAPCS

NUMBER OF PAGES INCLUDING THIS PAGE:

ADDITIONAL INFORMATION:

PLEASE DELIVER ASAP.
*************************************************************************

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE
PRIVILEGED PURSUANT TO THE ATTORNEY CLIENT PRIVILEGE AND
ATTORNEY WORK PRODUCT DOCTRINE.

IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECI-
PIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS
STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNI-
CATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELE-
PHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE
ABOVE ADDRESS.
*************************************************************************

P 1

\* \* \* Transmission Result Report(MemoryTX) ( Mar.19. 2007  4:58PM ) \* \* \*

1) Dalton  Dalton & Houston
2)

Date/Time: Mar 19  2007  4:54PM

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|
| 2133 Memory TX | SHO 202-442-5556 | P. 17 | OK | |

---

Reason for error
E.1) Hang up or line fail
E 3) No answer

E.2) Busy
E 4) No facsimile connection

---

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314
(703) 739-4300
FAX (703) 739-2323

DATE:    March 19, 2007

TO:    Hearing Officer Ruff

AT FAX:    202-442-5556

FROM:    Jessica M. Smith, Esq.

RE:    Da___ ___v. DCPS & MAPCS

NUMBER OF PAGES INCLUDING THIS PAGE:    17

ADDITIONAL INFORMATION:

PLEASE DELIVER ASAP.
*********************************************************
THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE
PRIVILEGED PURSUANT TO THE ATTORNEY CLIENT PRIVILEGE AND
ATTORNEY WORK PRODUCT DOCTRINE.

IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECI-
PIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS
STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNI-
CATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELE-
PHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE
ABOVE ADDRESS.
*********************************************************

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)**
**SPECIAL EDUCATION PROGRAMS**

D█████ S█████, DOB: 3/8/88            )
                                      )
v.                                    )
                                      )   Hearing Officer Coles B. Ruff, Jr.
District of Columbia Public Schools ("DCPS")  )
                                      )
and                                   )
                                      )
Maya Angelou Public Charter School ("MAPCS")  )
_____     )

## MAYA ANGELOU PCS'S CLOSING ARGUMENT

COMES NOW, MAPCS, by and through counsel, and hereby submits its Closing

Argument, pursuant to the Hearing Officer's request at the March 12, 2007 due process hearing.

**I.      OBJECTIONS TO PETITIONER'S SUBMISSIONS**

Prior to getting into the substance of MAPCS's Closing Argument, counsel for MAPCS

objects to the submissions that Petitioner included with his Closing Statement. At the due

process hearing, the Hearing Officer instructed the parties, and the parties agreed, to submit no

later than Wednesday, March 14, 2007 affidavits regarding the individualized tutoring provided

to the Petitioner by MAPCS. On March 14, 2007, MAPCS submitted the Affidavit of Nakita

West. No affidavits were filed by the Petitioner on March 14, 2007. On March 16, 2007, when

Petitioner submitted his Closing Statement, attached thereto was an Affidavit of D█████ S█████

Jr. MAPCS objects to the filing of this Affidavit as untimely and requests that it be stricken from

the record. Rather than file simultaneous affidavits, as agreed to at the hearing, the Petitioner

waited to receive MAPCS's affidavit, and then submitted his two days later in an effort to rebut

MAPCS's timely filed Affidavit of Ms. West. Additionally, Mr. D█████ S█████ Jr. was called

35

as witness in the Petitioner's case in chief, in which the statements made in his Affidavit were

not elicited from Mr. S████ during direct examination. Simply because Mr. S████

testimony was insufficient to prove Petitioner's case, the Petitioner's counsel cannot now try to

supplement her case in chief by providing an untimely filed affidavit.

MACPS also objects to the copy of the law which the Petitioner attached to his Closing

Statement because it is covered in handwritten notes from the Petitioner's attorney. Additionally,

MAPCS objects to the "Chapter VII" which Petitioner attached to his Closing Statement. There

is no citation attached to this document, and thus it is unclear where this document came from

and what authority, if any, it holds. Additionally, the document refers to the IDEA '97 and is

dated 5/29/01 on each page. The document is clearly outdated and should not be taken into

consideration by the Hearing Officer.

MAPCS requests that the above mentioned documents be stricken from the record.

## II.    CLOSING ARGUMENT

Pursuant to IDEIA, MAPCS must provide a free appropriate public education ("FAPE").

In this case, MAPCS has done just that. The evidence and testimony has shown that the

Petitioner did not meet his burden in proving that MAPCS failed to provide FAPE.

### A.    MAPCS Did Not Fail to Convene a Manifestation Determination Review.

The Petitioner did not meet his burden in proving the first allegation that MAPCS failed

to convene a manifestation determination review ("MDR"). MAPCS convened the MDR on

December 19, 2007. *See* MAPCS-05. While the incident occurred on or around November 17,

2007, the evidence revealed that MAPCS was making efforts to schedule the MDR within the

mandated 10 day period. The Petitioner's allegation that MAPCS did not make efforts to

2

schedule the MDR until the Petitioner retained counsel is absolutely false.

MAPCS sent a letter to the Petitioner on November 22, 2006 indicating the need to convene an MDR. *See* DS-17. The testimony of the Petitioner's father revealed that shortly after the incident, he and the Petitioner went to MAPCS on more than one occasion (the dates of which he could not recall) to meet with Mr. Luseni, the Director of Special Education, and Mr Pinkard, the Principal, at which time they all discussed the need to convene an MDR within 10 days. Mr. Luseni testified that he met with the Petitioner and his father on November 27, 2006 and again on November 28, 2006. Mr. Luseni testified that at those meetings, he informed the Petitioner of the need to convene the MDR within 10 days. Mr. Luseni testified that the Petitioner and his father asked for the MDR to be postponed until a new placement could be located. When the Petitioner's father did not recall attending these meetings on November 27, 2006 and November 28, 2006, counsel for MAPCS introduced the meeting notes as evidence. *See* MAPCS- 16 and MAPCS-17 (attached hereto).[1]

A letter for invitation for the MDR was sent out on December 12, 2006. *See* DS-19. While it is true that the MDR did not take place within the 10 day period, the evidence is clear that MAPCS was making efforts to convene the MDR and work with the Petitioner. Furthermore, a mere procedural violation such as convening the MDR a few days outside of the 10 day time period does not rise to a violation of IDEIA or a failure to provide FAPE. *See Shaw v. D.C.*, 238 F. Supp. 2d 127, 135-36 (D.D.C. 2002). In order for procedural inadequacies to amount to a violation of IDEIA, the Petitioner must prove that the inadequacy impeded the

---

[1]     MAPCS-16 and MAPCS-17 were not included in the 5-day disclosure, but rather were used for impeachment purposes at the hearing.

3

Petitioner's right to FAPE or caused some educational harm. *See* 34 C.F.R. § 300.513(a)(2). In

the instant case, the Petitioner has provided no evidence of educational harm or that his right to

FAPE was impeded by the short delay in convening the MDR.

The Petitioner has failed to meet his burden on this issue, and therefore the relief

requested should be denied.

### B.    MAPCS Did Not Fail to Provide FAPE by Not Conducting an FBA.

The Petitioner did not meet his burden in proving that MAPCS denied FAPE by not

conducting a Functional Behavior Assessment ("FBA"). The Petitioner argues, "Upon

suspension of a student with a disability, the [IEP] team is required to conduct a [FBA] and

implement a Behavior Plan for the student as soon as possible following the incident." Pet's

Closing Statement at 3. The Petitioner, however, fails to cite any legal authority in support of

this argument. The section of IDEIA that Petitioner cites to, 20 U.S.C. § 1415(k)(1)(g), makes

no reference to any requirement to conduct an FBA.[2]

---

[2]    The section of IDEIA relied on by the Petitioner states:

Special circumstances. School personnel may remove a student to an interim alternative educational setting for not
more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's
disability, in cases where a child--

    (i) carries or possesses a weapon to or at school, on school premises, or to or at a school function under the
    jurisdiction of a State or local educational agency;

    (ii) knowingly possesses or uses illegal drugs, or sells or solicits the sale of a controlled substance, while at
    school, on school premises, or at a school function under the jurisdiction of a State or local educational
    agency; or

    (iii) has inflicted serious bodily injury upon another person while at school, on school premises, or at a
    school function under the jurisdiction of a State or local educational agency
20 U.S.C. § 1415(k)(1)(G)

4

The law requires the IEP team to conduct an FBA, "If the local educational agency, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability. . . ." 20 U.S.C. § 1415(k)(1)(F); 30 C.F.R. §300.530(f). Additionally, a student who is removed from his current placement for more than 10 days due to a violation of the school's code of conduct must "receive, *as appropriate*, a functional behavior assessment. . . ." 20 U.S.C. § 1415(k)(1)(D)(ii); 30 C.F.R. § 300.530(d)(1)(ii) (emphasis added).

In the instant case, the student assaulted his ex-girlfriend in the hallway at MAPCS. The student was seen shoving the ex-girlfriend, choking her, and hitting her with an open fist. The evidence revealed that when the MDR convened, all parties were in agreement that such behavior was *not* a manifestation of the student's learning disability. The educational advocate, Mr. Hamilton, admitted during cross examination that, based on the student's current IEP (MAPCS-03), which calls for approximately 4.5 hours of specialized instruction and counseling per week and classifies the student as learning disabled, the behavior was not a manifestation of the student's disability.[3] Therefore, the IEP team was not required to conduct an FBA and was permitted to treat the student the same as a general education student for purposes of discipline. *See* 30 C.F.R. § 300.530(c).

Once the disciplinary decision to expel the student was made and the student was removed from his placement at MAPCS, the student must continue to receive educational services and "receive, *as appropriate*, a functional behavior assessment." 30 C.F.R. §

---

[3]    Petitioner would like the Hearing Officer to believe the IEP was inappropriate and thus the MDR decision was incorrect. However, the appropriateness of the IEP is not at issue in the instant complaint and should not be considered by the Hearing Officer

5

300.530(d)(1)(ii) (emphasis added). The unrebutted testimony of both Dr. Graham and Mr.

Luseni revealed that an FBA was not appropriate for this student. The evidence presented clearly

showed that the incident in question, assault on an ex-girlfriend, was an isolated incident

resulting from issues in a personal relationship. The evidence revealed that the student was not a

behavior problem at school. He had a few prior incidences of speaking disrespectfully to a

teacher, which is not uncommon for teenagers, but nothing that rose to the level of warranting an

FBA or behavior plan for the student. The Petitioner presented no evidence supporting his

argument that an FBA was warranted or appropriate.

Since the incident was not a manifestation of the student's disability and an FBA was not

appropriate for this student, MAPCS was under no legal requirement to conduct an FBA for the

Petitioner. Thus, the Petitioner has failed to meet his burden in proving that MAPCS denied

FAPE by not conducting an FBA.

## C.    MAPCS Continued to Provide Appropriate Services to the Petitioner after Removal from MAPCS.

The Petitioner did not meet his burden in proving that MAPCS denied Petitioner FAPE

by not continuing to provide services after removal from his placement at MAPCS. Pursuant to

IDEIA, a student who is removed from his placement after a determination that the behavior was

not a manifestation of the student's disability must continue to receive educational services "so

as to enable the child to continue to participate in the general education curriculum, although in

another setting, and to progress toward meeting the goals set out in the child's IEP." 30 C.F.R. §

300.530(d)(1)(l).

6

40

The evidence and testimony have shown that MAPCS met with the parent following the MDR and a determination was made that the student would continue to receive three hours of individualized tutoring per week for a reasonable period of time until another placement was secured. Mr. Luseni testified that on December 19, 2006, MAPCS was prepared to provide 3 hours of tutoring per week to D███ and that the parents and student were in agreement with this. It was not until almost two months later, February 8, 2007, that the Petitioner, through counsel, sent a letter to MAPCS requesting more tutoring hours. *See* DS-13. By that time, the Petitioner had already been offered another placement by DCPS. Additionally, such request was made *after* the filing of the Complaint, and thus is outside the scope of issues presented in the instant Complaint.

Contrary to the Petitioner's argument that MAPCS had "pre-determined" the decision to expel, MAPCS issued a letter indicating that the student was being suspended with the possibility of expulsion, but that an MDR needed to be convened. *See* DS-17. It was not until after the MDR, that the expulsion decision was made. *See* MAPCS-06. The evidence and testimony have further shown that after the expulsion, MAPCS contacted DCPS to inform them that the student was in need of a placement. Mr. Luseni testified that he spoke with Dr. Peggy Peagler, DCPS Placement Specialist assigned to MAPCS, and that she indicated that the student's neighborhood school could implement his IEP, and thus he should attend his neighborhood school, Cardozo Senior High School. MAPCS informed the Petitioner that he should enroll in his neighborhood school, in order to avoid any gaps in educational services. *See* MAPCS-06. MAPCS then delivered the Petitioner's educational record to Cardozo SHS. *See* MAPCS-08. The Petitioner was informed of his right to appeal the expulsion decision, however a proper appeal of the

7

41

expulsion was not received by MAPCS. Therefore, the student's expulsion was final and the student was to enroll in his neighborhood school. If the Petitioner had a problem with the change in location of the services, the Petitioner must challenge that decision with DCPS, not MAPCS.

In the interim, until the student enrolled in another school, MAPCS continued to provide appropriate educational services. Petitioner tries to distort the testimony of Dr. Graham and Mr. Luseni by stating, "Neither [Mr. Luseni or Dr. Graham] denied . . . that tutoring services began on or about January 17, 2007." Pet's Closing Statement at 2. However, neither Dr. Graham nor Mr. Luseni testified to any such statement and did not agree that tutoring began on January 17, 2007. In fact, the student's mother, Ms. Bobo, testified that she received a phone call on December 22, 2006 from Ms. West for tutoring services to begin.

The Affidavit of Ms. Nakita West indicates that tutoring was available starting on December 22, 2006 until the present time. MAPCS had the tutor available since December 22, 2006 and on every Wednesday since then. Ms. West's testimony reveals that on numerous occasions, the student did not show up for tutoring. MAPCS cannot be held accountable for the student not coming to the tutoring and availing himself of the services offered. Ms. West's tutoring log and her unrebutted testimony show that tutoring was provided and available for 3 hours per week in the subject areas of math, English, and history. *See* MAPCS-10; Affidavit of Nakita West. Ms. West testified that the tutoring hours were appropriate, based on the student's IEP. Ms. West also testified that the tutoring enabled the student to participate in the general education curriculum and make progress toward his IEP goals.

8

42

The Petitioner claims that he invoked Stay Put and thus had to be readmitted to MAPCS. However, the IDEIA provides that during the pendency of the proceedings, the student remains in the current educational placement, "unless the State or local agency and the parents of the child agree otherwise." 34 C.F.R. § 300.518(a). After the MDR, the Petitioner and MAPCS agreed that the student would receive three hours of individualized tutoring per week as an interim alternative placement. Thus, for purposes of Stay Put, the placement was the tutoring, which has been offered by MAPCS since December 22, 2006 through the present.

The Petitioner has failed to show that MAPCS did not offer and provide appropriate services to the student after he was removed from MAPCS. The Petitioner has failed to meet his burden in proving that MAPCS denied FAPE and thus the relief requested should be denied.

**D.    Petitioner is Barred from Arguing Issues Not Raised in the Complaint.**

The Petitioner has not met his burden with respect to the issues presented in the due process complaint notice, and thus attempts to raise other issues outside the scope of the complaint. The Petitioner is bound by the four corners of the complaint and cannot bring up issues that were not raised in the complaint. The only issues raised in the complaint are 1) failure to schedule an MDR; 2) failure to conduct an FBA; and 3) failure to provide educational services after the expulsion. As outlined above, the Petitioner has failed to meet his burden on proving all of these issues.

The Petitioner would like for the Hearing Officer to consider whether the IEP was appropriate, whether Cardozo was an appropriate placement, and whether a placement meeting should have been convened. These issues, however, were not raised in the complaint and thus

9

43

are outside the scope of the Hearing Officer's jurisdiction.

The Petitioner argues that the IEP hours were reduced and that the current IEP is not appropriate. In an attempt to inflame the Hearing Officer and obscure the real issues, the Petitioner alleges that the student had 15 hours on his IEP and thus MAPCS's providing of 3 hours of tutoring per week was insufficient. *See* DS-03, Complaint at 3. The Petitioner then included in his five-day disclosure the IEP from 2004 which indicates 15 hours of specialized instruction. *See* DS-28. However, the *current* IEP indicates just under 4.5 hours of specialized instruction and counseling per week. *See* MAPCS-03. Thus, any reference to the 2004 IEP or any reduction in IEP hours is an attempt to distort the real issues at hand and should not be considered by the Hearing Officer.

The Petitioner argues that he requested an IEP meeting to discuss increasing the hours on the IEP, but that MAPCS never responded to such request. First, Mr. Luseni testified and MAPCS's phone logs revealed that several calls were made to the Petitioner's counsel in an effort to schedule a meeting, however MAPCS never received a return call. *See* MAPCS-09. More importantly, the instant complaint was filed on January 12, 2007. *See* DS-03. The request to convene another IEP occurred *after* the complaint was filed and is thus outside the scope of the instant complaint. *See* DS-12. The Petitioner cannot argue issues that occurred after the complaint was filed.

The Petitioner argues that MAPCS, specifically Mr. Luseni, "unilaterally took it upon himself to determine that the student should be placed in his neighborhood school." Pet's Closing Statement at 2. The Petitioner also argues that the student should be allowed to return to

10

44

MAPCS because "The services offered by MAPCS were not services that would be available in the student's neighborhood school. Concern was expressed over the size of the student population at Cardozo and their ability to address vocational needs, particularly in light of the reduction of services." *Id.*

The evidence has shown that DCPS was informed of the student's need for placement and that DCPS indicated that the student should attend Cardozo. At no time did Mr. Luseni, or anyone at MAPCS, "unilaterally" place the student at Cardozo. The Petitioner may not think that the services offered at Cardozo are appropriate and he has every right to challenge that placement location. However, this is not the forum in which to do so. MAPCS, as an LEA, cannot and does not issue Notices of Placement to other schools, which is why DCPS was informed of the student's need for a new placement location. More importantly, the Complaint at hand does not challenge the appropriateness of the services offered at Cardozo, and thus the Hearing Officer cannot consider any arguments in regard to that issue.

The Petitioner argues that MAPCS unilaterally changed the student's placement without convening a placement meeting. If MAPCS comes to the determination that a student needs more services than what MAPCS can provide, then MAPCS will convene an IEP meeting to increase the level of services on the IEP, appeal to DCPS as the SEA, and convene a placement meeting to determine an appropriate placement. This, however, was not the case in the instant matter. In the instant case, it was not that MAPCS could not meet the needs of the student. Quite the contrary, in fact the student was making A's and B's and is seeking readmission as a form of relief. Rather in the instant case, the student was expelled, following a proper MDR, for violating the code of conduct. There was no change of services on the student's IEP. Rather, the

11

IEP services remained the same, however the *location* of services was changing due to the student violating MAPCS's code of conduct. Therefore, there was no requirement for MAPCS to convene a placement meeting. There is nothing in the IDEIA which requires MAPCS to convene a placement meeting after issuing an expulsion. *See White v. Ascension Parish Sch. Bd..* 343 F.3d 373, 379 (5th Cir.2003) (stating that "'Educational placement', as used in the IDEA, means educational program-not the particular institution where that program is implemented."); *see also Letter to Fisher,* 21 IDELR 992 (U.S. Dep't of Educ., Off. Of Special Educ. Programs 1994)(stating that a change in location of services does not trigger the notice of change of placement requirements or the maintenance of placement provision, as long as the student receives the same educational program and opportunities for interaction with non-disabled students at the new location).

MAPCS complied with IDEIA by convening the team to determine the proper interim alternative placement - three hours of tutoring per week - until a new location for services was determined. Once a new location was determined, the Petitioner should have enrolled there, and then challenged that location if he so chose. However, again, that issue is outside the scope of the instant complaint.

Finally, the Petitioner alleges academic failure in the complaint. *See* DS-03. However, during the hearing and in the Closing Statement, the Petitioner conceded that he was making A's and B's and on the honor roll. *See* Pet's Closing Statement at 5. This is yet another tactic by the Petitioner to inflame the Hearing Officer by alleging that MAPCS was allowing this student to flounder without any assistance from MAPCS, which is clearly incorrect. *See* MAPCS-04.

12

## III.    **CONCLUSION**

The evidence has clearly shown that MAPCS has not failed to provide FAPE to the

Petitioner. To the contrary, MAPCS has continued to provide FAPE, even after the expulsion

and a new location for services was determined. The Petitioner concedes that the services

provided at MAPCS were appropriate, such that he is seeking to be readmitted as a form of relief.

If the Petitioner was intent on challenging the decision to expel or the decision of the MDR, then

he should have appealed the expulsion or raised the appropriateness of the MDR decision in the

complaint. However, the Petitioner has not challenged the decision of the MDR. The Petitioner

has failed to prove that any minor procedural violations that may have occurred have resulted in

educational harm to him. Thus, any minor procedural inadequacies have not risen to a level such

that FAPE was denied.

The Petitioner has failed to meet his burden in proving the issues presented the complaint

and in proving that MAPCS failed to provide FAPE.

WHEREFORE, MAPCS respectfully requests that the Hearing Officer strike the

Affidavit of D███ S███ Jr. and the other documents attached to the Petitioner's Closing

Statement from the record.

WHEREFORE, MAPCS respectfully requests that the Hearing Officer issue judgment in

favor of MAPCS and deny the relief requested by the Petitioner.

13

DATE:        March 19, 2007                 Respectfully Submitted,

                                            Jessica M. Smith, Esq.
                                            Counsel for MAPCS
                                            Dalton, Dalton, & Houston, P.C.
                                            1008 Pendleton Street
                                            Alexandria, Virginia 22314
                                            703-739-4300
                                            703-642-2323 – fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document was served on counsel for the
parent, Roberta Gambale, Esq., at fax 202-742-2098, and Aaron Price, Esq. in the Office of
General Counsel at fax 202-442-5098/5097 on this 19th day of March, 2007.

                    Jessica M. Smith, Esq.
                    Counsel for MAPCS

14

# Parent Meeting

**STUDENT'S NAME:** D█████ S██████ Jr.     **Grade:** 11th

**Meeting Date:** November 27, 2006

## Meeting Attendance
1. Michael Luseni, Director of Special Education Services
2. D████ S█████ Jr.
3. Derrick Shelton Sr.

## Concerns
- Parent wants to know details about incident
- Class work
- Wants to Request a Meeting with Mr. Pinkard (School Principal)

## Meeting Notes

Mr. Shelton and I met on 11/27/2006 so that he could get more information about the incident and discuss how d██ is going to get class work, while he is out of school.

I explain the incident to Mr. Shelton with D████ present. Mr. Shelton indicated that he understood the school's position, but seemed very intent on the school considering a lesser consequence for D████ involvement in the incident.

### Manifestation Determination
I explained to Mr. Shelton that due to this incident and the uncertainty of whether or not D████ will be allow to continue his education here, we are required to convene a Manifestation Meeting to determine whether or not his actions was a result of his disability. I shared that at this meeting we would be looking at his IEP, Evaluation and other relevant data. I asked if he (Mr. Shelton) understood what I meant or if he needed someone to be present. He indicated that he understood what I said. I offered to make a copy of D████'s IEP and Evaluation, but Mr. Shelton stated that he didn't need it. I asked Mr. Shelton if he had a date in mind as to when he would like to schedule a manifestation meeting or if he wanted me to mail the Manifestation Meeting Notice with dates? Mr. Shelton stated that he did not have a date in mind at that point and that he would like me to wait for him to give me a date. I shared with Mr. Shelton that MAPCS is required to have this meeting with 10 days of the incident; he stated that he understood, but his first concern at this point is to get his son in school. He asked if I knew of any schools that I could recommend for D████. As he leaving my office he stated that he was on his way to Bell Multicultural School, because D████s neighborhood school is not good.

### Missing Class Work
Mr. Shelton was informed that after D████ reaches his 10th day of suspension he is entitled to receive educational services through MAPCS until the entire process is completed. I also shared with Mr. Shelton that at this point we are in the process of locating a tutor and if one is not located before the 10th day of his suspension his tutoring would be retroactive.

### Meeting with Mr. Pinkard
I asked Mr. Shelton to come in 11/28/2006 to meet with Mr. Pinkard.

**EXHIBIT**

MAPCS - 16

49

# *Parent Meeting*

| | |
|---|---|
| **STUDENT'S NAME:** D▮▮▮ S▮▮▮ Jr. | **Grade:** 11th |

**Meeting Date:** November 28, 2006

## Meeting Attendance
1. Michael Luseni, Director of Special Education Services
2. Gene Pinkard, Principal.
3. Derrick Shelton Sr.

## Concerns
- Appeal for a lesser consequence

### Meeting Notes

Mr. Shelton and I met with Mr. Pinkard on 11/28/2006. Mr. Shelton requested this meeting to appeal to Mr. Pinkard for a lesser consequence. Mr. Shelton stated "I am not trying to excuse D▮▮▮ behavior, but I would like Maya Angelo to consider another punishment."


EXHIBIT
MAPCS - 17

50

Law Offices
## DALTON, DALTON & HOUSTON, P.C.

1008 Pendleton Street
Alexandria, Virginia 22314-1837
Telephone: (703)-739-4300
Facsimile: (703)-739-2323

Washington DC. Office:
601 Pennsylvania Avenue, NW
South Building, Suite 900
Washington, DC 20004
Telephone: (202)-393-0060
Facsimile: (202)-393-1555

Paul S. Dalton ·*
Ellen Douglas Dalton ·*
William E. Houston^·*
Jessica M. Smith ·*
Kathryn T. McAuliffe ¥

* ADMITTED IN VA
· ADMITTED IN D.C.
· ADMITTED IN W. VA

°ADMITTED TO THE U.S. SUPREME COURT
^ADMITTED IN PA
¥ ADMITTED IN CT

## FIVE DAY DISCLOSURE

March 5, 2007

Roberta Gambale, Esq.
James E. Brown and Associates
1220 L Street, NW, Suite 700
Washington, DC 20005

**VIA FAX: 202-742-2098**

Re:    D████ S██████

Dear Ms. Gambale:

A Due Process Hearing has been scheduled for D████ S███ on March 12, 2007 at 3:00pm. Pursuant to 34 C.F.R. 300.512(b)(1), the purpose of this letter is to provide you with the following list of witnesses and documents we may rely on in the hearing.

## WITNESSES

1.    Dr. Quentin Graham, Director of Mental Health, Maya Angelou PCS
2.    Mr. Michael Luseni, Director of Special Education, MAPCS
3.    Ms. Nakita West, Instructor, MAPCS
4.    Mr. Corey Bellamy, Counselor, MAPCS

Some or all of the above witnesses may testify by phone or may use a designee.

## DOCUMENTS

| | | |
|---|---|---|
| MAPCS - 01 | Answer | 1/22/07 |
| MAPCS - 02 | Hearing Notice | 2/21/07 |
| MAPCS - 03 | IEP | 3/16/06 |
| MAPCS - 04 | Report Card - First Quarter | 11/22/06 |
| MAPCS - 05 | Manifestation Determination Review Notes | 12/19/06 |
| MAPCS - 06 | Expulsion Letter | 12/19/06 |
| MAPCS - 07 | Parent and Student Handbook | SY 2006-2007 |
| MAPCS - 08 | Receipt of Documents Submitted to DCPS | 12/21/06 |
| MAPCS - 09 | Communication Log with Parent | 1/13/07 - 2/22/07 |
| MAPCS - 10 | Tutoring Log | 12/22/06 - 2/28/07 |
| MAPCS - 11 | Letter to Ms. Gambale | 3/1/07 |
| MAPCS - 12 | Invitation for Resolution Session | 3/2/07 |
| MAPCS - 13 | Motion to Dismiss | 3/2/07 |
| MAPCS - 14 | Letter to Ms. Gambale | 3/2/07 |
| MAPCS - 15 | Letter to Ms. Gambale | 3/5/07 |

* We reserve the right to examine any witnesses disclosed by DCPS or the Parent as if they were witnesses for our client and rely on any documents disclosed by DCPS or the Parent as if they were our documents.

* We object to any documents identified by DCPS or the Parent in their 5 Day Disclosure if copies are not physically produced with the 5 Day Disclosure letter.

2

Sincerely,

Jessica M. Smith, Esq.
Counsel for MAPCS

cc:    Student Hearing Office
       Office of General Counsel

3

Case Time: Mar. 5, 2007  9:15PM

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
| --- | --- | --- | --- | --- |
| 1705 Memory TX | 12027422098 | P. 52 | OK | |

Reason for error
E.1) Hang up or line fail
E.3) No answer
E.2) Busy
E.4) No facsimile connection

**FAX TRANSMISSION COVER SHEET**
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

DATE:   March 5, 2007

TO:   Roberta Gambale, Esq.

AT FAX:   202-742-2098 / 2097

FROM:   Jessica M. Smith, Esq.

RE:   D███ S███ v DCPS and MAPCS

NUMBER OF PAGES INCLUDING THIS PAGE:   52

COMMENTS:

   MAPCS's Five Day Disclosure

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

Transmission Result Report (Mem TX) Mar. 5, 2007 4:00PM

Date Time Mar. 5, 2007 4:00PM

| File No. Mode | Destination | Pg(s) | Result | Page Not Sent |
| --- | --- | --- | --- | --- |
| 1706 Memory TX | 12024425097 | P. 52 | OK | |

```
Reason for error
    E.1) Hang up or line fail          E.2) Busy
    E.3) No answer                     E.4) No facsimile connection
```

**FAX TRANSMISSION COVER SHEET**
DaRoo, DaRoo & Houston P.C.
Attorneys at Law
1808 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

DATE:      March 5, 2007

TO:        Office of the General Counsel

AT FAX:    202-442-5098 / 5097

FROM:      Jessica M. Smith, Esq.

RE:        D███ S███ v DCPS and MAPCS

NUMBER OF PAGES INCLUDING THIS PAGE:    52

COMMENTS:

    MAPCS's Five Day Disclosure

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS

D███ S██████ DOB: 3/8/88     )
                                  )
v.                               )
                                  )     **January 22, 2007**
District of Columbia Public Schools ("DCPS")  )
                                  )
and                             )
                                  )
Maya Angelou Public Charter School ("MAPCS")  )
                                  )

## MAYA ANGELOU PCS'S ANSWER

### General Denial

COMES NOW, MAPCS, by and through counsel, and hereby submits its Answer to the amended due process complaint filed by D███ S██████. MAPCS denies all allegations not subsequently admitted or otherwise answered. MAPCS admits no allegations unless clearly so stated below. MAPCS denies all allegations presented in the amended hearing complaint and pursuant to the Individuals with Disabilities Education Improvement Act of 2004, 20 U.S.C. §1415(c)(2)(B) states the following:

The petitioner makes allegations against both DCPS and MAPCS. In this Answer, Respondent MAPCS will only address those issues relating to MAPCS. The petitioner alleges that MAPCS failed to comply with disciplinary procedures by not scheduling a manifestation determination review (MDR), not conducting a functional behavior assessment (FBA), and not implementing a behavior intervention plan (BIP). The petitioner also alleges that MAPCS failed to provide the student with appropriate services after the suspension exceeded 10 days.

MAPCS denies that it failed to follow the proper disciplinary procedures or provide the

student with FAPE. The student has a learning disability, and up to the recent incident leading to his expulsion, had only been suspended one time for speaking to a teacher disrespectfully. The student has not had any other behavioral issues throughout his time at MAPCS. In fact, the student was a relatively model student, and with intensive work with MAPCS, was on the honor roll. However, after a break-up with his girlfriend, the student assaulted his ex-girlfriend in the hallway at MAPCS. The student was seen shoving the ex-girlfriend, choking her, and hitting her with an open fist. Due to the nature of this incident, the student was immediately disciplined and removed from MAPCS.

The petitioner's outline of the facts bear little resemblance to the actual interactions that MAPCS had with the parents. MAPCS spoke with the parents on 11/27/06 to schedule an MDR to discuss the assault and the appropriate disciplinary steps. The parents, however, were unable to meet to hold the MDR within the 10 day guidelines. The student's father asked that the MDR be postponed until another placement could be found for the student. However, too much time had passed, and thus MAPCS scheduled the MDR for December 19, 2006. The parents were also informed that after the student's suspension exceeded 10 days, MAPCS would provide a tutor for the student so that he could continue to access the general education curriculum pending the MDR. MAPCS informed the parents that the tutor had recently quit working at MAPCS, but as soon as a replacement was hired, tutoring would be implemented retroactively for the student.

Contrary to the facts of the amended complaint, MAPCS convened the MDR on December 19, 2006. The student discussed with the MDR team the incident leading to his removal from the school. The student did not deny assaulting his ex-girlfriend. The team found that the assault was the result of a personal issue and not related to the student's performance at

2

57

school. The team also found that the assault was not a manifestation of the student's learning disability, and thus did not warrant an FBA or BIP.

Since the assault was not a manifestation of the student's learning disability, MAPCS treated this student the same as a general education student. According to MAPCS's Parent and Student Handbook, conduct which constitutes danger to another student's physical health or an assault on another student is an expellable offense. Thus, the student was expelled from MAPCS. The parents and student were informed of their right to appeal this disciplinary decision to the appropriate entity. MAPCS, however, remains committed to providing the student with the opportunity to access the education curriculum. MAPCS submitted the student's documentation for placement referral to DCPS on December 21, 2006. Until a new placement is determined, MAPCS will provide the student with three hours of tutoring per week for a reasonable period of time.

MAPCS is continuing in its efforts to schedule a resolution session to discuss the issues in the amended complaint.

Respectfully Submitted,

Jessica M. Smith, Esq.
Counsel for MAPCS
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
703-739-4300
703-642-2323 – fax

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document was filed with the Student Hearing Office at fax 202-442-5556, and served on counsel for the parent, Roberta Gambale, Esq., at fax 202-742-2098 and the Office of General Counsel at fax 202-442-5098/5097 on this 22nd day of January, 2007.

Jessica M. Smith, Esq.
Counsel for MAPCS

4

59

Reason for error
E.1) Hang up or line fail          E.2) Busy
E.3) No answer                     E.4) No facsimile connection

**FAX TRANSMISSION COVER SHEET**
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

DATE:        January 22, 2007

TO:          Ms. Sharon Newsome, Student Hearing Office

AT FAX:      202-442-5556

FROM:        Jessica M. Smith, Esq.

RE:          D███ S████ v. DCPS and MAPCS

NUMBER OF PAGES INCLUDING THIS PAGE:    5

COMMENTS:

    MAPCS's Answer

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

Reason for error
E.1) Hang up or line fail
E.3) No answer

E.2) Busy
E.4) No facsimile connection

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

DATE:    January 22, 2007

TO:    Office of the General Counsel

AT FAX:    202-442-5098 / 5097

FROM:    Jessica M. Smith, Esq.

RE:    D███ S█████v. DCPS and MAPCS

NUMBER OF PAGES INCLUDING THIS PAGE:    5

COMMENTS:

MAPCS's Answer

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE, IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendicton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

DATE:     January 22, 2007

TO:       Roberta Gambale, Esq.

AT FAX:   202-742-2098 / 2097

FROM:     Jessica M. Smith, Esq.

RE:       D████ S████ v. DCPS and MAPCS

NUMBER OF PAGES INCLUDING THIS PAGE:    5

COMMENTS:

          MAPCS's Answer

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

District of Columbia Public Schools
State Enforcement & Investigation Division
STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8th Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:     Parent (or Representative): R. GAMBALE / T. ARDNIS-SHAHID    790 - 8088
                                                                    (303) 237-2323

        LEA Legal Counsel: OGC

RE:     ▓▓▓▓▓▓ D▓▓▓▓▓▓    and (LEA) DOB: 3/8/88
        Student's Name

FROM:   SHARON NEWSOME
        Special Education Student Hearing Office Coordinator

DATE SENT:    2/21/07

‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹‹

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
1/12/07 . Please be advised that the hearing has been scheduled for:

        DATE:    3/12/07

        TIME:    3:00 pm

        AT:     825 North Capitol Street, NE, Washington, DC
                8th Floor

        ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made *exclusively* by the Hearing Officer, and cannot be made by SHO administrative staff. Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[X] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of evidence and witnesses to the opposing party is required at least *five business days* prior to the hearing with copies to the Special Education Student Hearing Office

**MAPCS-02**

63

MAPCS--IEP

THE MAYA ANGELOU PUBLIC CHARTER SCHOOL
WASHINGTON, D.C.
INDIVIDUALIZED EDUCATIONAL PROGRAM

| I.  IDENTIFICATION INFORMATION | | II. CURRENT INFORMATION |
|---|---|---|
| | | Date of IEP Meeting: 3/16/2006 |
| Student Name: Last: S███   First: D███   MI: | | Date of Last IEP Meeting: 3/23/05 |
| Student ID: 9103653   SSNo.   Grade: 11th | | Date of Most Recent Eligibility Decision: 3/16/06 |
| Gender: Male   Date of Birth: 3/8/88   Ethnic Group: African Amer. | | Purpose of IEP Conference: |

<table>
<tr><td>Address:  125 Franklin Street, NE M-13<br>Washington, DC 20002   Telephone: Home: 202-232-5092</td><td>___ Initial IEP   X Annual Review<br>___ 3-Yr. Reeval.   ___ Requested Eval.<br>___ Review of IEP</td></tr>
<tr><td>School (Home) MAPCS   (Attending) MAPCS</td><td>Indicate Level of Standardized Assessment: 11</td></tr>
<tr><td>Elem.   Mid/JHS   HS X   CWS   Non-attending<br>Parent: Rachelle Bobo</td><td>ADDENDA TO BE ATTACHED AS NEEDED<br>Check the appropriate box(es)</td></tr>
<tr><td>Address of (If different from student): ___ Parent ___ Guardian ___ Surrogate<br>Telephone: Home: _____ Work: _____</td><td>BEHAVIOR     TRANSPORTATION<br><br>ESY        X   TRANSITION</td></tr>
</table>

## III. LANGUAGE

| | Language | Language Used For Evaluation | Language Used In Conference | Communication Requirements | To be completed by Language Minority English Assess./Eval. |
|---|---|---|---|---|---|
| Student | English | English | English | English | Oral |
| Parent | English | English | English | English | Reading/Written |
| Home | English | English | English | English | Instrument: |
| | | | | | Date: |

## V. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | FREQUENCY Hr. Min. | Day/Wk./Mo. | PROVIDER (By Discipline) | SETTING Gen. Ed. | Sp. Ed. | DURATION (Mo./Day/Yr.) Begin | End |
|---|---|---|---|---|---|---|---|
| Counseling | 1 Hour 30 Min. | Wk. | Counselor | X | | 3/16/06 | 3/15/07 |
| Advisory | 1 Hour 55 Min. | Wk. | | | | 3/16/06 | 3/15/07 |
| Consultation | 1 Hour | Wk. | | | X | 3/16/06 | 3/15/07 |
| TOTAL | 4 Hours 25 Min. | Wk. | | X. | X | 3/16/06 | 3/15/07 |

| V. DISABILITY(IES) | GENERAL ED. SETTING | AMOUNT OF SPEC. SERV. 14% |
|---|---|---|
| LD | Check if setting is general ed. PERCENTAGE OF TIME IN REGULAR EDUCATION SETTING 86% | |

| VI. IEP TEAM (Participants in the development of IEP) | Print and sign your name below: |
|---|---|
| Parent/Guardian Ms Bob | Student / ███████ 12S |
| Special Education Teacher Michael Lusen | Surrogate |
| General Education Teacher (Hickey) | Other |
| LEA Representation | Other |
| Evaluator | Other |
| Principal | Other |

I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature _____   Date 3-21-06

MAPCS--IEP
2

Student: D___ S___

udent ID Number:  9103653

VII. Present Educational Performance Levels in Areas Affected By the Disability

| | |
|---|---|
| **Academic Areas:** (Evaluator)<br>**Strengths:**<br>Math: D___ is capable of solving math problems when formulas/equations are provided for him. He is an asset to the class when he participates during instruction.<br>Writing: D___ writing is getting better.<br>Reading Comprehension: D___ has the ability to understand textual concepts; cause and effect and inferences.<br><br>**Impact of disability on educational performance in general education curriculum:**<br>Math: D___ ability to stay focus and ask clarifying questions when experiencing confusion during math instruction is greatly affecting his academic performance.<br>Writing: D___ needs to add more complex sentences when writing and edit his work for spelling before turning in final draft.<br>Reading Comprehension: D___ ability to stay focus and return to text to gather information is greatly affecting his academic performance. | Math Cal. – 6.2 GE<br>Math Rea. = 5.4 GE<br>Rdg. Com. = 5.1 GE<br>Rdg. Basic = 4.2 GE<br>Written Ex. = 4.6 GE<br>Date:  3/12/04 |
| **Communication** (Speech and Language) (Evaluator)<br>**Strengths:** _____<br><br>**Impact of disability on educational performance in general education curriculum:** _____ | Score(s) When Available<br>Exp. Lang _____<br>Rec. Lang _____<br>Artic. _____<br>Voice _____<br>Fluency _____<br>See goal page: _____<br>Date: |
| **Doctor/health** (Evaluator): _____<br>**Strengths:** _____<br>**Impact of Disability on educational performance in general education curriculum:** | Score(s)/Results When Available<br>_____<br>_____<br>See goal page: _____<br>Date: |
| **Emotional Behavioral Areas:** (Evaluator) _____<br>**Strengths:** D___ has shown to have the ability to communicate effectively and engage in positive interactions with both peers and adults.<br><br>**Impact of Disability on educational performance in general education curriculum:**<br>D___ motivation to be in school and to take learning seriously is impacting his academic performance. He acknowledges this and understands the impact it is having on his education. | Score(s) When Available<br>_____<br>_____<br>See goal page: _____<br>Date: |
| **Cognitive/Adaptive Behavior:** (Evaluator) _____<br>**Strengths:** _____<br>**Impact of Disability on educational performance in general education curriculum:** _____ | Score(s) When Available<br>_____<br>_____<br>See goal page: _____<br>Date: |
| **Prevocational Skills:** (Evaluator) _____<br>**Strengths:** Using the TPI student form D___ indicated that he understood the employment process and knows his interests and abilities at this point in his life.<br><br>**Impact of Disability on educational performance in general education curriculum:**<br>D___ needs to meet with the Special Education Coordinator to discuss his interests and abilities as they relates to his post secondary options. He lacks understanding of the relationship between his attitude towards school and task completion and the impact on post secondary employment or educational options. | Transition Planning Inventory<br>(TPI) – Student Form<br>Date: 12/7/05 |

65

MAPCS--IEP

Student Name:  D███ S███       DOB:  3.8'88       Student ID No.:  9103633

## VIII. SPECIALIZED INSTRUCTION

ANNUAL GOAL: (including mastery criteria )          Area addressed by goal: Social/Emotional

| | QUARTERLY RESULTS | |
|---|---|---|
| D███ will demonstrate improved awareness of social/emotional functioning by the end of the school year. | DATE | PROGRESS |

Progress Codes:
A=achieved
MP/C=making progress/continue, I/D=Inappropriate/discontinue, NAY=not addressed yet, I=introduced, C=continue
Mastery of these goals will be determined through classroom observation, teacher conferences, and anecdotal records at 80% accuracy.

SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks       Provider: Counselor/Special Education Coordinator

| | | Obj. | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|---|---|
| 1. | When in conflict situations, D███ will accurately identify and express emotions about the situation without going into the consequences. | 1. | | | | |
| 2. | When in conflict situations, D███ will demonstrate an awareness of the impact of his actions on others | 2. | | | | |
| 3. | D███ will ignore distractions in environment (classroom; auditorium and other learning settings) by continuing to focus on own or group task | 3. | | | | |

EVALUATION PROCEDURE
___ Portfolio     X Observation
___ Log           X Report
___ Chart         X Other
___ Test

66

MAPCS--IEP

| Student Name: D___ S___ | DOB: 3.8.88 | Student ID No.: 9103653 |

### VIII. SPECIALIZED INSTRUCTION

ANNUAL GOAL: (including mastery criteria.)                              Area addressed by goal: __Math__

D___ will increase his ability to ask clarifying questions when experiencing confusion during math instruction.

Progress Codes:
A=achieved
MP/C=making progress/continue, I/D=Inappropriate/discontinue, NAY=not addressed yet, I=introduced, C=continue
Mastery of these goals will be determined through classroom observation, teacher conferences, and anecdotal records at 80% accuracy.

QUARTERLY RESULTS

| DATE | PROGRESS |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

SHORT-TERM OBJECTIVES (Include mastery criteria or benchmarks          Provider: __Math/Special Education Teacher__

1. When given math problems that D___ doesn't understand he will ask the teacher for more clarity during class and not put his head on the desk.

2. When D___ recognizes difficulties in understand some math concepts and equations, he will seek clarification or assistance before proceeding with the task.

3. When given notes on the board or handouts D___ will write or organize them for later use during assignments and/or other seatwork.

| Obj. | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

EVALUATION PROCEDURE

| | |
|---|---|
| ___ Portfolio | _X_ Observation |
| ___ Log | _X_ Report |
| ___ Chart | _X_ Other |
| ___ Test | |

MAPCS--IEP

| Student Name: D____ S____ | DOB: 3 8 88 | Student ID No. 9013053 |
|---|---|---|

## VIII. SPECIALIZED INSTRUCTION

ANNUAL GOAL: (Including mastery criteria.)                    Area addressed by goal: Transition

D____ will increase his awareness in the area of transition to ensure that he understands how his interest and abilities relates to his post secondary options.

| QUARTERLY RESULTS | |
|---|---|
| DATE | PROGRESS |
| | |
| | |
| | |

Progress Codes:
A=achieved
MP/C=making progress/continue, I/D=Inappropriate/discontinue, NAY=not addressed yet, I=introduced, C=continue
Mastery of these goals will be determined through classroom observation, teacher conferences, anecdotal records at 80% accuracy.

SHORT-TERM OBJECTIVES (Include mastery criteria or benchmarks    Provider: Transition/Special Education Coordinators

1. D____ will meet with the special education coordinator weekly to identify personal interests and abilities to develop realistic career/academic post secondary options.

2. D____ will meet with the special education coordinator weekly to develop an awareness regarding the relationship between his attitude towards school and task completion and the impact on post secondary employment or educational options.

3. D____ will meet with the Special Education Coordinator weekly review progress reports and develop strategies to increase his ability to become proactive.

| Obj. | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |

EVALUATION PROCEDURE
____ Portfolio    X Observation
____ Log          X Report
____ Chart        X Other
____ Test

MAPCS--IEP

| Student Name: D█████ S██████ | DOB: 3/5/88 | Student ID No. 9103653 |

## VIII. SPECIALIZED INSTRUCTION

ANNUAL GOAL: (Including mastery criteria )                    Area addressed by goal: <u>Reading Comprehension</u>

| D████ will increase his reading comprehension skills by staying focus and returning to text to gather information.<br><br>**Progress Codes:**<br>A=achieved<br>MP/C=making progress/continue, I/D=inappropriate/discontinue, NAY=not addressed yet, I=introduced, C=continue<br>Mastery of these goals will be determined through classroom observation, teacher conferences, and anecdotal records at **80% accuracy.** | QUARTERLY RESULTS<br><br>DATE                    PROGRESS |

SHORT-TERM OBJECTIVES (Include mastery criteria or benchmarks                    Provider: <u>English Teacher</u>

1. When given reading passages/materials, D████ will locate information by returning to the text for inference information, conclusion information and answers to comprehension questions.

2. When given reading passages/materials, D████ immediate begin work and ignore distractions while completing independent work

| Obj. | 1st | 2nd | 3rd | 4th |
|------|-----|-----|-----|-----|
| 1.   |     |     |     |     |
| 2.   |     |     |     |     |

EVALUATION PROCEDURE
___Portfolio        X Observation
___Log             X Report
___Chart           X Other
X Test

MAPCS--IEP

| Student Name:  D____ S____ | DOB:  3 8 88 | Student ID No.  9103653 |

## VIII. SPECIALIZED INSTRUCTION

ANNUAL GOAL: (Including mastery criteria.)                    Area addressed by goal: Writing

| D____ will add more complex sentences when writing and edit his work for spelling before turning in final draft. | QUARTERLY RESULTS |
| | DATE             PROGRESS |

**Progress Codes:**
A=achieved
MP/C=making progress/continue, I/D=Inappropriate/discontinue, NAY=not
addressed yet, I=introduced, C=continue
Mastery of these goals will be determined through classroom
observation, teacher conferences, anecdotal records at 80% accuracy.

SHORT-TERM OBJECTIVES (Include mastery criteria or benchmarks   Provider: Reading/Lang. Arts Teacher

| Obj. | 1st | 2nd | 3rd | 4th |
|------|-----|-----|-----|-----|
| 1.   |     |     |     |     |
| 2.   |     |     |     |     |

1. When given writing assignments, D____ will turn in a completed rough draft and review it with his school assigned tutor, special education teacher and/or classroom teacher.

2. After revision, D____ will be responsible for making all changes before turning in final draft.

EVALUATION PROCEDURE
___Portfolio        X Observation
___Log              X Report
___Chart            X Other
___Test

MAPCS--IEP 8

| Student: D____ S____ | DOB: 3/8/88 | School : MAPCS | Student ID No.: 0013053 |

Additional Information

**IX.   LEAST RESTRICTIVE (LRE) DETERMINATION SERVICE ALTERNATIVES**

A.   Full time general education class
B.   Full time general education w/specialized instructional services
C.   Combination - part-time in regular education classes and part-time in special education class or learning center

Complete an INTERIM PLACEMENT NOTICE to continue in the attending public school when considering D through J LREs.

Consult School Support Unit through the technical support supervisor for LREs in this section.[5]

D.   Special class (with no academic nor non-academic participation with non-disabled peers) in neighborhood school.
E.   Special class in other than neighborhood school
F.   Separate day special education school
G.   Residential School
H.   Homebound (VIS)
I.   Hospital (VIS)
J.   Correctional Facility

\*Explain why curricular modification, accommodation and/or supplemental aids and services cannot be used for a LRE setting in regular education. _____

Check the percentage of time the student receives specialized instruction and related services.
☐   0-20%
☐   21-60%
☐   61-100%

***

| X. Supplementary Aid(s) and Service(s) (Do not name products or companies) | Frequency | | Provider (By Discipline) | Setting | | Duration | |
|---|---|---|---|---|---|---|---|
| | Hr./Min. | Wk./Mo. | | Gen. Ed. | Sp. Ed. | Begin | End |
| Counseling (see page 1) | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing:
Timing/Scheduling: Additional Time (if needed)
Setting: Small classroom, minimal distraction
Presentation: Gain student's attention before giving directions, asking questions (eye contact and proximity)
Behavior: D____ and his mother were informed that he will be asked to leave the building immediately if he is assigned ISS. This will be in effect for the rest of the school year.

**XI. STATE AND DISTRICT ASSESSMENTS:**

___Level I Tested with non-disabled peers under standard conditions without accommodations

___ Level III (Describe non uniform conditions for Level III.) Tested under non-standard conditions with permissible accommodations

X Level II (Describe accommodations for Level II.) Tested under standard conditions with special accommodations

___Level IV (Describe the alternative assessment) Exempted students. Must have proper notification and determination that cognitive functioning is impaired to the extent that Permitted accommodations will benefit student.

***

**XII. Areas Requiring Specialized Instruction and Related Services:**

X Language Arts /English
X Mathematics
___ Biological and Physical Sciences
___Other: _____

___ Social Sciences
___ Fine Arts
___ Physical Development
___ Independent Living
___ Physical/Sensory

X Social Emotional
___ Speech/Language
___ Transition
X Vocational

Develop annual goals and/or modifications to address barriers in each area checked above.

71

MAPCS--IEP

XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| General Education | Reject – this level of services would not adequately meet the student's academic and emotional needs. | D███ self esteem would deteriorate and academic progress would be limited because of inadequate support |
| Combination of General Education and Resource Classroom | Accept. With periodic monitoring by special education coordinator, counselor, improve teaching techniques and strategies that each teacher uses during instruction. D███ can be academically successful in a general education setting with peers without disabilities. Classroom sizes are small giving him the opportunity to learn at his own pace and become a part of a small learning community. | |
| | | |
| | | |

Modification(s)/Accommodations to address the harmful effects:


Explanation for removal out of regular education classroom.

MAPCS-04

# The Maya Angelou Public Charter School

Official Report Card
Term: First Quarter (9/5/2006) - (11/3/2006)

D███ S█████  Student Number: 9103653
125 Franklin Street NE #M-13
Washington, DC 20002

| Period | Class | Teacher | Grade | Percent | Abs. | Comments |
|---|---|---|---|---|---|---|
| P1(M-F) | Biology | Houseman, Esther | B- | 81 | 8 | D████ has greatly improved in attitude and academic performance. He is a very capable student and shouldn't settle for less than his best, so I expect him to complete revisions to bring his 1st quarter grade even higher and make even higher grades 2nd quarter |
| P2(M-F) | English 3:Comtemp Lit | Hornonoff, Heather | A- | 90 | 8 | Excellent effort, class work, and participation - pleasure to have in class |
| P3(M-F) | Algebra IIA | West, Nakita | B- | 80 | 3 | |
| P4(M-F) | US History | Reed, Margaret | B+ | 89 | 2 | D████, you have been GREAT in class lately. However, you HAVE TO MAKE UP YOUR PRESENTATION. You are too smart to be failing this class. Please make up the presentation and do your homework more consistently and you can get your grade where it belongs-- on the Presidential Scholars board! |
| L/N(M-F) | Literacy/Numeracy Block | Gray, Chauncey | I | 109 | 2 | |
| ENR(M-T,H) | Basketball | Schnpfer, Kelly | A | 95 | 0 | |
| TUT(M-T,H) | Tutoring | Schnpfer, Kelly | | 0 | 1 | |
| VOC(M-F) | Vocational Education | Wilson, Derval | I | 61 | 2 | |

*** Printed: November 22, 2006

# Maya Angelou Public Charter School
## MAPCS
1851 9th Street, NW · WDC 20001 · phone: 202/939-9080 · fax: 202/939-9084
www.seeforever.org
### Manifestation Determination

STUDENT'S NAME: D█████ S███    DOB: 3/6/1988

Gr: 11th  ID#: 9103653  DISABILITY: Learning Disabled (LD)

MEETING DATE: December 19, 2006

## PARTICIPANTS

| PARTICIPANT'S NAME | PARTICIPANT'S SIGNATURE | TITLE |
|---|---|---|
| ████ ████ | ████ | Student |
| Rachelle Bibu | Rachelle | mother |
| Lisa Watkins | Lisa T Watkins | Special Ed master |
| Derrick K. Shelton | Derrick K. Shelton | Father |
| Corey Hamilton | Corey Hamilton | Education Advocate |
| Corey Bellamy | B.B. | Counselor |
| Quentin Graham, Ph.D. | Quentin Graham, Ph.D. | Psychologist |
| Alakita West | ⚬ | Algebra II Teacher |
| Michael Luseni | w/ Am | Dir of Sped |

---

## Manifestation Determination Review

The attach form is used to:

- Document the consideration and conclusion of the district representative, parent, and relevant members of the IEP team regarding whether the student's behavior was a manifestation of the student's disability as required by IDEA 2004, Sec. 615(k)(1)(E).

### Directions:

1. Enter the date the form was completed by the team.

2. Enter the student's name, birth date, student ID number, attending school, and case manager.

3. Complete Manifestation Review:

   (1) Behavior subject to disciplinary action: Describe student's behavior in objective terms. Include the date the behavior occurred. Include the intensity and duration of the behavior, etc. If the behavior involved other students, refer to those students by initials or other method that protects their confidentiality.

   (2) Current disability(ies) based on eligibility statements: List the student's current eligibility for special education services. For students who may have more than one disability but only one eligibility statement, as permitted by state law. List other educational needs identified on the IEP.

   (4) Consideration of all relevant student information: Check all sources of information considered by the team.

4. Based on all the information, answer the two questions by checking "yes" or "no".

   (1) *The conduct in question was a direct result of the district's failure to implement the student's IEP.*

   (2) *The conduct in question was caused by or had a direct and substantial relationship to the student's disability(ies).* Note: the relationship must be a direct result and not an "attenuated association, such as low self-esteem".

5. Manifestation determination:
   - If the answer to either question is a "yes", check the "yes" box that indicates the student's behavior is a manifestation of the student's disability.
   - If the answer to both questions is "no", check the "no" box indicating that the student's behavior is not a manifestation of the student's disability.

6. Team members: List all team members participating in the manifestation determination meeting.

7. Write the name of the staff person completing the form, that person's title, and telephone number.

75

# Manifestation Form

1. Behavior subject to disciplinary action:

   > D██████ grabbed a female student by the neck and punched her in the face.

2. Current disability(ies) based on eligibility statements (or identified educational needs):
   - ➤ Learning Disabled (LD)

3. Consideration of all relevant student information, including:

   ☑ Evaluation and diagnostic results     ☐ Relevant information provided by the parent

   ☐ Observations of the student     ☑ Current IEP and placement

   ☐ All relevant information in the student's file     ☐ Other _____

| For each statement answer "Yes" or "No": | Check the appropriate box |
|---|---|
| 1. The conduct in question was the direct result of the MAPCS's failure to implement the student's IEP. | ☐ Yes    ☑ No |
| 2. The conduct in question was caused by or had a direct and substantial relationship to the D██████ Learning disability. | ☐ Yes    ☑ No |

## Manifestation Determination

| | |
|---|---|
| ☐ Yes | The conduct/behavior is a manifestation of the student's disability. *Check if at least one answer to the above questions is Yes.* |
| ☑ No | The conduct/behavior is not a manifestation of D██████ Learning disability. *Check if both answers to the above questions are No.* |

| | |
|---|---|
| _____Michael Luseni_____ | _____12/19/2006_____ |
| Director of Special Education Services | Telephone |

76



Meeting was introduced and the rationale of the meeting was stated.

## Description of Incident
(Please see manifestation form)

## Student statement
D_____ stated that the female student grabbed him first and in defence for her grabbing him ~~Aick~~ (ML) by the throat and he pushed her with an open hand.

## Dr Graham, School Psychologist
Explained the assessment result completed on 3/22/04

## M.S. West, Regular Education Teacher
- Student is proactive in completing his work and has talked to him about how he interact with teacher.

Ms Bellamy Counselor
shared that he met with ▆▆▆ to

Educational Advocate

Wants to revisit IEP at a later date

Team decision

Team decided that ▆▆▆ recent incident
was not a manifestation of his disability

The See Forever Foundation 
The Maya Angelou Public Charter School

December 19, 2006

Mr. D███ S████Jr.
125 Franklin Street NE #M-13
Washington, D.C. 20002

Dear M. S████:

[You have] been expelled from Maya Angelou Public Charter School (MAPCS) as of December 19, 2006, for [assaulting] a fellow student. Assault on another student or staff is an infraction warranting expulsion, as [stated] on pages 16 and 18 of our student handbook. MAPCS has also notified the D. C. Metropolitan Police Department of the assault.

Maya Angelou Public Charter School will provide tutoring to compensate for time out of school after your tenth day of suspension. This will be at a site and times to be determined. Please be aware that coming on school grounds without permission (prior appointment) is trespassing.

This decision is pursuant to a manifestation meeting held earlier today. Per the District of Columbia Public Schools, you are expected to register at your neighborhood school as soon as possible to avoid gaps in receiving educational services. Your transcript and other paperwork will be mailed and/or faxed to your new school as soon as we receive notice. This communication is addressed directly to you because you are eighteen years of age.

If you have any questions or concerns, you can contact me at (202) 939-9080.

Sincerely,

Eugene Pinkard, Jr.
Principal

MAPCS-06

THE MAYA ANGELOU PUBLIC CHARTER SCHOOL
(MAPCS)



# PARENT & STUDENT HANDBOOK

Maya Angelou Public Charter School
Evans Campus – DCPS Partnership
5600 East Capitol Street NE
Washington, DC  20019
(202) 388-8960
(202) 727- 5548 Fax
Dr. Nataki Reynolds, Principal

Maya Angelou Public Charter School
Shaw Campus
1851 9th Street NW
Washington, DC  20001
(202) 939-9080
(202) 939-9084
Mr. Eugene Pinkard, Principal

Supported by the See Forever Foundation
2006-2007 Edition

MAPCS 07

# ABUSE OF ALCOHOL/DRUGS/ILLEGAL SUBSTANCES

Any student who comes to school and is suspected to be under the influence (as determined by the Principal, Assistant Principal, Dean of Students, Youth Development Counselor, and/or the student's counselor) will be required to:

- Leave school for the remainder of the day.
- Have an intervention and assessment conducted by a counselor and/or school nurse to determine the nature, severity, and ongoing treatment of the problem
- Follow the counselor's recommendations and treatment in order to continue at MAPCS.

A letter will be sent to the Parent/Guardian clarifying that if the student arrives under the influence again the student will not be able to return until the Parent/Guardian has come to school for a conference. At this conference, the Parent/Guardian, Student, Counselor and the Director of Mental Health Services will review/revise a treatment plan for the student. This could include mandatory substance abuse counseling. Complying with the treatment plan may be a condition of continued school attendance.

# DETENTION, SUSPENSION, AND EXPULSION

The staff at MAPCS is committed to taking all reasonable steps to create a learning environment where each of our students can succeed. In this context, prior to suspension or expulsion the staff takes many steps to help students develop positive and productive behaviors and to shed negative and destructive ones. Among our many strategies, we often:

- Provide counseling for students with members of our counseling staff and/or outside professionals,
- Meet with students, parents, social workers, siblings, and others involved in our students' lives, and
- Explore peer-mediation.

Nonetheless, some students may still behave in ways that will not permit them to remain here. The guidelines below are meant to provide MAPCS Students, Parents/Guardians, and Staff with examples of student behaviors that MAPCS can not tolerate. An administrator or Disciplinary Committee will use the guidelines below to determine appropriate consequences. In the case of students eligible for special education services, the Multidisciplinary Team will review decisions of the Disciplinary Committee.

Detention will be held at a faculty or staff member's discretion on a school day for any of the following reasons:

- Tardiness
- Incomplete work
- Off-task or unprepared in class
- Excessive talking or fooling around in class
- Failure to follow classroom norms, including following directions.

15

81



Detention Procedures:
- Students are expected to complete all assigned activities and assignments during detention.
- A student who fails to serve detention as assigned may be required to serve it at another time or may be subject to suspension and/or parent conference at the discretion of an administrator.
- Students who fail to comply with school staff during detention will be referred to school administrators and appropriate actions will be taken.

Suspension. Suspensions are a very serious discipline and are intended to communicate this seriousness to the student.
- Earning more than three (3) suspensions in any one term may result in expulsion.
- Mandatory meeting after suspension: Depending on the nature of the suspension, the student, the student's parent/guardian, the campus director or the staff person involved in the dispute, along with the student's counselor, must meet before the student can return to school. Failure to attend the meeting will result in an additional suspension.
- Students suspended for more than 2 days must meet with their counselor before returning to classes.
- After two (2) suspensions in one term (and at times sooner), a student may be placed on a contract outlining specific behaviors that the student will need to address to remain at the school.

Definitions:
- Short-Term Suspension: 1-3 days
- Long-Term Suspension: 4 or more days
- Suspension during Internships: Unless authorized, students are not to report to their internship site while serving a suspension. Students cannot receive their paycheck while on suspension.

Expulsion. Expulsions are reserved for students whose conduct constitutes danger to the physical or emotional health of other students and/or faculty. There will be zero tolerance for bringing deadly weapons to school or for any assault or threats on students and faculty members. A student may also be expelled for possession, use of, or selling of alcohol, drugs or controlled dangerous substances while on school property. Expulsion may also apply to a student who is repeatedly suspended and demonstrates no ability to respond to intervention or corrective measures such as behavioral contracts, modification plans, detention, suspension, advisor support, counseling and parental involvement.

1. Upon expulsion, a student is no longer enrolled at MAPCS/ DCPS-Evans or MAPCS-Shaw and/or any of its affiliates. (At the discretion of the Principal, the student may be allowed to apply for readmission for the following school year).
2. Students who are expelled will not receive their final paycheck unless otherwise authorized by a school administrator.

16

<u>Appeals to Expulsion Decisions</u>
Parents/Guardians have the right to appeal expulsion decisions.
Appeals Process:
1. The appeal must be filed within three (3) business days of the expulsion decision.
2. The appeal must be submitted in writing and directed to the Principal of the student's MAPCS campus. If the principal is directly involved in the incident leading to the expulsion decision, the Principal must forward the appeal to the SFF/MAPCS Executive Director or Board Designee.
3. The appeal must include the student's name, Parent/Guardian contact information, and the specific grounds for the appeal.
4. The principal or MAPCS official will review the specifics of the situation leading to the expulsion and the appeal and make a decision.
5. The decision of either the principal or official of MAPCS is final and will be communicated to the parent/guardian in a timely manner.

# SCHOOL GROUNDS AND OFF-CAMPUS ACTIVITIES

MAPCS expects our students to conduct themselves according to our school values and behavioral expectations whenever they are on school grounds or involved in off-campus activities sponsored by the school.

Therefore, the rules and consequences outlined in this handbook apply to all school related activities (including field trips/outings, enrichment classes/electives, internships, coming to and from school).

In addition, MAPCS reserves the right to take disciplinary action, including detention, suspension and expulsion, for student behavior that takes place beyond our school grounds when appropriate.

Please note that at the Shaw Campus, students are not permitted in the alley behind the school and at the Evans Campus, students are not to enter the first or second floors of the building, except as permitted by MAPCS administrators or their designees.

17

# Behavior Infractions and Responses

| Level I Infractions | Range of Responses |
|---|---|
| • Food/Drink/Candy/Gum<br>• Hats *(Evans Campus)*<br>• Walkmans/Games<br>• Cell Phones<br>• Disrespect<br>• Tardiness/Absenteeism<br>• General disruption of learning environment<br>• Failure to follow Staff Instructions | • Warning<br>• Conference with Student<br>• Privileges withheld<br>• Detention<br>• Clean Up Duty<br>• Parent/Teacher Conference<br>• Confiscation of property |
| **Level II Infractions** | **Range of Responses** |
| • Excessive tardiness/absenteeism<br>• Skipping Class/School/Internships<br>• Trespassing in shared space or in other unauthorized areas *(Evans Campus)*<br>• Inappropriate dress<br>• Disrespect/Threats<br>• Profanity<br>• Minor property damage<br>• Gambling<br>• Smoking tobacco products on school grounds<br>• Obscene materials<br>• Graffiti<br>• Committing multiple Level I infractions | Any of the above and/or:<br>• Immediate removal from class/school<br>• Referral to Counselor/Administrator<br>• Parent/Administrator conference<br>• Behavior improvement plan/contract<br>• Wrap around services intervention<br>• Removal from internship site<br>• Pay check temporarily withheld<br>• Alternative Programs/Assignments (i.e., substance abuse counseling, anger management sessions, etc.)<br>• Short-term suspension (1 – 3 days)<br>• Voluntary transfer<br>• Referral to law enforcement officials |
| **Level III Infractions** | **Range of Responses** |
| • Fighting/Assault<br>• Possession/Consumption/Distribution of Drugs/Alcohol<br>• Harassment (Physical/Sexual)<br>• Weapons<br>• Theft/ Major Property Damage<br>• Disrespect/Excessive Profanity<br>• Committing Multiple Level I/II Infractions | • Public apology to school community<br>• Long-Term Suspension (4 or more days)<br>• Voluntary/Involuntary Transfer<br>• Expulsion<br>• Referral to law enforcement officials |

Counselors will be made aware of all student infractions and will work with the students to correct the behavior.

Students will also be required to complete a written assignment in the form of a behavior packet, apology and/or a values reflection sheet for <u>any</u> infraction.

18



The Sea Forever Foundation
The Maya Angelou Public Charter School

Receipt of Documents

Documents Received

1. Psycho-educational Report

2. Current IEP

3. IEP Meeting Summary Notes

4. Letter of Expulsion

5. Manifestation Determination Form

MAPCS Staff Delivering Documents:

_Pauline Jackson McClean_ _12-21-06_
Name                              Date

School Staff Receiving Documents:

_[signature]_ _12/21/06_
Name                              Date

**MAPCS-08**

Communication Log

Student: D⬛⬛ S⬛⬛⬛

| | Date | Message |
|---|---|---|
| 1. | January 13, 2007 | Called 5:35 Attorney Mailbox was full |
| 2. | January 19, 2007 | Attorney Mailbox was full, but left detail message with secretary for Attorney about scheduling a resolution meeting for D⬛⬛ S⬛⬛⬛ Jr. Did not get a return call |
| 3. | January 19, 2007 | Left message for D⬛⬛ Advocate regarding the lack of return calls by Attorney. Did not get a return call |
| 4. | February 22, 2007 | Left a message in Attorney Mailbox wanting to schedule a resolution meeting and we are not going to waive our right to a resolution meeting. Did not get a return call |

Hi Michael-

Here are my hours and overview of tutoring for D█████ S█████.

| Date<br>Activity | Time |
| --- | --- |
| **Friday, December 22, 2006**<br>*Make-up Assignments* | 1:00 - 4:00pm |
| **Wednesday, December 27, 2006**<br>*Make-up Assignments* | 1:00 - 4:00pm |
| **Wednesday, January 3, 2007**<br>*Make-up Assignments* | 1:00 - 4:00pm |
| ***Wednesday, January 10, 2007***<br>*Algebra 2*<br>*Real Number Properties*<br>*Solving Equations*<br>*Quadratic Functions and Formulas* | *2:00 - 5:00pm* |
| **Wednesday, January 17, 2007**<br>*Algebra 2*<br>*Quadratic Functions and Formulas*<br>*Factoring Polynomials*<br>*Adding, Subtracting, Multiplying and Dividing Polynomials*<br>*Classifying Polynomial Functions* | 2:00 - 5:00pm |
| **Wednesday, January 24, 2007**<br>*Algebra 2*<br>*End Behaviors of Polynomial Functions*<br>*Real Life Application of Polynomial Functions*<br>*Polynomials Quiz* | 2:00 - 5:00pm |

Nakita West

Jessica M. Smith, Esq.

| | |
|---|---|
| From: | Michael Luseni Director of Special Ed. Services [mluseni@seeforever.org] |
| Sent: | Thursday, March 01, 2007 9:53 AM |
| To: | Jessica M. Smith, Esq. |
| Subject: | FW: Tutoring Services for D███ S█████ |

Michael A. Luseni M.Ed
Director of Special Education Services
Maya Angelou Public Charter School - Shaw Campus
1851 9th Street NW, Washington, DC 20009
Phone: 202-939-9080 Ex:303/Fax: 202-939-9084

-----Original Message-----
From: Nakita West Math
Sent: Wednesday, February 28, 2007 4:48 PM
To: Michael Vavala Business Manager; Michael Luseni Director of Special Ed. Services
Subject: Tutoring Services for D████ S█████

Here are my hours and overview of tutoring for D████ S█████.  I spoke with Ms. Homonoff
and she is going to assist with the English portion of his lessons when she can.

Wednesday, January 31, 2007 - 1:00 - 4:00 3 Hours Introduction to Exponential/Logarithmic
Functions Introduction to Kite Runner Assignments Last 60 Years Documents Assignments

Wednesday, February 7, 2007 - 4:00 - 7:00 3 Hours Notes on Exponential/Logarithmic
Functions Logarithmic Properties Key Terms for English III

Wednesday, February 14, 2007 - 12:00pm - 1:30pm 1.5 Hours Continued Notes on
Exponential/Logarithmic Functions Solving Exponential/Logarithmic Equations Guidelines for
Teacher for a Day

Wednesday, February 21, 2007 2:00 - 5:00 3 Hours Notes on Mathopoly Project Project for
Last 60 Years Notes on Kite Runner

Wednesday, February 28, 2007 1:00 - 4:00 Hours  3 Hours Review of Solving
Exponential/Logarithmic Equations Logarithmic Functions

-Nakita West
Algebra 11 Instructor
Maya Angelou Public Charter School
Room 409

1

88

Law Offices
## DALTON, DALTON & HOUSTON, P.C.

1006 Pendleton Street
Alexandria, Virginia 22314-1837
Telephone: (703)-739-4300
Facsimile:  (703)-739-2323

Paul S. Dalton ' ' '
Ellen Douglass Dalton ' ' '
William E. Houston ' '
Jessica M. Smith ' '
Kathryn T. McAuliffe '

Washington DC. Office:
601 Pennsylvania Avenue, NW
South Building,  Suite 900
Washington, DC 20004
Telephone: (202)-393-0060
Facsimile: (202)-393-1555

' ADMITTED IN VA
' ADMITTED IN D.C.
' ADMITTED IN W. VA

' ADMITTED TO THE U.S. SUPREME COURT
' ADMITTED IN PA
' ADMITTED IN CT

March 1, 2007

Roberta Gambale, Esq.
James E. Brown and Associates
1220 L Street, NW, Suite 700
Washington, DC 20005

**VIA FAX: 202-742-2098**

Re:    D█████ S█████

Dear Ms. Gambale:

This letter is in response to your letter to Mr. Luseni, Special Education Coordinator at Maya Angelou PCS ("MAPCS"), dated February 22, 2007.  Your letter indicates that 1) D█████ is not being provided with the agreed upon tutoring services, and 2) stay put protections have been invoked.  As counsel for MAPCS, I would like to correct the inaccuracies in your letter.

D█████ was expelled from MAPCS following a proper manifestation determination review where the team determined that the behavior was not a manifestation of the student's disability.  The parents were informed of their right to appeal the expulsion decision, however they failed to do so and the time frame for appeal has lapsed.  After expulsion, MAPCS referred the student to DCPS for placement.  In the interim, while placement is pending, MAPCS has been and continues to provide D█████ with tutoring after school for three hours per week in order to allow him to access his education.  This interim alternative placement was agreed to by the MDT team and the parent at the December 19, 2006 meeting.

MAPCS has been and continues to provide FAPE to this student.  If you have any questions or concerns, please contact me.

Sincerely,

Jessica M. Smith, Esq.

Cc:    Quentin Graham, MAPCS
Michael Luseni, MAPCS

**MAPCS-11**

89

FAX TRANSMISSION COVER SHEET
Daines, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

DATE:        March 1, 2007

TO:          Roberta Gambrale, Esq.

AT FAX:      202-742-2098 / 2097

FROM:        Jessica M. Smith, Esq.

RE:          D███████

NUMBER OF PAGES INCLUDING THIS PAGE:    2

COMMENTS:

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

Law Offices
## DALTON, DALTON & HOUSTON, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314-1837
Telephone: (703)-739-4300
Facsimile: (703)-739-2323

Paul S. Dalton[*][**]
Ellen Douglass Dalton[*][**]
William E. Houston[*][°]
Jessica M. Smith[*][°]
Kathryn T. McAuliffe[§]

Washington DC Office:
601 Pennsylvania Avenue, NW
South Building, Suite 900
Washington, DC 20004
Telephone: (202)-393-0060
Facsimile: (202)-393-1555

[*] ADMITTED IN VA
[*] ADMITTED IN D.C.
[*] ADMITTED IN W. VA

[*]ADMITTED TO THE U.S. SUPREME COURT
[^]ADMITTED IN PA
[§] ADMITTED IN CT

## INVITATION FOR RESOLUTION SESSION

March 2, 2007

Roberta Gambale, Esq.
James E. Brown and Associates
1220 L Street, NW, Suite 700
Washington, DC 20005

**VIA FAX: 202-742-2098**

     Re:     D██ S██████

Dear Ms. Gambale:

     Your amended complaint was filed on January 12, 2007. Since that time, Maya Angelou has made several attempts to contact your office and the advocate for the parent in an attempt to schedule a resolution meeting. Specifically, calls were made to your office on January 13, 2007, January 19, 2007, and February 22, 2007. Each time, messages were left with your office, however no return call was received. Maya Angelou is not waiving its right to convene a resolution meeting. Thus, Maya Angelou is proposing the following dates for a resolution meeting:

          Monday, March 5, 2007 - any time between 3pm - 5pm
          Wednesday, March 7, 2007 - any time between 3pm - 5pm
          Thursday, March 8, 2007 - any time

     Please confirm what date / time works best for you and the parent. We look forward to hearing from you so that the issues in the complaint can be discussed and so that we can work towards a resolution of the case.

          Sincerely,

          Jessica M. Smith, Esq.

Cc:   Quentin Graham, MAPCS
      Michael Luseni, MAPCS

MAPCS 12

91

| Fax | Destination | Pg. | Result | Page Ident |
|-----|-------------|-----|--------|------------|

Reason for error
E.1) Hang up or line fail          E.2) Busy
E.3) No answer                     E.4) No facsimile connection

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1908 Pendleton Street
Alexandria, Virginia 22314-1637
(703) 739-4300
FAX (703)739-2323

DATE:     March 2, 2007

TO:       Roberta Gambaie, Esq.

AT FAX:   202-742-2096 / 2097

FROM:     Jessica M. Smith, Esq.

RE:       ████████

NUMBER OF PAGES INCLUDING THIS PAGE:     2

COMMENTS:

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS

Rachelle Bobo, on behalf of                )
D███ S████, DOB: 3/8/88              )
                                            )
v.                                          )
                                            )    Chief Hearing Officer David Smith
District of Columbia Public Schools ("DCPS")  )
                                            )
and                                         )
                                            )
Maya Angelou Public Charter School ("MAPCS")  )
─────────────────────────────────          )

## MAYA ANGELOU PCS'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, REMOVE THE HEARING FROM THE CALENDAR

COMES NOW, MAPCS, by and through counsel, and hereby moves the Hearing Officer to dismiss the Petitioner's complaint, or in the alternative, remove the hearing scheduled for March 12, 2007 from the calendar.

1.    The amended complaint was filed by Petitioner on January 12, 2007.

2.    Since that time, MAPCS has made reasonable attempts to schedule a resolution meeting with the parent. The parent's advocate and attorney, however, have not been responsive to MAPCS's attempts to convene a resolution meeting. *See* Ex. 1.

3.    MAPCS therefore requests that the Hearing Officer dismiss the case pursuant to 34 C.F.R. § 300.510(b)(4) for failure of the parent to participate in the resolution session.

4.    MAPCS is not waiving its right to convene a resolution session. Thus, if the Hearing Officer is not inclined to dismiss the Petitioner's case outright, MAPCS requests that the hearing be removed from the calendar until such time that a resolution session is convened. If, after the resolution session, the parties have not resolved the pending

complaint. the hearing can be scheduled.

DATE:        March 2, 2007                 Respectfully Submitted,

                                           Jessica M. Smith, Esq.
                                           Counsel for MAPCS
                                           Dalton, Dalton, & Houston, P.C.
                                           1008 Pendleton Street
                                           Alexandria, Virginia 22314
                                           703-739-4300
                                           703-642-2323 – fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document was served on counsel for the parent, Roberta Gambale, Esq., at fax 202-742-2098 and the Office of General Counsel at fax 202-442-5098/5097 on this 2nd day of March, 2006.

                                           Jessica M. Smith, Esq.
                                           Counsel for MAPCS

Communication Log

Student: D██████ S███████

| | Date | Message |
|---|---|---|
| 1. | January 13, 2007 | Called 5:35 Attorney Mailbox was full |
| 2. | January 19, 2007 | Attorney Mailbox was full, but left detail message with secretary for Attorney about scheduling a resolution meeting for D████ S██████ Jr. Did not get a return call |
| 3. | January 19, 2007 | Left message for D██████ Advocate regarding the lack of return calls by Attorney. Did not get a return call |
| 4. | February 22, 2007 | Left a message in Attorney Mailbox wanting to schedule a resolution meeting and we are not going to waive our right to a resolution meeting. Did not get a return call |

Ex. 1

Reason for error
E.1) Hang up or line fail          E.2) Busy
E.3) No answer                     E.4) No facsimile connection

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

DATE:     March 2, 2007

TO:       Roberta Gambale, Esq.

AT FAX:   202-742-2098 / 2097

FROM:     Jessica M. Smith, Esq.

RE:       D█████S█████

NUMBER OF PAGES INCLUDING THIS PAGE:    4

COMMENTS:

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

Reason for error
E-1) Hang up or line fail          E-2) Busy
E-3) No answer                     E-4) No facsimile connection

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

DATE:   March 2, 2007

TO:     Roberta Garabale, Esq.

AT FAX: 202-742-2098 / 2097

FROM:   Jessica M. Smith, Esq.

RE:     D█████ S█████

NUMBER OF PAGES INCLUDING THIS PAGE:    4

COMMENTS:

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

Reason for error
  E.1) Hang up or line fail          E.2) Busy
  E.3) No Answer                     E.4) No facsimile connection

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703) 739-2323

DATE:     March 2, 2007

TO:       Chief Hearing Officer David Smith, Student Hearing Office

AT FAX:   202-442-5556

FROM:     Jessica M. Smith, Esq.

RE:       D███ S███

NUMBER OF PAGES INCLUDING THIS PAGE:  4

COMMENTS:

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4380
FAX (703)739-2323

DATE:           March 2, 2007

TO:             Office of the General Counsel

AT FAX:         202-442-5098 / 5097

FROM:           Jessica M. Smith, Esq.

RE:             D██████ v DCPS & MAPCS

NUMBER OF PAGES INCLUDING THIS PAGE:    4
_____

COMMENTS:

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.



Law Offices
# DALTON, DALTON & HOUSTON, P.C.

1008 Pendleton Street
Alexandria, Virginia 22314-1837
Telephone: (703)-739-4300
Facsimile: (703)-739-2323

Washington DC. Office:
601 Pennsylvania Avenue, NW
South Building, Suite 900
Washington, DC 20004
Telephone: (202)-393-0060
Facsimile: (202)-393-1555

Paul S. Dalton`···`
Ellen Douglass Dalton `···`
William E. Houston `·`
Jessica M. Smith `··`
Kathryn T. McAuliffe `·`

` · ADMITTED IN VA
· ADMITTED IN D.C.
· ADMITTED IN W. VA`

`·ADMITTED TO THE U.S. SUPREME COURT
·ADMITTED IN PA
¥ ADMITTED IN CT`

March 2, 2007

Roberta Gambale, Esq.
James E. Brown and Associates
1220 L Street, NW, Suite 700
Washington, DC 20005

**VIA FAX: 202-742-2098**

Re:     D█████ S█████

Dear Ms. Gambale:

I want to clarify that MAPCS is in no way attempting to harass the parent by trying to schedule a resolution meeting through your office. A resolution meeting was convened for the complaint filed on December 12, 2006. However, the 12/12/06 complaint was subsequently deemed insufficient and dismissed. An amended complaint was filed on January 12, 2007 and a resolution meeting for that complaint has not yet been held.

I did not receive your March 2, 2007 letter until late in the day on Friday. Due to the lateness of the hour, and since your 3/2/07 letter lacked a specific time that you are available for the resolution meeting, I was not able to confirm a time for a resolution meeting. However, please confirm a **specific time** that you and your client are available on the following days:

Wednesday, March 7, 2007 - any time between 3pm - 5pm
Thursday, March 8, 2007 - any time

We look forward to hearing from you so that the issues in the complaint can be discussed and so that we can work towards a resolution of the case.

Sincerely,

*Jessica M. Smith*

Jessica M. Smith, Esq.

Cc:    Quentin Graham, MAPCS
Michael Luseni, MAPCS

MAPCS 14



Reason for error
    E.1) Hang up or line fail        E.2) Busy
    E.3) No answer                    E.4) No facsimile connection

**FAX TRANSMISSION COVER SHEET**
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703) 739-2323

DATE:        March 2, 2007

TO:          Roberta Gambale, Esq.

AT FAX:      202-742-2098 / 2097

FROM:        Jessica M. Smith, Esq.

RE:          D█████ S███████

NUMBER OF PAGES INCLUDING THIS PAGE:    2

COMMENTS:

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY-CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

Law Offices

# DALTON, DALTON & HOUSTON, P.C.

1008 Pendleton Street
Alexandria, Virginia 22314-1837
Telephone: (703)-739-4300
Facsimile: (703)-739-2323

Washington DC Office:
601 Pennsylvania Avenue, NW
South Building,  Suite 900
Washington, DC 20004
Telephone: (202)-393-0060
Facsimile: (202)-393-1555

Paul S. Dalton ⁺ ' ⁺
Ellen Douglass Dalton ' ' ⁺
William E. Houston ' ⁺
Jessica M. Smith ' ⁺
Kathryn T. McAuliffe ˣ

⁺ ADMITTED IN VA
⁺ ADMITTED IN D.C.
' ADMITTED IN W. VA

⁺ ADMITTED TO THE U.S. SUPREME COURT
⁺ ADMITTED IN PA
ˣ ADMITTED IN CT

March 5, 2007

Roberta Gambale, Esq.
James E. Brown and Associates
1220 L Street, NW, Suite 700
Washington, DC 20005

**VIA FAX: 202-742-2098**

Re:    D██████ S███████

Dear Ms. Gambale:

This is to confirm the Resolution Session for D█████ S██████ on Wednesday, March 7, 2007 at 3pm at Maya Angelou PCS.  Since D█████ is age 18, and according to the Amended Complaint has retained counsel to proceed with the case against MAPCS, please ensure that D█████ will be at the Resolution Session.

Sincerely,

Jessica M. Smith, Esq.

Cc:    Quentin Graham, MAPCS
Michael Luseni, MAPCS

**MAPCS-15**

FAX TRANSMISSION COVER SHEET
Dalton, Dalton & Houston P.C.
Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4380
FAX (703)739-2323

DATE:       March 5, 2007

TO:         Roberts Gambaie, Esq.

AT FAX:     202-742-2098 / 2097

FROM:       Jessica M. Smith, Esq.

RE:         D███ N████

NUMBER OF PAGES INCLUDING THIS PAGE:    2

_____

COMMENTS:

THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

# *Parent Meeting*

STUDENT'S NAME: D████S███████Jr.        Grade: <u>11th</u>

<u>Meeting Date: November 27, 2006</u>

## Meeting Attendance
1. Michael Luseni, Director of Special Education Services
2. D████S██████ Jr.
3. Derrick Shelton Sr.

## Concerns
- Parent wants to know details about incident
- Class work
- Wants to Request a Meeting with Mr. Pinkard (School Principal)

## Meeting Notes

Mr. Shelton and I met on 11/27/2006 so that he could get more information about the incident and discuss how d███ is going to get class work, while he is out of school.
I explain the incident to Mr. Shelton with D███ present. Mr. Shelton indicated that he understood the school's position, but seemed very intent on the school considering a lesser consequence for D███ involvement in the incident.

### Manifestation Determination
I explained to Mr. Shelton that due to this incident and the uncertainty of whether or not D███ will be allow to continue his education here, we are required to convene a Manifestation Meeting to determine whether or not his actions was a result of his disability. I shared that at this meeting we would be looking at his IEP, Evaluation and other relevant data. I asked if he (Mr. Shelton) understood what I meant or if he needed someone to be present. He indicated that he understood what I said. I offered to make a copy of D███ IEP and Evaluation, but Mr. Shelton stated that he didn't need it. I asked Mr. Shelton if he had a date in mind as to when he would like to schedule a manifestation meeting or if he wanted me to mail the Manifestation Meeting Notice with dates? Mr. Shelton stated that he did not have a date in mind at that point and that he would like me to wait for him to give me a date. I shared with Mr. Shelton that MAPCS is required to have this meeting with 10 days of the incident; he stated that he understood, but his first concern at this point is to get his son in school. He asked if I knew of any schools that I could recommend for D███. As he leaving my office he stated that he was on his way to Bell Multicultural School, because D███ neighborhood school is not good.

### Missing Class Work
Mr. Shelton was informed that after D███ reaches his 10th day of suspension he is entitled to receive educational services through MAPCS until the entire process is completed. I also shared with Mr. Shelton that at this point we are in the process of locating a tutor and if one is not located before the 10th day of his suspension his tutoring would be retroactive.

### Meeting with Mr. Pinkard
I asked Mr. Shelton to come in on 11/28/2006 to meet with Mr. Pinkard.

**EXHIBIT**

MAPCS - 16

104

# *Parent Meeting*

| | |
|---|---|
| STUDENT'S NAME: D███ S██████ | Grade: <u>11th</u> |

**Meeting Date: <u>November 28, 2006</u>**

## Meeting Attendance
1.  Michael Luseni, Director of Special Education Services
2.  Gene Pinkard, Principal.
3.  Derrick Shelton Sr.

## Concerns
*   Appeal for a lesser consequence

## Meeting Notes

Mr. Shelton and I met with Mr. Pinkard on 11/28/2006. Mr. Shelton requested this meeting to appeal to Mr. Pinkard for a lesser consequence. Mr. Shelton stated "I am not trying to excuse D███████ behavior, but I would like Maya Angelo to consider another punishment."



EXHIBIT

MAPCS - 17

# JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| ----------------------------------- | e-mail: Admin@Jeblaw.biz | ------------------------------- |
| | | ! DC Bar Special Legal Consultant |
| | | + Admitted in Bolivia |

March 5, 2007

**Hand Delivery**
Office of General Counsel
District of Columbia Public Schools
825 North Capitol Street, NE, 9th Floor
Washington, DC 20002

Re:  Amended Five-Day Disclosure for D███ S████ / DOB: ░/░/88

Dear Counsel:

For the upcoming hearing scheduled for ████ ██ ████ at 3:00 p.m. or any subsequent hearing regarding this student and pursuant to 34 C.F.R. 300.509 (a)(3); Assistance to States for the Education of Children with Disabilities, 70 Fed. Reg. 35782, 35872 (June 21, 2005) (to be codified at 34 C.F.R. pt. 300); and D.C. Mun. Regs. tit. 5, § 3031.2 (2003), and in addition to any documents and witnesses that the District of Columbia Public Schools ("DCPS") may disclose, the parent may rely on the following documents and witnesses:

### Witnesses

1. Rachelle Bobo, Mother;
2. D███ S████, Student;
3. Corey Hamilton, Educational Advocate, or designee;
4. Melanie Cobb, Dean of Student Affairs, Maya Angelo PCS, or designee;
5. Yamileth Amaya, Paralegal or designee.

### Documents

DS-1  DCPS Hearing Date Notice 2/21/07;
DS-2  Notice to Appear with fax confirmations 1/25/07
DS-3  Amended Due Process Complaint 1/12/07;

Witnesses' names, addresses, and phone numbers:
1, 2, 3, and 5– James E. Brown & Associates, PLLC, 1220 L Street NW, Suite 700 Washington, DC 20005; 202-742-2000
4-Maya Angelo PCS, 1851 9th Street, N.W. Washington, D.C. 20001, 202-939-9080

2007 MAR -6 PM 3 54 DC PUBLIC SCHOOL SYSTEM

Page Two
Amended 5-Day Disclosure for D▆▆ S▆▆
March 5, 2007

DS-4     Scheduling Memorandum from DCPS 1/12/07;
DS-5     Maya's Angelou PCS's Motion to Dismiss 12/20/06;
DS-6     Order 12/22/06;
DS-7     Petitioner's Response to Motion to Dismiss 12/12/06;
DS-8     Due Process Complaint 12/12/06;
DS-9     Scheduling Memorandum from DCPS 12/12/06;
DS-10    Correspondence to Maya Angelou PCS from advocate 12/19/06;
DS-11    Correspondence to Maya Angelou PCS from attorney 12/4/06;
DS-12    Correspondence to Maya Angelou PCS from advocate 1/18/07;
DS-13    Correspondence to Maya Angelou PCS from attorney 2/8/07;
DS-14    Correspondence to Maya Angelou PCS from attorney 2/22/07
DS-15    Correspondence to Charter School's attorney 3/2/07;
DS-16    Correspondence to DCPS from attorney 2/6/07;
DS-17    Correspondence to parent from Maya Angelou PCS 11/22/06;
DS-18    Correspondence to parent from Maya Angelou PCS 9/14/07;
DS-19    Correspondence to parent from Maya Angelou PCS 12/19/06;
DS-20    Correspondence to parent from Maya Angelou PCS 12/12/06;
DS-21    Manifestation Determination 12/19/06;
DS-22    MAPCS Student Intern Weekly Evaluation Undated;
DS-23    Report Card (9/5/06)-(11/3/06);
DS-24    Office Referral 11/17/06;
DS-25    Notification of Multi-Disciplinary Team (MDT Meeting) 12/12/06;
DS-26    Vocational Assessment 11/5/04;
DS-27    Psycho-Educational Report 3/22/04;
DS-28    Individualized Educational Program & (IEP) Meeting Notes 3/26/04 3/26/04;
DS-29    (MDT) Meeting Notes 1/10/05;
DS-30    Correspondence to Charter School attorney 3/5/07.

* Witnesses may testify via telephone

Parent reserves the right to rely on any documents presented by DCPS that the parent deems relevant in this case.

Additionally, parent reserves the right to introduce any and all witnesses and/or documents for the purpose of impeachment and rebuttal.

If you should have any questions or wish to discuss any aspect of this case before the hearing, please contact me at (202) 742-2000.

Sincerely,

Roberta Gambale, Esq.

Attachments
cc: Sharon Newsome, Hearing Coordinator

107

# Exhibit 1



# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:    Parent (or Representative): *R. GAMBALE / T. ABDUS-SHAHID*    Fax No.: *742-2098*
(703) 739-2323

LEA Legal Counsel: *OGC*

RE:    S‑‑‑‑‑‑, D‑‑    and (LEA) DOB: *3/8/88*
       Student's Name

FROM:    **SHARON NEWSOME**
         Special Education Student Hearing Office Coordinator

DATE SENT: *2/21/07*

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
*1/12/07*. Please be advised that the hearing has been scheduled for:

DATE: *3/12/07*

TIME: *3:00 pm*

AT:    825 North Capitol Street, NE, Washington, DC
       8th Floor

ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made **exclusively** by the Hearing Officer, and cannot be made by SHO administrative staff. Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[X] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special Education Student Hearing Office.

109

# Exhibit 2

## J. IES E. BROWN & ASSOCIA. .S, PLLC

*A Professional Limited Liability Company*

.ies E. Brown
Jomiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

------------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

**January 25, 2007**

**Via Facsimile**
Office of General Counsel
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, DC 20002

Re: D█████ S█████
DOB: 3/8/88

Dear Counsel:

Please be advised that parent is requesting that the following Individual be available to testify at the Due Process Hearing Scheduled for February 8, 2007 at 1:00 p.m. Ms. Melanie Cobb, Dean of Student Affairs at Maya Angelou Public Charter School. In the event that she is not available, please contact this office immediately.

Please feel free to contact me should you have any questions or concerns. I may be reached at (202) 742-2021. I appreciate your assistance in this matter and look forward to hearing from you.

Sincerely,

Roberta Gambale, Esq.

Attachment: Motion to Compel

Cc: Maya Angelou PCS
File

111

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO              1971
CONNECTION TEL                    94425098
CONNECTION ID
ST. TIME             01/25 17:10
USAGE T              00'31
PGS. SENT               4
RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

--------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

-------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: January 25, 2007

TO:    Office of General Counsel, DCPS

PHONE:    202-442-5000

FAX NO:    202- 442-5098

FROM:    Yamileth Amaya, Paralegal

SUBJECT:    D██ S██████

DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 4

COMMENTS: Please find attached Correspondence regarding witnesses and the Motion to Compel Ms. Melanie Cobb, Dean of Student Affairs.

## JA ES E. BROWN & ASSOCIAT , PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

------------------------------------

------------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: January 25, 2007

TO:    Office of General Counsel, DCPS

PHONE:    202-442-5000

FAX NO:    202- 442-5098

FROM:    Yamileth Amaya, Paralegal

SUBJECT:    D█████ S██████

DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 4

COMMENTS: Please find attached Correspondence regarding witnesses and the Motion to Compel Ms. Melanie Cobb, Dean of Student Affairs.

113

Fax number: 202/442-5556

## STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the matter of: | § | BEFORE A SPECIAL EDUCATION |
| **D S** | § | |
| Petitioner | § | |
| | § | HEARING OFFICER |
| vs. | § | |
| **Maya Angelou Pcs** | § | |
| Respondent | § | DC PUBLIC SCHOOLS |

2007 JAN 26 AM 8:08
DC PUBLIC SCHOOL SYSTEM

## NOTICE TO APPEAR

To: **Melanie Cobb, Dean of Student Affairs**

This is to notify you that you are required to appear and under oath to give testimony as a witness at the Special Education Due Process Hearing in the above styled cause. The hearing is scheduled for:

Date: **February 8, 2007**

Time: **1:00 pm.**

Place:    Special Education Student Hearing Office
          825 North Capitol St., NE
          8th Floor
          Washington, DC 20002

This Notice to Appear is issued under the authority of the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(h)(2), 5 D.C.M.R. § 3031.1(b), and § 800.1(4), Student Hearing Office Standard Operating Procedures. Any party to a special education administrative hearing has the right to present evidence and compel the attendance of witnesses who have knowledge of relevant facts or whose opinions are important for reaching an appropriate disposition on the merits of this case.

The exact time of your testimony cannot be determined prior to the date of the hearing. Under the hearing rules please be advised that you might be excluded from the hearing room prior to your testimony. You are welcome to bring reading material or such other activities as you may need to pass the time while waiting.

Your appearance has been requested by:

Name:     **Roberta Gambale, Esq.**

Address:  **1220 L Street, N.W.**
          **Suite 700**
          **Washington, D.C. 20005**
                                        47

Standard Operating Procedures
Special Education Student Hearings and Appeals
Effective June 30, 2006

Phone: _(202) 742-202 1_

Signed this _25_ day of _January_, _2006_. 

ATTORNEY

SPECIAL EDUCATION HEARING OFFICER

## PROOF OF SERVICE

This will certify that a true and correct copy of this Notice to Appear was served on:

Name of witness: _Melanie Cobb, Dean of Student Affairs_

Date: _February 8, 2007_

Time: _1:00 p.m._

Manner of Service:

_____ Certified mail, return receipt requested

_✓_ Fax transmission

_____ Hand delivery

By: _Yamileth Amaya_
(Person executing service)

Date: _1/25/07_

48

Standard Operating Procedures
Special Education Student Hearings and Appeals
Effective June 30, 2006

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

------------------------

! DC Bar Special Legal Consultant
+ Admitted In Bolivia

# *FAX COVER SHEET*

DATE:      January 25, 2007

TO:        Sharon Newsome, Student Hearing Coordinator, Student Hearing Office

PHONE:     202-442-4800

FAX NO:    202-442-5556

FROM:      Yamileth Amaya, Paralegal

Subject:   D██████ S██████
DOB:       3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 4

COMMENTS: Please find attached motion to Compel Ms. Melanie Cobb, Dean of Student

Affairs and correspondence regarding witnesses.

116

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO             2072
CONNECTION TEL                      99399084
CONNECTION ID
ST. TIME             01/30 16:29
USAGE T              00'51
PGS. SENT            3
RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

-------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: January 30, 2007

TO:    Melanie Cobb, Dean of Student Affairs,
       Maya Angelou Public Charter School

PHONE NO: (202) 939-9080

FAX NO: (202) 939-9084

FROM: Yamileth Amaya, Paralegal

SUBJECT:  D███ S███████
DOB:      3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 3

COMMENTS: Please find attached Motion to Compel signed by Hearing Officer.

117

## JA. ES E. BROWN & ASSOCIAT. J, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

---------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:  January 30, 2007

TO:    Melanie Cobb, Dean of Student Affairs,
       Maya Angelou Public Charter School

PHONE NO: (202) 939-9080

FAX NO: (202) 939-9084

FROM: Yamileth Amaya, Paralegal

SUBJECT:  D█████ S█████
DOB:      3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET:  3

COMMENTS:  Please find attached Motion to Compel signed by Hearing Officer.

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for
the exclusive use of the addressee(s) and may contain confidential or privileged information.  If you are not
the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000,
and destroy all copies of this message and any attachments.

```
                    *********************
                *** TX REPORT ***
                    *********************

        TRANSMISSION OK

        TX/RX NO            2077
        CONNECTION TEL              97037392323
        CONNECTION ID
        ST. TIME            01/30 16:52
        USAGE T             00'28
        PGS. SENT           3
        RESULT              OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: January 30, 2007

TO: Paul Dalton, Es. Dalton, Dalton & Houston, P.C

PHONE NO: (703) 739-4300

FAX NO: (703) 739-2323

FROM: Yamileth Amaya, Paralegal for Roberta Gambale, Esq.

SUBJECT: D██████ S██████
DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: **3**

COMMENTS: Please find attached Motion to Compel signed by Hearing Officer.

119

## JA. .ES E. BROWN & ASSOCIATL J, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

----------------------------------

----------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:  January 30, 2007

TO:     Paul Dalton, Es. Dalton, Dalton & Houston, P.C

PHONE NO: (703) 739-4300

FAX NO: (703) 739-2323

FROM: Yamileth Amaya, Paralegal for Roberta Gambale, Esq.

SUBJECT:  D███ S█████
DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: **3**

COMMENTS:  Please find attached Motion to Compel signed by Hearing Officer.

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information.  If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

120

# JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

**January 25, 2007**

<u>Via Facsimile</u>
Office of General Counsel
District of Columbia Public Schools
825 North Capitol Street, NE, 8th Floor
Washington, DC 20002

Re: D███S████
DOB: 3/8/88

Dear Counsel:

Please be advised that parent is requesting that the following individual be available to testify at the Due Process Hearing Scheduled for February 8, 2007 at 1:00 p.m. Ms. Melanie Cobb, Dean of Student Affairs at Maya Angelou Public Charter School. In the event that she is not available, please contact this office immediately.

Please feel free to contact me should you have any questions or concerns. I may be reached at (202) 742-2021. I appreciate your assistance in this matter and look forward to hearing from you.

Sincerely,

Roberta Gambale, Esq.

Attachment: Motion to Compel

Cc: Maya Angelou PCS
    File

121

**Fax number: 202/442-5556**

## STATE EDUCATION AGENCY
### DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the matter of: | § | BEFORE A SPECIAL EDUCATION |
| ▆▆▆ S▆▆▆ | § | |
| *Petitioner* | § | |
| | § | **HEARING OFFICER** |
| vs. | § | |
| Maya Angelov PCS | § | |
| *Respondent* | § | DC PUBLIC SCHOOLS |

### <u>NOTICE TO APPEAR</u>

To:  Melanie Cobb, Dean of Student Affairs

   This is to notify you that you are required to appear and under oath to give testimony as a witness at the Special Education Due Process Hearing in the above styled cause. The hearing is scheduled for:

**Date:**  February 8, 2007

**Time:**  1:00 pm.

**Place:**  Special Education Student Hearing Office
825 North Capitol St., NE
8th Floor
Washington, DC 20002

   This Notice to Appear is issued under the authority of the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(h)(2), 5 D.C.M.R. § 3031.1(b), and § 800.1(4), Student Hearing Office Standard Operating Procedures. Any party to a special education administrative hearing has the right to present evidence and compel the attendance of witnesses who have knowledge of relevant facts or whose opinions are important for reaching an appropriate disposition on the merits of this case.

   The exact time of your testimony cannot be determined prior to the date of the hearing. Under the hearing rules please be advised that you might be excluded from the hearing room prior to your testimony. You are welcome to bring reading material or such other activities as you may need to pass the time while waiting.

Your appearance has been requested by:

**Name:**  Roberta Gambale, Esq.

**Address:**  1220 L Street, N.W.
   Suite 700
   Washington, D.C. 20005

47

Standard Operating Procedures
Special Education Student Hearings and Appeals
Effective June 30, 2006

122

Phone: _(202) 742-2021_

Signed this __25__ day of __January__, 2006.

_____
ATTORNEY

_____
SPECIAL EDUCATION HEARING OFFICER

## PROOF OF SERVICE

This will certify that a true and correct copy of this Notice to Appear was served on:

Name of witness: __Melanie Cobb, Dean of Student Affairs__

Date: __February 8, 2007__

Time: __1:00 p.m.__

Manner of Service:

_____ Certified mail, return receipt requested

__✓__ Fax transmission

_____ Hand delivery

By: __Yamileth Amaya__
(Person executing service)

Date: __1/25/07__

48

123

```
**********************
***   TX REPORT   ***
**********************


TRANSMISSION OK

TX/RX NO            1972
CONNECTION TEL                  94425556
CONNECTION ID
ST. TIME           01/25 17:11
USAGE T            00'28
PGS. SENT              4
RESULT             OK
```

# JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

----------------------------

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

-----------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:      January 25, 2007

TO:        Sharon Newsome, Student Hearing Coordinator, Student Hearing Office

PHONE:     202-442-4800

FAX NO:    202-442-5556

FROM:      Yamileth Amaya, Paralegal

Subject:   D▮▮▮ S▮▮▮▮
DOB:       3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 4

COMMENTS: Please find attached motion to Compel Ms. Melanie Cobb, Dean of Student

Affairs and correspondence regarding witnesses.

```
        ********************
   ***    TX REPORT    ***
        ********************

   TRANSMISSION OK

   TX/RX NO            1973
   CONNECTION TEL                    99399084
   CONNECTION ID
   ST. TIME            01/25 17:12
   USAGE T             01'04
   PGS. SENT           4
   RESULT              OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

---

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:  January 25, 2007

TO:   Melanie Cobb, Dean of Student Affairs,
       Maya Angelou Public Charter School

PHONE NO: (202) 939-9080

FAX NO: (202) 939-9084

FROM: Yamileth Amaya, Paralegal

SUBJECT:  D█████ S████
DOB:     3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET:  4

COMMENTS:  Please find attached Motion to Compel and Correspondence.

## JA. ES E. BROWN & ASSOCIATI , PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

-----------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:    January 25, 2007

TO:    Sharon Newsome, Student Hearing Coordinator, Student Hearing Office

PHONE:    202-442-4800

FAX NO:    202-442-5556

FROM:    Yamileth Amaya, Paralegal

Subject:    D█████ S█████.
DOB:    3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 4

COMMENTS:  Please find attached motion to Compel Ms. Melanie Cobb, Dean of Student

Affairs and correspondence regarding witnesses.

126

## JA. .ES E. BROWN & ASSOCIATL ., PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

------------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:  January 25, 2007

TO:    Melanie Cobb, Dean of Student Affairs,
       Maya Angelou Public Charter School

PHONE NO: (202) 939-9080

FAX NO: (202) 939-9084

FROM: Yamileth Amaya, Paralegal

SUBJECT:  D███ S███
DOB:      3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 4

COMMENTS:  Please find attached Motion to Compel and Correspondence.

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for
the exclusive use of the addressee(s) and may contain confidential or privileged information.  If you are not
the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000,
and destroy all copies of this message and any attachments.

# Exhibit 3

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID)*
*Special Education Programs*



### *Amended Due Process Complaint Notice*

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals wit**
- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office for the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

A.   **INFORMATION ABOUT THE STUDENT:**

Name of the Student: D███S████    Date of Birth: **3/8/88**
Address: **125 Franklin Street , N.E.  # M13  Washington, DC 20002**
Home School: **Maya Angelou School**
Present School of Attendance: **Same**

  Is this a charter school? Yes      (If yes, you must also provide a copy of this
                                    notice to the charter school principal or director)

129

Parent/Guardian of the S\_\_\_ent  **The student has attained the ag\_ \_f 18 and is his own guardian.**[1]

Address (if different from the student's above): <u>same</u>

**B.**  **Legal Representative/Attorney:**

Name: <u>Roberta L. Gambale, Esq. ( James Brown and Associates, PLLC)</u>
Address: <u>1220 "L" Street, Suite 700, Washington, DC 20005</u>
Phone: (w) <u>(202)742-2000 (ext. 2021)</u> (Fax) <u>(202) 742-2098</u>    (e-mail)
<u>Rgambale@jeblaw.biz</u>
Will attorney / legal representative attend the resolution session?  **X** Yes        ☐ No

**C.**  **Complaint Made Against (check all that apply):**

**X**  Maya Angelou Public Charter School ("MAPCS")
**X**  District of Columbia Public Schools ("DCPS")

**D.**  **Resolution Session Meeting Between Parent/Representative and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint. I also understand that I may voluntarily waive this right if I choose. (Note: All parties must agree to waive the resolution meeting to avoid having this meeting.)

The parent, by and through counsel, wishes to waive the Resolution Session Meeting for this process.

**E.**  **Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

**I am requesting an administrative due process hearing <u>only</u>.**

**F.**  **Facts and Reasons for the Complaint:**

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions (attach additional pages if needed):

**I. Nature of the problem.**
### RELEVANT FACTS

1.  D\_\_\_S\_\_\_, ( hereinafter "D.S..") is an 11th grade learning disabled student who last attended Maya Angelou Public Charter High School where he was in the 11th grade.

---

[1] The student resides with his parents, Rachelle Bobo, mother and Derrick Shelton Sr., father. The student has retained counsel to proceed with this action on his own behalf.

2

2.   According to tl.  student's Individualized Educational  ₒgram ("IEP") he should be receiving fifteen (15) hours of instruction and thirty (30) minutes of counseling per week.

3.   On or about November 22, 2006, D.S. was suspended with the intent to expel as a result of an incident wherein he assaulted a fellow student.

4.   A Manifestation Determination Review meeting was never held to address the relationship between the student's disability and the incident despite the express request of the parent that such a meeting be held as soon as possible.

5.   Despite repeated requests from the parent on both the day of incident and/or the next school day following the incident when the father accompanied D.S. to school and spoke with both principal and the special education coordinator, Mr. Luseni,  the parent was not provided with a copy of the incident report.

6.   Though the student has been out of school for more than ten (10) days arrangements have not been made to ensure that this student continues to receive a free and appropriate public education (FAPE). He has been given no class work to take home. He has been given no access to parallel instruction.  He has not been provided with related services.

7.   The parent went to the school on or about November 27, 2006 for the purpose of obtaining records and/or picking up class work for his son.

8.   An MDT meeting has yet to be  convened to address the incident, discuss the need for a change of placement, and/or address behavior interventions that might be warranted for this student.

9.   To the best of the parent's knowledge, MAPCS, has never sent written notice to DCPS so as to advise them that they are not able to meet this student's individualized needs.

10. Though D.S. is identified as a learning disabled student, he has had difficulties with behavior and self esteem and depression since the time of his initial evaluations and receives counseling as a related service.  In the past, evaluators have found that the student's frustration, self esteem issues stem from depression around school failure. *(See – psychological evaluation pg 3)*

## ISSUES/ARGUMENTS

## 1.    MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO SCHEDULE A MANIFESTATION DETERMINATION REVIEW MEETING

District of Columbia Public Schools ("DCPS") suspended this student for more than ten (10) days and failed to comply with procedural safeguards involving discipline and suspensions of students suspected of having a disability by failing to convene a

3

SEID DPCN Rev'd. 7/01/05

manifestation de\_\_ \_ination review meeting to discuss the \_\_\_ationship between the incident and the students disability.

Because a suspension of more than ten (10) days has been determined to constitute a change of placement, within ten(10) days of such a suspension, the public agency is required to convene a meeting to determine whether or not the student's disability caused the behavior which violated the code of conduct for which the student is being suspended. See 20 U.S.C. Section 1412(a)(1)(A).

A suspension of a student for more than ten (10) days as a result of the violation of student conduct code is considered to be an impermissible "change of placement" unless the local education agency convenes a meeting within ten (10) days to address the nexus between the behavior warranting the suspension and the student's disability and/or suspected disability. The team must determine whether the behavior is a manifestation of his disability and if so they are not permitted to suspend.[2] Even where the school determines that the behavior was not a manifestation of the disability, the school still has an obligation to provide the child with a Free and Appropriate Public Education ("FAPE") even if the violation involves the violation of a code of conduct and/or possession of a weapon. See: 20 U.S.C. Section 1412(a)(1)(A)

In the instant matter, it is clear DCPS failed to comply with the requirements of the statute. A manifestation was never held within the requisite time frame despite the parent's request.

Though the student is identified as a learning disabled student, there is a history of behavior concerns at school and depression linked to school failure. Parent is concerned that current behavior exhibiting is the direct result over continued academic frustrations and grade placement issues.

## 2.    MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO CONDUCT A FUNCTIONAL BEHAVIORAL ASSESSMENT AND/OR IMPLEMENT A BEHAVIOR PLAN

<u>A Functional Behavioral Assessment and Behavior Plan should have been developed for this student</u>

Upon the suspension of a student with a disability, the Individualized Educational Team ("IEP") team is required to conduct a Functional Behavioral Assessment and implement a Behavior Plan for the student as soon as possible following the incident. If a behavior plan is already in place, the school is required to modify that plan to address behavior as necessary and thereby prevent reoccurrence. See: 20 U.S.C. Section 1415(k)(1)(g). If a behavior plan is not in place then the MDT is required to discuss behavior strategies.

---

[2] It should be noted that even where the behavior is determined to not be a manifestation, the public agency still must continue to provide the student a Free and Appropriate Public Education ("FAPE")

4

MAPCS failed to reconvene the IEP team to discuss behavior and/or failed conduct a Functional Behavioral Assessment and/or develop a Behavior Plan for this student. Parent is concerned that the student's emotional needs are not being fully met and that acting out behavior is the result of frustration over academics.   As a result, this student has been denied a  Free and Appropriate Public Education ("FAPE").

3.    **MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO ENSURE THAT THE STUDENT CONTINUED TO RECEIVE A FREE AND APPROPRIATE PUBLIC EDUCATION**

Irregardless of whether the student's behavior was a manifestation of his disability or not, the public education still has an obligation to ensure that a Free and Appropriate Public Education is provided to disabled students irregardless of the severity of the action for which they are being suspended.  See: 20 U.S.C. Section 1415(k)(1)(g) so that the child can participate in the general education curriculum, make progress on IEP goals and receive the services needed to ensure behavior doesn't' repeat it self.

The obligation is to ensure that a "Free and Appropriate Public Education is available to all children with a disabilities residing within the State between the ages of 3 and 21"

Not only did MAPCS fail to ensure this student continued to receive a FAPE to ensure that he didn't fall behind in his classes, they failed to give the student any homework to do during the suspension period despite the fact that the father went to the school to pick up homework for his son to complete.  IN the event that MAPCS could not continue to provide FAPE to D.S. an alternate placement should have been located.  However, MAPCS failed to undertake the appropriate steps to ensure that this student had an alternate educational placement during the suspension period. Such an undertaking would require that the MDT be convened as the decision to place a child in an alternate interim educational setting must be made by the MDT team not by school administration acting on its own.  I

 MAPCS failed to reconvene the IEP team to discuss behavior and/or failed conduct a Functional Behavioral Assessment and/or develop a Behavior Plan for this student. Since that time, this student has  been feeling discouraged, frustrated and parent is concerned that frustration is impacting his motivation to attend school.  In the event that MAPCS could not meet this student's needs, District of Columbia Public Schools ("DCPS") should have been notified in writing. 30 DCMR Section 30019 and *Gadsby v. Grasmick, 109 F.3d 940, 952-953 (4th Cir. 1997)* requires that the LEA notify the SEA when it cannot provide services to the student.

As a result, this student has been denied a  Free and Appropriate Public Education ("FAPE").

5

II. **Issues presented.**

1. MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO SCHEDULE A MANIFESTATION DETERMINATION REVIEW MEETING IN A TIMELY MANNER?

2. MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO  CONDUCT A FUNCTIONAL BEHAVIORAL ASSESSMENT AND/OR IMPLEMENT A BEHAVIOR PLAN.

3. MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO ENSURE THAT THE STUDENT CONTINUED TO RECEIVE A FREE AND APPROPRIATE PUBLIC EDUCATION  AFTER HIS SUSPENSION EXCEEDED THE DAYS.

4. MAYA ANGELOU PUBLIC CHARTER SCHOOL HAS FAILED TO PROVIDE THIS STUDENT WITH A FAPE.

III. **To the extent known to you at this time, how can this problem be resolved?**

WHEREFORE, the guardian, by and through counsel, requests the following relief:

1. A finding that  D.S.  has been denied  a FAPE by  Maya Angelou Public Charter School ;

2. The student shall be immediately allowed to return to Maya Angelou Public Charter School;

3. The student shall b provided with individualized tutoring to assist the student in making up any class work that missed during the suspension period;

4. A functional behavioral assessment and clinical evaluation shall be conducted for this student;

5. That upon completion of the evaluations the MDT shall convene   to review completed evaluations, to revise the student's program, discuss placement, discuss compensatory education, and issue a Notice of Placement to a suitable program with parent participation;

6. Parent reserves the right to address compensatory education and request that compensatory education plan that addresses the individual needs of this student and remediation for denials of FAPE be drafted that includes but is not limited to individualized tutoring, make up services, and/or counseling;

6

7.  That at the a.   : mentioned meeting, MAPCS shall se. ..re the participation of all necessary IEP team members to include but not limited to the appropriate personnel required to review assessments and develop an appropriate program for this child;

8.  In the event that MAPCS determines that they cannot meet this student's needs, MAPCS shall promptly notify DCPS in writing with copies to be provided to the parent;

9.  That MAPCS agrees to pay counsel for the parent's reasonable attorney's fees in an amount not to exceed Four Thousand Dollars and Zero Cents ($4,000.00), as full payment of attorneys' fees and related costs incurred in the matter;

10. All meetings shall be scheduled through counsel for the parent, Roberta L. Gambale, Esq., in writing, via facsimile, at 202-742-2097 or 202-742-2098;

11. Provide the student with a due process hearing within 20 calendar days of a request on any issue arising out of the noncompliance with the MAPCS' obligation hereunder, or any disagreement with the assessment, programming or placement the parent may have;

12. Provide counsel for the parent with copies, pursuant to 5 DCMR 3021.8, of all evaluation reports and all educational records on the student no later than sixteen (16) business hours prior to the convening of any meeting;

13. MAPCS shall ensure that this student has available a Free and Appropriate Public Education including special education, transportation (5 DCMR 3000.3), and Other related services as are defined at 34 C.F.R. 300.24, designed to meet this student's unique needs and preparation for employment and independent living;

14. MAPCS within ten (10) calendar days of the filing of this complaint, pursuant to 20 U.S.C. 1415(b)(7),[3] provide the parent's representative, Roberta L. Gambale, Esq., via facsimile, at 202-742-2097 or 202-742-2098, the following:  i) an explanation of why DCPS proposed or refused to take the action raised in the complaint; ii) a description of other options that the IEP team considered and the reasons why those options were rejected, iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and iv) a description of the other factors that are relevant to the agency's proposed or refused action;

15. MAPCS in the event they fail to answer/respond to the issues alleged in the parent's administrative due process hearing complaint, within ten (10) calendar days, the arguments and facts as averred by the guardian will be deemed true and accurate and act as a waiver, on the part of MAPCS for their desire to have a Resolution Session Meeting, and the guardian's administrative due process hearing will be scheduled pursuant to the applicable timelines contained in the IDEIA;

---

[3] 300.508(e)

7

16. That MAPC. within fifteen (15) calendar days ⌄. receiving the parent's complaint, pursuant to 20 U.S.C. 1415(c)(2)[4] respond to the parent's request alleging any insufficiency of notice.

17. That MAPCS failure to comply with the Individuals with Disabilities Education Improvement Act of 2004 and allege any insufficiency of the administrative due process complaint, will constitute waiver on the part of MAPCS to make such argument at any later date and time.

18. That MAPCS, pursuant to 20 U.S.C. 1415(f)(1)(B)[5] within fifteen (15) calendar days of receiving the parent's administrative due process complaint, shall contact the parent's representative, in writing, via facsimile, at 202-742-2097 or 202-742-2098, to schedule and convene a Resolution Session Meeting;

19. That MAPCS convene the Resolution Session Meeting, with the parent, the parent's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the child and the facts contained in the complaint. That the relevant members of the MDT/IEP Team that shall be present at the Resolution Session Meeting for the student shall include the following persons: 1) the student's special education teacher, 2) the student's regular education teacher, if applicable, 3) a representative of the local education agency with decision making authority, 4) a person who can interpret the data, 5) any person(s) who conducted any assessments on the student and/or would be qualified to conduct the evaluations requested in the parent's complaint.

20. That MAPCS failure to timely schedule and convene the Resolution Session Meeting within the timeframe identified in 20 U.S.C. !415(f)(1)(B) constitute joint waiver between MAPCS and the guardian to have such meeting and the forty-five (45) days timeline to schedule the student's administrative due process hearing and receive a timely decision will begin to run upon written notice, via facsimile, at 202-442-5556, to the DCPS Office of Student Hearings, by the parent's counsel; and

21. A finding that the parent is the prevailing party in this action.

**Accommodations and Assistance Needed:**

- N/A

Dated this 12th Day of January, 2007

Roberta L. Gambale, Esq.,
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2021

---

[4] 300.508(d)
[5] 300.510

8

Counsel for the Parent.

**Mail, fax or deliver this complaint notices to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC  20002**
**Fax number: 202/442-5556**

9

01/12/2007 13:36 FAX 2027422098          James E Brown & Assoc.                    ☒001

```
                    *********************
                    ***   TX REPORT   ***
                    *********************


      TRANSMISSION OK

      TX/RX NO                1295
      RECIPIENT ADDRESS       97037392323
      DESTINATION ID
      ST. TIME                01/12 13:34
      TIME USE                01'37
      PAGES SENT              10
      RESULT                  OK
```

# JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine |
| ------------------------------- | e-mail: Admin@Jeblaw.biz | ------------------------------- |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

DATE:           **January 12, 2007**

TO:             **Dalton, Dalton, & Houston, P.C.**

FAX NO.:        **(703)739-4300**

FROM:           **Roberta L. Gambale, Esq.**

SUBJECT:        **Amended Due Process Complaint- D▓▓ S▓▓▓**

NUMBER OF PAGES INCLUDING COVER SHEET:

COMMENTS:

# JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

----------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine

----------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

DATE:          **January 12, 2007**

TO:             **Dalton, Dalton, & Houston, P.C.**

FAX NO.:       **(703)739-4300**

FROM:          **Roberta L. Gambale, Esq.**

SUBJECT:       **Amended Due Process Complaint- D██████ S███████**

NUMBER OF PAGES INCLUDING COVER SHEET:

COMMENTS:

The attached information is **CONFIDENTIAL** and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

139

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO                1293
RECIPIENT ADDRESS       94425556
DESTINATION ID
ST. TIME                01/12 12:53
TIME USE                01'33
PAGES SENT              10
RESULT                  OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine |
| | e-mail: Admin@Jeblaw.biz | |

----------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

**DATE:**          **January 12, 2007**

**TO:**            **Ms. Sharon Newsom  DCPS Student Hearing Coordinator**

**FAX NO.:**       **(202)442-5556**

**FROM:**          **Roberta L. Gambale, Esq.**

**SUBJECT:**       **Amended Due Process Complaint, D███S███, DOB: 3/8/88**

NUMBER OF PAGES INCLUDING COVER SHEET:

**COMMENTS:**   *Please find attached a copy of the amended complaint and order authorizing the amendment issued by Hearing Officer Smith, Esq.*

140

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown                  Attorneys at Law                  Juan J. Fernandez!+
Domiento C.R. Hill              1220 L Street, NW                 Tilman L. Gerald
Roberta Gambale                 Suite 700                         John A. Straus
Miguel A. Hull                  Washington, DC 20005              Roxanne D. Neloms
Christopher L. West             Telephone: (202) 742-2000         Omar Karram
                                Facsimile: (202) 742-2098         Christie Fontaine
-----------------------------------   e-mail: Admin@Jeblaw.biz
                                                                  -------------------------------
                                                                  ! DC Bar Special Legal Consultant
                                                                  + Admitted in Bolivia

# FAX COVER SHEET

**DATE:**          **January 12, 2007**

**TO:**            **Ms. Sharon Newsom  DCPS Student Hearing Coordinator**

**FAX NO.:**       **(202)442-5556**

**FROM:**          **Roberta L. Gambale, Esq.**

**SUBJECT:**       **Amended Due Process Complaint, D⬛S⬛ DOB: 3/8/88**

NUMBER OF PAGES INCLUDING COVER SHEET:

**COMMENTS:**      *Please find attached a copy of the amended complaint and order authorizing the amendment issued by Hearing Officer Smith, Esq.*

The attached information is **CONFIDENTIAL** and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

141

# Exhibit 4

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556



# Fax

# Time Sensitive Materials Attached

### Prompt Attention: Attorney:Roberta Gambale, Esq.
### Parent:

Telephone Number: **(202) 742-2000**          Pages: 3
Fax Number: **(202) 742-2098**          Date: **January 12, 2007**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student:  D█████ S█████
School:  **Attending Maya Angelo School**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office. If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556. Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

                                    **Thank You**
                                    **Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that is legally
privileged. The information is intended only for use of the individual or entity named Above, if you are not the
intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in
reliance of the contents of this copied information is Strictly prohibited. If you receive this telecopy in error, please
immediately notify us by telephone For return of the original document to us.

# STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| S⬛⬛, D.     Petitioner | ) | |
| | ) | HEARING OFFICER |
|      Vs. | ) | |
| | ) | |
| **DCPS** | ) | |
| **Attending Maya Angelo PCS** | ) | DISTRICT OF COLUMBIA |
| | | |
|     Respondent | ) | PUBLIC SCHOOLS |

# SCHEDULING MEMORANDUM

1. A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **<u>The Student Hearing Office does not schedule or participate in resolution meetings</u>**.

2. The complaint notice was filed on **January 12, 2007**

3. The deadline for the resolution meeting is **January 27, 2007** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A. ***Prior Written Notice Not Issued by the Local Educational Agency***. If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

1. An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
2. A description of other options that the IEP Team considered and the reasons why those options were rejected;
3. A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and
4. A description of the factors that is relevant to the agency's proposal or refusal.

Rev'd. 7/6/05

144

B.    Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **January 22, 2007**.

C.    ***Deficiency Notice***.  A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

    D.    The deadline for filing a deficiency notice is **January 27, 2007**.

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence. A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice. The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law. The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Rev'd. 7/6/05

# Exhibit 5

### STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
### STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
### SPECIAL EDUCATION PROGRAMS

| | |
|---|---|
| Rachelle Bobo, on behalf of )<br>D████ S██████, DOB: 3/8/88  )<br>  )<br>v.   )<br>  )<br>District of Columbia Public Schools ("DCPS")  )<br>  )<br>and   )<br>  )<br>Maya Angelou Public Charter School ("MAPCS")  )<br>  ) | **Chief Hearing Officer David Smith** |

### <u>MAYA ANGELOU PCS'S MOTION TO DISMISS</u>

COMES NOW, MAPCS, by and through counsel, and hereby submits this Motion to

Dismiss.  The complaint omits important information regarding who is the petitioner bringing

this complaint.  The due process complaint notice lacks specificity regarding who the actual

complainant is.  Thus, MAPCS respectfully requests that the complaint be deemed deficient and

dismissed with prejudice.


DATE:        December 20, 2006                    Respectfully Submitted,

*Jessica M. Smith*

Jessica M. Smith, Esq.
Counsel for MAPCS
Dalton, Dalton, & Houston, P.C.
1008 Pendleton Street
Alexandria, Virginia 22314
703-739-4300
703-642-2323 – fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document was filed with the Student Hearing Office at fax 202-442-5556, and served on counsel for the parent, Roberta Gambale, Esq., at fax 202-742-2098 and the Office of General Counsel at fax 202-442-5098/5097 on this 20th day of December, 2006.

Jessica M. Smith, Esq.
Counsel for MAPCS

# FAX TRANSMISSION COVER SHEET
## Dalton, Dalton & Houston P.C.
### Attorneys at Law
1008 Pendleton Street
Alexandria, Virginia 22314-1837
(703) 739-4300
FAX (703)739-2323

**DATE:**     December 20, 2006

**TO:**     Roberta Gambale, Esq.

**AT FAX:**     202-742-2098 / 2097

**FROM:**     Jessica M. Smith, Esq.

**RE:**     D▮▮ S▮▮ v DCPS & MAPCS

**NUMBER OF PAGES INCLUDING THIS PAGE:**     7

**COMMENTS:**

MAPCS's Answer & Motion to Dismiss

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

149

# Exhibit 6

# District of Columbia Public Schools
## *State Enforcement Investigative Division*
# STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
FAX: (202) 442-5556



## *FACSIMILE SHEET*

Date:  December 22, 2006

TO:  Roberta Gambale

FROM:  STUDENT HEARING OFFICE

RE:  S██████, D██████

TOTAL NUMBER OF PAGES, INCLUDING COVER: 2

COMMENTS:

***CONFIDENTIALITY NTOICE:*** The information accompanying this facsimile is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the content of this telecopied information is strictly prohibited.

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                              )          BEFORE A SPECIAL EDUCATION
                                               )
D███ S███     (3-8-88)                          )          INDEPENDENT HEARING OFFICER
              *Petitioner*                      )
         Vs.                                    )
DCPS & Maya Angelou PCS                          )          STATE EDUCATION AGENCY
              *Respondent*

ON THIS DAY came on to be heard Respondent's Motion to Dismiss and Petitioner's Opposition filed in the above styled cause.

Respondent filed its Motion contending that the Complaint lacked specificity regarding the identification of the actual Complainant. Petitioner responded by stating that the Complainant is the student who attained the age of 18, but was still residing in his parent's household as a dependent.

It is noted that the Complainant in Section D, with regard to the holding of the Resolution Session, the Complainant states "The parent, by and through counsel, wishes to waive the Resolution Session Meeting for this process."

Accordingly, in view of the student's age, the Complainant does not clearly identify the Complainant.

## ORDER

After reviewing the evidence, the Motion is **GRANTED; however, the Complaint may be amended by the student. All applicable timelines will begin upon the filing of an amended complaint.**

SIGNED: this date 12-21-06

Impartial Special Education Hearing Officer

Issue Date: 12/22/06

Original to SHO – Student's File
Copy To:       Parent' - C/O:          Roberta Gambale
               DCPS - C/O:            OGC
               Charter School - C/O:   Jessica M. Smith

# Exhibit 7

STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS

| | | |
|---|---|---|
| In re:   `     D███ S███ | ) | |
| (DOB: 3/8/88) | ) | **Petitioner's Response** |
| | ) | **To Motion to Dismiss** |
| | ) | |
| Attending School:   Maya Angelou PCS | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| District of Columbia Public Schools | ) | |
| 825 North Capitol, Street, NE Sixth Floor | ) | |
| Washington, DC 20002 | ) | |
| | ) | |

## Petitioner's Response to Motion to Dismiss

**COMES NOW**, Rachelle Bobo ( hereinafter "complainant") by and through his attorney, the Law Office of James E. Brown & Associates, PLLC (hereinafter "counsel") and responds to the Motion to Dismiss as follows:

Maya Angelou PCS's motion is based on allegations that the Complaint lacks specificity regarding who the actual complainant is. This information is clearly specified in the Complaint on page one and page two. Student is named as D███ S███. His parent is Rachelle Bobo. The contact information is true and accurate. Such an allegation goes towards the sufficiency of the Complaint and would not support a Motion to Dismiss.

D███ has attained the age of 18 and has retained the services of counsel on his own behalf. However, his rights have never been transferred by the public agency and he continues to reside in his parent's household upon whom he is dependent for support.

**WHEREFORE**, the complainant, by and through counsel, hereby requests the following relief:

1. The Motion to Dismiss should be denied.

Roberta L. Gambale, Esq.,
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2021
Counsel for the Parent

### CERTIFCATE OF SERVICE

I, Roberta L. Gambale, Esq., hereby certify that a copy of the Parent's administrative due process complaint was served to the  Maya Angelou Public Charter School   via facsimile.

Roberta L. Gambale, Esq.

# Exhibit 8

*State Education Agency for the District of Columbia*
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



### *Due Process Complaint Notice*

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals wit**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office for the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting **(called a "Resolution Session")** with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings**.

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

A.  **INFORMATION ABOUT THE STUDENT:**

Name of the Student: D██████ S██████    Date of Birth: **3/8/88**
Address: **125 Franklin Street , N.E. # M13  Washington, DC 20002**
Home School: **Maya Angelou School**
Present School of Attendance:  **Same**

Is this a charter school? **Yes**    (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student:  **Rachelle Bobo**
Address (if different from the student's above): same

157

**B.**    **Legal Representative/Attorney:**

Name: **Roberta L. Gambale, Esq. ( James Brown and Associates, PLLC)**
Address: 1220 "L" Street, Suite 700, Washington, DC 20005
 Phone: (w) (202)742-2000 (ext. 2021) (Fax) (202) 742-2098    (e-mail)
Rgambale@jeblaw.biz
Will attorney / legal representative attend the resolution session?  **X** Yes        ☐ No

**C.**    **Complaint Made Against (check all that apply):**

**X** Maya Angelou Public Charter School ("MAPCS")
X District of Columbia Public Schools ("DCPS")

**D.**    **Resolution Session Meeting Between Parent/Representative and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint. I also
understand that I may voluntarily waive this right if I choose. (Note: All parties must agree
to waive the resolution meeting to avoid having this meeting.)

The parent, by and through counsel, wishes to waive the Resolution Session Meeting for this
process.

**E.**    **Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be
offered at no cost to the parent. Both parties can request mediation as an alternative to the
Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all
that apply:

**I am requesting an administrative due process hearing only.**

**F.**    **Facts and Reasons for the Complaint:**

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA),
please complete the following questions (attach additional pages if needed):

**I. Nature of the problem.**

## RELEVANT FACTS

1. D███ S███ ( hereinafter "D.S..") is a repeating 11th grade learning disabled
   student who last attended Maya Angelou Public Charter High School (hereinafter
   "MAPCS"). MAPCS is the school where he first repeated the 11th grade.

2. According to D.S.'s Individualized Educational Program ("IEP") he should be
   receiving fifteen (15) hours of instruction and thirty (30) minutes of counseling per
   week.

2

SEID DPCN Rev'd. 7/01/05

3. On or about No. ..ber 22, 2006, D.S. was suspended wi. ..e intent to expel him as a result of an incident wherein he assaulted a fellow student.

4. A Manifestation Determination Review meeting was never held to address the relationship between the student's disability and the incident despite the express request of the parent that such a meeting be held as soon as possible.

5. Despite repeated requests from the parent on both the day of incident and/or the next school day following the incident when the father accompanied D.S. to school and spoke with both principal and the special education coordinator, Mr. Luseni, the parent was not provided with a copy of the incident report.

6. Though the student has been out of school for more than ten (10) days arrangements have not been made to ensure that this student continues to receive a free and appropriate public education (FAPE). He has been given no class work to take home. He has been given no access to parallel instruction. He has not been provided with related services.

7. The parent went to the school on or about November 27, 2006 for the purpose of obtaining records and/or picking up class work for his son.

8. An MDT meeting has yet to be convened to address the incident, discuss the need for a change of placement, and/or address behavior interventions that might be warranted for this student.

9. To the best of the parent's knowledge, MAPCS has never sent written notice to DCPS so as to advise them that they are not able to meet this student's individualized needs.

10. Though D.S. is identified as a learning disabled student, he has had difficulties with behavior and self esteem and depression since the time of his initial evaluations and receives counseling as a related service. In the past, evaluators have found that the student's frustration, self esteem issues stem from depression around school failure. *(See – psychological evaluation pg 3)*

## ISSUES/ARGUMENTS

## 1.    MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO SCHEDULE A MANIFESTATION DETERMINATION REVIEW MEETING

District of Columbia Public Schools ("DCPS") suspended this student for more than ten (10) days and failed to comply with procedural safeguards involving discipline and suspensions of students suspected of having a disability by failing to convene a manifestation determination review meeting to discuss the relationship between the incident and the students disability.

Because a suspension of more than ten (10) days has been determined to constitute a change of placement, within ten(10) days of such a suspension, the public agency is

3

159

required to conve _ a meeting to determine whether or no. _ student's disability caused the behavior which violated the code of conduct for which the student is being suspended. See 20 U.S.C. Section 1412(a)(1)(A).

A suspension of a student for more than ten (10) days as a result of the violation of student conduct code is considered to be an impermissible "change of placement" unless the local education agency convenes a meeting within ten (10) days to address the nexus between the behavior warranting the suspension and the student's disability and/or suspected disability. The team must determine whether the behavior is a manifestation of his disability and if so they are not permitted to suspend.[1] Even where the school determines that the behavior was not a manifestation of the disability, the school still has an obligation to provide the child with a Free and Appropriate Public Education ("FAPE") even if the violation involves the violation of a code of conduct and/or possession of a weapon. See: 20 U.S.C. Section 1412(a)(1)(A)

In the instant matter, it is clear DCPS failed to comply with the requirements of the statute. A manifestation was never held within the requisite time frame despite the parent's request.

Though the student is identified as a learning disabled student, there is a history of behavior concerns at school and depression linked to school failure. Parent is concerned that current behavior exhibiting is the direct result over continued academic frustrations and grade placement issues.

## 2.    MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO  CONDUCT A FUNCTIONAL BEHAVIORAL ASSESSMENT AND/OR IMPLEMENT A BEHAVIOR PLAN

A Functional Behavioral Assessment and Behavior Plan should have been developed for this student

Upon the suspension of a student with a disability, the Individualized Educational Team ("IEP") team is required to conduct a Functional Behavioral Assessment and implement a Behavior Plan for the student as soon as possible following the incident. If a behavior plan is already in place, the school is required to modify that plan to address behavior as necessary and thereby prevent reoccurrence. See: 20 U.S.C. Section 1415(k)(1)(g). If a behavior plan is not in place then the MDT is required to discuss behavior strategies.

MAPCS failed to reconvene the IEP team to discuss behavior and/or failed conduct a Functional Behavioral Assessment and/or develop a Behavior Plan for this student. Parent is concerned that the student's emotional needs are not being fully met and that acting out behavior is the result of frustration over academics.   As a result, this student has been denied a Free and Appropriate Public Education ("FAPE").

---

[1] It should be noted that even where the behavior is determined to not be a manifestation, the public agency still must continue to provide the student a Free and Appropriate Public Education ("FAPE")

4

3.    **MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO ENSURE THAT THE STUDENT CONTINUED TO RECEIVE A FREE AND APPROPRIATE PUBLIC EDUCATION**

Irregardless of whether the student's behavior was a manifestation of his disability or not, the public education still has an obligation to ensure that a Free and Appropriate Public Education is provided to disabled students irregardless of the severity of the action for which they are being suspended. See: 20 U.S.C. Section 1415(k)(1)(g) so that the child can participate in the general education curriculum, make progress on IEP goals and receive the services needed to ensure behavior doesn't' repeat it self.

The obligation is to ensure that a "Free and Appropriate Public Education is available to all children with a disabilities residing within the State between the ages of 3 and 21"

Not only did MAPCS fail to ensure this student continued to receive a FAPE to ensure that he didn't fall behind in his classes, they failed to give the student any homework to do during the suspension period despite the fact that the father went to the school to pick up homework for his son to complete. IN the event that MAPCS could not continue to provide FAPE to D.S. an alternate placement should have been located. However, MAPCS failed to undertake the appropriate steps to ensure that this student had an alternate educational placement during the suspension period. Such an undertaking would require that the MDT be convened as the decision to place a child in an alternate interim educational setting must be made by the MDT team not by school administration acting on its own. I

MAPCS failed to reconvene the IEP team to discuss behavior and/or failed to conduct a Functional Behavioral Assessment and/or develop a Behavior Plan for this student. Since that time, this student has been feeling discouraged, frustrated and parent is concerned that frustration is impacting his motivation to attend school. In the event that MAPCS could not meet this student's needs, District of Columbia Public Schools ("DCPS") should have been notified in writing. 30 DCMR Section 30019 and 30019.9 and *Gadsby v. Grasmick, 109 F.3d 940, 952-953 (4th Cir. 1997)* requires that the LEA notify the SEA when it cannot provide services to the student.

As a result, this student has been denied a Free and Appropriate Public Education ("FAPE").

## II. Issues presented.

1.   MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO SCHEDULE A MANIFESTATION DETERMINATION REVIEW MEETING IN A TIMELY MANNER?

2.   MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO CONDUCT

5

161

A FUNCTIONA ⌐EHAVIORAL ASSESSMENT AND⌐  ⌐ IMPLEMENT A BEHAVIOR PLAN.

3. MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO ENSURE THAT THE STUDENT CONTINUED TO RECEIVE A FREE AND APPROPRIATE PUBLIC EDUCATION AFTER HIS SUSPENSION EXCEEDED THE DAYS.

4. MAYA ANGELOU PUBLIC CHARTER SCHOOL )"MAPCS") HAS FAILED TO PROVIDE THIS STUDENT WITH A FAPE.

III. **To the extent known to you at this time, how can this problem be resolved?**

**WHEREFORE**, the guardian, by and through counsel, requests the following relief:

1. A finding that D.S. has been denied a FAPE by Maya Angelou Public Charter School ;

2. The student shall be immediately allowed to return to Maya Angelou Public Charter School;

3. The student shall b provided with individualized tutoring to assist the student in making up any class work that missed during the suspension period;

4. A functional behavioral assessment and clinical evaluation shall be conducted for this student;

5. That upon completion of the evaluations the MDT shall convene to review completed evaluations, to revise the student's program, discuss placement, discuss compensatory education, and issue a Notice of Placement to a suitable program with parent participation;

6. Parent reserves the right to address compensatory education and request that compensatory education plan that addresses the individual needs of this student and remediation for denials of FAPE be drafted that includes but is not limited to individualized tutoring, make up services, and/or counseling;

7. That at the afore mentioned meeting, MAPCS shall secure the participation of all necessary IEP team members to include but not limited to the appropriate personnel required to review assessments and develop an appropriate program for this child;

8. In the event that MAPCS determines that they cannot meet this student's needs, MAPCS shall promptly notify DCPS in writing with copies to be provided to the parent;

9. That MAPCS agrees to pay counsel for the parent's reasonable attorney's fees in an amount not to exceed Four Thousand Dollars and Zero Cents ($4,000.00), as full payment of attorneys' fees and related costs incurred in the matter;

6

162

10. All meeting. ...all be scheduled through counsel ... the parent, Roberta L. Gambale, Esq., in writing, via facsimile, at 202-742-2097 or 202-742-2098;

11. Provide the student with a due process hearing within 20 calendar days of a request on any issue arising out of the noncompliance with the MAPCS' obligation hereunder, or any disagreement with the assessment, programming or placement the parent may have;

12. Provide counsel for the parent with copies, pursuant to 5 DCMR 3021.8, of all evaluation reports and all educational records on the student no later than sixteen (16) business hours prior to the convening of any meeting;

13. MAPCS shall ensure that this student has available a Free and Appropriate Public Education including special education, transportation (5 DCMR 3000.3), and Other related services as are defined at 34 C.F.R. 300.24, designed to meet this student's unique needs and preparation for employment and independent living;

14. MAPCS within ten (10) calendar days of the filing of this complaint, pursuant to 20 U.S.C. 1415(b)(7),[2] provide the parent's representative, Roberta L. Gambale, Esq., via facsimile, at 202-742-2097 or 202-742-2098, the following:  i) an explanation of why DCPS proposed or refused to take the action raised in the complaint; ii) a description of other options that the IEP team considered and the reasons why those options were rejected, iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and iv) a description of the other factors that are relevant to the agency's proposed or refused action;

15. MAPCS in the event they fail to answer/respond to the issues alleged in the parent's administrative due process hearing complaint, within ten (10) calendar days, the arguments and facts as averred by the guardian will be deemed true and accurate and act as a waiver, on the part of MAPCS for their desire to have a Resolution Session Meeting, and the guardian's administrative due process hearing will be scheduled pursuant to the applicable timelines contained in the IDEIA;

16. That MAPCS within fifteen (15) calendar days of receiving the parent's complaint, pursuant to 20 U.S.C. 1415(c)(2)[3] respond to the parent's request alleging any insufficiency of notice.

17. That MAPCS failure to comply with the Individuals with Disabilities Education Improvement Act of 2004  and allege any insufficiency of the administrative due process complaint, will constitute waiver on the part of MAPCS to make such argument at any later date and time.

18. That MAPCS, pursuant to 20 U.S.C. 1415(f)(1)(B)[4] within fifteen (15) calendar days of receiving the parent's administrative due process complaint, shall contact

---

[2] 300.508(e)
[3] 300.508(d)
[4] 300.510

7

the parent's representative, in writing, via facsimile, at 202-742-2097 or 202-742-2098, to schedule and convene a Resolution Session Meeting;

19. That MAPCS convene the Resolution Session Meeting, with the parent, the parent's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the child and the facts contained in the complaint. That the relevant members of the MDT/IEP Team that shall be present at the Resolution Session Meeting for the student shall include the following persons: 1) the student's special education teacher, 2) the student's regular education teacher, if applicable, 3) a representative of the local education agency with decision making authority, 4) a person who can interpret the data, 5) any person(s) who conducted any assessments on the student and/or would be qualified to conduct the evaluations requested in the parent's complaint.

20. That MAPCS failure to timely schedule and convene the Resolution Session Meeting within the timeframe identified in 20 U.S.C. !415(f)(1)(B) constitute joint waiver between MAPCS and the guardian to have such meeting and the forty-five (45) days timeline to schedule the student's administrative due process hearing and receive a timely decision will begin to run upon written notice, via facsimile, at 202-442-5556, to the DCPS Office of Student Hearings, by the parent's counsel; and

21. A finding that the parent is the prevailing party in this action.

**Accommodations and Assistance Needed:**

- N/A

Dated this 12th Day of December 2006

Roberta L. Gambale, Esq.,
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2021
Counsel for the Parent

**Mail, fax or deliver this complaint notices to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

8

```
*********************
***   TX REPORT   ***
*********************


TRANSMISSION OK

TX/RX NO           0800
CONNECTION TEL                    99399084
CONNECTION ID
ST. TIME           12/12 13:54
USAGE T            06'32
PGS. SENT              9
RESULT             OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: December 12, 2006

TO:    Special Education Coordinator,
       Maya Angelou Public Charter School

PHONE NO: (202) 939-9080

FAX NO: (202) 939-9084

FROM: Yamileth Amaya, Paralegal

SUBJECT: D███ S███
DOB:      3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 9

COMMENTS: Please find attached Due Process Complaint for the above- mentioned student.

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              0801
CONNECTION TEL                   94425556
CONNECTION ID
ST. TIME             12/12 14:01
USAGE T              01'34
PGS. SENT            9
RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:       December 12, 2006

TO:         Sharon Newsome, Student Hearing Office Coordinator, DCPS

PHONE:      202-442-4800

FAX NO:     202-442-5556

FROM:       Yamileth Amaya, Paralegal

Subject:    D██████ S███████
            DOB: 7/28/90

NUMBER OF PAGES INCLUDING COVER SHEET: 9

COMMENTS:  Please find attached Due Process Complaint.

166

## JA~ ~S E. BROWN & ASSOCIATL~, PLLC

*A Professional Limited Liability Company*

James E. Brown

Domiento C.R. Hill

Roberta Gambale

Miguel A. Hull

Christopher L. West

----------------------------------

Attorneys at Law

1220 L Street, NW

Suite 700

Washington, DC 20005

Telephone: (202) 742-2000

Facsimile: (202) 742-2098

e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+

Tilman L. Gerald

John A. Straus

Roxanne D. Neloms

Omar Karram

Christie Fontaine-Covington

----------------------------------

! DC Bar Special Legal Consultant

+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:  December 12, 2006

TO:    Special Education Coordinator,
       Maya Angelou Public Charter School

PHONE NO: (202) 939-9080

FAX NO: (202) 939-9084

FROM: Yamileth Amaya, Paralegal

SUBJECT:  D▮▮▮ S▮▮▮▮
DOB:      3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 9

COMMENTS: Please find attached Due Process Complaint for the above- mentioned student.

**STATEMENT OF CONFIDENTIALITY:**

The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

◊  *"Practice is limited solely to matters before the District of Columbia Public Schools' Office of Student Hearings under the District of Columbia Court of Appeals Rule 49(c)(5)."*

167

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

--------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:       December 12, 2006

TO:         Sharon Newsome, Student Hearing Office Coordinator, DCPS

PHONE:      202-442-4800

FAX NO:     202-442-5556

FROM:       Yamileth Amaya, Paralegal

Subject:    D█████ S██████
            DOB:  7/28/90

NUMBER OF PAGES INCLUDING COVER SHEET: 9

COMMENTS:  Please find attached Due Process Complaint.

# Exhibit 9

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556



# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney:Roberta Gambale, Esq.**
**Parent: Rachelle Bobo**

Telephone Number: **(202) 742-2000**          Pages: **3**
Fax Number: **(202) 742-2098**               Date: **December 12, 2006**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: D███ S███

School: **Maya Angelou PCS**

The Complaint Intake Unit is responsible for providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office. If you have questions about the attached Notice, please contact the Complaint Intake Unit at (202) 724-6556. Otherwise, if you have questions about the content of the compliant you should contact your legal counsel for further advice.

**Thank You**
**Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that is legally privileged. The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited. If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

# STATE EDUCATION AGENCY
# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| S█████, D.          Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| DCPS | ) | |
| Attending Maya Angelou PCS | | |
| | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1.  A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings.**

2.  The complaint notice was filed on **December 12, 2006**

3.  The deadline for the resolution meeting is **December 27, 2006** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.  ***Prior Written Notice Not Issued by the Local Educational Agency***.  If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

1.  An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
2.  A description of other options that the IEP Team considered and the reasons why those options were rejected;
3.  A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

Rev'd. 7/6/05

    4.    A description of the factors that is relevant to the agency's proposal or refusal.

B.    Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **December 22, 2006.**

C.    ***Deficiency Notice.*** A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, within 15 days of receiving the notice of the complaint, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.    The deadline for filing a deficiency notice is **December 27, 2006.**

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence. A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice. The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law. The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Rev'd. 7/6/05

172

# Exhibit 10

# JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

--------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

**December 19, 2006**

<u>**Via Facsimile Only**</u>
Maya Angelou Public Charter School
Attn: Mr. Luseni, Special Education Coordinator
1851 9th Street N.W. – (Shaw Campus)
Washington, D.C. 20001

Re:  D███ S█████ DOB: 3/08/88

Dear Mr. Luseni:

Upon review of the meeting notes and discussion with the parent, I wanted to make sure the parent's position regarding the Manifestation Determination was accurately reflected.

While parent acknowledges that based on the current IEP the incident would not appear to be a manifestation, parent strongly feels the IEP does not correctly identify D████ disability. If D████'s IEP correctly reflected his disability- parent feels the incident would have been a manifestation. Hopefully we can rectify the defects with the IEP at the next meeting.

Parent and D████ also dispute the school's version of what transpired. According to D████ the other party initiated physical contact and he responded. PArent and D████ would request a hearing to address the proposed expulsion.

Please contact me once the functional behavioral assessment is completed to discuss available meeting dates. I would hope the meeting could go forward immediately after school reconvenes following the Christmas Holiday.

Sincerely,

Corey Hamilton
Educational Advocate

Cc: Parent

174

HP Fax Series 900
Plain Paper Fax/Copier

Fax History Report for

(202) 742-2099
Jan 12 1970 8:25am

## Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Jan 12 | 8:25am | Sent | 99399084 | 0:48 | 2 | OK |

Result:
  OK - black and white fax

175

# JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| ----------------------------------- | e-mail: Admin@Jeblaw.biz | --------------------------------- |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

TO:     Mr. Michael Luseni, Special Education Coordinator, Maya Angelou PCS

FROM:   Corey Hamilton

DATE:   12/19/06

FAX NO: (202) 939-9084

SUBJECT: D███ S████

NUMBER OF PAGES, INCLUDING FAX COVER SHEET:  2

COMMENTS:

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

*Admitted Only in Virginia. Practicing Pursuant to Rule 49(c) (8): Supervision by Tilman L. Gerald and John Straus, Members of the D.C. Bar.*

# Exhibit 10

# JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
|---|---|---|
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| ----------------------------------- | e-mail: Admin@Jeblaw.biz | ------------------------------- |
| | | ! DC Bar Special Legal Consultant |
| | | + Admitted in Bolivia |

**December 19, 2006**

**Via Facsimile Only**
Maya Angelou Public Charter School
Attn: Mr. Luseni, Special Education Coordinator
1851 9th Street N.W. – (Shaw Campus)
Washington, D.C. 20001

Re:  **D███ S████, DOB: 3/08/88**

Dear Mr. Luseni:

Upon review of the meeting notes and discussion with the parent, I wanted to make sure the parent's position regarding the Manifestation Determination was accurately reflected.

While parent acknowledges that based on the current IEP the incident would not appear to be a manifestation, parent strongly feels the IEP does not correctly identify D█████ disability. If D██████ IEP correctly reflected his disability- parent feels the incident would have been a manifestation. Hopefully we can rectify the defects with the IEP at the next meeting.

Parent and D████ also dispute the school's version of what transpired. According to D████ the other party initiated physical contact and he responded. PArent and D████ would request a hearing to address the proposed expulsion.

Please contact me once the functional behavioral assessment is completed to discuss available meeting dates. I would hope the meeting could go forward immediately after school reconvenes following the Christmas Holiday.

Sincerely,

Corey Hamilton
Educational Advocate

Cc: Parent

178

# Exhibit 11

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

--------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

**December 4, 2006**

<u>**Via Facsimile Only**</u>
Maya Angelou Public Charter School
Attn: Mr. Luseni, Special Education Coordinator
1851 9th Street N.W. – (Shaw Campus)
Washington, D.C. 20001

Re:  <u>Suspension of D██████ S██████, DOB: 3/08/88</u>

Dear Mr. Luseni:

It was a pleasure speaking with you earlier. As I indicated during our conversation, Ms. Bobo has recently contact me regarding the suspension of her child, D████ S██████, as of November 22, 2006. It is my understanding that this is not the first suspension of D████ this school year and that a Manifestation Determination Review Meeting has not yet been scheduled.

Parent is concerned that arrangements have not been made to continue to provide D████ with education. He will have been out of school for more than ten(10) days as a result oft his suspension. Please be advised that Maya Angelou still has an obligation to provide D████ with a free and appropriate public education ("FAPE") pursuant to 20 U.S.C. Section 1415(k)(1). Furthermore, the IEP team should be convened immediately to discuss the suspension and possible placement in an alternate educational setting. In addition, a functional behavioral assessment should be conducted. I would propose the following meeting dates: <u>December 20th</u> at 2:30 p.m., <u>December 19th</u> at 10 a.m., or <u>December 18th</u> at 10 a.m. Please confirm by noon on Friday, December 8, 2006.

Please feel free to contact me at (202)742-2000 (ext. 2021) and/or the Educational Advocate working with the family, Mr. Corey Hamilton, at (202)742-2000 (ext 2014). I appreciate your cooperation and look forward to hearing from you.

Sincerely,

Roberta L. Gambale Esq.

Cc: Parent

180

# JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
|---|---|---|
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| ---------------------------------- | e-mail: Admin@Jeblaw.biz | -------------------------------- |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

TO:    Mr. Michael Luseni, Special Education Coordinator, Maya Angelou PCS

FROM:  Roberta L. Gambale, Esq.

DATE:  12/4/06

FAX NO: (202) 939-9084

SUBJECT: D███ S███

NUMBER OF PAGES, INCLUDING FAX COVER SHEET:  2

COMMENTS:

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

* Admitted Only in Virginia  Practicing Pursuant to Rule 49(c) (8); Supervision by Tilman L. Gerald and John Straus, Members of the D.C. Bar.

04/2006 16:03 FAX 2027422098          James E Brown & Assoc.                    ☎001

```
************************
***   TX REPORT   ***
************************

TRANSMISSION OK

TX/RX NO               0406
RECIPIENT ADDRESS      93399084
DESTINATION ID
ST. TIME               12/04 16:02
TIME USE               01'22
PAGES SENT             2
RESULT                 OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

-------------------------------

I DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

**TO:**   Mr. Michael Luseni, Special Education Coordinator, Maya Angelou PCS

**FROM:** Roberta L. Gambale, Esq.

**DATE:** 12/4/06

**FAX NO:** (202) 939-9084

**SUBJECT:** D████ S████

**NUMBER OF PAGES, INCLUDING FAX COVER SHEET:** 2

**COMMENTS:**

182

# Exhibit 12

His
## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| wn | Attorneys at Law | Juan J. Fernandez!+ |
| .R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| ambale | Suite 700 | John A. Straus |
| .. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| .pher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | ------------------------------- |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

**January 18, 2007**

**VIA FACSIMILE**
Mr. Luseni, Special Education Coordinator
Maya Angelo Public Charter School
1851 9th Street, NW (Shaw Campus)
Washington, DC 20001

**Re: D█████ S█████**

Dear Mr. Luseni:

    I am writing in regards to the above referenced-student, **D█████ S█████**. In our recent meeting we were able to discuss the IEP and it was decided by the team that we would come back and to convene an MDT/IEP meeting after the holiday. There were some concerns about the amount of services the student was receiving and parent would like to revisit those concerns. I have proposed the following dates for your consideration.

Wednesday, January 31, 2007 at 10:00
Friday, February 2, 2007 at 1:30
Monday, February 5, 2007 at 9:00

Please confirm or reschedule by close of business Wednesday, January 24, 2007.

Sincerely,

Corey Hamilton

Corey Hamilton
Education Advocate

184

# JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

----------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez !+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram

----------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

**DATE:**          **01/19/06**

**TO:**            **Special Education Coordinator**

**FAX NO.:**       **(202) 939-9084**

**FROM:**          **Corey Hamilton, Education Advocate**

**SUBJECT:**       D███ S███████

**NUMBER OF PAGES INCLUDING COVER SHEET:**     **2**

**COMMENTS:**

----------------------------------------------------------------

----------------------------------------------------------------

----------------------------------------------------------------

----------------------------------------------------------------

The attached information is **CONFIDENTIAL** and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

# Exhibit 13

# JAmES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
|---|---|---|
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| ---------------------------------- | e-mail: Admin@Jeblaw.biz | ---------------------------------- |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

**February 8, 2007**

<u>**Via Facsimile Only**</u>
Maya Angelou Public Charter School
Attn: Mr. Luseni, Special Education Coordinator
1851 9th Street N.W. – (Shaw Campus)
Washington, D.C. 20001

Re: D████ S███ DOB: 3/08/88

Dear Mr. Luseni:

I have recently spoken to D████ regarding the tutoring that the school has promised him. So far there have been only four sessions that have been scheduled despite the fact that the suspension took place last November, 2006. Each time Derrick has gone to the school work has not been ready for him in any other course except for math. He also needs assistance in his other course, English, Science and History and assignments so that he doesn't fall behind in achieving his graduation requirements.

D████ is also concerned that the hours the school is willing to provide aren't enough to give him the academic assistance he needs and would request additional tutoring time of at least 1- 2 more hours per week.

Please feel free to contact me at (202)742-2000 (ext. 2021) and/or the Educational Advocate working with the family, Mr. Corey Hamilton, at (202)742-2000 (ext 2014). I appreciate your cooperation and look forward to hearing from you.

Sincerely,

Roberta L. Gambale Esq.

Cc: Student

187

# JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

------------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

------------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

TO:    Mr. Michael Luseni, Special Education Coordinator, Maya Angelou PCS

FROM:  Roberta L. Gambale

DATE:  2/8/07

FAX NO: (202) 939-9084

SUBJECT: D███S█████

NUMBER OF PAGES, INCLUDING FAX COVER SHEET:  2

COMMENTS:

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

* Admitted Only in Virginia  Practicing Pursuant to Rule 49(c) (8): Supervision by Tilman L. Gerald and John Straus, Members of the D.C. Bar.

```
********************
***  TX REPORT  ***
********************

TRANSMISSION OK

TX/RX NO              2044
RECIPIENT ADDRESS     99389084
DESTINATION ID
ST. TIME              02/08 11:04
TIME USE              00'57
PAGES SENT            2
RESULT                OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*
Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

---------------------------------

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

TO:     Mr. Michael Luseni, Special Education Coordinator, Maya Angelou PCS

FROM:  Roberta L. Gambale

DATE:  2/8/07

FAX NO: (202) 939-9084

SUBJECT:  D████ S█████

NUMBER OF PAGES, INCLUDING FAX COVER SHEET:  2

COMMENTS:

189

# Exhibit 14

# J. .MES E. BROWN & ASSOCIA ı ⊂S, PLLC

*A Professional Limited Liability Company*

<table>
<tr><td>James E. Brown<br>Domiento C.R. Hill<br>Roberta Gambale<br>Miguel A. Hull<br>Christopher L. West<br><br>-----------------------------------</td><td>Attorneys at Law<br>1220 L Street, NW<br>Suite 700<br>Washington, DC 20005<br>Telephone: (202) 742-2000<br>Facsimile: (202) 742-2098<br>e-mail: Admin@Jeblaw.biz</td><td>Juan J. Fernandez!+<br>Tilman L. Gerald<br>John A. Straus<br>Roxanne D. Neloms<br>Omar Karram<br>Christie Fontaine-Covington<br>-----------------------------------<br>! DC Bar Special Legal Consultant<br>+ Admitted in Bolivia</td></tr>
</table>

**February 22,2007**

<u>Via Facsimile Only</u>
Maya Angelou Public Charter School
Attn: Mr. Luseni, Special Education Coordinator
1851 9th Street N.W. – (Shaw Campus)
Washington, D.C. 20001

Re:   D██████ S██████ DOB: 3/08/88

Dear Mr. Luseni:

   We have recently heard from D█████ regarding the tutoring that the school is supposed to be providing to him. It is our understanding that tutoring services have been discontinued. Though D█████ has been allowed to pick up class work- he is not being provided with the assistance that he needs to complete it nor are graded assignments that he turns in being returned to him. He has done his part. He has shown up faithfully and is willing to put forth the effort to earn the credits he needs to graduate.

   This student has invoked his right to a "Stay Put" pursuant to the Individuals with Disabilities Education Act of 2004. This student should be entitled to return to the school and his classes until such time as a determination is rendered at a hearing. The student does not feel that his neighborhood school can meet his educational needs and has no intentions of voluntarily withdrawing from Maya Angelou.

   Please advise us in writing as to when this student may return to his classes and/or when and how a FAPE will be made available to this student.

Sincerely,

Roberta L. Gambale Esq.

Cc: Student
    Advocate
    File

191

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

TX/RX NO                2704
CONNECTION TEL                      99399084
CONNECTION ID
ST. TIME               02/22 15:16
USAGE T                00'47
PGS. SENT                 2
RESULT                 OK

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: February 22, 2007

TO:    Mr. Luseni, Special Education Coordinator,
       Maya Angelou Public Charter School

PHONE NO: (202) 939-9080

FAX NO: (202) 939-9084

FROM: Yamileth Amaya, Paralegal

SUBJECT: D██████ S██████
DOB:      3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 2

COMMENTS: Please find attached correspondence regarding services and placement.

## J. ∕IES E. BROWN & ASSOCIA .S, PLLC

*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

----------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

----------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:  February 22, 2007

TO:    Mr. Luseni, Special Education Coordinator,
       Maya Angelou Public Charter School

PHONE NO: (202) 939-9080

FAX NO: (202) 939-9084

FROM: Yamileth Amaya, Paralegal

SUBJECT:  D███ S███
DOB:      3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 2

COMMENTS:  Please find attached correspondence regarding services and placement.

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

# Exhibit 15

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

----------------------------------

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

----------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

**March 2, 2007**

**Via Facsimile Only**
Ms. Jessica Smith, Esq
March 2, 2007
1008 Pendleton Street
Alexandria, VA 20005

Re:   D█████ S█████ DOB: 3/08/88

Dear Ms. Smith:

I am in receipt of your March 1, 2007 correspondence. It is the student's position that 1) the behavior for which he was suspended was the result of a disability and 2) that the placement proposed by DCPS and MAPCS at the December 19, 2006 meeting was inappropriate. For these reasons, he has elected to invoke his right to Stay Put. As MAPCS was the last educational placement for this student, student should remain in his current educational setting until such time as the opportunity to litigate presents itself.

At the December 19, 2006 meeting, the Charter School was in agreement with this and verbally offered tutoring to the student to take place after school which they have failed to deliver. While MAPCS offered only three hours of tutoring despite the fact that D████ felt like he needed more assistance in order to keep up with work, he has shown up faithfully to receive these services and pick up his assignments. Unfortunately, the school has not had the tutor available.

D████ is clearly not receiving a FAPE at this time. Please feel free to contact me at (202)742-2000 (ext. 2021) and/or the Educational Advocate working with the family, Mr. Corey Hamilton, at (202)742-2000 (ext 2014). I appreciate your cooperation and look forward to hearing from you.

Sincerely,

Roberta L. Gambale Esq.

Cc: D████ S████, Student

195

HP Fax Series 900
Plain Paper Fax/Copier

Fax History Report for

(202) 742-2099
Mar 02 2007 11:29am

Last Fax

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Mar 2 | 11:28am | Sent | 97037392323 | 0:51 | 2 | OK |

Result:
  OK - black and white fax

196

# JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

----------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

TO:      Ms. Jessica Smith, Esq. -Dalton, Dalton & Houston, P.C.

FROM:   Roberta L. Gambale, Esq.

DATE:   3/2/07

FAX NO: (703) 739-2323

SUBJECT:  D███  S█████

NUMBER OF PAGES, INCLUDING FAX COVER SHEET:   2

COMMENTS:

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

* Admitted Only in Virginia. Practicing Pursuant to Rule 49(c) (8); Supervision by Tilman L. Gerald and John Straus, Members of the D.C. Bar.

197

# FAX TRANSMISSION COVER SHEET
## Dalton, Dalton & Houston P.C.
### Attorneys at Law
### 1008 Pendleton Street
### Alexandria, Virginia 22314-1837
### (703) 739-4300
### FAX (703)739-2323

**DATE:**  March 1, 2007

**TO:**  Roberta Gambale, Esq.

**AT FAX:**  202-742-2098 / 2097

**FROM:**  Jessica M. Smith, Esq.

**RE:**  D███ S███

**NUMBER OF PAGES INCLUDING THIS PAGE:**     2

_____

**COMMENTS:**

**********************************************************************************
THIS COMMUNICATION IS CONFIDENTIAL AND IS INTENDED TO BE PRIVILEGED PURSUANT TO THE
ATTORNEY CLIENT PRIVILEGE AND ATTORNEY WORK PRODUCT DOCTRINE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION,
DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE
RECEIVED THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS
COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE
ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS.

**********************************************************************************

Law Offices
## DALTON, DALTON & HOUSTON, P.C.

1008 Pendleton Street
Alexandria, Virginia 22314-1837
Telephone: (703)-739-4300
Facsimile: (703)-739-2323

Paul S. Dalton[1][*]
Ellen Douglass Dalton[1][*][+]
William E. Houston[*][+]
Jessica M. Smith[1][+]
Kathryn T. McAuliffe[¥]

[1] ADMITTED IN VA
[+] ADMITTED IN D.C.
[*] ADMITTED IN W. VA

Washington DC. Office:
601 Pennsylvania Avenue, NW
South Building, Suite 900
Washington, DC 20004
Telephone: (202)-393-0060
Facsimile: (202)-393-1555

[*]ADMITTED TO THE U.S. SUPREME COURT
[*]ADMITTED IN PA
[¥]ADMITTED IN CT

March 1, 2007

Roberta Gambale, Esq.
James E. Brown and Associates
1220 L Street, NW, Suite 700
Washington, DC 20005

**VIA FAX: 202-742-2098**

Re:   D███ S███

Dear Ms. Gambale:

This letter is in response to your letter to Mr. Luseni, Special Education Coordinator at Maya Angelou PCS ("MAPCS"), dated February 22, 2007. Your letter indicates that 1) D███ is not being provided with the agreed upon tutoring services, and 2) stay put protections have been invoked. As counsel for MAPCS, I would like to correct the inaccuracies in your letter.

D███ was expelled from MAPCS following a proper manifestation determination review where the team determined that the behavior was not a manifestation of the student's disability. The parents were informed of their right to appeal the expulsion decision, however they failed to do so and the time frame for appeal has lapsed. After expulsion, MAPCS referred the student to DCPS for placement. In the interim, while placement is pending, MAPCS has been and continues to provide D███ with tutoring after school for three hours per week in order to allow him to access his education. This interim alternative placement was agreed to by the MDT team and the parent at the December 19, 2006 meeting.

MAPCS has been and continues to provide FAPE to this student. If you have any questions or concerns, please contact me.

Sincerely,

Jessica M. Smith, Esq.

Cc:   Quentin Graham, MAPCS
Michael Luseni, MAPCS

199

# Exhibit 16

# JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |
| ----------------------------- | | ------------------------------- |
| | | ! DC Bar Special Legal Consultant |
| | | + Admitted in Bolivia |

February 6, 2007

<u>Via Facsimile Only</u>
Ms. Newsome, Student Hearing Office
District of Columbia Public Schools
825 North Capitol Street, NE, 9th Floor
Washington, DC 20002

<b>Re: Hearing for D███ S███ / DOB: 3/8/88</b>

Dear Newsome:

It has come to my attention that the hearing has been scheduled for the above referenced student for February 8, 2007 at 1:00 p.m. for the Complaint that was filed on or about December 12, 2006. Based upon the Motion by Counsel for Maya Angelou Public Charter School this Complaint was dismissed. *(See Attached Order by Hearing Officer Mr. Smith Esq. issued on or about December 22, 2006 and the Hearing Date Notice issued January 17, 2007)* Wherefore the hearing should be removed from calendar for February 8, 2007.

Please be advised that an Amended Complaint was filed on or about January 12, 2007. A hearing date has not yet been issued for that Complaint.

If you should have any questions or wish to discuss any aspect of this case before the hearing, please contact me at (202) 742-2000.

Sincerely,

Roberta Gambale, Esq.

Attachments
cc:    Dalton, Dalton & Houston, P.C.
       DCPS Office of General Counsel

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



### HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:  Parent (or Representative): _R. GAMBALE / T. ABOUS-SHALA_ Fax No.: _742-2098_
_(703) 739-2323_

LEA Legal Counsel: _OGC_

RE:  S_____, D_____ and (LEA) DOB: _3/8/88_
Student's Name

FROM:  **SHARON NEWSOME**
Special Education Student Hearing Office Coordinator

DATE SENT: _1/17/07_

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on _12/7/06_. Please be advised that the hearing has been scheduled for:

DATE: _2/8/07_

TIME: _1:00 PM_

AT:  825 North Capitol Street, NE, Washington, DC
8th Floor

ASSIGNED HEARING OFFICER: _____

[ ] THIS IS A FINAL NOTICE OF HEARING: If you wish to request a continuance of this hearing, you must submit your request to the Special Education Student Hearing Office at the above address, or by fax at 202 442-5556. All decisions regarding continuances are made *exclusively* by the Hearing Officer, and cannot be made by SHO administrative staff. Unless you receive notice that the Hearing Officer has granted your request for a continuance, you must appear for the hearing as scheduled above.

[X] THIS IS A PROVISIONAL NOTICE OF HEARING: The SHO was unable to accommodate any of your proposed dates. If you are unavailable for the above date, you must inform the SHO in writing (letter or fax) that the date is unavailable and specify times during the next four business days when you are either available or unavailable for a teleconference with the Hearing Officer. If the SHO does not receive a response from you within three business days of your receiving this provisional notice, the notice becomes a final notice of hearing that may be modified with only a request for a continuance.

Failure to appear for a properly scheduled hearing may result in dismissal of the case or a default judgment against you. Disclosure of evidence and witnesses to the opposing party is required at least **five business days** prior to the hearing with copies to the Special Education Student Hearing Office.

202

# District of Columbia Public Schools
## *State Enforcement Investigative Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
FAX: (202) 442-5556



## *FACSIMILE SHEET*

Date: December 22, 2006

TO: Roberta Gambale

FROM: STUDENT HEARING OFFICE

RE: S███, D███ ·

TOTAL NUMBER OF PAGES, INCLUDING COVER: 2

COMMENTS:

*CONFIDENTIALITY NTOICE:* The information accompanying this facsimile is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the content of this telecopied information is strictly prohibited.

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| D___ S___  (3-8-88) | ) | INDEPENDENT HEARING OFFICER |
| Petitioner | ) | |
| Vs. | ) | |
| DCPS & Maya Angelou PCS | ) | STATE EDUCATION AGENCY |
| Respondent | | |

ON THIS DAY came on to be heard Respondent's Motion to Dismiss and Petitioner's Opposition filed in the above styled cause.

Respondent filed its Motion contending that the Complaint lacked specificity regarding the identification of the actual Complainant. Petitioner responded by stating that the Complainant is the student who attained the age of 18, but was still residing in his parent's household as a dependent.

It is noted that the Complainant in Section D, with regard to the holding of the Resolution Session, the Complainant states "The parent, by and through counsel, wishes to waive the Resolution Session Meeting for this process."

Accordingly, in view of the student's age, the Complainant does not clearly identify the Complainant.

## ORDER

After reviewing the evidence, the Motion is **GRANTED; however, the Complaint may be amended by the student. All applicable timelines will begin upon the filing of an amended complaint.**

SIGNED: this date  12-21-06

Impartial Special Education Hearing Officer

Issue Date: 12-22-06

Original to SHO – Student's File
Copy To:    Parent' - C/O:
            DCPS - C/O:        OGC
            Charter School - C/O:  Jessica M. Smith

            Roberta Gambale

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              2292
CONNECTION TEL                        94425098
CONNECTION ID
ST. TIME             02/06 15:46
USAGE T              00'40
PGS. SENT            5
RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*
Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

---
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

DATE: February 6, 2007

TO:    Office of General Counsel, DCPS

PHONE:    202-442-5000

FAX NO:    202- 442-5098

FROM:    Yamileth Amaya, Paralegal

SUBJECT:    D██████ S███████

DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 5

COMMENTS: Please find attached correspondence regarding hearing.

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO                2293
CONNECTION TEL                      97037392323
CONNECTION ID
ST. TIME                02/06 15:43
USAGE T                 00'51
PGS. SENT               5
RESULT                  OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

Attorneys at Law

1220 L Street, NW

Suite 700

Washington, DC 20005

Telephone: (202) 742-2000

Facsimile: (202) 742-2098

e-mail: Admin@Jeblaw.biz

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: February 6, 2007

TO:    Paul Dalton, Es. Dalton, Dalton & Houston, P.C

PHONE NO: (703) 739-4300

FAX NO: (703) 739-2323

FROM: Yamileth Amaya, Paralegal for Roberta Gambale, Esq.

SUBJECT: D█████ S█████
DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: **5**

COMMENTS: Please find attached correspondence regarding hearing.

02/06/2007 15:46 FAX 202 742 2098          Brown & Associates                    ☐001

```
                        ***********************
                        ***   TX REPORT   ***
                        ***********************


        TRANSMISSION OK

        TX/RX NO              2291
        CONNECTION TEL                       94425556
        CONNECTION ID
        ST. TIME             02/06  15:45
        USAGE T              00'37
        PGS. SENT                 5
        RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

--------------------------------                                    ---------------------------------
                                                                    ! DC Bar Special Legal Consultant
                                                                    + Admitted in Bolivia


# *FAX COVER SHEET*


**DATE:**       February 6, 2007

**TO:**         Sharon Newsome, Student Hearing Office Coordinator, DCPS

**PHONE:**      202-442-4800

**FAX NO:**     202-442-5556

**FROM:**       Yamileth Amaya, Paralegal

**Subject:**    D███ S█████
**DOB:** 3/8/88

**NUMBER OF PAGES INCLUDING COVER SHEET: 5**

**COMMENTS:**  Please find attached correspondence regarding hearing.

207

## JA. .ES E. BROWN & ASSOCIAT..., PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

------------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

-------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: February 6, 2007

TO:    Office of General Counsel, DCPS

PHONE:    202-442-5000

FAX NO:    202- 442-5098

FROM:    Yamileth Amaya, Paralegal

SUBJECT:    D▆▆▆ S▆▆▆

DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 5

COMMENTS: Please find attached correspondence regarding hearing.

## JA...ES E. BROWN & ASSOCIATL..., PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

--------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:      February 6, 2007

TO:        Sharon Newsome, Student Hearing Office Coordinator, DCPS

PHONE:     202-442-4800

FAX NO:    202-442-5556

FROM:      Yamileth Amaya, Paralegal

Subject:   D███ S███
DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: 5

COMMENTS:  Please find attached correspondence regarding hearing.

## JA. .ES E. BROWN & ASSOCIATLͻ, PLLC
*A Professional Limited Liability Company*

| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
|---|---|---|
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| ------------------------------- | e-mail: Admin@Jeblaw.biz | ------------------------------- |

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: February 6, 2007

TO:    Paul Dalton, Es. Dalton, Dalton & Houston, P.C

PHONE NO: (703) 739-4300

FAX NO: (703) 739-2323

FROM: Yamileth Amaya, Paralegal for Roberta Gambale, Esq.

SUBJECT:  D███ S███
DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: **5**

COMMENTS:  Please find attached correspondence regarding hearing.

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information.  If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

# Exhibit 17



The See Forever Foundation
The Maya Angelou Public Charter School

November 22, 2006

Mr. Derrick Shelton Sr.
125 Franklin Street NE #M-13
Washington, D.C. 20002

Dear Mr. Shelton:

D█████ S█████ is suspended, with the intent to expel, for assaulting a fellow student. Assault on another student or staff is an infraction warranting expulsion. MAPCS has also notified the D. C. Metropolitan Police Department of the assault.

Per your conversation with Michael Luseni, Special Education Coordinator, a manifestation meeting will be scheduled as soon as possible.

If you have any questions or concerns, you can contact me at (202) 939-9080, extension 104.

Sincerely,

*Melanie Cobb*

Melanie Cobb
Dean of Student Affairs

# Exhibit 18

**The Maya Angelou Public Charter School**

September 14, 2006

Ms. Rachelle Bobo
25 Franklin Street NE #M-13
Washington, D.C. 20002

Dear Ms. Bobo:

███ S████ is suspended for two (2) days for disrupting the learning environment and disrespecting a staff member. D████ can only return to school on Monday, September 18 accompanied by a parent. At that time we would like to discuss, how we can help D████ develop a plan to be successful at MAPCS.

If you have any questions or concerns, you can contact me at (202) 939-9080, extension 104.

Sincerely,

Melanie Cobb
Dean of Student Affairs

# Exhibit 19



See Forever Foundation
Maya Angelou Public Charter School
Shaw Campus

December 12, 2006

Ms. Rachelle Bobo
Mr. D███ S████ Jr.
125 franklin Street NE
# M-13
Washington, DC 20002

Dear Ms. Bobo & D███ S████ Jr,

Based on a conversation with your attorney (Ms. Gambale) on 12/12/2006, she agreed for MAPCS to schedule meetings for D███ on 12/20/2006 to discuss the following:

1. **Manifestation Determination @ 10:00 AM**

2. **Resolution of a recent issue in a Due Process Compliant Notice @ 2:00 PM**

Please review the form attached to this letter and call 202-939-9080 ex: 303 to confirm that you will be present or to reschedule the meeting at a more convenient time. I look forward to hearing from you. Thank you!

Sincerely, Michael Luseni



**See Forever Foundation**
**Maya Angelou Public Charter School**
1851 9th Street, NW  Washington, DC 20001  phone (202) 939-9080  fax (202) 939-9084  www.seeforever.org

## FAX

TO: Roberta L. Gambale Esq.

PHONE: (202) 742 - 2000

FAX: (202) 742 - 2098

FROM: Michael Luseni

DATE/TIME: 12/12/06    4:15 pm

NUMBER OF PAGES: 5

COMMENTS:

See Forever's mission is to create learning environments in lower income urban communities where teens, particularly those who have not succeeded in traditional schools, can reach their potential.

Through the Maya Angelou Public Charter School and other See Forever programs, our students develop the academic, social, and employment skills that they need to build rewarding lives and promote positive change in their communities.

Our students succeed because we provide:
- ☆ 11 hour school days & year round curriculum
- ☆ 300 tutors for 85 students
- ☆ paid employment to teach job skills
- ☆ small class sizes
- ☆ a residential program
- ☆ 1 teacher for every 8 students
- ☆ group and individual counseling

Our students succeed where they are expected to fail.

*"I wasn't supposed to make it. I was supposed to be pulled in by the drugs on my street, the poverty in the neighborhoods. I was supposed to have failed..."*

-Donny Gonzalez, Maya Angelou Public Charter School Graduate 2002. Donny is now attending the University of the District of Columbia.

217

# Exhibit 20



**The See Forever Foundation**
**The Maya Angelou Public Charter School**

December 19, 2006

Mr. D███ S███ Jr.
125 Franklin Street NE #M-13
Washington, D.C. 20002

Dear Mr. S███:

You have been expelled from Maya Angelou Public Charter School (MAPCS) as of December 19, 2006, for assaulting a fellow student. Assault on another student or staff is an infraction warranting expulsion, as specified on pages 16 and 18 of our student handbook. MAPCS has also notified the D. C. Metropolitan Police Department of the assault.

Maya Angelou Public Charter School will provide tutoring to compensate for time out of school after your tenth day of suspension. This will be at a site and times to be determined. Please be aware that coming on school grounds without permission (prior appointment) is trespassing.

This decision is pursuant to a manifestation meeting held earlier today. Per the District of Columbia Public Schools, you are expected to register at your neighborhood school as soon as possible to avoid gaps in receiving educational services. Your transcript and other paperwork will be mailed and/or faxed to your new school as soon as we receive notice. This communication is addressed directly to you because you are eighteen years of age.

If you have any questions or concerns, you can contact me at (202) 939-9080.

Sincerely,

Eugene Pinkard, Jr.
Principal

# Exhibit 21

**Maya Angelou Public Charter School**
**MAPCS**
1851 9th Street NW · WDC 20001 · phone: 202/939-9080 · fax: 202/939-9084
www.seeforever.org

**Manifestation Determination**

STUDENT'S NAME: D███ S███        DOB: <u>3/8/1988</u>

Gr: <u>11</u>th  ID#: <u>9103653</u>  DISABILITY: <u>Learning Disabled (LD)</u>

MEETING DATE: <u>December 19, 2006</u>

### PARTICIPANTS

| PARTICIPANT'S NAME | PARTICIPANT'S SIGNATURE | TITLE |
|---|---|---|
| ███ S███ | ███ | Student |
| Rachelle Bobo | Rachelle | Mother |
| Lisa Watkins | Lisa T. Watkins | Special Ed mater |
| D███ S███ | Demick K. Shelton | Father |
| Corey Hamilton | Corey Hamilton | Education Advocate |
| Corey Bellamy | C.B. | Counselor |
| Quentin Graham, Ph.D. | Quentin Graham, Ph.D. | Psychologist |
| Nakita West | ☺ | Algebra II Teacher |
| Michael Luseni | M. Luseni | Dir. of Sped |

221

## Manifestation Determination Review

**The attach form is used to:**

- Document the consideration and conclusion of the district representative, parent, and relevant members of the IEP team regarding whether the student's behavior was a manifestation of the student's disability as required by IDEA 2004, Sec. 615(k)(1)(E).

**Directions:**

1. Enter the date the form was completed by the team.

2. Enter the student's name, birth date, student ID number, attending school, and case manager.

3. Complete Manifestation Review:

   (1) Behavior subject to disciplinary action: Describe student's behavior in objective terms. Include the date the behavior occurred. Include the intensity and duration of the behavior, etc. If the behavior involved other students, refer to those students by initials or other method that protects their confidentiality.

   (2) Current disability(ies) based on eligibility statements: List the student's current eligibility for special education services. For students who may have more than one disability but only one eligibility statement, as permitted by state law. List other educational needs identified on the IEP.

   (4) Consideration of all relevant student information: Check all sources of information considered by the team.

4. Based on all the information, answer the two questions by checking "yes" or "no".

   (1) *The conduct in question was a direct result of the district's failure to implement the student's IEP.*

   (2) *The conduct in question was caused by or had a direct and substantial relationship to the student's disability(ies).* Note: the relationship must be a direct result and not an "attenuated association, such as low self-esteem".

5. Manifestation determination:
   - If the answer to either question is a "yes", check the "yes" box that indicates the student's behavior is a manifestation of the student's disability.
   - If the answer to both questions is "no", check the "no" box indicating that the student's behavior is not a manifestation of the student's disability.

6. Team members: List all team members participating in the manifestation determination meeting.

7. Write the name of the staff person completing the form, that person's title, and telephone number.

# Manifestation Form

1. Behavior subject to disciplinary action:

   D█████ grabbed a female student by the neck and punched her in the face.

2. Current disability(ies) based on eligibility statements (or identified educational needs):
   - Learning Disabled (LD)

3. Consideration of all relevant student information, including:

   ☑ Evaluation and diagnostic results     ☐ Relevant information provided by the parent

   ☐ Observations of the student           ☑ Current IEP and placement

   ☐ All relevant information in the student's file     ☐ Other _____

| For each statement answer "Yes" or "No": | Check the appropriate box |
|---|---|
| 1. The conduct in question was the direct result of the MAPCS's failure to implement the student's IEP. | ☐ Yes  ☑ No |
| 2. The conduct in question was caused by or had a direct and substantial relationship to the D█████ Learning disability. | ☐ Yes  ☑ No |

## Manifestation Determination

| ☐ Yes | The conduct/behavior is a manifestation of the student's disability. *Check if at least one answer to the above questions is Yes.* |
|---|---|
| ☑ No | The conduct/behavior is not a manifestation of D█████ Learning disability. *Check if both answers to the above questions are No.* |

| Michael Luseni | 12/19/2006 |
|---|---|
| Director of Special Education Services | Telephone |

223

██████ █████ ᵀR.

Meeting was introduced and the rationale of the meeting was stated.

Description of Incident
(Please see manifestation form)

Student statement
D█████ stated that the female student grabbed him first and in defence for her grabbing him ~~him~~ (ml) by the throat and he pushed her with an open hand.

Dr. Graham, School Psychologist
Explained the assessment result completed on 3/22/04

Ms. West, Regular Education Teacher
- Student is proactive in completing his work and has talked to him about how he interact with teachers.

224

^con't
Ms. Bellamy, Counselor

Shared that he met with █████ to

Educational Advocate

Wants to revisit IEP at a later date

Team decision

team decided that ██████ recent incident
was not a manifestation of his disability

# Exhibit 22

*Cortha Pringle*
*cpringle@seeforever.org*
*202-939-9080 ext 304*



## See Forever Foundation and The Maya Angelou Public Charter School

# MAPCS Student Intern Weekly Evaluation

The workplace supervisor should evaluate the student's performance weekly by completing this evaluation sheet and adding any additional comments. Please use this form as a tool to provide supervision and guidance to the student. This form should be signed by the worksite supervisor and the student and faxed to Maya Angelou, Attn: Cortha Pringle every Friday before the close of business.

**Supervisor's Name:** _____  *DC Central Kitchen*

**Supervisor's Signature:** _____

**Student Name:** ~~D████ S████~~

**Student Signature:** ~~J.S.~~

## Hours Worked

|  | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|
| Time In | ✕ | 8:30 | 8:30 | Sick | 8:30 |
| Time Out | ✕ | 3:30 | 3:30 |  | 3:30 |

## General Work Habits

**1- rarely/never   2- occasionally   3- always**

|  | Score | Comments |
|---|---|---|
| Comes to work on time and prepared to work | 3 |  |
| Returns from break and/or lunch in a timely manner |  |  |
| Shows enthusiasm and presents a positive attitude |  |  |
| Greets clients/customers and staff cordially and respectfully |  |  |
| Actively listens to and follows directions |  |  |
| Asks questions to successfully complete tasks |  |  |
| Adheres to company dress code |  |  |
| Stays on task with little distraction |  |  |
| Demonstrates, with your mentoring, a positive approach to work |  |  |

Any additional comments, areas of strength, or suggestions for improvement _____

_____

_____

_____

# Exhibit 23

# The Maya Angelou Public Charter School

Official Report Card
Term: First Quarter (9/5/2006) - (11/3/2006)

D███ S██████ Student Number: 9103653
125 Franklin Street NE #M-13
Washington, DC 20002

| Period | Class | Teacher | Grade | Percent | Abs. | Comments |
|---|---|---|---|---|---|---|
| P1(M-F) | Biology | Houseman, Esther | B- | 81 | 8 | D█████ has greatly improved in attitude and academic performance. He is a very capable student and shouldn't settle for less than his best, so I expect him to complete revisions to bring his 1st quarter grade even higher and make even higher grades 2nd quarter |
| P2(M-F) | English 3:Comtemp Lit | Hornonoff, Heather | A- | 90 | 8 | Excellent effort, class work, and participation - pleasure to have in class |
| P3(M-F) | Algebra II/A | West, Nakita | B- | 80 | 3 | 1 |
| P4(M-F) | US History | Reed, Margaret | B+ | 89 | 2 | D█████- you have been GREAT in class lately. However, you HAVE TO MAKE UP YOUR PRESENTATION. You are too smart to be failing this class.  Please make up the presentation and do your homework more consistently and you can get your grade where it belongs-- on the Presidential Scholars board! |
| L/N(M-F) | Literacy/Numeracy Block | Gray, Chauncey | | 109 | 2 | |
| ENR(M-T,H) | Basketball | Schrepfer, Kelly | A | 95 | 0 | |
| TUT(M-T,H) | Tutoring | Schrepfer, Kelly | | 0 | 1 | |
| VOC(M-F) | Vocational Education | Wilson, Denva L | I | 61 | 2 | |

*** Printed: November 22, 2006

229

# Exhibit 24

# OFFICE REFERRAL

Navajo Public Charter School/Elsie Whitlow
1351 Nicholson Street, NW
Washington, DC 20011
(202) 939-9080

STUDENT'S NAME: _____   CLASS - GRADE: 11th

DATE AND TIME OF INCIDENT: 11/16/06   12:40 - 1:00 pm   TEACHER: Cobb

### Reason for Referral:

— Disrupting own or other's learning
— Insubordination
— Unprepared
✓ Fighting
— Disrespectful to staff
— Inappropriate language
— Excessive tardiness
— Vandalism

### Actions Taken by Teacher:

— Conference with student
— Parent/Guardian Contact
— Referral to Counselor
— Detention
— Changed seat/workspace
— Time out

Teacher's Signature

### Teacher Recommendations:

— Conference and return to class
— Out for remainder of class
— Request conference with student, teacher or administrator

Additional Comments:

### Action Taken by Administrator:

— Conference and return to class
— Behavior packet
— Parent conference
— Detention
✓ Suspension (# of days) TBD
— Parent contact
— Referral to counselor
— Loss of privileges
— Other

Additional Comments: _____ was suspended for pushing Ayana

but didn't leave the bldg. went to her class and started a fight. Ayana said she choked her + pushed her in the face.

Administrator's Signature: M. Cobb   Date: 11/17/06

White - Teacher Copy    Yellow - Counselor Copy    Pink - Student File Copy    Gold - Parent/Guardian Copy

231

# Exhibit 25

**See Forever**
**The Maya Angelou Public Charter School**
1851 9th Street, NW - WDC 20001 - phone: 202/939-9080 - fax: 202/939-9084
www.seeforever.org

## Notification of Multi-Disciplinary Team (MDT) Meeting

Student's Name: D███ S███
ID#: **9103653**      DOB: **3/8/88**      Grade: **11th**
Campus: **SHAW**  Disability: **Learning Disabled**

Date: December 12, 2006

Parent/Guardian: Rachelle Bobo

Student: D███ S███
**Only if there is a documented transfer of rights**

We would like to invite you to a Multi-Disciplinary Team (MDT) meeting to discuss the following:

| | | | Annual | | Initial | |
|---|---|---|---|---|---|---|
| Develop IEP (Individual Education Plan) | | | Annual | | Initial | |
| Assessment Review | | Re-Evaluation | | Initial Evaluation | | |
| Academic Progress Review | | | | | | |
| Develop Transition Goals | | | | | | |
| Parent Request | | | | | | |
| X | Other: Manifestation Determination Meeting And A Resolution Meeting | | | | | |

Comments:
10:00 AM - This is Manifestation Determination Meeting to discuss whether recent incident involving D███
was a manifestation of his disability.
2:00 PM – Resolution Meeting to discuss issues that are listed on the December 12, 2006 compliant
form.

Multi-Disciplinary Team (MDT) meeting:

| Location | MAPCS Room 311 |
|---|---|
| Date | December 19, 2006 |
| Time | 10:00 AM – Manifestation Determination<br>2:00 PM - Resolution Meeting |

The following Special Education Team Members are requested to attend:

| Name | Title |
|---|---|
| Ms. Rachelle Bobo | Parent |
| D███ S███ | Student (Now of Age) |
| Roberta L. Gambale Esq. | Student Attorney |
| Mr. Corey Hamilton | Education Advocate |
| Dr. Graham | School Psychologist |
| Michael Luseni | Director of Special Education Services |
| Margaret Reed | Regular Education Teacher |
| Jesse Kearney | Counselor |

**Parents are encouraged to attend and to participate as a partner in all discussions during the meeting. If someone who is not on this notice will join you please let me know one day before the meeting.

*Michael Luseni, Director of Special Education Services*
*(202) 939-9080 ex. 303*

233

# Exhibit 26



*Making a Difference*

## INTERDYNAMICS, INC.
### *Evaluations and Therapy*

### <u>VOCATIONAL ASSESSMENT</u>

| | |
|---|---|
| Client: | D███ K. S████ |
| Age: | 16 (3-08-88) |
| Date of Assessment: | November 5, 2004 |
| Reason for Referral: | Court Ordered |
| Evaluator: | Gerald L. Weston |
| Tests Administered: | Career Assessment Inventory – Vocational Version |
| | Differential Aptitude Tests |
| | Wide Range Achievement Test-3 |
| Other Resources: | Client Interview |
| | Learning Styles Assessment |
| | The Occupational Outlook Handbook (2002-2003 Edition) |

D███ S████ is a 16-year-old African-American male who was referred for a vocational assessment to assist the District of Columbia Public Schools in planning a vocational program to meet his needs.

### <u>Background Information</u>

<u>Background History</u>

D███ S████ is a 10th grade student who attends the Maya Angelou Charter Public School. He enrolled at the Maya Angelou Public Charter School in September 2004 after attending Brown Junior High School for the 8th and 9th grade. D███ was identified as a student with a learning disability while in the 4th grade and has been in special education classes since the 4th grade. D███ reports that his favorite classes are History and Arithmetic and his least favorite class is Reading. He does not participate in any extracurricular activities at school. D███ says that his hobbies are playing chess and he likes sports. D███ has never participated in a vocational training program, however, he works on weekends for 8 hours performing general maintenance work at the apartment where his family lives. He says that his goal is to become a maintenance engineer, the same work that his father performs. He says that he frequently works with his father and his weekend job is with the same company that employs D███'s father. D███ also expressed interest in working in retail sales.

 D████K. S████ 2

## Assessment Behavior

D████ was accompanied to the test site by his mother. He is a tall, slim teenager who exhibited excellent social interaction skills. His hygiene was good and he was neatly dressed in typical teenager attire. D████ smiled easily and seemed very comfortable during the assessment session. He understood the directions to all the tests without difficulty and displayed very good working habits throughout the assessment period. He worked deliberately on all of the tests and seemed to be striving for accuracy. The tests are considered an accurate measurement of his abilities.

## Tests Results

### Differential Aptitude Tests

|  | Raw Score | % tile | Rating |
|---|---|---|---|
| Abstract Reasoning | 20 | 15 | Below Average |
| Clerical Speed and Accuracy | 36 | 30 | Below Average |
| Mechanical Reasoning | 45 | 35 | Low Average |
| Space Relations | 19 | 25 | Below Average |

### Wide Range Achievement Test 3

|  | Raw Score | Std. Score | % tile | Grade |
|---|---|---|---|---|
| Reading | 31 | 69 | 2 | 3 |
| Spelling | 25 | 65 | 1 | 2 |
| Arithmetic | 32 | 76 | 5 | 5 |

### Career Assessment Inventory Vocational Version

#### General Theme Scales

|  | Std. Score | Rating |
|---|---|---|
| Realistic | 48 | Average |
| Investigative | 60 | High |
| Artistic | 55 | Average |
| Social | 55 | Average |
| Enterprising | 66 | Very High |
| Conventional | 55 | Average |

D K. S 3

## Basic Interest Area

| Realistic Theme | Std. Score | Rating |
|---|---|---|
| Mechanical/Fixing | 59 | High |
| Electronics | 56 | Average |
| Carpentry | 56 | Average |
| Manual/Skilled Trades | 58 | High |
| Agriculture | 41 | Low |
| Nature/Outdoors | 31 | Very Low |
| Animal Service | 47 | Average |

| Investigative Theme | Std. Score | Rating |
|---|---|---|
| Science | 60 | High |
| Numbers | 54 | Average |

| Artistic Theme | Std. Score | Rating |
|---|---|---|
| Writing | 53 | Average |
| Performing/Entertaining | 57 | Average |
| Arts/Crafts | 49 | Average |

| Social Theme | Std. Score | Rating |
|---|---|---|
| Social Service | 55 | Average |
| Teaching | 63 | High |
| Child Care | 50 | Average |
| Medical Service | 50 | Average |
| Religious Activities | 52 | Average |

| Enterprising Theme | Std. Score | Rating |
|---|---|---|
| Business | 64 | High |
| Sales | 68 | Very High |

| Conventional Theme | Std. Score | Rating |
|---|---|---|
| Office Practices | 60 | High |
| Clerical/Clerking | 58 | High |
| Food Service | 60 | High |

## Test Interpretation

D■■■ was administered a battery of tests to measure his vocational interests, vocational aptitudes and academic achievement level. An assessment of his learning style was developed through observation of his work habits on tasks, response to instructions and through a client interview.

237

D████ was administered the Career Assessment Inventory in order to develop a profile of his vocational and career interests. The interests on this test are divided into six categories called General Theme Scales. The six General Theme Scales are Realistic, Investigative, Artistic, Social, Enterprising and Conventional. These six General Theme Scales are subdivided into 22 Basic Interest Area Scales that identify specific areas of vocational interest. The test also consists of Occupational Scales which indicate the degree of similarity between D████ interests and those of people employed in various occupations. The Career Assessment Inventory is an interest test and does not measure intelligence, education, training and aptitude, which can also impact a person's ability to be successful vocationally. Scores between 43 and 57 are within the average range for all scales.

D████ recorded a score of 66 for the Enterprising Theme which places him within the very high range. This indicates that he has interests very similar to people who are skillful at using words to persuade other people. They are often successful in sales work and see themselves as confident and enthusiastic. They are frequently employed in retail sales, an occupation where D████ expressed some interest in pursuing. Individuals with very high interest in the Enterprising Theme also enjoy working in customer service, politics, business and in various management positions.

D████ recorded a score of 60 for the Investigative Theme which places him within the high range. This indicates that his interests are similar to people who enjoy using words and ideas to find solutions to scientific problems. They prefer working alone and enter occupations such as laboratory research worker, scientist, medical technician, computer programming and various engineering positions.

D████ score of 55 for the Artistic Theme places him within the average range and indicates that his interests are somewhat similar to people who enjoy expressing themselves by creating works of art. They usually like to work alone, but enjoy sharing their creations with others. They enjoy working as artists, entertainers, interior decorators, caters, graphic designers and photographers.

D████ score of 55 for the Social Theme places him within the average range and indicates his interests are somewhat similar to people who like to help other people solve personal problems. They see themselves as cheerful and popular, and get along with many types of people. These individuals prefer occupations as social workers, nurses, recreational leaders, counselors and teachers.

D████ also scored within the average range for the Conventional Theme with a score of 55. This indicates that his interests are somewhat similar to people who enjoy jobs where they know exactly what is expected of them. They describe themselves as conventional and dependable. They prefer jobs in the business world such as banking, accounting, bookkeeping, computer operations and various clerical positions.

D█████ score of 48 for the Realistic Theme places him within the average range and indicates that his interests are somewhat similar to people who like to repair or build things. They generally prefer working outdoors rather than indoors. D████ reported that most of the work he performs on his weekend job is outdoors and that he is interested in becoming a maintenance engineer, a job that would come under this category. People who enjoy this type of work view themselves as practical and would rather work with things than with people. Other occupations they may pursue include automobile mechanic, the construction skills and various technical and engineering positions.

D█████ scores on the Basic Interest Area Scales reveal that he has very high interest for sales and high interest for business and teaching. His very high interest for sales is consistent with his stated interest in working in retail sales. Sales and business are closely related and share many of the same activities, skills and tasks.

The Occupational Scales indicate the degree of similarity between D██████ interests and those of people employed in various occupations. People who enter an occupation for which they have similar scores as others in that occupation, tend to be more satisfied than if they enter an occupation for which they have dissimilar scores. D██████ scores were found to be similar to those of people employed as court reporters, manufacturing representatives, insurance agents, buyers, hotel managers and purchasing agents. It is noted that four of the six occupations identified for D█████ are in sales. He has indicated his interest in possibly working in retail sales in clothing. All of these jobs require two to four years of post-high school training/education. Job opportunities for insurance agents, buyers and purchasing agents are projected to grow slower than average through 2006 by the Occupational Outlook Handbook. Clothing sales is an entry level position that does not require education beyond high school and training is primarily on the job.

D█████ was administered the Differential Tests in order to measure his abstract reasoning, clerical speed and accuracy, mechanical reasoning and space relations. These aptitudes can indicate the degree of success or the level of difficulty that a person may experience in vocational training. The scales for the Differential Aptitude Tests are divided into four ability groups with below average being at the 30th percentile and below, low average is between the 35th and 50th percentile, high average ranges from the 55th to the 75th percentile and superior is at the 80th percentile and above.

D█████ strongest aptitude is Mechanical Reasoning. He scored in the 35th percentile which places him in the low average range. D█████ Mechanical Reasoning is much better than his score indicates. D█████ was correct on 45 of the 57 problems that he attempted on this 70 problem test. As previously mentioned, D█████ is a very deliberate worker who strives for accuracy. Thus, he tends to sacrifice speed in order to be correct at what he does. Mechanical Reasoning is an aptitude that is relevant for individuals planning to pursue occupations as a maintenance engineer, automobile mechanic and those seeking training and employment in the construction skills. D█████ scored in the below average range for Clerical Speed and Accuracy with his test performance placing him in the 30th percentile. D█████ was correct on 36 of the 39 problems that he attempted on this 100 problem test. Again, D█████ is highly accurate, but works at a

239

rather slow pace. It is possible to improve clerical speed and accuracy through training and practice. D████ scored in the 25th percentile for Space Relations which places him in the below average range. Space Relations is the ability to deal with concrete objects through visualization. It is the ability to mentally create a three-dimensional structure from a flat pattern. This is an ability that is needed in occupations such as architecture, art, graphic design and drafting. D████ Abstract Reasoning is also below average and he scored in the 15th percentile. D████ was correct on 20 of the 31 problems that he attempted on this 45 problem test. Again, D███ is accurate and his abstract ability is better than his score indicates. Abstract reasoning is a non-verbal measure of an individual's reasoning ability. It is the ability to understand the relationship among things rather than among words or numbers. It is closely related to mechanical reasoning. People who have good abstract reasoning ability are able to function well in mechanically and technically oriented training and occupations.

D████ was administered the Wide Range Achievement Test-3 in order to measure his academic skills as they relate to participation in vocational training. D████ reading skills are at the 3rd grade level and he has a limited bank of words that he can pronounce on sight. His phonics skills are weak and he has difficulty with unfamiliar words. His spelling skills are at the 2nd grade level and he is hampered by the same limitations in spelling as with reading. D████ arithmetic skills are at the 5th grade level and he understands the concepts of addition, subtraction, multiplication and division. He has difficulty performing calculations in problems involving more than two digits.

## Learning Style

D████ is able to use his mechanical reasoning and abstract reasoning ability to solve problems and learn new skills. These aptitudes would serve him well in vocational training in a mechanical or technical field. He seems to compensate for his weak reading skills by being a very attentive listener who pays close attention to directions and is able to quickly learn from hands-on examples.

## Summary and Recommendation

D███ S████ is a 16-year-old student who has been in special education classes since the 4th grade. D████ is a very sociable young man who displayed excellent interpersonal skills during this assessment. He is neat, well groomed and presents himself very well to others. He displayed excellent work habits on the tasks required for this evaluation and seems to have a good work ethic. He has been exposed to the world of work through a weekend job and he reports that the Maya Angelou Public Charter School requires all students to participate in work training. D████ reports that he is currently assigned to work in the school kitchen. He says that 11th and 12th grade students generally work on jobs outside of the school. D████ says that his goal is to work as a maintenance engineer or in clothing sales. D████ has the ability to be successful at either of these occupations based on his interest test profile, aptitude test and personal presentation. He has gained some experience as a maintenance engineer by working with his father and on his weekend job. The Maya Angelou School has a

D█ K. S█ 7

work/study component that allows students to gain valuable on-the-job experience. When D█ is eligible to work outside of the school, he could be assigned to work with his father as a way of acquiring maintenance engineering skills. He could also be assigned to work at a retail clothing store since those jobs are easy to obtain entry level positions. The Career Assessment Inventory and the Differential Aptitude Test results indicate that D█ has the ability and interest to be successful in either position.

The following career development program is recommended for D█:

1.    It appears that the programs in the Maya Angelou Public Charter School currently meet the educational and vocational requirements for D█. In addition to the regular school day, students participate in tutorial instruction at the school. They also participate in a work/study program that introduces them to the world of work and can provide them with job-related skills through on-the-job experience. D█ should remain at the Maya Angelou Public Charter School at least through the 2004-2005 school year.

2.    Another charter school that does offer specific vocational training in construction skills is the Booker T. Washington Public Charter School. This school has a comprehensive vocational training program that offers instruction in electrical wiring, plumbing and carpentry. Students also participate in a work/study program where they gain practical on-the-job experience. This is the type of training that D█ will need in order to become a maintenance engineer. The school also provides special education instruction. The Booker T. Washington Public Charter School is located at 1346 Florida Avenue, N.W. and the telephone number is: 202-232-6090.

Report Prepared by

*[signature]*    11-28-04

Gerald L. Weston
Vocational Consultant

241

# Exhibit 27

**DISTRICT OF COLUMBIA
PUBLIC SCHOOLS**

**Office of Special Education**
825 North Capitol Street, N.E., 6ᵗʰ Floor
Washington, D.C. 20002-4232
202-442-4800, fax: 202-442-5518
www.k12.dc.us

# Psychoeducational Report

NAME: D██████ (D█████) S██████          REPORT DATE: 03/22/04
AGE: 16 years 0 months                 EXAMINER: Esther Mills, Ph.D.
DATE OF BIRTH: 03/08/88                 TITLE: School Psychologist
ID: 9103653                             Date Of Examination: 3-12-04
GENDER: Male
GRADE: 9
SCHOOL: Browne JH

**Tests Administered:**

Wechsler Intelligence Scale for Children - Third Edition (WISC-III)
Woodcock-Johnson III Tests Of Achievement
Developmental Test Of Visual-Motor Integration (VMI)
Record Review
Student Interview
Kinetic Family Drawing

Reason For Referral:

D████ is a 16 year old student who is in the 9th grade at Browne Junior High School. He was given a routine re-evaluation to assess his academic and cognitive progress. He is presently receiving special education services to address his learning problems in the areas of reading and math. Previous psychological data was not in his file. D████ attended school in Maryland prior to enrolling at Browne for his 8th grade school year.

Test Behavior and General Observations:

D████ is a pleasant looking student who is tall and slender in body build and stature. His general health seemed adequate as observed by the absence of any physical or sensory problems. He is left-handed.

D████ was accompanied to the school by his mother who left immediately following a brief

introduction with the examiner. He was brought to the school specifically to be evaluated since he was currently on suspension. According to D⬛⬛, he was suspended because he refused to remove his hat at the request of the assistant principal. He did not appear to harbor any negative feelings regarding his suspension. Neither did his mother.

D⬛⬛ was cooperative and pleasant to work with throughout the evaluation process. His willingness to share in friendly conversation made a pleasant working atmosphere. He appeared to put forth his best effort at all times. The following test results are believed to represent an accurate description of his cognitive and academic abilities.

## SCORES SUMMARY

| WISC-III SCALE | SCORE |
|---|---|
| Verbal (VIQ) | 82 |
| Performance (PIQ) | 117 |
| Full Scale    (FSIQ) | 98 |

## Interpretation of WISC-III Results

D⬛⬛ unique set of thinking and reasoning abilities make his overall intellectual functioning difficult to summarize by a single score on the Wechsler Intelligence Scale for Children--Third Edition. However, for information purposes, D⬛⬛ Full Scale IQ Score is included in the Scores Summary Profile. As can be seen, D⬛⬛ nonverbal reasoning abilities are much better developed than his verbal reasoning abilities. Processing complex visual information by forming spatial images of part-whole relationships and/or by manipulating the parts to solve novel problems without using words is a strength for D⬛⬛. Comprehending verbal information, however, and using verbal abilities to solve new problems are weaknesses. His verbal reasoning abilities are in the low average range and above those of approximately 12% of his peers (VIQ = 82; 90% confidence interval = 78 - 88). His nonverbal reasoning abilities are in the high average range and better than those of approximately 87% of his peers (PIQ = 117; 90% confidence interval = 109 - 122).

On verbal reasoning tests, D⬛⬛ scores reveal a pattern of skills ranging from solid average to borderline functioning in the various verbal abilities examined. In particular, he demonstrated adequate skills on measures of short-term auditory memory, quantitative reasoning ability, and word knowledge. In a similar manner, he tested in the low average range when he was required to express essential relationships between two concepts, as well as solve everyday problems using common-sense reasoning and judgment. In slight contrast, a "mild" weakness was detected in his ability to recall factual information gleaned from experience and education.

With regards to nonverbal reasoning tests, D⬛⬛ demonstrated a very strong strength on the

Picture Arrangement subtest. His performance on this particular task was much better than most of his age-mates. Specifically, D███ was required to rearrange each set of randomly-ordered pictures into a logical story sequence. Additionally, this particular subtest assessed his ability to infer cause and effect in social situations and to properly sequence events in time. It should be noted that performance on this task also may be influenced by planning ability and attentiveness to relevant details. D███ was also observed to use verbal mediation as a strategy to help him determine the logical order of the pictures.

In a similar manner, abilities ranging from average to bright average functioning were demonstrated on four of the five tests comprising the performance scale. Thus, it can be inferred that D███ attention to detail in pictures is adequate (visual-closure skills), he has adequate visual-motor coordination abilities, and he is able to perceive part / whole relationships when the model is not presented. He also has the ability to mentally organize visual information that is presented spatially. Overall, D███ nonverbal reasoning skills may be viewed as a strong area of strength for him.

Developmental Test Of Visual-Motor Integration (VMI):

D███ obtained a standard score of 95 on the Developmental Test Of Visual-Motor Integration which places his skills in the Average range of functioning. The VMI is a pencil and paper test which required D███ to copy geometric patterns which increased in level of complexity as the session progressed. His designs were neatly drawn and showed good planning ability. D███ handwriting is neat and legibly performed.

Academic Testing:

TABLE OF SCORES: *Woodcock-Johnson III Tests of Achievement*
Report Writer for the WJ III, Version 1.1
Norms based on grade 9.6

| CLUSTER/Test | Raw | GE | EASY to DIFF | | RPI | PR | SS(68% BAND) | AE |
|---|---|---|---|---|---|---|---|---|
| BROAD READING | - | 4.4 | 3.6 | 5.4 | 12/90 | 6 | 76 (75-78) | 9-9 |
| BROAD MATH | - | 5.8 | 4.5 | 7.7 | 58/90 | 10 | 81 (78-84) | 11-5 |
| MATH CALC SKILLS | - | 6.2 | 4.5 | 8.6 | 68/90 | 13 | 83 (80-87) | 11-9 |
| ACADEMIC SKILLS | - | 4.4 | 3.6 | 5.4 | 20/90 | 2 | 68 (65-71) | 9-8 |
| ACADEMIC FLUENCY | - | 4.7 | 3.7 | 6.0 | 19/90 | 6 | 76 (75-78) | 10-2 |

245

Form A of the following achievement tests was administered:

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Letter-Word Identification | 50 | 4.2 | 3.6 | 5.0 | 9/90 | 8 | 79 | (76-81) | 9 |
| Reading Fluency | 40 | 4.4 | 3.7 | 5.2 | 1/90 | 7 | 77 | (76-79) | 9-1 |
| Calculation | 21 | 6.2 | 4.8 | 8.1 | 61/90 | 18 | 86 | (81-91) | 11-9 |
| Math Fluency | 77 | 6.3 | 3.9 | 9.3 | 74/90 | 15 | 84 | (82-87) | 11-8 |
| Spelling | 28 | 3.3 | 2.6 | 4.2 | 10/90 | 2 | 68 | (63-72) | 8-5 |
| Writing Fluency | 15 | 4.6 | 3.6 | 5.7 | 24/90 | 7 | 78 | (74-82) | 10-0 |
| Passage Comprehension | 31 | 5.1 | 3.5 | 8.0 | 65/90 | 18 | 87 | (82-91) | 10-3 |
| Applied Problems | 36 | 5.4 | 4.4 | 6.6 | 38/90 | 15 | 84 | (81-87) | 11-0 |

D███ obtained a standard score of 76 on the Broad Reading Cluster which places his skills in the Low range of functioning. He earned an overall grade equivalent of 4.4. Broad Reading includes reading decoding, reading speed, and the ability to comprehend connected discourse while reading. Subtests making up Broad Reading include: Letter / Word Identification (4.2), Reading Fluency (4.4), and Passage Comprehension (5.1). As can be seen, Passage Comprehension represents a relative area of sstrength for D███. He was observed to use word context clues to help him identify the word that would complete the passage. His reading difficulties reflect a combination of weak word decoding skills, limited sight vocabulary, as well as reading comprehension problems.

He earned a standard score of 81 on the Broad Math Cluster which places his skills in the Low Average range of functioning. D███ obtained an overall grade equivalent of 5.8. Broad Math includes mathematics reasoning and problem solving, number facility, and automaticity. Subtests making up Broad Math include: Calculation (6.2), Math Fluency (6.3), and Applied Problems (5.4). On the Calculation test, D███ was able to solve problems involving advanced addition and subtraction, write the sum for a basic multiplication fact, subtract fractions with like denominators, as well as multiply decimals and point them off correctly. In contrast, he was not able to divide a 2-digit number by a 3-digit number, add mixed fractions with unlike denominators, nor was he able to multiply two 1-digit numbers with unlike signs (-6 x 7= ? (-42 is the correct answer). D███ should continue to receive remediation to improve his math skills.

He tested on a 3.3 grade level on the written Spelling test. It was noted that D███ was able to write the first syllable correctly in words that he was not able to spell completely: "tably" for table; "erly" for early; "advencher" for adventure, "cristill" for crystal, etc. He earned a grade level score of 4.6 on the Writing Fluency test which measured his ability to formulate and write simple sentences in a rapid manner. It was noted that a large number of D███ sentences were rather lengthy which limited the number of sentences he was able to complete in a 7-minute time frame.

Social and Emotional Development:

246

D███ presents as a relatively well adjusted student whose self concept seems to be developing adequately. He has good solid average intelligence that he can draw from when faced with a problematic situation. He seems to have a close relationship with his mother. At this time psychological counseling is not recommended. However, if D███ continues to show disrespect for school rules and those in authority, perhaps counseling may have to be re-considered.

## Summary

D███ is a 16-year-old student who is in the 9th grade at Browne Junior High School. He was given a routine re-evaluation to assess his academic and cognitive progress. Previous psychological data was not contained in his file which would allow for various comparisons to be made relative to his intellectual progress. Reportedly, this is D███ second year at Browne JH.

Cognitive testing as examined by the WISC-III indicated that D███ unique set of thinking and reasoning abilities make his overall intellectual functioning difficult to summarize by a single score. For information purposes however, he obtained a Full Scale IQ Score of 98. His nonverbal reasoning abilities are in the high average range and better than those of approximately 87% of his peers (VIQ = 117). His verbal reasoning skills are in the low average range and above those of approximately 12% of his peers. A significant discrepancy of 35 points was noted between his scores. A difference of this magnitude is highly suggestive of learning disabilities in the verbal reasoning domain. Achievement testing as measured by the Woodcock-Johnson placed D███ overall Reading skills on a 4.4 grade level, Math 5.8, Spelling 3.3, and Writing Fluency (4.6). When compared to others at his grade level, D███ performance is low average in mathematics and math calculation skills, and low in broad reading.

An overall evaluation of the test data describes D███ as a student who continues to meet the criteria of a student with learning disabilities. His academic progress is not consistent with what is expected of a student with his cognitive learning potential. Special education services should continue at the level already implemented.

Report Prepared by

Esther Mills, Ph.D.
School Psychologist
NCSP
March 22, 2004

247

IQ SCORES SUMMARY

| SCALE | IQ | 90% CONFIDENCE INTERVAL | PR | CLASSIFICATION OF INTELLECTUAL FUNCTIONING |
|---|---|---|---|---|
| Verbal | 82 | 78- 88 | 12 | Low Average |
| Performance | 117 | 109-122 | 87 | High Average |
| Full Scale | 98 | 93-103 | 45 | Average |

Difference Between VIQ and PIQ = 35 (p < .05, Freq =0.4%)

INDEX SCORES SUMMARY

| | INDEX | 90% CONFIDENCE INTERVAL | PR |
|---|---|---|---|
| Verbal Comprehension | 81 | 76- 88 | 10 |
| Perceptual Organization | 120 | 111-125 | 91 |
| Freedom from Distractibility | 96 | 89-104 | 39 |

SUBTEST SCORES SUMMARY

| VERBAL SUBTESTS | RAW SCORE | SCALED SCORE | PR |
|---|---|---|---|
| Information (IN) | 14 | 5 | 5 |
| Similarities (SM) | 16 | 6 | 9 |
| Arithmetic (AR) | 19 | 8 | 25 |
| Vocabulary (VO) | 36 | 8 | 25 |
| Comprehension (CO) | 23 | 7 | 16 |
| (Digit Span DS) | 17 | 10 | 50 |

248

| PERFORMANCE SUBTESTS | RAW SCORE | SCALED SCORE | PR |
|---|---|---|---|
| Picture Completion (PC) | 26 | 13 | 84 |
| Coding (CD) | 71 | 10 | 50 |
| Picture Arrangement (PA) | 63 | 19 | >99 |
| Block Design (BD) | 47 | 8 | 25 |
| Object Assembly (OA) | 39 | 13 | 84 |



GRAPH OF SUBTEST SCALED SCORES

| SUBTEST | IN | SM | AR | VO | CO | DS | PC | CD | PA | BD | OA | SS | MZ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SS | 5 | 6 | 8 | 8 | 7 | 10 | 13 | 10 | 19 | 8 | 13 | | |
| SEM | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 1 | 2 |

249

DIFFERENCES BETWEEN SUBTEST SCORES AND MEAN OF SUBTEST SCORES

| SUBTEST | SCALED SCORE | DIFF. FROM MEAN | SIGNIF. OF DIFF. | FREQ. | S/W |
|---|---|---|---|---|---|
| **VERBAL** | | | | | |
| Information (IN) | 5 | -2.33 | ns | 25% | |
| Similarities (SM) | 6 | -1.33 | ns | >25% | |
| Arithmetic (AR) | 8 | 0.67 | ns | >25% | |
| Vocabulary (VO) | 8 | 0.67 | ns | >25% | |
| Comprehension (CO) | 7 | -0.33 | ns | >25% | |
| (Digit Span DS) | 10 | 2.67 | .15 | >25% | |

Mean of Six Verbal Subtest Scaled Scores = 7.33
Scatter = 5  (p < .05, Freq = 64.2%)

| | | | | | |
|---|---|---|---|---|---|
| **PERFORMANCE** | | | | | |
| Picture Completion (PC) | 13 | 0.40 | ns | >25% | |
| Coding (CD) | 10 | -2.60 | ns | >25% | |
| Picture Arrangement (PA) | 19 | 6.40 | .05* | 1% | S |
| Block Design (BD) | 8 | -4.60 | .05* | 5% | W |
| Object Assembly (OA) | 13 | 0.40 | ns | >25% | |

Mean of Five Performance Subtests Scaled Scores = 12.60
Scatter = 11  (p < .05, Freq = 3.7%)

\* significant at the .05 level

WISC-III Writer Windows Version 1.0

# Exhibit 28

DRAFT

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### WASHINGTON, D.C.
### INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP  Page 1 of 4

Additional Comments:

### I. IDENTIFICATION INFORMATION

Student Name: Last S███████   First D█████   MI

Student ID 9103653   Soc. Sec. No.   Age: 16   Grade 09

Gender ☒M ☐F   Date of Birth 03/08/1988   Ethnic Group B

Address 125 Franklin Street   NE   M-13
House No.   Street Name   Quadrant   Apartment #

Washington   DC   20002
City   State   Zip Code

☐ Non-attending

Attending School Browne Junior High   Home School Browne Junior High

☐ Elem. ☒ Mid/JHS ☐ SHS ☐ CWS /

Parent   Ms. Rachelle Bobo

Address of (if different from student):   ☒ Parent  ☐ Guardian  ☐ Surrogate

House No.   Street Name   Quad   Apt. No.   City   State   Zip Code

Telephone: Home 399-6090   Work

### II. CURRENT INFORMATION

Date of IEP Meeting:   03/26/2004

Date of Last IEP Meeting:   11/17/2003

Date of Most Recent Eligibility Decision:   03/26/2004  11/22/2002

Purpose of IEP Conference:
☐ Initial IEP   ☒ Review of IEP
☐ Requested Eval.   ☒ 3yr ReEval.

Indicate Level of Standardized Assessment:
Level III

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| BEHAVIOR | | TRANSPORTATION |
|---|---|---|
| ESY | ☒ | TRANSITION |

### III. LANGUAGE

| III. LANGUAGE | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | | Oral |
| Parent | English | English | English | | Rdg./ Written |
| Home | English | English | English | | Instrument: |
| | | | | | Date: |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING GenEd | SETTING SpEd | SETTING Total | FREQUENCY Hr./ Min | FREQUENCY D/W/M. | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # | DURATION wks./mos |
|---|---|---|---|---|---|---|---|---|---|
| Specialized Instruction | 0.00 | 15.00 | 15.00 | Hrs | Week | Special Education Teacher | 03/29/2004 | 10 | Months |
| Psychological Services | 0.00 | 30.00 | 30.00 | Mins | Week | School Social Worker | 03/29/2004 | 3 | Months |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| | | | 0.00 | | | | | | |
| TOTAL | 0.00 | 15.50 | 15.50 | Hours Per Week | | | | | |

### V. Disability(ies)  Learning Disabled

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☐ 0-20%   ☒ 21-60%   ☐ 61-100%
Percent of time NOT in a General Education Setting   48%

### VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

| | |
|---|---|
| Rachelle Bobo — Parent | Derrick Shelton — Student |
| Angela Welton — Special Ed Teacher | Egola Moore — Social Worker |
| Lorraine Philyaw-Weans — General Ed Teacher | Esther Mills, Ph.D. — School Psychologist |
| Brenda Latimer — LEA Representative | |
| Cynthia B. Clarke — Principal or Designee | |

*I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature   Rachelle ███   Date 3-26-04

District of Columbia Public Schools   07-02-2001   Division of Special Education   Appendix - A   IEP Page 1 of 4

| Student Name | D____ S____ | Managing School | Browne JH S | DCPS - IEP |
| Student ID Number | | DOB 3-8-88 | Attending School Browne | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)** Esther Mills Ph. D.

**Math Strengths:**
D____ is able to solve advanced addition and subtraction problems, as well as subtract fractions with like denominators

Impact of disability on educational performance in general education curriculum:
Deficits noted in math operations, math facts, and math reasoning skills all impact D____ ability to work problems on grade level

**Reading Strengths:**
D____ shows a relative strength in reading comprehension skills

Impact of disability on educational performance in general education curriculum:
Weaknesses noted in word decoding skills and sight vocabulary both impact D____ ability to read on grade level.

**Score(s) When Available**
- Math Cal. 6.2 G.E.
- Math Rea. 5.4 G.E.
- See goal page:
- Date: 3-12-04
- Rdg. Com 5.1 G.E.
- Rdg. Basic 4.2 G.E
- Written Ex. 4.6 G.E
- See goal page:
- Date: 3-12-04

**Communication (Speech & Language) (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**
- Exp.Lang. ___
- Rec- Lang. ___
- Artic ___
- Voice ___
- Fluency ___
- Exp. Voc. ___
- Rec. Voc. ___
- See goal page: ___
- Date: ___

**Motor/Health (Evaluator)** Esther Mills, Ph. D.
Strengths:
Although not formally assessed, D____ gross motor skills appear age appropriate based on test observations

Impact of disability on educational performance in general education curriculum:
No delays noted in fine and gross motor skills

**Score(s) /Results When Available**
- VMS  SS = 95
- Gross motor = 12 yrs.
- See goal page:
- Date: 3-12-04

**Social Emotional Behavioral Areas: (Evaluator)** Esther Mills, ph. D.
Strengths:
D____ self concept seems to be developing adequately

Impact of disability on educational performance in general education curriculum:
No major problems observed in this area of development at this time; however, D____ shows disrespect for school rules at times.

**Score(s) When Available**
- ___
- ___
- ___
- See goal page:
- Date: 3-12-04

**Cognitive/Adaptive Behavior: (Evaluator)** Esther Mills, Ph. D.
Strengths:
D____ demonstrates a strong strength in the area of nonverbal reasoning skills

Impact of disability on educational performance in general education curriculum:
Deficits observed in verbal reasoning skills and academic skill development all impact D____'s ability to use his cognitive abilities.

**Score(s) When Available**
- ___
- ___
- ___
- See goal page:
- Date: 3-12-04

**Prevocational Skills: (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**
- ___
- ___
- ___
- See goal page:
- Date:

DRAFT

| Student Name | D███ S███ | Managing School | Browne Junior High | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9103653 | Attending School | Browne Junior High | Page 3 of 4 |
| | DOB 03/08/1988 | | | |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐      Goal Number: ☐ 5

Area addressed by goal: __Academic Areas: Math__

**ANNUAL GOAL: (including mastery criteria.)**

D███ will demonstrate improvement in his Math skills, produce a satisfactory product of all required assignment, works angles, observations, informal and formal tests.

Provider(s): __Special Education Teacher/Resource Room Teacher__

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| 1. D███ will be able to add, subtract, multiply and divide algebraic expressions with 80% accuracy. | | Monthly |
| 2. D███ will multiply and divide fractions with 80% accuracy. | | Monthly |
| 3. D███ will write equations for word problems with 80% accuracy. | | Monthly |
| 4. D███ will read and interpret graphs and charts with 80% accuracy | | Monthly |
| 5. D███ will find the perimeter of common polygons with 80% accuracy | | Monthly |
| 6. D███ apply his math skills to real life situations with 80% accuracy. | | Monthly |

**EVALUATION PROCEDURE(S)**

☒ Portfolio ☐ Log ☐ Chart ☒ Test ☐ Documented Observation ☐ Report ☒ Other Teacher Observation

254

~~DRAFT~~

| Student Name | D█████  S█████ | Managing School | Browne Junior High | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9103653 | DOB 03/08/1988 | Attending School  Browne Junior High | Page 3 of 4 |

| **VIII. SPECIALIZED SERVICES** | Additional Comments: ☐ | Goal Number: 2 |
|---|---|---|

Area addressed by goal:  Academic Areas: Reading

**ANNUAL GOAL: (including mastery criteria.)**

D██████ will improve his reading skills by one grade level. He will comprehend and compose a wide range of written, oral and visual texts in the process of making meaning.

Provider(s):  Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| 1. D██████ will demonstrate an understanding of the rules of the English language (grammar, paragraph, punctuation, sentence construction, spelling and usage) in written and oral work with 80% accuracy | | Monthly |
| 2. D██████ will identify the main idea and locate details of a reading selection with 80% accuracy. | | Monthly |
| 3. D██████ will be able to describe the setting of a story, the characters of a story, and the story plot in 8 out of 10 trials. | | Monthly |
| 4. D██████ will be able to identify and construct prefixes, suffixes, and compound words with 80% accuracy | | Monthly |
| 5. D██████ will use context clues to define words with 80% accuracy | | Monthly |
| 6. D██████ will understand and answer comprehension questions with 80% accuracy. | | Monthly |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☒ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☐ Documented Observation  ☐ Report  ☒ Other  Teacher Observation |

DRA

| Student Name | D_____ S_____ | Managing School | Browne Junior High | DCPS - IEP |
|---|---|---|---|---|
| Student ID Number | 9103653    DOB 03/08/1988 | Attending School | Browne Junior High | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**   Additional Comments: ☐   Goal Number: 2

Area addressed by goal:   Academic Area: Written Expression (English/Language Arts)

**ANNUAL GOAL:** (including mastery criteria.)

D_____ will demonstrate improvement in his language arts skills.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| 1. D_____ will be able to identify the parts of speech of given words with 80% accuracy | | Monthly |
| 2. D_____ will apply common spelling rules in completing assignment with 80% accuracy | | Monthly |
| 3. D_____ will be able to distinguish between singular and plural forms of nouns and the correct tense of verbs with 80% accuracy. | | Monthly |
| 4. D_____ will be able to write a friendly letter and business format letter in 8out of 10 trials | | Monthly |
| 5. D_____ will write a book report applying the rules of grammar and proper paragraph format with 80% accuracy | | Monthly |
| 6. D_____ will learn the steps in the writing process with 80% accuracy | | Monthly |

**EVALUATION PROCEDURE(S)**

☒ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☐ Documented Observation  ☐ Report  ☒ Other  Teacher Observation

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

| Student Name | D____ S____ | | Managing School | Browne Jr. High | | DCPS - IEP |
| Student ID Number | 9103653 | DOB | 3/1988 | Attending School | Browne Jr. High | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments: ☐    Goal Number: ☐

Area addressed by goal: Pre-vocational Skills

**ANUAL GOAL: (including mastery criteria.)**

D____ will demonstrate improvement in the areas of transitional/vocational skills to prepare for future needs.

Provider(s): Special Education Teacher/ Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| D____ will practice time management strategies with 80% accuracy. | | Monthly |
| D____ will set and meet short and long range goals with 80% accuracy. | | Monthly |
| ____ will evaluate aptitudes to help make career choices. | | Monthly |
| D____ will research career possibilities. | | Monthly |
| D____ will use community resources to explore career options. | | Monthly |
| D____ will participate in on-site job shadowing and observation. | | Monthly |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☒ Portfolio   ☐ Log   ☐ Chart   ☐ Test   ☐ Documented Observation   ☐ Report   ☒ Other Teacher Observation |

District of Columbia Public Schools      07-02-2001      Division of Special Education      Appendix - A      IEP Page 3 of 4

257

DRAFT

| Student Name D▇▇▇▇ S▇▇▇▇ | Managing School Browne Junior High | DCPS - IEP |
|---|---|---|
| Student ID Number 9103653    DOB 03/08/1988 | Attending School Browne Junior High | Page 3 of 4 |

| **VIII. SPECIALIZED SERVICES** | Additional Comments: ☐ | Goal Number: ☒ |

Area addressed by goal: Vocational/Transition

**ANNUAL GOAL:** (including mastery criteria.)

D▇▇▇ will increase his vocational skill aptitude and knowledge with 80% accuracy.

Provider(s): Special Education Teacher/Resource Room Teacher

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| D▇▇▇ will repond appropriately to introductions from adults and peers in 8 out of 10 trials. _instructions ?_ | Nov. ? Feb. ? n | Quarterly |
| D▇▇▇ will identify and research careers of interest in pursuing employment goals with 80% accuracy. | 3 up n | Quarterly |
| D▇▇▇ will maintain a portfolio of his career interest information. | | Quarterly |
| D▇▇▇ will be able to communicate effectively with peers and adults in 8 out of 10 trials. | | Quarterly |
| D▇▇▇ will be able to distinguish between acceptable and unacceptable behavior for given situations and environments in 8 out of 10 trials. | | Monthly |
| | | |

| **EVALUATION PROCEDURE(S)** |
|---|
| ☒ Portfolio  ☐ Log  ☐ Chart  ☐ Test  ☒ Documented Observation  ☐ Report  ☐ Other _____ |

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

DRAFT

| Student Name | D████  S████ | Managing School | Browne Junior High | DCPS - TRANSITION SERVICES PLAN PAGE 1 OF 2 |
|---|---|---|---|---|
| Student ID Number 9103653 | DOB  03/08/1988 | Attending School | Browne Junior High | |

Date Developed:  03/26/2004

## DCPS TRANSITION SERVICES PLAN

**Note:** The MDT determines if the IEP must include a statement of transition service needs which focuses on the Courses of study if the student will turn 14 during the implementation of the IEP. Furthermore, the MDT must include a detailed transition plan for a student who will turn 16 during the implementation of the IEP.

**I.  *Record student's post-secondary goals and interests.***

Employment:  Professional football player

Community Participation:  None

Post-Secondary Education and Training:  College

Independent Living:  Resides at home with his parents

**II.  *Courses of study leading to student's post-high school goals.***

| Grade or School Year | Courses of Study |
|---|---|
| 9th Grade | Math - consumer math, word problems |
| 9th Grade | Reading - comprehension, functional, vocabulary |
| 9th Grade | English/LA - Grammar, punctuation, writing skills |
| | |
| | |
| | |

**III.  *Transition Services Needed.***
*Evaluate the student's present level of performance in the following areas: Academic, Career Courses, Community-based Training, Supported or Competitive Employment, Communication, Independent Living Skills, Community Travel, Transportation, Employability Skills, Social Skills, Community Resources, Educational, Financial, Career Training, Community-Based Instruction, Skill/Trade Training, Vocational, or Social Relationships.*

| Transition Services | Coordinated Activities and Strategies | Agency Responsible |
|---|---|---|
| Employment  If service is not needed, provide explanation. | Explore various career and vocational options of interest. | DCPS |
| Community Participation  If service is not needed, provide explanation. | Explore volunteer activities/projects for 100 hours community service requirement. | DCPS |
| Post - Secondary Education and Training  If service is not needed, provide explanation. | Continue academic remediation | DCPS |
| Independent and Adult Living  If service is not needed, provide explanation. | Introduce to basic daily living (consumer) skills. | DCPS |

| Student Name ████████ | Managing School Browne Jr. High | DCPS - TRANSITION SERVICES PLAN PAGE 1 OF 2 |
| Student ID Number 103653    DOB ██/08/88 | Attending School Browne Jr. High | |

Date Developed: _____

## DCPS TRANSITION SERVICES PLAN

**Note:** The MDT determines if the IEP must include a statement of transition service needs which focuses on the Courses of study if the student will turn 14 during the implementation of the IEP. Furthermore, the MDT must include a detailed transition plan for a student who will turn 16 during the implementation of the IEP.

**I.** *Record student's post-secondary goals and interests.*

Employment: *Computers. Theater*

Community Participation: *none*

Post-Secondary Education and Training: *Community college, trade schools*

Independent Living: *resides with parent*

**II.** *Courses of study leading to student's post-high school goals.*

| Grade or School Year | Courses of Study |
|---|---|
| 9th | Math - Pre-Algebra |
| 9th | Reading - Vocabulary and comprehension |
| 9th | English/Language Arts - usage/written |
| | expression, Research paper |
| 9th | Pre-vocational - Career Choices Project, Million Dollar Project |

**III.** *Transition Services Needed.*
*Evaluate the student's present level of performance in the following areas: Academic, Career Courses, Community-based Training, Supported or Competitive Employment, Communication, Independent Living Skills, Community Travel, Transportation, Employability Skills, Social Skills, Community Resources, Educational, Financial, Career Training, Community-Based Instruction, Skill/Trade Training, Vocational, or Social Relationships.*

| Transition Services | Coordinated Activities and Strategies | Agency Responsible |
|---|---|---|
| **Employment** <br><br> If service is not needed, provide explanation. | | |
| **Community Participation** <br><br> If service is not needed, provide explanation. | | |
| **Post - Secondary Education and Training** <br> If service is not needed, provide explanation. | | |
| **Independent and Adult Living** <br> If service is not needed, provide explanation. | | |

260

DRAFT

| Student Name | D██████ S██████ | Managing School | Browne Junior High | DCPS - TRANSITION SERVICES PLAN |
|---|---|---|---|---|
| Student ID Number 9103653 | DOB 03/08/1988 | Attending School | Browne Junior High | PAGE 2 OF 2 |

Date Developed:  03/26/2004

| Transition Services | Coordinated Activities and Strategies | Agency Responsible |
|---|---|---|
| **Daily Living Skills** If service is not needed, provide explanation. | Career fair, summer employment | DCPS |
| **Functional Vocational Evaluation** If service is not needed, provide explanation. | Will not exit high school until June 2008 | DCPS |
| **Other** | | |

**IV.**

| Projected Exit Category (check one) | High School Diploma Status | | Projected Exit Date (mm/yyyy) |
|---|---|---|---|
| [x] DC High School Diploma | 3 | # Credits Earned toward graduation | |
| [ ] High School Certificate at age 21 | | | 06/2007 |
| [ ] High School Certificate *prior* to age 21 | | # Community Service Hours Completed | |

| State Test Requirements | Area | Date Taken / Score Received |
|---|---|---|
| Stanford 9 | Math and Reading | 04/04/2003  Below Basic |
| Alternative Portfolio Assessment | Access Skills - Social | 04/04/2003  Progressing (or Bridging |
| | | |

**V.** *Identify any other agencies likely to be responsible for providing or paying for specific transition services.*

Examples of Agency Linkages Needed for Transition
- Rehabilitation Services Administration (RSA)
- Mental Retardation and Developmental Disabilities Administration (MRDDA)
- Commission on Mental Health Services (CMES)
- UDC or other higher education institutions

| Agency | Agency Representative/ Telephone Number | Purpose of Contact | Date |
|---|---|---|---|
| Other: | / Telephone No.: 724-4547 | Referral - / | 03/26/2004 |
| | Telephone No.: | | |
| | Telephone No.: | | |
| | Telephone No.: | | |

District of Columbia Public Schools    07-02-2001    Division of Special Education    IEP Attachment C  Transition Services Plan  Page 2 of 2

STEP SEVEN

# Explanation of Transition Services
## for
## Parents and Guardians

Transition Services are a coordinated set of activities for students with disabilities that promote movement from school to post-school activities. The "Individuals with Disabilities Education Act (IDEA), amendments of 1997, Public Law 105-17" mandate that the Individualized Education Program (IEP) must include:

(I.)    beginning at age 14, an updated annually, a statement of the Transition Service needs of the child under the applicable components of the child's IEP that focuses on the child's courses of study.

(II.)    beginning at age 16 (or younger if determined appropriate by the IEP Team), a statement of needed Transition Services for the child, including, when appropriate, a statement of inter-agency responsibilities or any needed linkages; and

(III.)    beginning at least one year before the child reaches the age of majority under state law, a statement that the child has been informed of his or her rights under this title, if any, that will transfer to the child on reaching the age of majority under Section 615(m).

The IEP Team, including the student, parent, local agencies, and community organizations (if/when appropriate), should annually develop goals, objectives, and activities in preparation for transition into adult life as they relate to:
- career and employment
- post-secondary and continuing education
- community participation
- independent and adult living

## Role and Responsibilities of the Parent
- participate in the IEP/Transition Planning meeting
- express expectations of student outcomes
- provide insight into the student's needs and abilities
- participate in parent training opportunities

-------------------------------------------------------------------

## Parent/Guardian Statement of Understanding

Transition Planning has been explained and I understand how it relates to the provision of services for my child ⬛⬛⬛⬛⬛⬛⬛
(Student Name)

_____                    3-26-04
(Parent/Guardian Signature)                              (Date)

Page 20

262

03/26/2004

| Student Name | D_____ S_____ | | Managing School | Browne Junior High | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | 9103653 | DOB 03/08/1988 | Attending School | Browne Junior High | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
## SERVICE ALTERNATIVES

~~DRAFT~~

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in general education?  ☐ Yes  ☒ No

Explanation for removal out of regular education classroom.

Requires specialized instruction in reading, math, and english within the resource classroom.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hr./ Min | D/W/M. | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing:  ☐ None needed

| | |
|---|---|
| Timing/Scheduling: | Allowance of extra 'think time' when awaiting or |
| Setting: | Reduced, minimalized distractions |
| Presentation: | Gain student's attention before giving directions, asking questions (eye contact, touch, proximity) |
| Response: | |
| Equipment: | |

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I  Tested with non-disabled peers under standard conditions without accommodations.

☒ Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V  Portfolio:

☐ Level II  (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ Level IV  (Describe the alternative assessment)

## XII. Areas Requiring Specialized Instruction and Related Services:

☒ Reading
☒ Mathematics
☒ Written Expression
☐ Other:
☐ None

☐ Physical/Sensory
☐ Social Emotional
☐ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☐ Speech/Language

**Modifications:**
☒ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| Combination General Education and Resource Classro | Accepted | Impact on self esteem |
| In General Education Classroom Setting | Rejected | Continued school failure |
| Out of General Education Classroom | Rejected | Time away from non-disabled peers in academic sett |
| | | |
| | | |

Modification(s)/Accommodation(s) to address the harmful effects:

Participation in counseling to address self-esteem issues

Location for Services  Browne Junior High

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
825 North Capital Street, N.E., 6th Floor
Washington, D.C. 20002-4232

<u>Caring for Our Students with Disabilities</u>
<u>A Procedural Manual for Parents</u>

RECEIPT

I, _Rachelle Bobo_____, received a copy of *A Procedural*
(Parent/Guardian Name)

*Manual for Parents* from _Latimer_____ /Title _Sp. Ed Coord_
(Person Issuing Document)

at _Browne_____
(School)

3, 26, 04 .
(Date)

_____
Parent/Guardian Signature

**(This receipt is to remain in a designated file in the school.)**

16

WASHINGTON, D.C.

### INDIVIDUALIZED EDUCATION PROGRAM
### (IEP)
### MEETING NOTES

STUDENT D_____ S_____          SCHOOL Browne Junior High          DATE: 03/26/2004

| PARTICIPANTS: | PARTICIPANTS: (Sign Name) | DISCIPLINE |
|---|---|---|
| Rachelle Bobo | _Rachelle Bobo_ | Parent |
| Angela Welton | _Angela Welton_ | Special Ed Teacher |
| Lorraine Philyaw-Weans | | General Ed Teacher |
| Brenda Latimer | _Brenda Latimer_ | LEA Representative |
| Cynthia B. Clarke | _CBClarke_ | Principal or Designee |
| D_____ S_____ | | Student |
| Egola Moore | _Egola Moore_ | Social Worker |
| Esther Mills, Ph.D. | _Esther Mills Ph.D._ | School Psychologist |

Review of IEP due to 3 year reevaluation.
D_____ does not qualify for ESY or compensatory
education. Does not require DCPS transportation.
Continues to need remediation to improve his skills
in reading, math, and language arts.
Discussed techniques to improve his sight vocabulary;
for example current events in the newspaper. Parent also
word lists that she uses at home.
D_____ wants to play professional football, own his
business, and buy nice things for his mother and grandmother
Counseling services to be discontinued at the end of
June 2004. Specialized instruction continued @ 15 hour
per week in academic areas of reading, math, language arts.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    IEP MEETING NOTES

265

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

~~DRAFT~~

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT

MEETING DATE: 03/26/2004

STUDENT: D███ S███              SCHOOL: Browne Junior High

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Rachelle Bobo | *Rachelle Bob* | Parent |
| Angela Welton | *Angela Welton* | Special Ed Teacher |
| Lorraine Philyaw-Weans | *signature* | General Ed Teacher |
| Brenda Latimer | *Brenda Latimer* | LEA Representative |
| Cynthia B. Clarke | *CB Clarke* | Principal or Designee |
| D███ S███ | | Student |
| Egola Moore | *Egola Moore* | Social Worker |
| Esther Mills, Ph.D. | *Esther Mills, Ph.D.* | School Psychologist |

Reevaluation. Parent has received the Procedural Manual with
an explanation of its contents.
Cognitive testing indicated that D███'s nonverbal
reasoning abilities are within the high average range. Verbal
reasoning skills in the low average range. Significant
discrepancy of 35 pts noted between scores -- suggestive of
learning disability in the language area. Achievement
testing scores between 4th and 6th grade as measured by the
Woodcock Johnson. FSIQ-98; NIQ-117
Math-5.8 GE, Reading-4.4 GE; Spelling-3.3 GE, Writing Fluency-4.6 GE

THE PARENT ☒ IS PRESENT ☐ IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT D███ S███

☒ CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

☐ IS TO BE EXITED FROM SPECIAL EDUCATION

NEXT SCHEDULED IEP DEVELOPMENT MEETING DATE: 03/26/2004

# Exhibit 29

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE:_____

MEETING DATE: 1/10/05

MDT

STUDENT: ~~D____ S____~~        SCHOOL: MAPCS

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Zakiya Sackor | Zakiya Sau | Asst. Principal |
| Cindy Cowan | Cynthia Cowan | Sped Coordinator |
| CMSET | | CMSET |
| Cynthia Sharpe | Sharpe | Sped Intern/ Reading Pa |
| Carol Nemures | Nemures | Transition specialist |
| Cortha M. Pringle | Cortha M. Pringle | Vocational Coordinator |
| Jodi Bossio | Jodi Bossio | Teacher |
| Rochelle Bob Rachelle Bob | Rachelle Bob | Mother |

Introductions were made.

The purpose of this meeting is to review the Vocational assessment administered by DCPS and the speech evaluation administered by MAPCS. D____ was unable to attend today's meeting because he has already missed a couple days of his internship due to illness and could not miss another day. The results will be reviewed with him by the special

THE PARENT ☑ IS PRESENT ☐ IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT_____

☐ CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

☐ IS TO BE EXITED FROM SPECIAL EDUCATION

Maya Angelou Public Charter School
1851 9th Street, NW
Washington, DC

MULTIDISCIPLINARY TEAM (MDT)
CONTINUATION MEETING NOTES
MEETING TYPE: _____

Student: ▮▮▮▮▮▮▮  School: Maya Angelou PCS    Date: 1/10/05

Subject area: _____

education coordinator at a later date.
The vocational assessment was reviewed
and it indicated that ▮▮▮▮▮ interests
specifically lie in retail sales and
maintenance engineer. He currently is
receiving job experience from MAPCS
and is doing well (on time, professional
behavior + performs tasks adequately)
he is also receiving experience as a
maintenance worker, working with his
father on jobs around their apartment
complex.
    The speech + lang. eval. was
reviewed by Ms. Downs. ▮▮▮▮▮ is currently
performing at an average level. It was

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, DC

MDT REFERRAL DATE: _____     MULTIDISCIPLINARY TEAM (MDT)     Page: _____ of ___
                                 CONTINUATION MEETING NOTES
                                 MEETING TYPE: _____

STUDENT: ▮▮▮▮▮▮  SCHOOL: MAPCS          DATE: 1/10/05

noted that he needs extended time in order to complete tasks.

Ms. Bobo stated that she was very happy with D▮▮▮▮'s placement + performance here at MAPCS

Different job placements that would be more in line with ▮▮▮▮'s interests were discussed. Ms. Neloms stated she would ▮▮▮▮▮▮ try to provide our vocational coordinator with a list of possible internship sites.

Parent Rights packet was provided to the parent.

An MDT meeting will be held in March to review his progress and determine new goals and objectives for the new year. + new IEP.

# Exhibit 30

# JAMES E. BROWN & ASSOCIATES, PLLC

*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| ----------------------------- | e-mail: Admin@Jeblaw.biz | ----------------------------- |
| | | ! DC Bar Special Legal Consultant |
| | | + Admitted in Bolivia |

March 5, 2007

**Via Facsimile**
Jessica Smith, Esq.
Counsel for MAPCS
1008 Pendleton Street
Alexandria, Virginia 22314

Re: D███ S███
DOB: 3/8/88

Dear Counsel:

Please be advised that parent is requesting that the following Individual be available to testify at the Due Process Hearing Scheduled for March 12, 2007 at 3:00 p.m. Ms. Melanie Cobb, Dean of Student Affairs at Maya Angelou Public Charter School. In the event that she is not available, please contact this office immediately.

Please feel free to contact me should you have any questions or concerns. I may be reached at (202) 742-2021. I appreciate your assistance in this matter and look forward to hearing from you.

Sincerely,

Roberta Gambale, Esq.

Attachment: Motion to Compel

Cc: File

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

James E. Brown
Domiento C.R. Hill
Roberta Gambale
Miguel A. Hull
Christopher L. West

----------------------------------

Attorneys at Law
1220 L Street, NW
Suite 700
Washington, DC 20005
Telephone: (202) 742-2000
Facsimile: (202) 742-2098
e-mail: Admin@Jeblaw.biz

Juan J. Fernandez!+
Tilman L. Gerald
John A. Straus
Roxanne D. Neloms
Omar Karram
Christie Fontaine-Covington

--------------------------------
! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE:  March 5, 2007

TO:    Paul Dalton, Es. Dalton, Dalton & Houston, P.C

PHONE NO: (703) 739-4300

FAX NO: (703) 739-2323

FROM: Yamileth Amaya, Paralegal for Roberta Gambale, Esq.

SUBJECT:  D██████ S██████
DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: **2**

COMMENTS:  Please find attached correspondence regarding Notice to Appear Witness.

**STATEMENT OF CONFIDENTIALITY:**
The information contained in this electronic message and any attachments to this message are intended for the exclusive use of the addressee(s) and may contain confidential or privileged information. If you are not the intended recipient, please notify James E. Brown and Associates, PLLC immediately at (202) 742-2000, and destroy all copies of this message and any attachments.

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              2975
CONNECTION TEL                    97037392323
CONNECTION ID
ST. TIME             03/05 11:37
USAGE T              00'20
PGS. SENT            2
RESULT               OK
```

## JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| | e-mail: Admin@Jeblaw.biz | |

---------------------------- --------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# *FAX COVER SHEET*

DATE: March 5, 2007

TO:    Pau Dalton, Es. Dalton, Dalton & Houston, P.C

PHONE NC: (703) 739-4300

FAX NO: (703) 739-2323

FROM: Yamileth Amaya, Paralegal for Roberta Gambale, Esq.

SUBJECT:  D█████ S█████
DOB: 3/8/88

NUMBER OF PAGES INCLUDING COVER SHEET: **2**

COMMENTS:  Please find attached correspondence regarding Notice to Appear Witness.

!

STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS

D███ S███ (adult student)       )
                                )
            Petitioner,          )
                                )        Hearing Officer Coles B. Ruff, Jr.
v.                               )
                                )
District of Columbia Public Schools  )
            ("DCPS"),            )
and                              )
                                )
Maya Angelou Public Charter School   )
            ("MAPCS")            )
                                )
            Respondents.         )
_____  )

### AFFIDAVIT OF NAKITA WEST

I, Nakita West, hereby declare and state the following:

1.      I am a teacher at MAPCS. I teach Algebra II.

2.      During the 2006-2007 school year, I was D███ S███ Algebra II teacher.

3.      I am familiar with D███ IEP, which classifies him as having learning disabilities and provides that he will receive 1.5 hours of counseling per week and just under three hours of specialized instruction per week. I believe that the current IEP is appropriate for D███, as he is receiving grades of As and Bs in his classes and was on the honor roll.

4.      I participated in the Manifestation Determination Review ("MDR") meeting on December 19, 2006. At that meeting, it was determined that the behavior was not a manifestation of D███ learning disability. I was in agreement with that decision.

5.      Immediately following the MDR, a Resolution Meeting convened regarding a complaint filed against MAPCS for D███ At the Resolution Meeting, the team discussed what type of interim services would be put in place for D███ while he was out of school.

275

6.    In my view, and based on D̶▮▮▮ current IEP, three hours of individualized tutoring per week was appropriate for D̶▮▮ as an interim alternative placement.

7.    Due to the good working relationship that I have with D̶▮▮, I was selected to be the tutor to provide the three hours of individualized tutoring per week for D̶▮▮.  It was determined that D̶▮▮ would come in for tutoring on Wednesday afternoons, when most of the other students were out of the school building at their internships.

8.    Tutoring for D̶▮▮ was scheduled to begin on December 22, 2006.  On December 22, and 27, 2006 and January 3, 2007, I was at the school ready to provide tutoring to D̶▮▮ but he did not show up.

9.    On January 10, 17, 24, 31, and February 7 and 21, 2007, D̶▮▮came to MAPCS and I provided him with three hours of individualized tutoring each day.  The tutoring sessions typically took place between 1:00pm - 4:00 pm or 2:00pm - 5:00pm, depending on what time D̶▮▮ arrived.

10.   On February 14, 2007, I was available at the school, however D̶▮▮did not show up for tutoring.

11.   After February 21, 2007, D̶▮▮ stopped coming to the tutoring sessions.  I did not receive any notification that D̶▮▮ would no longer be attending the tutoring.

12.   On February 28 and March 7, 2007, I was available at the school to provide tutoring.  I was informed that D̶▮▮ was seen in the school building on those days; however, Derrick never came to me for the tutoring sessions.

13.   I kept a tutoring log which documented the tutoring that I provided to D̶▮▮.  There was a clerical error on the last day of tutoring indicated in the log, February 28, 2007.  Although I was prepared to tutor D̶▮▮ that day, as stated above, he did not show up.  I corrected the tutoring log to accurately reflect that D̶▮▮ did not show up to tutoring that day.  However, the

2

276

tutoring log was not updated until after the five-day disclosure deadline. Thus, the document number 10, submitted by MAPCS's attorney at the hearing, should be corrected to reflect that D█████ did not show up for tutoring services on February 28, 2007.

14.     On the days that I tutored D█████, the tutoring sessions took place in a room where, at times, one or two other students were also present. Those other students were working for me during the internship hours and did not interfere with the tutoring provided to D█████.

15.     During the individualized tutoring sessions, I tutored D█████ in math, English and history.

16.     The tutoring provided enabled D█████ to participate in the general education curriculum, as well as make progress toward his IEP goals.


In accordance with 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/14/2007_____

_____

Nakita West                              Date    3-14-07

Subscribed and sworn before me this _14th_ day of March, 2007.

                                        Notary Public

SEAL

DIONNE J. CASTRO
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES MARCH 31, 2009

STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA
STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)
SPECIAL EDUCATION PROGRAMS

| | | |
|---|---|---|
| In re:    `     D███ S█████ | ) | **Petitioner's Response** |
| (DOB: 3/8/88) | ) | **To Motion to Dismiss** |
| | ) | |
| | ) | |
| Attending School:    Maya Angelou PCS | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| District of Columbia Public Schools | ) | |
| 825 North Capitol, Street, NE Sixth Floor | ) | |
| Washington, DC 20002 | ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

## Petitioner's Response to Motion to Dismiss

COMES NOW, Rachelle Bobo ( hereinafter "complainant") by and through his attorney, the Law Office of James E. Brown & Associates, PLLC (hereinafter "counsel") and responds to the Motion to Dismiss as follows:

Maya Angelou PCS's motion is based on allegations that the Complaint lacks specificity regarding who the actual complainant is. This information is clearly specified in the Complaint on page one and page two. Student is named as D████ S████. His parent is Rachelle Bobo. The contact information is true and accurate. Such an allegation goes towards the sufficiency of the Complaint and would not support a Motion to Dismiss.

D████ has attained the age of 18 and has retained the services of counsel on his own behalf. However, his rights have never been transferred by the public agency and he continues to reside in his parent's household upon whom he is dependent for support.

276

**WHEREFORE**, the complainant, by and through counsel, hereby requests the following relief:

1. The Motion to Dismiss should be denied.

Roberta L. Gambale, Esq.,
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2021
Counsel for the Parent

## CERTIFCATE OF SERVICE

I, Roberta L. Gambale, Esq., hereby certify that a copy of the Parent's administrative due process complaint was served to the  Maya Angelou Public Charter School   via facsimile.

Roberta L. Gambale, Esq.

277

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)**
**SPECIAL EDUCATION PROGRAMS**

| | |
|---|---|
| In re:       D███ S█████ <br> (DOB: 3/8/88) | ) ) ) )   **Petitioner's Closing Statement** <br>   **Student: D███ S████ Jr.** <br>   **Hearing Date: 3/12/07** |
| Attending School: | ) )   **Hearing Officer: Giles B. Ruff** |
| v. | ) ) |
| Maya Angelou Public Charter School | ) ) |
| _____ | ) |

COMES NOW the Student, D███ S████, ( hereafter referenced as "D.S.") by and through counsel with his closing statements pursuant to the direction of the Hearing Officer:

## I.    STATEMENT OF ISSUES

The Due Process Hearing Complaint was filed to address the harm that resulted as a result of the failure of Maya Angelou Public Charter School ("MAPCS")  to comply with Discplinary Procedures set  forth in IDEA (34 C.F.R. Section 300.530) by a) failing to convene a MDR review within 10 days b) failing to conduct FBA and c) by failing to continue to provide student with FAPE on the 11th day and thereafter to ensure progress and access general curriculum and achieve IEP goals and as a result this student has been denied a FAPE.

## II. OVERVIEW OF  WITNESS TESTIMONY

Mr. Luseni and Dr. Graham testified on behalf of MAPCS.  Their testimony clearly supported the position of the student and did not dispute that MAPCS failed to comply with the IDEA or that the student has not been provided a FAPE. Mr. Luseni  admitted that they did not convene the MDR meeting until December 19,  when the meeting should have occurred by no later than December 5, 2006 taking into account the Thanksgiving Holidays.  Mr. Lusenia admitted that interim services were not put into

Closing Statement pg 1

place by MAPCS until after he was expelled and he testified that MAPCS did not make an official decision to expel until after the MDR. ( though documentation clearly indicates the intent to expel existed well before the meeting). Furthermore, Mr. Luseni testified that he did not provide the student with work packets to enable him to attempt to keep up with his studies or that D.S. was on track to graduate this school year.

Mr. Luseni confirmed that there were 5 days of suspension prior to the suspension with the intent to expel on November 17, 2006. Wherefore, pursuant to the requirements of the IDEA- services should have been put into place by no later than November 24, 2006. Services were not put into place by that date.   It is undisputed that for a period of five (5) weeks the student received no educational services whatsoever. He did not dispute that prior to the incident on November 17, 2006, D.S. was doing well academically. D.S. was applying himself. There were no attendance issues.

One of the most concerning things about Mr. Luseni's testimony was that when he offered to provide the student with tutoring- did it not with the intent of providing the student with what he needed but rather with the expectation that more hours would be negotiated. Furthermore, he unilaterally took it upon himself to determine that the student should be placed in his neighborhood school.

Both Mr. Luseni and Dr. Graham testified that MAPCS though D.S.'s IEP hours had been significantly reduced, MAPCS was providing the student with a 9-1 student teacher ratio, vocational services ( such as job training and college prep, counseling and as a result the student was able to succeed academically. The services offered by MAPCS were not services that would be available in the student's neighborhood school. Concern was expressed over the size of student population at Cardozo and their ability to address vocational needs, particularly in light of the reduction in services.

Both Mr. Luseni and Dr. Graham testified that there was never a placement meeting held and there was never an FBA conducted. Neither denied that the student requested a "Stay Put" or that tutoring services began on or about January 17, 2007.

Closing Statement pg 2

The student testified that he wants to be in school, that he is willing to do whatever is necessary to be able graduate on schedule. The student and/or parents have always been available to participate in meetings. The father testified that he went to the school on several occasions to obtain documents and that work packets were requested but not provided. Student did not enroll in his neighborhood DCPS school because it was believed by parent and student that it did not have a suitable program for D.S., particularly in light of the reduction of IEP services.

The advocate testified that he had concerns that were expressed about the existing IEP at the MDR meeting and requested that the MDT reconvene to at the December 19, 2006 meeting. He proposed dates to the school but the school failed to convene a meeting .

## III. LEGAL AUTHORITY

The LEA's obligation is clearly set forth in both 20 U.S.C. Section 1412 and 1415[1] ( See also <u>Honig v. Doe</u>, 484 U.S. 305 (1988). (attached)

Because a suspension of more than ten (10) days has been determined to constitute a change of placement, within ten(10) days of such a suspension, the public agency is required to convene a meeting to determine whether or not the student's disability caused the behavior which violated the code of conduct for which the student is being suspended. See 20 U.S.C. Section 1412(a)(1)(A).

Upon the suspension of a student with a disability, the Individualized Educational Team ("IEP") team is required to conduct a Functional Behavioral Assessment and implement a Behavior Plan for the student as soon as possible following the incident. If a behavior plan is already in place, the school is required to modify that plan to address behavior as necessary and thereby prevent reoccurrence. See: 20 U.S.C. Section 1415(k)(1)(g). If a behavior plan is not in place then the MDT is required to discuss behavior strategies.

---

[1] 34 C.F.R. Section 300.530

Closing Statement pg 3

Irregardless of whether the student's behavior was a manifestation of his disability or not, the public education still has an obligation to ensure that a Free and Appropriate Public Education is provided to disabled students irregardless of the severity of the action for which they are being suspended. See: 20 U.S.C. Section 1415(k)(1)(g) so that the child can participate in the general education curriculum, make progress on IEP goals. Furthermore, the school had an obligation to honor the parent's invocation of "Stay –put" provisions of the IDEA.

## IV.    ARGUMENT

This student has been significantly harmed by MAPCS failure to comply with IDEA. As the LEA- MAPCS was responsible for ensuring the student receives FAPE and needed services so as to advance in general curriculum and achieve IEP goals. Rather then fulfill their obligation to this student, they denied him services with the expectation that he would return to his neighborhood school and they would deal with the situation. The school gave no consideration of whether the neighborhood school was appropriate or could meet the student's needs – particularly in light of the fact that the student's program had been modified and services substantially reduced as a result of the unique services that MAPCS provided to all of their students.

a) Evidence has shown that they didn't schedule MDR within time frame set forth in IDEA (10 days) Didn't even attempt to schedule until after Counsel was retained and filed HR and that was after student had already been excluded from school for over 10 days. (Ex 4 and 19)

b) MAPCS was required under law to conduct FBA and develop behavior plan and by admission failed to do this.

c) On day 11 services should have been put into place to ensure student could keep up with general curriculum and achieve IEP goals but that didn't happen. He has received a total of 12 hours of tutoring since November 17, 2006.

Closing Statement pg 4

281

Because a suspension of more that ten (10) days constitutes a change of placement under the law, there should have been placement meeting held.

MAPCS was also supposed to convene MDT to adjust his IEP and determine what services should be put into place to ensure the student continued to receive a FAPE but they never did that.

D.S. was doing well academically before the incident. He was an honor roll student and wanted to go to college. So many other students in his position would have given up, but he has continued to show up for tutoring, he is asking for help because he wants his high school degree. He is willing to do his part and he should not be denied an education.


## V.    CONCLUSION/ REQUEST FOR RELIEF

MAPCS failure to provide work and/or services to D.S. will irreparably harm him, if as a result he is unable to earn his high school diploma. In order to minimize the harm that has already been caused to this student, he is requesting that he be allowed to return to MAPCS and finish up the current school year and that he be provided with supplemental tutoring to help him catch up with class work missed.

In the alternate, an MDT/IEP/placement meeting should be scheduled, though counsel for the student, the student should be provided with class work and independent tutoring services and/or related services.

In the event that there is a disagreement about the placement identified for the student indpendent services, the student should have the right to invoke the "Stay-Put" provisions of the IDEA.

Roberta L. Gambale, Esq.
Attorney for the Student

Closing Statement pg 5

**STATE EDUCATION AGENCY FOR THE DISTRICT OF COLUMBIA**
**STATE ENFORCEMENT AND INVESTIGATION DIVISION (SEID)**
**SPECIAL EDUCATION PROGRAMS**

| | |
|---|---|
| In re:    D███ S██████ | ) |
| (DOB: 3/8/88) | ) **Declaration of** |
| | )    D███ S██████ Jr. |
| | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| Maya Angelou Public Charter School | ) |
| | ) |

I declare and state as follows:

To the best of my recollection, tutoring services began on January 17, 2007. I was never notified by MAPCS to come in for tutoring before that and on December 22, 27, and January 3, it was my understanding that the school was closed.

In total I have received approximately between 8-10 hours of tutoring since November 17, 2006. The sessions began at 2:00 p.m. and the teacher dismissed me at approximately 4:00 p.m. -4:30 p.m. each day though the sessions were supposed to last three hours. There was one occasion when I went to the school and the teachers were having a party and eating. While they were present and said hello to me, they didn't provide me with any instruction.

My tutor was Ms. West, my math teacher, who provided me assistance and work in math. I didn't receive assistance in any other areas. On one occasion- the day of the dinner party, I was given class work for history to complete.

There was one session that was cancelled due to snow on February 14, 2007.

I have not received class work packets in any subject except math and 1 history lesson.

I have not received counseling services.

283

I have not received a report card since the first semester report card .

I have not been given any tests to take.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is a true and accurate statement to the best of my knowledge.

Dated this _5-16-07_ day o f March, 2007

D██████ S██████, Jr. Student

Washington, District of Columbia
The foregoing instrument was subscribed and sworn before me this _16th_ day of _March_ , _2007_
by _D████████████_ _JR._
_Kelly Nau_ Notary Public
My commission expires _1-1-10_

284

## JAMES E. BROWN & ASSOCIATES, PLLC
### *A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine-Covington |
| ------------------------------- | e-mail: Admin@Jeblaw.biz | ------------------------------- |
| | | ! DC Bar Special Legal Consultant |
| | | + Admitted in Bolivia |

# *FAX COVER SHEET*

**DATE:**    December 12, 2006

**TO:**    Sharon Newsome, Student Hearing Office Coordinator, DCPS

**PHONE:**    202-442-4800

**FAX NO:**    202-442-5556

**FROM:**    Yamileth Amaya, Paralegal

**Subject:**    D█████ S█████
DOB: 7/28/90

NUMBER OF PAGES INCLUDING COVER SHEET: 9

COMMENTS:  Please find attached Due Process Complaint.

State ̲ ̲ucation Agency for the District of C ̲ ̲ ̲ ̲abia
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



### Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals wit**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office for the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting **(called a "Resolution Session")** with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings**.

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

A.  **INFORMATION ABOUT THE STUDENT:**

Name of the Student: D____ S____.    Date of Birth: **3/8/88**
Address: **125 Franklin Street , N.E. # M13  Washington, DC 20002**
Home School: **Maya Angelou School**
Present School of Attendance:  **Same**

Is this a charter school? Yes     (If yes, you must also provide a copy of this
                                   notice to the charter school principal or director)

Parent/Guardian of the Student:  **Rachelle Bobo**
Address (if different from the student's above): same                                286

**B.**    **Legal Representative/Attorney:**

Name: **Roberta L. Gambale, Esq. ( James Brown and Associates, PLLC)**
Address: 1220 "L" Street, Suite 700, Washington, DC 20005
Phone: (w) (202)742-2000 (ext. 2021)  (Fax)  (202) 742-2098    (e-mail)
Rgambale@jeblaw.biz
Will attorney / legal representative attend the resolution session?   **X** Yes        ☐ No

**C.**    **Complaint Made Against (check all that apply):**

**X** Maya Angelou Public Charter School ("MAPCS")
X District of Columbia Public Schools ("DCPS")

**D.**    **Resolution Session Meeting Between Parent/Representative and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint. I also
understand that I may voluntarily waive this right if I choose. (Note: All parties must agree
to waive the resolution meeting to avoid having this meeting.)

The parent, by and through counsel, wishes to waive the Resolution Session Meeting for this
process.

**E.**    **Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be
offered at no cost to the parent. Both parties can request mediation as an alternative to the
Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all
that apply:

**I am requesting an administrative due process hearing only.**

**F.**    **Facts and Reasons for the Complaint:**

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA),
please complete the following questions (attach additional pages if needed):

**I. Nature of the problem.**
<strong>RELEVANT FACTS</strong>

1.  D⬛⬛ S⬛⬛; ( hereinafter "D.S..")  is a repeating 11th grade learning disabled
    student who last attended Maya Angelou Public Charter High School (hereinafter
    "MAPCS"). MAPCS is the school where he first repeated the 11th grade.

2.  According to D.S.'s Individualized Educational Program ("IEP") he should be
    receiving fifteen (15) hours of instruction and thirty (30) minutes of counseling per
    week.

2

3. On or about No. ..ber 22, 2006, D.S. was suspended wi. ..e intent to expel him as a result of an incident wherein he assaulted a fellow student.

4. A Manifestation Determination Review meeting was never held to address the relationship between the student's disability and the incident despite the express request of the parent that such a meeting be held as soon as possible.

5. Despite repeated requests from the parent on both the day of incident and/or the next school day following the incident when the father accompanied D.S. to school and spoke with both principal and the special education coordinator, Mr. Luseni, the parent was not provided with a copy of the incident report.

6. Though the student has been out of school for more than ten (10) days arrangements have not been made to ensure that this student continues to receive a free and appropriate public education (FAPE). He has been given no class work to take home. He has been given no access to parallel instruction. He has not been provided with related services.

7. The parent went to the school on or about November 27, 2006 for the purpose of obtaining records and/or picking up class work for his son.

8. An MDT meeting has yet to be convened to address the incident, discuss the need for a change of placement, and/or address behavior interventions that might be warranted for this student.

9. To the best of the parent's knowledge, MAPCS has never sent written notice to DCPS so as to advise them that they are not able to meet this student's individualized needs.

10. Though D.S. is identified as a learning disabled student, he has had difficulties with behavior and self esteem and depression since the time of his initial evaluations and receives counseling as a related service. In the past, evaluators have found that the student's frustration, self esteem issues stem from depression around school failure. *(See – psychological evaluation pg 3)*

## ISSUES/ARGUMENTS

## 1.    MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO SCHEDULE A MANIFESTATION DETERMINATION REVIEW MEETING

District of Columbia Public Schools ("DCPS") suspended this student for more than ten (10) days and failed to comply with procedural safeguards involving discipline and suspensions of students suspected of having a disability by failing to convene a manifestation determination review meeting to discuss the relationship between the incident and the students disability.

Because a suspension of more than ten (10) days has been determined to constitute a change of placement, within ten(10) days of such a suspension, the public agency is

3

required to conve _ a meeting to determine whether or no. _ student's disability caused the behavior which violated the code of conduct for which the student is being suspended. See 20 U.S.C. Section 1412(a)(1)(A).

A suspension of a student for more than ten (10) days as a result of the violation of student conduct code is considered to be an impermissible "change of placement" unless the local education agency convenes a meeting within ten (10) days to address the nexus between the behavior warranting the suspension and the student's disability and/or suspected disability. The team must determine whether the behavior is a manifestation of his disability and if so they are not permitted to suspend.[1] Even where the school determines that the behavior was not a manifestation of the disability, the school still has an obligation to provide the child with a Free and Appropriate Public Education ("FAPE") even if the violation involves the violation of a code of conduct and/or possession of a weapon. See: 20 U.S.C. Section 1412(a)(1)(A)

In the instant matter, it is clear DCPS failed to comply with the requirements of the statute. A manifestation was never held within the requisite time frame despite the parent's request.

Though the student is identified as a learning disabled student, there is a history of behavior concerns at school and depression linked to school failure. Parent is concerned that current behavior exhibiting is the direct result over continued academic frustrations and grade placement issues.

## 2.    MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO CONDUCT A FUNCTIONAL BEHAVIORAL ASSESSMENT AND/OR IMPLEMENT A BEHAVIOR PLAN

A Functional Behavioral Assessment and Behavior Plan should have been developed for this student

Upon the suspension of a student with a disability, the Individualized Educational Team ("IEP") team is required to conduct a Functional Behavioral Assessment and implement a Behavior Plan for the student as soon as possible following the incident. If a behavior plan is already in place, the school is required to modify that plan to address behavior as necessary and thereby prevent reoccurrence. See: 20 U.S.C. Section 1415(k)(1)(g). If a behavior plan is not in place then the MDT is required to discuss behavior strategies.

MAPCS failed to reconvene the IEP team to discuss behavior and/or failed conduct a Functional Behavioral Assessment and/or develop a Behavior Plan for this student. Parent is concerned that the student's emotional needs are not being fully met and that acting out behavior is the result of frustration over academics. As a result, this student has been denied a Free and Appropriate Public Education ("FAPE").

---

[1] It should be noted that even where the behavior is determined to not be a manifestation, the public agency still must continue to provide the student a Free and Appropriate Public Education ("FAPE")

4

3.    **MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO ENSURE THAT THE STUDENT CONTINUED TO RECEIVE A FREE AND APPROPRIATE PUBLIC EDUCATION**

Irregardless of whether the student's behavior was a manifestation of his disability or not, the public education still has an obligation to ensure that a Free and Appropriate Public Education is provided to disabled students irregardless of the severity of the action for which they are being suspended. See: 20 U.S.C. Section 1415(k)(1)(g) so that the child can participate in the general education curriculum, make progress on IEP goals and receive the services needed to ensure behavior doesn't' repeat it self.

The obligation is to ensure that a "Free and Appropriate Public Education is available to all children with a disabilities residing within the State between the ages of 3 and 21"

Not only did MAPCS fail to ensure this student continued to receive a FAPE to ensure that he didn't fall behind in his classes, they failed to give the student any homework to do during the suspension period despite the fact that the father went to the school to pick up homework for his son to complete. IN the event that MAPCS could not continue to provide FAPE to D.S. an alternate placement should have been located. However, MAPCS failed to undertake the appropriate steps to ensure that this student had an alternate educational placement during the suspension period. Such an undertaking would require that the MDT be convened as the decision to place a child in an alternate interim educational setting must be made by the MDT team not by school administration acting on its own. I

 MAPCS failed to reconvene the IEP team to discuss behavior and/or failed conduct a Functional Behavioral Assessment and/or develop a Behavior Plan for this student. Since that time, this student has been feeling discouraged, frustrated and parent is concerned that frustration is impacting his motivation to attend school. In the event that MAPCS could not meet this student's needs, District of Columbia Public Schools ("DCPS") should have been notified in writing. 30 DCMR Section 30019 and 30019.9 and *Gadsby v. Grasmick, 109 F.3d 940, 952-953 (4th Cir. 1997)* requires that the LEA notify the SEA when it cannot provide services to the student.

As a result, this student has been denied a Free and Appropriate Public Education ("FAPE").

II. **Issues presented.**

1.  MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO SCHEDULE A MANIFESTATION DETERMINATION REVIEW MEETING IN A TIMELY MANNER?

2.  MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO  CONDUCT

5

290

A FUNCTIONA  BEHAVIORAL ASSESSMENT AND,   IMPLEMENT A BEHAVIOR PLAN.

3.  MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS") FAILED TO ENSURE THAT THE STUDENT CONTINUED TO RECEIVE A FREE AND APPROPRIATE PUBLIC EDUCATION AFTER HIS SUSPENSION EXCEEDED THE DAYS.

4.  MAYA ANGELOU PUBLIC CHARTER SCHOOL )"MAPCS") HAS FAILED TO PROVIDE THIS STUDENT WITH A FAPE.

III.  **To the extent known to you at this time, how can this problem be resolved?**

WHEREFORE, the guardian, by and through counsel, requests the following relief:

1.  A finding that D.S. has been denied a FAPE by Maya Angelou Public Charter School ;

2.  The student shall be immediately allowed to return to Maya Angelou Public Charter School;

3.  The student shall b provided with individualized tutoring to assist the student in making up any class work that missed during the suspension period;

4.  A functional behavioral assessment and clinical evaluation shall be conducted for this student;

5.  That upon completion of the evaluations the MDT shall convene   to review completed evaluations, to revise the student's program, discuss placement, discuss compensatory education, and issue a Notice of Placement to a suitable program with parent participation;

6.  Parent reserves the right to address compensatory education and request that compensatory education plan that addresses the individual needs of this student and remediation for denials of FAPE be drafted that includes but is not limited to individualized tutoring, make up services, and/or counseling;

7.  That at the afore mentioned meeting, MAPCS shall secure the participation of all necessary IEP team members to include but not limited to the appropriate personnel required to review assessments and develop an appropriate program for this child;

8.  In the event that MAPCS determines that they cannot meet this student's needs, MAPCS shall promptly notify DCPS in writing with copies to be provided to the parent;

9.  That MAPCS  agrees to pay counsel for the parent's reasonable attorney's fees in an amount not to exceed Four Thousand Dollars and Zero Cents ($4,000.00), as full payment of attorneys' fees and related costs incurred in the matter;

6

10. All meeting_ _.iall be scheduled through counsel ... the parent, Roberta L. Gambale, Esq., in writing, via facsimile, at 202-742-2097 or 202-742-2098;

11. Provide the student with a due process hearing within 20 calendar days of a request on any issue arising out of the noncompliance with the MAPCS' obligation hereunder, or any disagreement with the assessment, programming or placement the parent may have;

12. Provide counsel for the parent with copies, pursuant to 5 DCMR 3021.8, of all evaluation reports and all educational records on the student no later than sixteen (16) business hours prior to the convening of any meeting;

13. MAPCS shall ensure that this student has available a Free and Appropriate Public Education including special education, transportation (5 DCMR 3000.3), and Other related services as are defined at 34 C.F.R. 300.24, designed to meet this student's unique needs and preparation for employment and independent living;

14. MAPCS within ten (10) calendar days of the filing of this complaint, pursuant to 20 U.S.C. 1415(b)(7),[2] provide the parent's representative, Roberta L. Gambale, Esq., via facsimile, at 202-742-2097 or 202-742-2098, the following: i) an explanation of why DCPS proposed or refused to take the action raised in the complaint; ii) a description of other options that the IEP team considered and the reasons why those options were rejected, iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and iv) a description of the other factors that are relevant to the agency's proposed or refused action;

15. MAPCS in the event they fail to answer/respond to the issues alleged in the parent's administrative due process hearing complaint, within ten (10) calendar days, the arguments and facts as averred by the guardian will be deemed true and accurate and act as a waiver, on the part of MAPCS for their desire to have a Resolution Session Meeting, and the guardian's administrative due process hearing will be scheduled pursuant to the applicable timelines contained in the IDEIA;

16. That MAPCS within fifteen (15) calendar days of receiving the parent's complaint, pursuant to 20 U.S.C. 1415(c)(2)[3] respond to the parent's request alleging any insufficiency of notice.

17. That MAPCS failure to comply with the Individuals with Disabilities Education Improvement Act of 2004 and allege any insufficiency of the administrative due process complaint, will constitute waiver on the part of MAPCS to make such argument at any later date and time.

18. That MAPCS, pursuant to 20 U.S.C. 1415(f)(1)(B)[4] within fifteen (15) calendar days of receiving the parent's administrative due process complaint, shall contact

---

[2] 300.508(e)
[3] 300.508(d)
[4] 300.510

7

the parent's representative, in writing, via facsimile, a. _ .2-742-2097 or 202-742-2098, to schedule and convene a Resolution Session Meeting;

19. That MAPCS convene the Resolution Session Meeting, with the parent, the parent's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the child and the facts contained in the complaint. That the relevant members of the MDT/IEP Team that shall be present at the Resolution Session Meeting for the student shall include the following persons: 1) the student's special education teacher, 2) the student's regular education teacher, if applicable, 3) a representative of the local education agency with decision making authority, 4) a person who can interpret the data, 5) any person(s) who conducted any assessments on the student and/or would be qualified to conduct the evaluations requested in the parent's complaint.

20. That MAPCS failure to timely schedule and convene the Resolution Session Meeting within the timeframe identified in 20 U.S.C. !415(f)(1)(B) constitute joint waiver between MAPCS and the guardian to have such meeting and the forty-five (45) days timeline to schedule the student's administrative due process hearing and receive a timely decision will begin to run upon written notice, via facsimile, at 202-442-5556, to the DCPS Office of Student Hearings, by the parent's counsel; and

21. A finding that the parent is the prevailing party in this action.

**Accommodations and Assistance Needed:**

- N/A

Dated this 12th Day of December 2006

Roberta L. Gambale, Esq.,
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2021
Counsel for the Parent

**Mail, fax or deliver this complaint notices to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC 20002**
**Fax number: 202/442-5556**

8

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556



# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney:Roberta Gambale, Esq.**
**Parent: Rachelle Bobo**

Telephone Number: **(202) 742-2000**           Pages: **3**
Fax Number: **(202) 742-2098**                 Date: **December 12, 2006**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: D███ S███
School: **Maya Angelou PCS**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office. If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556. Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

                                        **Thank You**
                                        **Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that is legally privileged. The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited. If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

294

# STATE EDUCATION AGENCY
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| S██████, D.                Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| DCPS | ) | |
| Attending Maya Angelou PCS | | |
| | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

# SCHEDULING MEMORANDUM

1. A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. <u>The Student Hearing Office does not schedule or participate in resolution meetings</u>.

2. The complaint notice was filed on **December 12, 2006**

3. The deadline for the resolution meeting is **December 27, 2006** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A. *Prior Written Notice Not Issued by the Local Educational Agency*. If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

   1. An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
   2. A description of other options that the IEP Team considered and the reasons why those options were rejected;
   3. A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

Rev'd. 7/6/05

4.  A description of the factors that is relevant to the agency's proposal or refusal.

B.  Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **December 22, 2006.**

C.  ***Deficiency Notice.*** A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.  The deadline for filing a deficiency notice is **December 27, 2006.**

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence. A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice. The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law. The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Rev'd. 7/6/05

```
┌─────────────────────────────────────┐
│   TRANSMISSION VERIFICATION REPORT   │
└─────────────────────────────────────┘
                        TIME   : 02/22/2007 10:01
                        NAME   :
                        FAX    :
                        TEL    :
                        SER.#  : BROE6J471573
```

```
┌──────────────────────────────────────────────────────────────────────┐
│   DATE,TIME              02/22  10:01                                   │
│   FAX NO./NAME           97422097                                       │
│   DURATION               00:00:17                                       │
│   PAGE(S)                01                                             │
│   RESULT                 OK                                             │
│   MODE                   STANDARD                                      │
│                          ECM                                           │
└──────────────────────────────────────────────────────────────────────┘
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



HEARING NOTICE

| MEMORANDUM VIA: [✗] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |

TO:  Parent (or Representative): *R. GAMBALE/T. ABDUS-SHAHD*  Fax No.: *742-2098*
(703) 739-2323

LEA Legal Counsel: *OGC*

RE:  S̶̶̶̶̶̶̶ D̶̶̶̶̶̶  and (LEA) DOB: *3/8/88*
     Student's Name

FROM:  **SHARON NEWSOME**
       Special Education Student Hearing Office Coordinator

DATE SENT:  *2/21/07*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on *1/12/07*. Please be advised that the hearing has been scheduled for:

DATE:  *3/12/07*

TIME:  *3:00 pm*

297

```
┌─────────────────────────────────────────┐
│   TRANSMISSION VERIFICATION REPORT       │
└─────────────────────────────────────────┘
                          TIME  : 02/22/2007 10:00
                          NAME  :
                          FAX   :
                          TEL   :
                          SER.# : BROE6J471573

        DATE,TIME           02/22  10:00
        FAX NO./NAME        97037392323
        DURATION            00:00:18
        PAGE(S)             01
        RESULT              OK
        MODE                STANDARD
                            ECM
```

# District of Columbia Public Schools
### *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



## HEARING NOTICE

| MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY |
|---|

TO:   Parent (or Representative): R. GAMBALE / T. ABDUS-SHAHID   Fax No.: 742-2098

LEA Legal Counsel: OGC   (703) 739-2323

RE:   S█████ D█████   and (LEA) DOB: 3/8/88
          Student's Name

FROM:   **SHARON NEWSOME**
          Special Education Student Hearing Office Coordinator

DATE SENT:   2/21/07

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
1/17/07 . Please be advised that the hearing has been scheduled for:

DATE:   3/12/07

TIME:   3:00 pm

298

# STATE EDUCATION AGENCY
# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| **S██████, D.**          Petitioner | ) | |
| | ) | HEARING OFFICER |
| Vs. | ) | |
| | ) | |
| **DCPS** | ) | |
| **Attending Maya Angelo PCS** | ) | DISTRICT OF COLUMBIA |
| | | |
| Respondent | ) | PUBLIC SCHOOLS |

## <u>SCHEDULING MEMORANDUM</u>

1.  A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint <u>within 15 calendar days of receiving notice of the parents' complaint</u>. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings**.

2.  The complaint notice was filed on **January 12, 2007**

3.  The deadline for the resolution meeting is **January 27, 2007** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A.  ***Prior Written Notice Not Issued by the Local Educational Agency***.  If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, <u>within 10 days of receiving the complaint</u>, send to the parent a response that shall include:

1.  An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
2.  A description of other options that the IEP Team considered and the reasons why those options were rejected;
3.  A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and
4.  A description of the factors that is relevant to the agency's proposal or refusal.

Rev'd. 7/6/05

B.  Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **January 22, 2007**.

C.  ***Deficiency Notice***.  A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

    The deadline for filing a deficiency notice is **January 27, 2007**.

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence.  A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice.  The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law.  The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.



Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 442-5693

# Fax

# Time Sensitive Materials Attached

**Prompt Attention: Principal/Administrator**
**Special Education Coordinator**

Telephone Number: **(202) 388-9830**         Pages: **13**
     Fax Number: **(202) (202) 727-5548**         Date: **January 12, 2007**

**Please find attached a copy of a Scheduling Memorandum and a copy of the Due Process Complaint Notice regarding:**

Student: **D⬛⬛-S⬛⬛**

School:   **Attending Maya Angelo School**

**The complaint Intake Unit is responsible for only providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office. If you have questions about the attached Notice, regarding any fax errors or discrepancies, please contact the Complaint Intake Unit @ (202) 724-6556.**

                                              **Thank You,**
                                              **Marica P. Brown**
                                              **Staff Assistant**

The document(s) accompanying this telecopy transmission contains confidential information that is legally privileged. The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited. If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556

DISTRICT OF COLUMBIA PUCLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

 **Fax**

# Time Sensitive Materials Attached

**Prompt Attention: Attorney:Roberta Gambale, Esq.**
**Parent:**

Telephone Number: **(202) 742-2000**
Fax Number: **(202) 742-2098**

Pages: **3**
Date: **January 12, 2007**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **D███ S███**
School:  **Attending Maya Angelo School**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

**Thank You**
**Marica Brown**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally
privileged.  The information is intended only for use of the individual or entity named Above, if you are not the
intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in
reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please
immediately notify us by telephone For return of the original document to us.

01/12/2007 15:32 FAX 2024425253          CENTRAL INTAKE UNIT                          ☑001

```
                    ************************
                    ***  TX REPORT   ***
                    ************************

        TRANSMISSION OK

        TX/RX NO               1201
        RECIPIENT ADDRESS      92027275548
        DESTINATION ID
        ST. TIME               01/12 15:25
        TIME USE               07'31
        PAGES SENT             13
        RESULT                 OK
```

**Complaint Intake Unit**
**825 North Capitol Street, NE- 8th Fl.**
**Washington, DC 20002**
**(202) 442-5693**



# Fax

# Time Sensitive Materials Attached

**Prompt Attention: Principal/Administrator**
                    **Special Education Coordinator**

Telephone Number: (202) 388-9830                Pages: 13
          Fax Number: (202) (202) 727-5548      Date: January 12, 2007

**Please find attached a copy of a Scheduling Memorandum and a copy of the Due Process Complaint Notice regarding:**

Student: D██████ S███████

School:   **Attending Maya Angelo School**

**The complaint Intake Unit is responsible for only providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office.  If you have questions about the attached Notice, regarding any fax errors or discrepancies, please contact the Complaint Intake Unit @ (202) 724-6556.**

**Thank You.**                                                          303

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              1210
RECIPIENT ADDRESS     97422097
DESTINATION ID
ST. TIME              01/16 09:58
TIME USE              00'29
PAGES SENT            3
RESULT                OK
```

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 724-6556



# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney:Roberta Gambale, Esq.**
**Parent:**

Telephone Number: **(202) 742-2000**          **Pages: 3**
Fax Number: **(202) 742-2098**          **Date: January 12, 2007**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: D█████ S█████
School:  **Attending Maya Angelo School**

The Complaint Intake Unit is responsible for providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office.  If you have questions about the attached Notice, please contact the Complaint Intake Unit at (202) 724-6556.  Otherwise, if you have questions about the content of the compliant you should contact your legal counsel for further advice.

                                        **Thank You**
                                        **Marica Brown**

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



### *Amended Due Process Complaint Notice*

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals wit

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office for the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a **"Resolution Session"**) with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

A.    **INFORMATION ABOUT THE STUDENT:**

Name of the Student: D███ S█████    Date of Birth: **3/8/88**
Address: **125 Franklin Street , N.E.  # M13  Washington, DC 20002**
Home School: **Maya Angelou School**
Present School of Attendance:  **Same**

         Is this a charter school?  Yes      (If yes, you must also provide a copy of this
                                              notice to the charter school principal or director)

305

Parent/Guardian of the Student   The student has attained the age of 18 and is his own guardian.[1]

Address (if different from the student's above): same _____

**B.**     **Legal Representative/Attorney:**

Name: Roberta L. Gambale, Esq. ( James Brown and Associates, PLLC)
Address: 1220 "L" Street, Suite 700, Washington, DC 20005
 Phone: (w) (202)742-2000 (ext. 2021)  (Fax)  (202) 742-2098      (e-mail)
Rgambale@jeblaw.biz
Will attorney / legal representative attend the resolution session?   **X** Yes          ☐ No

**C.**     **Complaint Made Against (check all that apply):**

**X**  Maya Angelou Public Charter School ("MAPCS")
X District of Columbia Public Schools ("DCPS")

**D.**     **Resolution Session Meeting Between Parent/Representative and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint.  I also
understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree
to waive the resolution meeting to avoid having this meeting.)

The parent, by and through counsel, wishes to waive the Resolution Session Meeting for this
process.

**E.**     **Mediation Process:**

IDEIA requires that any time a party requests a due process hearing, mediation should be
offered at no cost to the parent.  Both parties can request mediation as an alternative to the
Resolution Session Meeting or as an alternative to a Due Process Hearing.  Please check all
that apply:

**I am requesting an administrative due process hearing only.**

**F.**     **Facts and Reasons for the Complaint:**

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA),
please complete the following questions (attach additional pages if needed):

**I.  Nature of the problem.**
                                  **RELEVANT FACTS**

  1.   D⬛ S⬛, ( hereinafter "D.S..") is an 11th grade learning disabled student who
        last attended Maya Angelou Public Charter High School where he was in the 11th
        grade.

---

[1] The student resides with his parents, Rachelle Bobo, mother and  Derrick Shelton Sr., father.  The student has
retained counsel to proceed with this action  on his own behalf.

2

2.  According to this student's Individualized Educational Program ("IEP") he should be receiving fifteen (15) hours of instruction and thirty (30) minutes of counseling per week.

3.  On or about November 22, 2006, D.S. was suspended with the intent to expel as a result of an incident wherein he assaulted a fellow student.

4.  A Manifestation Determination Review meeting was never held to address the relationship between the student's disability and the incident despite the express request of the parent that such a meeting be held as soon as possible.

5.  Despite repeated requests from the parent on both the day of incident and/or the next school day following the incident when the father accompanied D.S. to school and spoke with both principal and the special education coordinator, Mr. Luseni,   the parent was not provided with a copy of the incident report.

6.  Though the student has been out of school for more than ten (10) days arrangements have not been made to ensure that this student continues to receive a free and appropriate public education (FAPE). He has been given no class work to take home. He has been given no access to parallel instruction.  He has not been provided with related services.

7.  The parent went to the school on or about November 27, 2006 for the purpose of obtaining records and/or picking up class work for his son.

8.  An MDT meeting has yet to be  convened to address the incident, discuss the need for a change of placement, and/or address behavior interventions that might be warranted for this student.

9.  To the best of the parent's knowledge, MAPCS, has never sent written notice to DCPS so as to advise them that they are not able to meet this student's individualized needs.

10. Though D.S. is identified as a learning disabled student, he has had difficulties with behavior and self esteem and depression since the time of his initial evaluations and receives counseling as a related service.  In the past, evaluators have found that the student's frustration, self esteem issues stem from depression around school failure. *(See – psychological evaluation pg 3)*

## ISSUES/ARGUMENTS

### 1.    MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO SCHEDULE A MANIFESTATION DETERMINATION REVIEW MEETING

District of Columbia Public Schools ("DCPS") suspended this student for more than ten (10) days and failed to comply with procedural safeguards involving discipline and suspensions of students suspected of having a disability by failing to convene a

3

manifestation determination review meeting to discuss the relationship between the incident and the students disability.

Because a suspension of more than ten (10) days has been determined to  constitute a change of placement, within ten(10) days of  such a suspension, the public agency is required to convene a meeting to determine whether or not the student's disability caused the behavior which violated the code of conduct for which the student is being suspended. See  20 U.S.C. Section 1412(a)(1)(A).

A suspension of a student for more than ten (10) days as a result of the violation of student conduct code is considered to be an impermissible "change of placement" unless the  local education agency convenes a meeting within ten (10) days to address the nexus between the behavior warranting the suspension and the student's disability and/or suspected disability. The team must determine whether the  behavior is a manifestation of his disability and if so they are not permitted to suspend.[2] Even where the school determines that the behavior was not a manifestation of the disability, the school still has an obligation to provide the child with a Free and Appropriate Public Education ("FAPE") even if the violation involves the violation of a code of conduct and/or possession of a weapon.  See: 20 U.S.C. Section 1412(a)(1)(A)

In the instant matter, it is clear DCPS failed to comply with the requirements of the statute.  A manifestation was never held within the requisite time frame despite the parent's request.

Though the student is identified as a learning disabled student, there is a history of behavior concerns at school and depression linked to school failure.  Parent is concerned that current behavior exhibiting is the direct result over continued academic frustrations and grade placement issues.

## 2.    MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO  CONDUCT A FUNCTIONAL BEHAVIORAL ASSESSMENT AND/OR IMPLEMENT A BEHAVIOR PLAN

### A Functional Behavioral Assessment and Behavior Plan should have been developed for this student

Upon the suspension of a student with a disability, the Individualized Educational Team ("IEP") team is required to conduct a Functional Behavioral Assessment and implement a Behavior Plan for the student as soon as possible following the incident. If a behavior plan is already in place, the school is required to modify that plan to address behavior as necessary and thereby prevent reoccurrence. See:  20 U.S.C. Section 1415(k)(1)(g).  If a behavior plan is not in place then the MDT is required to discuss behavior strategies.

---

[2] It should be noted that even where the behavior is determined to not be a manifestation, the public agency still must continue to provide the student a Free and Appropriate Public Education ("FAPE")

4

MAPCS failed to reconvene the IEP team to discuss behavior and/or failed conduct a Functional Behavioral Assessment and/or develop a Behavior Plan for this student. Parent is concerned that the student's emotional needs are not being fully met and that acting out behavior is the result of frustration over academics. As a result, this student has been denied a Free and Appropriate Public Education ("FAPE").

### 3. MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO ENSURE THAT THE STUDENT CONTINUED TO RECEIVE A FREE AND APPROPRIATE PUBLIC EDUCATION

Irregardless of whether the student's behavior was a manifestation of his disability or not, the public education still has an obligation to ensure that a Free and Appropriate Public Education is provided to disabled students irregardless of the severity of the action for which they are being suspended. See: 20 U.S.C. Section 1415(k)(1)(g) so that the child can participate in the general education curriculum, make progress on IEP goals and receive the services needed to ensure behavior doesn't' repeat it self.

The obligation is to ensure that a "Free and Appropriate Public Education is available to all children with a disabilities residing within the State between the ages of 3 and 21"

Not only did MAPCS fail to ensure this student continued to receive a FAPE to ensure that he didn't fall behind in his classes, they failed to give the student any homework to do during the suspension period despite the fact that the father went to the school to pick up homework for his son to complete. IN the event that MAPCS could not continue to provide FAPE to D.S. an alternate placement should have been located. However, MAPCS failed to undertake the appropriate steps to ensure that this student had an alternate educational placement during the suspension period. Such an undertaking would require that the MDT be convened as the decision to place a child in an alternate interim educational setting must be made by the MDT team not by school administration acting on its own. I

MAPCS failed to reconvene the IEP team to discuss behavior and/or failed conduct a Functional Behavioral Assessment and/or develop a Behavior Plan for this student. Since that time, this student has been feeling discouraged, frustrated and parent is concerned that frustration is impacting his motivation to attend school. In the event that MAPCS could not meet this student's needs, District of Columbia Public Schools ("DCPS") should have been notified in writing. 30 DCMR Section 30019 and 30019.9 and *Gadsby v. Grasmick*, 109 F.3d 940, 952-953 (4th Cir. 1997) requires that the LEA notify the SEA when it cannot provide services to the student.

As a result, this student has been denied a Free and Appropriate Public Education ("FAPE").

5

309

## II. Issues presented.

1. MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO SCHEDULE A MANIFESTATION DETERMINATION REVIEW MEETING IN A TIMELY MANNER?

2. MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO COMPLY WITH DISCIPLINARY PROCEDURES BY FAILING TO CONDUCT A FUNCTIONAL BEHAVIORAL ASSESSMENT AND/OR IMPLEMENT A BEHAVIOR PLAN.

3. MAYA ANGELOU PUBLIC CHARTER SCHOOL ("MAPCS")FAILED TO ENSURE THAT THE STUDENT CONTINUED TO RECEIVE A FREE AND APPROPRIATE PUBLIC EDUCATION AFTER HIS SUSPENSION EXCEEDED THE DAYS. *10*

4. MAYA ANGELOU PUBLIC CHARTER SCHOOL HAS FAILED TO PROVIDE THIS STUDENT WITH A FAPE.

## III. To the extent known to you at this time, how can this problem be resolved?

WHEREFORE, the guardian, by and through counsel, requests the following relief:

1. A finding that D.S. has been denied a FAPE by Maya Angelou Public Charter School ;

2. The student shall be immediately allowed to return to Maya Angelou Public Charter School;

3. The student shall b provided with individualized tutoring to assist the student in making up any class work that missed during the suspension period;

4. A functional behavioral assessment and clinical evaluation shall be conducted for this student;

5. That upon completion of the evaluations the MDT shall convene  to review completed evaluations, to revise the student's program, discuss placement, discuss compensatory education, and issue a Notice of Placement to a suitable program with parent participation;

6. Parent reserves the right to address compensatory education and request that compensatory education plan that addresses the individual needs of this student and remediation for denials of FAPE be drafted that includes but is not limited to individualized tutoring, make up services, and/or counseling;.

6

310

7. That at the afore mentioned meeting, MAPCS shall secure the participation of all necessary IEP team members to include but not limited to the appropriate personnel required to review assessments and develop an appropriate program for this child;

8. In the event that MAPCS determines that they cannot meet this student's needs, MAPCS shall promptly notify DCPS in writing with copies to be provided to the parent;

9. That MAPCS agrees to pay counsel for the parent's reasonable attorney's fees in an amount not to exceed Four Thousand Dollars and Zero Cents ($4,000.00), as full payment of attorneys' fees and related costs incurred in the matter;

10. All meetings shall be scheduled through counsel for the parent, Roberta L. Gambale, Esq., in writing, via facsimile, at 202-742-2097 or 202-742-2098;

11. Provide the student with a due process hearing within 20 calendar days of a request on any issue arising out of the noncompliance with the MAPCS' obligation hereunder, or any disagreement with the assessment, programming or placement the parent may have;

12. Provide counsel for the parent with copies, pursuant to 5 DCMR 3021.8, of all evaluation reports and all educational records on the student no later than sixteen (16) business hours prior to the convening of any meeting;

13. MAPCS shall ensure that this student has available a Free and Appropriate Public Education including special education, transportation (5 DCMR 3000.3), and Other related services as are defined at 34 C.F.R. 300.24, designed to meet this student's unique needs and preparation for employment and independent living;

14. MAPCS within ten (10) calendar days of the filing of this complaint, pursuant to 20 U.S.C. 1415(b)(7),[3] provide the parent's representative, Roberta L. Gambale, Esq., via facsimile, at 202-742-2097 or 202-742-2098, the following:  i) an explanation of why DCPS proposed or refused to take the action raised in the complaint; ii) a description of other options that the IEP team considered and the reasons why those options were rejected, iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and iv) a description of the other factors that are relevant to the agency's proposed or refused action;

15. MAPCS in the event they fail to answer/respond to the issues alleged in the parent's administrative due process hearing complaint, within ten (10) calendar days, the arguments and facts as averred by the guardian will be deemed true and accurate and act as a waiver, on the part of MAPCS for their desire to have a Resolution Session Meeting, and the guardian's administrative due process hearing will be scheduled pursuant to the applicable timelines contained in the IDEIA;

---

[3] 300.508(e)

SEID DPCN Rev'd. 7/01/05

16. That MAPCS within fifteen (15) calendar days of receiving the parent's complaint, pursuant to 20 U.S.C. 1415(c)(2)[4] respond to the parent's request alleging any insufficiency of notice.

17. That MAPCS failure to comply with the Individuals with Disabilities Education Improvement Act of 2004 and allege any insufficiency of the administrative due process complaint, will constitute waiver on the part of MAPCS to make such argument at any later date and time.

18. That MAPCS, pursuant to 20 U.S.C. 1415(f)(1)(B)[5] within fifteen (15) calendar days of receiving the parent's administrative due process complaint, shall contact the parent's representative, in writing, via facsimile, at 202-742-2097 or 202-742-2098, to schedule and convene a Resolution Session Meeting;

19. That MAPCS convene the Resolution Session Meeting, with the parent, the parent's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the child and the facts contained in the complaint. That the relevant members of the MDT/IEP Team that shall be present at the Resolution Session Meeting for the student shall include the following persons: 1) the student's special education teacher, 2) the student's regular education teacher, if applicable, 3) a representative of the local education agency with decision making authority, 4) a person who can interpret the data, 5) any person(s) who conducted any assessments on the student and/or would be qualified to conduct the evaluations requested in the parent's complaint.

20. That MAPCS failure to timely schedule and convene the Resolution Session Meeting within the timeframe identified in 20 U.S.C. !415(f)(1)(B) constitute joint waiver between MAPCS and the guardian to have such meeting and the forty-five (45) days timeline to schedule the student's administrative due process hearing and receive a timely decision will begin to run upon written notice, via facsimile, at 202-442-5556, to the DCPS Office of Student Hearings, by the parent's counsel; and

21. A finding that the parent is the prevailing party in this action.

**Accommodations and Assistance Needed:**

- N/A

Dated this 12th Day of January, 2007

Roberta L. Gambale, Esq.,
James E. Brown & Associates, PLLC
1220 L Street, NW Suite 700
Washington, DC 20005
202-742-2021

---

[4] 300.508(d)
[5] 300.510

8

Counsel for the Parent

**Mail, fax or deliver this complaint notices to:**
**State Enforcement and Investigation Division**
**For Special Education Programs (SEID)**
**Student Hearing Office (SHO)**
**825 North Capitol Street, NE, 8th Floor**
**Washington, DC  20002**
**Fax number: 202/442-5556**

9

01/12/2007 12:53 FAX 2027422098      James E Brown & Assoc.

# JAMES E. BROWN & ASSOCIATES, PLLC
*A Professional Limited Liability Company*

| | | |
|---|---|---|
| James E. Brown | Attorneys at Law | Juan J. Fernandez!+ |
| Domiento C.R. Hill | 1220 L Street, NW | Tilman L. Gerald |
| Roberta Gambale | Suite 700 | John A. Straus |
| Miguel A. Hull | Washington, DC 20005 | Roxanne D. Neloms |
| Christopher L. West | Telephone: (202) 742-2000 | Omar Karram |
| | Facsimile: (202) 742-2098 | Christie Fontaine |
| | e-mail: Admin@Jeblaw.biz | |

----------------------------------

! DC Bar Special Legal Consultant
+ Admitted in Bolivia

# FAX COVER SHEET

DATE:           **January 12, 2007**

TO:             **Ms. Sharon Newsom  DCPS Student Hearing Coordinator**

FAX NO.:        **(202)442-5556**

FROM:           **Roberta L. Gambale, Esq.**

SUBJECT:        **Amended Due Process Complaint, D▮▮▮ S▮▮▮▮, DOB: 3/8/88**

NUMBER OF PAGES INCLUDING COVER SHEET:

COMMENTS:       ***Please find attached a copy of the amended complaint and order
authorizing the amendment issued by Hearing Officer Smith, Esq.***

The attached information is CONFIDENTIAL and is intended only for the use of the addressee(s) named above. If the reader of this message is not the intended recipient(s) or the employee or agent responsible for delivering the message to the intended recipient(s). Please note that any dissemination, distributions or copying of this communication is strictly prohibited. Anyone who receives this communication in error should notify us immediately by telephone and return the original message to us at the above address via the U.S. Mail.

314

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
STUDENT HEARING OFFICE


IN THE MATTER OF
DERRICK SHELTON

HEARING DATE:  MARCH 12, 2007


TRANSCRIBED BY
LEGAL PERSONNEL, INC.    (301) 277-5711

## APPEARANCES

HEARING OFFICER:   COLES RUFF

ATTORNEY ADVISOR FOR D.C. PUBLIC SCHOOLS:  AARON PRICE, SR.

PARENT:  ROCHELLE BOBO

ATTORNEY FOR STUDENT:  ROBERTA GAMBALE

STUDENT:  DERRICK SHELTON

FAMILY'S ADVOCATE:  TERRENCE COREY HAMILTON

SPECIAL EDUCATION SERVICES:  MICHAEL LUCINI

PSYCHOLOGIST FOR MAYA ANGELO PUBLIC CHARTERED SCHOOL:   QUENTIN GRAHAMS

COUNSEL FOR MAYA ANGELO PUBLIC CHARTERED SCHOOL:   JESSICA SMITH

1

2                          **PROCEEDINGS**

3       **HEARING OFFICER:** Good afternoon today's date is March

4   12, 2007; I'm Coles Ruff, Independent Hearing Officer.

5   This is an Administrative Due Process Hearing conducted

6   under the Individuals for Disability's Educational

7   Improvement Act. This is in the matter of Derrick Shelton;

8   Derrick's date of birth is March 8, 1988. Can I have

9   everyone identify yourself, please, starting with Ms.

10  GAMBALE.

11      **MS. GAMBALE:** My name is ROBERTA GAMBALE, the

12  attorney for the student, Derrick Shelton.

13      **DERRICK SHELTON:** Derrick Shelton, the student.

14      **ROCHELLE BOBO:** My name is Rochelle Bobo, Derrick

15  Shelton's mother.

16      **COREY HAMILTON:** My name is Corey Hamilton, the

17  family's advocate.

18      **AARON PRICE, SR.:** Good afternoon, Aaron Price, Sr.,

19  attorney advisor, here on behalf of the District of

20  Columbia Public Schools, amicus, hopefully on this matter.

21      **QUENTIN GRAHAMS:** Good afternoon, I'm Quentin Grahams,

22  psychologist, at Maya Angelo Public Chartered School.

23      **MICHAEL LUCINI:** Michael Lucini, regarding Special Ed

24  Services.

1      **JESSICA SMITH:** Jessica Smith, counsel for Maya Angelo

2   Public Chartered School.

3      **HEARING OFFICER:**  Great, you wave formal reading of

4   the rights.

5      **MS.  GAMBALE:**  We waive formal reading of the rights.

6      **HEARING OFFICER:**  Let's see 88, means Derrick is 19,

7   okay.  Derrick, what that means is that I've relied upon

8   Ms.  GAMBALE to inform you of all the rights, your rights

9   in this hearing and the procedures for the hearing.  I'll

10   just add that I am an Independent Hearing Officer; I'm not

11   an employee of D.C. Public Schools nor Maya Angelo and in

12   that capacity as an Independent Hearing Officer, I'll

13   listen to the evidence presented and render a fair and

14   impartial decision. Okay.  Let's see, any preliminary

15   matters.

16      **MS.  GAMBALE:**  Yes.

17      **AARON PRICE, SR.:**  Yes.

18      **HEARING OFFICER:**  Okay.

19      **AARON PRICE, SR.:**  Hopefully the easiest preliminary

20   matter would be DCPS to ask that they, uh, they be

21   dismissed as a party as a thorough reading of the complaint

22   and clearly identify no issues applicable to the DCPS other

23   than some, uh, checkmark on the complaint which, um, DCPS

2

1  believes is insufficient to, um, trigger any liability, uh,

2  with respect to this matter.

3       **HEARING OFFICER:** Ms. GAMBALE.

4       **MS. GAMBALE:** Um, when DCPS went to FBA in this case,

5  um, would be responsible for providing a placement test,

6  um, should, um, Maya Angelo refused to.

7       **HEARING OFFICER:** Okay, so perspective remedy but

8  nothing with regard to the alleged violations here.

9       **MS. GAMBALE:** The alleged violations are against the

10  chartered school.

11      **HEARING OFFICER:** Okay, alright, so unless there is an

12  issue of placement for the future, it's my understanding

13  that's the extent of the claim against DCPS, if any.

14      **AARON PRICE, SR.:** Recognizing that, um, in reading

15  the complaint there is no issue with respect to the

16  appropriateness of the charter school which would have put

17  DCPS on notice for any perspective placement.  However, in

18  the event that there is, um, a placement issue with respect

19  to this disciplinary matter, um, the most, um, DCPC could

20  be asked for is a meeting to, um

21      **HEARING OFFICER:** Mmm, to determine placement

22      **AARON PRICE, SR.:** To determine placement, um, but

23  other than that, that would be it.

24      **HEARING OFFICER:** Do you have a concern?

3

1    **MS. GAMBALE:** Well prior to the, um, complaint being

2    filed, um, when the student was no longer at, um, Maya

3    Angelo, Maya Angelo informed DCPS of the student's need for

4    replacement. Um, he was to enroll at Cordoza.

5    **HEARING OFFICER:** And when is that alleged to have

6    occurred?

7    **MS. GAMBALE:** Um, it was December 22nd around, um, is

8    when his information was sent over there, yeah, December

9    21st of 06.

10    **HEARING OFFICER:** And that is where? Which document?

11    **MS. GAMBALE:** Maya Angelo document Number 8.

12    **HEARING OFFICER:** Okay, have you all received the

13    documents from--

14    **AARON PRICE, SR.:** Uh, it is my position that, that

15    document does identify some documents having been

16    transmitted to DCPS but it does not, with respect, um, make

17    an issue as to the need for placement but, it is also my

18    understanding that document went to the local school and

19    the local school is able to accommodate the student's four

20    hour IEP.

21    **HEARING OFFICER:** What's the local school?

22    **AARON PRICE, SR.:** Cordoza Senior High School.

23    **HEARING OFFICER:** Oh, you did say that, okay. {Pause}

24    Is he in Cordoza or not?

4

1    **MS.  GAMBALE:** He's not at Cordoza.  He's at Maya

2    Angelo, um, well he should be at Maya Angelo.

3    **AARON PRICE, SR.:** I understand but

4    **MS.  GAMBALE:** He was, well it gets into the

5    substance of the case.

6    **HEARING OFFICER:** Mmm mmm.

7    **MS.  GAMBALE:** Um, it's not appropriate for them to

8    just give this child a school to go to, they are suppose

9    to, first of all any placement from this

10    **HEARING OFFICER:** Pull the mike closer to you.

11    **MS.  GAMBALE:** Placement decisions for the MBT, not

12    for the school acting unilaterally.

13    **HEARING OFFICER:** Okay, but is he attending Maya

14    Angelo now?

15    **MS.  GAMBALE:** No, he's been attempting to get

16    tutoring through Maya Angelo, they had promised that he has

17    showed up regularly to get the tutoring but it's not been

18    made available to him.

19    **HEARING OFFICER:** So there was a stay-put request

20    made?

21    **MS.  GAMBALE:** There was.

22    **HEARING OFFICER:** Okay, well then that answers it, if

23    there was a stay put request made even if you notified

5

1    **MS. SMITH:**  Well, the student was expelled following

2    the MBR.  We have been providing tutoring weekly.

3    **MS.  GAMBALE:**  No.

4    **MS. SMITH:**  We have documentation.

5    **HEARING OFFICER:**  But is there a dispute about whether

6    or not there was a stay-put request when the complaint was

7    filed?

8    **MS. SMITH:**  I don't see a stay-put request in the

9    complaint anywhere.

10    **HEARING OFFICER:**  Well, where is--

11    **MS.  GAMBALE:**  It was first requested at the MDT

12    meeting, at the meeting that was convened on December 19th.

13    Um, and then we also subsequently, um, sent some follow-up

14    letters to the school advising them that we were invoking a

15    stay put, um.

16    **HEARING OFFICER:**  Okay, Mr. Price, I presume you have

17    other things to do.

18    **AARON PRICE, SR.:**  Yes

19    **HEARING OFFICER:**  So, what I hear is that there's

20    potential issue as to whether, um, or not Maya Angelo

21    notified DCPS that the student was in need of another

22    placement.

23    **AARON PRICE, SR.:**  That's not the issue in these--

6

1    **HEARING OFFICER:** I know it, I don't, I haven't really

2    gone through the complaint to really know, I'm just basing

3    this on what's being represented to me here.  So,

4    potentially, I don't see that there is a direct issue that

5    DCPS is responsible for something, if the student in fact

6    has not been able to go to Maya Angelo since that MDT

7    meeting, but mean there's a potential, um, issue.  What I

8    can do is allow you to depart if that becomes a more

9    clarified issue we'll let you know.

10    **AARON PRICE, SR.:** That's, that's--

11    **HEARING OFFICER:** Step back in and you can also listen

12    to what ever has been recorded in your absence.

13    **AARON PRICE, SR.:** Uh, yes, um, DCPS would ask that

14    that issue then be held for a subsequent hearing at which

15    time DCPS can present and the record would be as is at this

16    point because the record contains no communication

17    requesting replacement for DCPS, from DCPS.

18    **HEARING OFFICER:** Ms. Smith seems to think otherwise,

19    do you not?

20    **MS. SMITH:** Yeah, I can proffer testimony of

21    conversations with Dr. Peigler about the need for

22    replacement and--

23    **AARON PRICE, SR.:** The record, the written record

24    **HEARING OFFICER:** Written record

7

1       **MS. SMITH:**  And document Number 8.

2       **HEARING OFFICER:**  Number 8.

3       **AARON PRICE, SR.:**  Would, would be frozen as would be

4    DCPS is asking that in that there would be no opportunity

5    to supplement because of --

6       **HEARING OFFICER:**  Or supplement the record

7       **AARON PRICE, SR.:**  Yes, supplement this written record

8    there's been no request, um.

9       **HEARING OFFICER:**  Got it, okay, we'll let you know.

10   It looks like we may not conclude today anyway, so.  Thank

11   you, but you have no objections to these documents from

12   either party?

13      **AARON PRICE, SR.:**  Oh, I do.

14      **HEARING OFFICER:**  What?

15      **AARON PRICE, SR.:**  Uh, Parent's Number 28, I believe

16   it is, Parents Number 28 and 29, um, um based on

17   completeness and accuracy, these documents are several

18   years removed as the most recent IEP and relevant IEP in

19   question is in part of the record as part of the Maya

20   Angelo documents.  These documents serve no purpose other

21   than to inflame the Hearing Officer with respect to the

22   difference in services, uh.

23      **HEARING OFFICER:**  Is that your only concern?

8

1     **AARON PRICE, SR.:**  That is my subsequent concern, I

2  have no --

3     **HEARING OFFICER:**  This, this IEP.

4     **AARON PRICE, SR.:**  That, that IEP 28 and 29 which are

5  the notes--

6     **HEARING OFFICER:**  Notes from the same meeting--

7     **AARON PRICE, SR.:**  Notes from that meeting, that's

8  correct.

9     **HEARING OFFICER:**  Okay, I'll take that under

10  advisement but if it was disclosed timely.

11     **AARON PRICE, SR.:**  Um, timeliness I have no issue

12  with, however, substantively I do.

13     **HEARING OFFICER:**  Okay, we'll take that under

14  advisement.  Um, otherwise, do you have any problems with

15  these?

16     **MS. GAMBALE:** No

17     **HEARING OFFICER:**  They were disclosed timely?

18     **MS. GAMBALE:**  Yeah, I do have a procedural issue.

19     **HEARING OFFICER:**  These are to be admitted.

20     **MS. GAMBALE:**  First, preliminaries.

21     **HEARING OFFICER:**  These will be admitted.  Did you

22  receive Ms. Smith's?

23     **MS. GAMBALE:**  I did.

24     **HEARING OFFICER:**  Any objections to these?

1    **MS. SMITH:** Number

2    **HEARING OFFICER:** They will be admitted. What's your

3    preliminary issue?

4    **MS. GAMBALE:** Um, since the student is in the

5    majority, the right to quadrieren regarding issues to

6    subject matter jurisdiction.

7    **HEARING OFFICER:** You want to quadrieren the student

8    with subject matter jurisdiction.

9    **MS. GAMBALE:** I can't talk with the issue and camerize

10   too.

11   **HEARING OFFICER:** Why don't we do that, let's go

12   outside.

13   {OFF THE RECORD}

14   **HEARING OFFICER:** Okay, we're back on record, Derrick

15   I need to inquire of you something. So, I need you to

16   identify yourself, please.

17   **DERRICK SHELTON:** Um, Derrick Shelton, the student.

18   **HEARING OFFICER:** And raise your right hand. Do you

19   swear and affirm the statement that you make today will be

20   the truth, the whole truth and nothing but the truth.

21   **DERRICK SHELTON:** Yes.

22   **HEARING OFFICER:** Okay, um. Ms. GAMBALE, um, is

23   going to determine whether or not she's been retained by

1    you personally to represent you in this matter because you

2    are 18 now.

3        **DERRICK SHELTON:**  Yes.

4        **HEARING OFFICER:**  Have you signed a retainer agreement

5    with her, do you recall?

6        **DERRICK SHELTON:**  Yes I remember.

7        **HEARING OFFICER:**  Do you recall, if you don't recall

8    just say you don't recall.  You think you have?

9        **DERRICK SHELTON:**  Oh yes she has it.

10       **HEARING OFFICER:**  If you don't remember, just say you

11   don't remember.

12       **DERRICK SHELTON:**  I don't remember but I --

13       **HEARING OFFICER:**  Then we'll rely on Ms.  GAMBALE to

14   find it, show it to us.  Are there any other questions you

15   might have?

16       **MS. SMITH:**  Derrick did you ask Ms.  GAMBALE to sue

17   Maya Angelo?

18       **DERRICK SHELTON:**  Did I ask her to sue?

19       **MS.  GAMBALE:**  I think that's a little bit confusing.

20       **HEARING OFFICER:**  That sue language might be, what,

21   what could you clarify?

22       **MS. SMITH:**  To file a lawsuit on your behalf?

23       **DERRICK SHELTON:**  Yes.

11

1    **HEARING OFFICER:**  Okay.  She's back, huh, did she have

2    the paper. Yes it's dated 12/11/06 and it has his name.

3    Okay, does that satisfy you?

4    **MS. SMITH:**  Yes, thank you sir.

5    **HEARING OFFICER:**  Okay, great.  Alright, what normally

6    happens under the Federal Law that governs special

7    education is once you turn 18 you are responsible to make

8    your own educational decisions and the rights transfer from

9    the parent to the student at that point, irrespective of

10   whether you have been given notice of that.  Now the school

11   is suppose to give you notice, that's why at the outset I

12   addressed my comments to you directly and not to the

13   parent, okay, good.  So, any other matters before we get

14   underway.

15   **MS. SMITH:**  No Sir.

16   **HEARING OFFICER:**  Ms.  GAMBALE, what are you alleging

17   against Maya Angelo?

18   **MS.  GAMBALE:**  Well, the issues that we are here to

19   address first of all that Maya Angelo failed to comply with

20   the disciplinary procedure that were brought from the IDA,

21   specifically, Section 300530 by, um, failing to convene a

22   MBR review within 10 days of, um, suspension, um, by

23   failing to conduct a FBA and by failing to continue to

24   provide the student with fape after the

12

1    suspension/expulsion.  Um, on the 11th day after he was

2    excluded he should have been given services, um, to help

3    him stay, um, with the general curriculum and achieve his

4    IEP goals and that never happened.  Um, and, um, I guess

5    the student had been specifically harmed by the failure to

6    comply with the IDA.  Um, as to the LEA they are

7    responsible for insuring that the students receive date and

8    the needed services so as to prevent the general curriculum

9    and achieve his IEP goals.  The evidence will show that

10   they didn't schedule the MGR with the timeframes set forth

11   with the idea which is 10 days.  They did not even attempt

12   to schedule until after counsel was retained and a hearing

13   request was filed.  Um, and at that point, Mr. Shelton had

14   already been out of school for over 10 days.  Um, and

15   that's where Exhibits 14 and 19.  Um, there is

16   correspondence, um, with regards to that.  Um, Maya Angelo

17   was required under the law to conduct an FBA and develop a

18   behavior plan and they failed to do this.  Um, and under

19   the law they are required to do that whether or not the

20   behavior was a manifestation of his disability or not.  Um,

21   and um, the evidence will show is that on the 11th day when

22   services should have been put into place, um, that never

23   happened.  Um, they did state that they were going to, at

24   the 19th meeting they did say in an apparent letter that

13

1   they were going to put tutoring in place for the student

2   and that tutoring wasn't even scheduled to begin until

3   after the Christmas break.

4       **HEARING OFFICER:**  The letter was sent.

5       **MS.  GAMBALE:**  Um, that is, um, let's see, Exhibit 20.

6   Um, the letter which I asked for the stay put is in Exhibit

7   18 as well.  Um, and so, um, they never, um, put the

8   services into place even after they said they would make

9   tutoring available for the student.  Um, the student has

10  gone to the school on a regular basis.  He's not failed to

11  show up at the school.  But, every time he goes either the

12  teachers are not available, um, or the packets of work

13  aren't there that he's suppose to be taking to do at home

14  and he's frustrated and he's upset.  Um, and the sad thing

15  is that this is a student who was on the honor roll that

16  was making all A's and B's, that was on a college bound

17  graduation track.  Um, and so all of this now is serving to

18  hold him back from, from being able to graduate and to move

19  on in his future.  Um, he's concerned about how credits

20  from Maya Angelo would transfer to another school.  He's

21  concerned that he wouldn't be able to be successful in the

22  neighborhood school, um, and decisions about placement.

23  What should have happened is, um, after they decided they

24  were going to suspend him, um, and after the MGR, actually

14

1    during that timeframe they should have, they are required

2    by law to schedule the MBT meeting to talk about what

3    services he needed to be put into place and how they were

4    going to provide the services, um, to him.  And, the

5    services that we are particularly concerned about are

6    things like vocational training and getting him ready for

7    the next step after graduation.  He's, he's in his last

8    year now.  Um, he wants to be in school.  He has made every

9    attempt to try to receive at least some of the tutoring

10    that was offered.  Um, he wants that opportunity to

11    graduate, um, and to keep up with his class work.  This has

12    put him behind, um, and, um, this has simply put him behind

13    and he's been hurt by all this.

14        **HEARING OFFICER:**  Your response.

15        **MS. SMITH:**  Yes Sir, under the IDIA Maya Angelo must

16    provide aid to the student and they have done so.  The

17    evidence and testimony will show that the allegations in

18    the complaint as well as the, um, information, just offered

19    in the opening statement is completely untrue.  Um, and the

20    student will be unable to meet their burden in this case.

21    Um, should the matter proceed to hearing evidence, um, we

22    will be showing that fait has been provided.  Contrary to

23    the first issue in the complaint that a MDR was not

15

1  scheduled, a MDR was scheduled on 12/19.  The notes from

2  that are at --

3      **HEARING OFFICER:**  When did this incident occur?

4      **MS. SMITH:**  November 27th, I believe, and evidence will

5  show that the school was working in conjunction with the

6  parents and the student to schedule that meeting, um, prior

7  to that date.  Uh, the MDR meeting of this Maya Angelo

8  Document 5, which the student and the advocate, were in

9  attendance at that meeting.  The prior evaluations were

10  reviewed and the current IEP was also reviewed.  The

11  current IEP which is Maya Angelo Document Number 3

12  indicates the student has learning disabilities and 4.5,

13  approximately 4.5 hours on his IEP.  Then, um, counsel for

14  the student misrepresents in the complaint that the student

15  has a 15-hour IEP when in fact that is inaccurate.  It is

16  also represented that he was failing and experiencing

17  academic frustrations but, yet, just submitted, a few

18  minutes ago, that he was indeed on the honor roll and his

19  report card is also at Maya Angelo Document Number 7 which

20  indicates A's and B's.  Um, student was doing well at Maya

21  Angelo.  Following an incident in which the student

22  assaulted, um, another student the MGR was convened and it

23  was determined that after lengthy discussions that the

24  incident was not due to failure to implement the IEP nor

1   was it due to the, um, student's learning disabilities.  It
2   was determined that it was not a manifestation of his
3   learning disability.  The student was thus treated as a
4   generalized student and an expulsion was issued.  Document
5   Number 7 from Maya Angelo is the code of conduct which
6   seeks that an assault is an expellable offense and that the
7   student does have the right to appeal that decision within,
8   I believe, three business days in writing.  However, there
9   was no appeal issued and indeed the complaint does not
10  appeal, um, the expulsion decision nor does it challenge
11  the decision of the MDR team.  Um, thus the evidence will
12  show that the student will not be able to meet their burden
13  on that issue.  The second issue of conducting a FBA (and a
14  Behavior Intervention Plan), um, a FBA is only warranted
15  when the MDR team determines that the behavior was a
16  manifestation of the student's disability.  There have been
17  no behavioral concerns with this student in the past.  He
18  was a model student at Maya Angelo and due to a personal
19  issue with an ex-girlfriend that occurred in the school an
20  expulsion was issued.  And finally as to issue Number 3 of
21  the complaint that Maya Angelo failed to give any services,
22  that is also completely false.  The testimony as well as
23  documentation Number 10 will show that tutoring began on
24  December 22nd and has continued for over 2 months (about 10

1   weeks) of providing the student with 3 hours of

2   individualized tutoring per week and since the student only

3   has 4.5 hours on his IEP, um, 3 hours of individualized

4   tutoring is sufficient.  The team did meet immediately

5   after the MDR meeting to discuss 3 hours of tutoring.  The

6   parents and student advocate took that back with them and

7   later called the Special Ed coordinator at Maya Angelo and

8   stated they would accept 3 hours of tutoring at the interim

9   services while the expulsion was issued.  After the student

10  was expelled, the Special Ed Coordinator, at Maya Angelo,

11  contacted DCPS and informed them that the student was in

12  need of replacement.  Um, upon learning that the student

13  had an IEP report of 4.5 hours they, um, stated that he

14  would be able to attend his neighborhood school, which I

15  believe is Cardoza Senior High School and that's Document 8

16  is the receipt of the student's record shipped over to that

17  high school.  Um, so based on the evidence that will be

18  submitted we would ask that you issue a judgment in favor

19  of Maya Angelo that fait has been provided and dismisses

20  the complaint with prejudice.

21      **HEARING OFFICER:**  Okay, Ms.  GAMBALE, who are you

22  calling first?  Or do you want to do documents first, which

23  one?

18

1    **MS. GAMBALE:** Um, well, I can do documents at the end

2    after --. I will actually call Mr. Hamilton.

3    **HEARING OFFICER:** You know what, let's do documents

4    first, okay, it helps me.

5    **MS. GAMBALE:** Okay.

6    **HEARING OFFICER:** It helps me even if we don't go

7    through them thoroughly because of course I did not have

8    any time to review these before coming into here, so---

9    because there may be something in the document that I may

10    want to inquire about of the witness' testimony.

11    **MS. GAMBALE:** What in terms of some of the

12    allegations that was made in her statement, um, first of

13    all if you would look at the letter that was sent by the

14    school, um, to, to address the ----- . First of all I sent

15    a letter out on December 4 asking for the, um, MDR to be

16    held and that letter, um, is, um, {PAUSE}  that one.

17    **HEARING OFFICER:** Is there any dispute that he was out

18    of school from November 22nd to December the 19th.

19    **Ms. SMITH & MS. GAMBALE:** No, it was the 27th; no it

20    was before that, it was the 22nd.

21    **HEARING OFFICER:** When was the incident?

22    **MS. GAMBALE:** It was the 22nd.

23    **HEARING OFFICER:** What was the date of the incident is

24    that in dispute?

1        **MS. GAMBALE:** That should be in the documents as

2  well. Let me look at a calendar. I have --

3        **HEARING OFFICER:** You want a calendar; it was what day

4  of the week?

5        **MR. HAMILTON:** I think it was a Thursday, I believe it

6  happened on a Thursday.

7        **MS. GAMBALE:** There is, according to the student the

8  incident occurred on December, November 12 --

9        **HEARING OFFICER:** Thursday?

10       **MS. GAMBALE:** November 17 was the date of the incident

11  and that's not included in Exhibit Number 24.

12       **HEARING OFFICER:** That's a Friday. It's Exhibit what?

13       **MS. GAMBALE:** Twenty-four.

14       **HEARING OFFICER:** Okay, it says the date and time of

15  the incident is 17th, which is a Friday, any dispute about

16  that?

17       **MS. GAMBALE:** No

18       **HEARING OFFICER:** Okay, so my question was, was he out

19  of school from the 17th to the 19th of December when the MBR

20  was **held?**

21       **MR. HAMILTON:** Yes.

22       **HEARING OFFICER:** He was out of school, so he was told

23  not to come back to school?

1       **MS. GAMBALE:** Yeah, we have testimony and

2    documentation to show that this Special Ed, Mr. Lucini,

3    Special Education director was in contact with the parents

4    and the student and held meetings prior to that to show

5    that MBR did need to be conducted.  They were trying to

6    work with the schedules and stuff.

7       **HEARING OFFICER:** Alright, you were taking me too

8       **MS. GAMBALE:** On November 22nd they sent a letter to

9    the parent.

10      **HEARING OFFICER:**  Which document is that?

11      **MS. GAMBALE:**  And that's in Exhibit Number 17 that

12   advised them on the 22nd they were suspending with the

13   intent to expel, um, and that they had notified the police.

14      **HEARING OFFICER:**  Okay.

15      **MS. GAMBALE:**  And then we had, we were not involved

16   in the case on the 17th.  We got into the case after that,

17   in which as soon as we were involved in the case we did

18   send out a letter asking them (and this report is in

19   Exhibit Number 11).  We asked them to schedule the MBR

20   meeting.  Um, we advised that it had not been scheduled for

21   the parent and the student.  We gave them proposed dates

22   for the meeting, um, and we asked them to provide services

23   and we asked them, um, so that he could continue to receive

24   a ----------.  They, um, and this was sent out on the 4th.

1    On December 12th they sent out a letter scheduling the, um,

2    MBR meeting and that was, um, after the hearing, the

3    initial hearing with us that we amended to put in the

4    student's name alone.  That you will see from the records

5    was after that.  Um, and actually that meeting if you

6         **HEARING OFFICER:**  The document you are referring too?

7         **MS.  GAMBALE:**  I don't remember, that's in Exhibit

8    Number 19.  If you look at that letter you will, um, see

9    that

10        **HEARING OFFICER:**  Number 20?

11        **MS.  GAMBALE:**  Number 19.

12        **HEARING OFFICER:**  Nineteen.

13        **MS.  GAMBALE:**  You will see that the fact that they

14    were already aware of the fact that we had filed that they

15    scheduled both this meeting and the MBR in that same letter

16    and that was on the 12$^{t.}$  That was well after the 10 days

17    that they should have scheduled the meeting in.  Um, and

18    that's another thing, um, but then also if you look at the,

19    um, next letter, Exhibit Number 20, they are notifying him

20    that they are expelling him and, um, they are basically

21    telling him to go to his neighborhood school and then once

22    he's done that they will forward the records and this was

23    sent on the 19th.  There was no placement when talking about

24    a transfer.  There was no discussion to talk about whether

22

1   the neighborhood school was suitable for the student.  Um,

2   one of the reasons why he was at Maya Angelo was because it

3   was a smaller setting and because it had a strong

4   vocational.  Back in 2004 he had a vocational assessment

5   that specifically recommended Maya Angelo as a replacement

6   because of their, um, because of their vocational program.

7   And, um, that's, that's, um, why he was there.  There was

8   no discussion, there was no one available from DCPS to talk

9   about what vocational skills he could receive through DCPS,

10   um, about the class size, um, about what kind of counseling

11   would be in place and also something that she said also was

12   incorrect, and the student has had a history of, um,

13   suspensions, um, counseling is part of his IEP.  Um, if you

14   go back to 2004, there was, that's why I included the 2004

15   IEP there.

16   **MS. SMITH:**  I'm going to object to the statute of

17   limitations.

18   **MS. GAMBALE:**  We are not seeking to collect damages

19   from 2004 onward but what we are seeking to do is to tell

20   the pattern that has existed all along for the student.

21   But if you also look into our Exhibit um, let me get the

22   um---there's also a suspension letter from a September

23   incident that's also included, this is not the first time

24   he was having problems like this and what the concern was,

1    it's in Exhibit Number 18, um, and this kind of goes right

2    back to the issues that were raised initially in 2004, that

3    there was psycho-educational and the IEP.  There was

4    concern that this had a habit of appearing on occasion,

5    interfering with his ability to, um, address his education

6    because of, um, interference with that.  Um, and they had

7    actually recommended that they increase his add counseling

8    and he is receiving a significant amount of counseling.  In

9    his IEP the, um, parents have expressed concern that one of

10   the reasons why the incident happened was because the does

11   have some emotional issues that make it difficult for him

12   not to react and that was one of their concerns that his

13   needs in the area are not being addressed and that was

14   something that was brought up by the advocate at the, um,

15   resolution meeting and that there was in fact a correlation

16   and we sent some follow-up letters.  Uh, and if you look at

17   some of the letters, um, you'll see that not only did we

18   institute a request for the MBR which they did not do in

19   the timeframe, um, and not only, um, we, um, participated

20   in the meetings but we also raised concerns with time

21   length, we also invoke to stay-put.  We also asked them to

22   do the FBA which is mandatory.  What she said about the law

23   isn't true because even if it's not a manifestation it is

24   still required to do that FBA, um, and that's one of the

1   provisions under the disciplinary statute.  Um, what the
2   student's concern is that he's loosing credit and he's
3   loosing time and his ability to graduate and that's the
4   reference of the student.  He, um, wants to be able to be
5   in school, he wants to be able to graduate.  Um, and he was
6   working hard for this not to graduate and all this time out
7   of school has harmed him and we are not talking about him
8   getting specialized instruction.  He has not received any
9   instruction during the day and I will let him testify in
10  terms of what has happened with the tutoring because, um,
11  we have such follow-up letters too, to advise him of what
12  was going on, um, but he hasn't gotten the tutoring that
13  they promised and even the tutoring that they promised came
14  too late.  He had been out of school for almost 2 months
15  before they had planned on beginning the tutoring and he
16  still has not gotten it and so I would ask you, that um,
17  that the letters that we sent to request that when we asked
18  for the MBP meeting to be convened to talk about the
19  services that would be put into place.  At the MBR meeting
20  we asked for that and they never did it.  We gave them
21  dates so that we could reconvene in January to do that as
22  soon as they got back from Christmas and they never did
23  that.  They've got the ball a lot of different ways and
24  what we are asking for since they have not complied with

25

1    the procedures, we asking for reinstatement back at Maya

2    Angelo so that we can give him any tutoring that he needs

3    to help him make up those classes that he missed and the

4    work that he missed so that he can, in fact, graduate on

5    time.

6        **HEARING OFFICER:**  Okay, the only three issues here I

7    see presented, whether or not they timely held the MBR,

8    whether or not they conducted a FBA and I don't know if

9    there is an allegation of whether that is even required

10   under the law, FBA and BIP and finally was, um, he provided

11   with continued fait after the suspension which exceeded,

12   um, the 10 days, okay.

13       **MS.  GAMBALE:**  Anything after settlement to those

14   three issues.

15       **HEARING OFFICER:**  Alright, shall you call Mr. Hamilton

16   first.

17       **MS.  GAMBALE:** Yes

18       **HEARING OFFICER:**  Mr. Hamilton, state your name again.

19       **MR. HAMILTON:**  Corey Hamilton.

20       **HEARING OFFICER:**  Keep your hand raised, do you swear

21   and affirm the statements that you make today will be the

22   truth, the whole truth and nothing but the truth.

23       **MR. HAMILTON:**  Yes I do.

24       **HEARING OFFICER:**  Ms.  GAMBALE, you may proceed.

1      **MS. GAMBALE:** Could you repeat your name for the

2  record.

3      **MR. HAMILTON:** Corey Hamilton.

4      **MS. GAMBALE:** And what is your occupation?

5      **MR. HAMILTON:** I work as a Special Ed Advocate, James

6  E. Brown & Associates.

7      **MS. GAMBALE:** And where, how long have you been in

8  that position?

9      **MR. HAMILTON:** For almost a year now.

10     **MS. GAMBALE:** And what qualifies you for that

11  position?

12     **MR. HAMILTON:** I have a, um, Bachelor of Science in

13  early childhood development education.  I have a Masters in

14  emotional behavior disorders which is special education.

15  I've worked as an elementary, middle and high school

16  special education teacher as well as a high school special

17  education coordinator.

18     **MS. GAMBALE:** Are you familiar with Derrick Shelton?

19     **MR. HAMILTON:** Yes I am.

20     **MS. GAMBALE:** How are you familiar?

21     **MR. HAMILTON:** I work as a family's advocate.

22     **MS. GAMBALE:** And how long have you been in that

23  position?

24     **MR. HAMILTON:** For, I retained him in December.

27

1    **MS. GAMBALE:** And have you entered into any meetings

2    with the school, first of all what documents have you

3    reviewed on behalf of Derrick?

4    **MR. HAMILTON:** His previous IEP, as well as the

5    current IEP at the actual meeting, his psychological report

6    from 2004, his vocational and a previous IEP, I'm sorry a

7    previous Psycho Ed evaluation from 98, referrals from the

8    school, instant reports and correspondence from SCC to

9    counsel.

10   **MS. GAMBALE:** And what meetings have you attended on

11   behalf of the student?

12   **MR. HAMILTON:** There was a December MDR meeting,

13   December 2006.

14   **MS. GAMBALE:** Were the parent and the student both in

15   attendance at that meeting?

16   **MR. HAMILTON:** Yes they were.

17   **MS. GAMBALE:** And what was the purpose, there was a,

18   and what was the determination at that meeting?

19   **MR. HAMILTON:** It was determined at that meeting with

20   the current IEP in place which labeled the student LD that

21   it was not a manifestation of his disability.

22   **MS. GAMBALE:** Were you in agreement with that?

23   **MR. HAMILTON:** Number

24   **MS. GAMBALE:** And why not?

28

1    **MR. HAMILTON:** Because there were questions about
2    students' disability, the amount of services he was
3    receiving, previously he was receiving more.  At the MBR
4    meeting we found out that the level of service had been
5    reduced.  Parents also had concerns regarding student may
6    be exhibiting some emotional problems.  The team never
7    addressed the concerns of his psychological report which
8    stated that the student may need additional counseling
9    services if issues were to re-hatch, as well as him
10   receiving psychological services on current and previous
11   IEP.

12   **MS. GAMBALE:** And what request did you make for this
13   student at that meeting?

14   **MR. HAMILTON:** At that meeting, because there were
15   questions about the current IEP and evaluations, the team
16   agreed that we would reconvene the meeting in January to
17   address the issues of the inappropriateness of the IEP.
18   The meeting was on the 19th, school was out on the 22nd for
19   Christmas, therefore we couldn't meet before the New Year
20   had come around.  So we agreed to meet in January.

21   **MS. GAMBALE:** And at the time of the meeting what
22   services had been put into place for the student?

23   **MR. HAMILTON:** Um, the student had no services at the
24   time of the meeting.  At the time of the meeting, none.

1    **MS. GAMBALE:** And, um, did you have any follow-up

2    correspondence with the school or communication with the

3    school?

4    **MR. HAMILTON:** There was communication with the

5    school. Yes, I sent out two letters: one the date of the

6    actual manifestation meeting and one in January to follow-

7    up with our proposed meeting dates, the -------meeting.

8    **MS. GAMBALE:** And have you received, and you, the

9    school is acquainted, you are acquainted with the school?

10    **MR. HAMILTON:** Right.

11    **MS. GAMBALE:** They knew you were working with the

12    family?

13    **MR. HAMILTON:** Right.

14    **MS. GAMBALE:** Did you receive any evaluations, what

15    evaluations did you receive after the, um, December 19th

16    meeting?

17    **MR. HAMILTON:** None.

18    **MS. GAMBALE:** Um, and did the school ever confirm a

19    meeting date?

20    **MR. HAMILTON:** No they didn't.

21    **MS. GAMBALE:** Did they ever propose a meeting date?

22    **MR. HAMILTON:** No they didn't.

23    **MS. GAMBALE:** Um and has the team reconvened at this

24    point?

1       **MR. HAMILTON:**  No they haven't.

2       **MS.  GAMBALE:**  And, um, in terms of placement, um,

3   was the suitability of the , what was discussed in terms of

4   placement at the MBR meeting?

5       **MR. HAMILTON:**  Placement wasn't discussed.

6       **MS.  GAMBALE:**  This was, um, I have nothing further.

7       **Coles Ruff:**  Ms. Smith, your witness.

8       **MS. SMITH:**  You stated that you were at the MDR

9   meeting on 12/19?

10      **MR. HAMILTON:**  Correct.

11      **MS. SMITH:**  Let me turn your attention to the meeting

12  notes.  And it is your testimony that you were not in

13  agreement with the determination of the team that the

14  behavior was not a manifestation of the student's

15  disability.

16      **MR. HAMILTON:**  Because there were questions about the

17  IEP.

18      **MS. SMITH:**  That's correct

19      **MR. HAMILTON:**  About the IEP.

20      **MS. SMITH:**  Is that correct though, your testimony is

21  that you were not in agreement with the MDR decision at the

22  meeting.

23      **MR. HAMILTON:**  Under his current IEP we weren't in

24  agreement with the IEP but with that IEP it only gave him 5

31

1    hours with, 4 hours of time per day classification of LD,

2    which would have not constituted it being a manifestation

3    of his disability.

4        MS. SMITH:  So under his current IEP we're in

5    agreement that it was not a manifestation?

6        MR. HAMILTON:  We weren't in agreement with the IEP

7    but we couldn't fight it because that was on paper so we

8    had to agree with the decision.

9        MS. SMITH:  So you did agree with the MDR decision at

10   the meeting based on his current IEP?

11       MR. HAMILTON:  On his current IEP.

12       MS. SMITH:  On, it's also your testimony that you sent

13   two letters:  one dated 12/19, um, and another following

14   that.  I was just wondering if we could point those out in

15   the documents.

16       MR. HAMILTON:  I'm sorry, Exhibit Number 10 of the

17   Parent's Disclosure, it's dated December 19, 2006.

18       MS. SMITH:  Mmm, mmm. Okay, and what was the next

19   letter?

20       MR. HAMILTON:  Exhibit Number 12 and that's where we

21   requested the meeting dates requesting a time.

22       MS. SMITH:  And what's the date of that letter on

23   Exhibit Number 12?

24       MR. HAMILTON:  January 17.

1       MS. SMITH:  And isn't that before the MDR meeting

2   convened?

3       MR. HAMILTON:  I'm sorry.

4       MS. SMITH:  I'm sorry.

5       MR. HAMILTON:  Okay.

6       MS. SMITH:  Excuse me, I was thinking December, sorry

7   about that.

8       MR. HAMILTON:  Oh, I'm sorry.

9       MS. SMITH:  And those were the two letters that you

10  sent?

11      MR. HAMILTON:  Yes Maam.

12      MS. SMITH:  And did you recently attend the resolution

13  meeting for the student?  On the amended complaint?

14      MR. HAMILTON:  No I didn't.

15      {Pause}

16      MS. SMITH:  And were you at, after the MDR meeting, a

17  follow-up resolution meeting occurred based on the original

18  complaint, were you at that resolution meeting?

19      MR. HAMILTON:  Number

20      HEARING OFFICER:  When was the resolution meeting?

21      MS. SMITH:  There were two, there was one December 19

22  and there was one on March ------

23      HEARING OFFICER:  Well, December 19th was the

24  manifestation.

1    **Ms. SMITH & MS. GAMBALE:** It was the same day.

2    **HEARING OFFICER:** It was the same day. Were there two

3    separate meetings?

4    **Ms. Smith & MS. GAMBALE:** Yes.

5    **HEARING OFFICER:** What was the second one?

6    **MR. HAMILTON:** March.

7    **MS. SMITH:** There was the manifestation meeting came

8    first and the resolution meeting after that. I was at the

9    resolution meeting, Corey was at the manifestation meeting

10   ------------ and the student resolution meeting.

11   **HEARING OFFICER:** Both of those were on the 19th, then

12   was there a subsequent resolution meeting?

13   **MS. SMITH:** We amended it, they had filed a question

14   because the complaint originally listed both the parent and

15   the student's name, so we amended the complaint to remove

16   the parent's name. They wanted another resolution meeting.

17   They actually filed a motion, we had proposed meeting dates

18   after the second

19   **MS. GAMBALE:** A resolution meeting was convened.

20   **MS. SMITH:** There was a whole bunch of different -----

21   **HEARING OFFICER:** Last week, okay. Where are the

22   meeting notes from the 19th meeting?

23   **MS. SMITH:** The 19th meeting. It should be in 21.

24   {Pause}

34

1    **HEARING OFFICER:** Did you have any other questions for

2    Mr. Hamilton?

3    **MS. SMITH:** I actually have nothing further.

4    **HEARING OFFICER:** Okay, Mr. Hamilton the manifestation

5    determination, who all in the meeting, I have a list of

6    participants, who all in the meeting determined that it was

7    in fact a manifestation or was not a manifestation

8    disclosed. How did that, what were the logistics of the

9    decision?

10   **MR. HAMILTON:** Okay, at the meeting members of the

11   school, let's see Mr. Grahams, Dr. Grahams, Ms. West, Mr.

12   Lucini, and Mr. (the counselor) were in agreement in

13   agreeing that it was not a manifestation of the student's

14   disability. Um, initially parent nor myself were in

15   agreement because we were questioning the adequacy of the

16   IEP. So therefore we didn't want to agree that it was not

17   a manifestation because we were questioning the IEP. Um,

18   the rest of the team members didn't consider the student's

19   history and as a result we made it simple and plain that

20   based on this document here (pounding) did we believe that

21   it was a manifestation of his disability, not going on

22   what's in his record but on that document (pounding) and

23   then we all came to agree that that document, the incident

24   was not a manifestation of his disability. However, mom

1    and dad did not want to agree to that.  But because that

2    document we had to go with that document and that document

3    was in question.

4        **HEARING OFFICER:**  And was there an agreement to

5    reconvene a meeting to discuss the IEP and/or to amend the

6    IEP?

7        **MR. HAMILTON:**  Yes, it's actually on the second page

8    of the meeting notes that was and it's where I requested

9    that we revisit the IEP at a later date and the team was in

10   agreement with that.

11       **HEARING OFFICER:**  The team agreed to do that?

12       **MR. HAMILTON:**  Correct.

13       **HEARING OFFICER:**  Was the meeting date set?

14       **MR. HAMILTON:**  Not that day, Number

15       **HEARING OFFICER:**  But it's your impression that the

16   members of the team from Maya Angelo were in agreement to

17   reconvening to discuss the IEP?

18       **MR. HAMILTON:**  Correct.  And I sent dates in January

19   to follow-up.

20       **HEARING OFFICER:**  Okay, any other questions for him?

21   None, okay thank you, we're done.  Whose next?

22       **MS. SMITH:**  The next person I'll call will be the

23   student.

1     **HEARING OFFICER:**  Okay.  Remember you are already

2     under oath.

3     **DERRICK SHELTON:**  Okay.

4     **MS.  GAMBALE:**  Would you please state your name for

5     the record?

6     **DERRICK SHELTON:**  Derrick Shelton, the student.

7     **MS.  GAMBALE:**  And where are you currently in school?

8     **DERRICK SHELTON:**  I'm currently getting tutored from

9     Angelo.

10    **MS.  GAMBALE:**  And how long were you in attendance at

11    Maya Angelo?

12    **DERRICK SHELTON:**  Since my 10th grade year.

13    **MS.  GAMBALE:**  And what kind of grades were you making

14    prior to your expulsion?

15    **DERRICK SHELTON:**  My last year I was on the honor

16    roll.

17    **MS.  GAMBALE:**  And why were you suspended?

18    **DERRICK SHELTON:**  Getting in an incident with another

19    student.

20    **MS.  GAMBALE:**  And was this your first suspension in

21    this school year?

22    **DERRICK SHELTON:**  Number

23    **MS.  GAMBALE:**  When were you suspended before?

24    **DERRICK SHELTON:**  Different occasions.

37

1    **MS. GAMBALE:** How many times were you suspended this

2  school year?

3    **DERRICK SHELTON:** More than five.

4    **HEARING OFFICER:** In this school year here, that's

5  still going on?

6    **DERRICK SHELTON:** Yes.

7    **HEARING OFFICER:** Five times?

8    **DERRICK SHELTON:** Yes

9    **HEARING OFFICER:** In school year 06-07?

10    **DERRICK SHELTON:** Yes

11    **HEARING OFFICER:** That's your answer.

12    **DERRICK SHELTON:** I've been sent home from the school

13  on several occasions.

14    **HEARING OFFICER:** Okay.

15    **MS. GAMBALE:** And how were you notified of this last

16  suspension?

17    **DERRICK SHELTON:** I was told that I was suspended and

18  that I was not suppose to come back to the school.

19    **MS. GAMBALE:** And when did the incident occur?

20    **DERRICK SHELTON:** On the 17th.

21    **MS. GAMBALE:** And, so have you been back to the

22  school since the 17th.

23    **DERRICK SHELTON:** Tutor.

24    **MS. GAMBALE:** And when did that tutoring began?

1    **DERRICK SHELTON:**  January 17.

2    **MS. GAMBALE:**  Can you describe what kind of services

3    the school made available to you.

4    **DERRICK SHELTON:**  When I go to tutoring the work isn't

5    all provided, my math teacher tutoring, so the work that I

6    do is mostly math only, only math.  I received history

7    once.

8    **MS. GAMBALE:**  So what courses were you enrolled in

9    before this incident occurred?

10   **DERRICK SHELTON:**  English, Math, History, Science, and

11   I believe that's it.

12   **MS. GAMBALE:**  And when did you expect to graduate?

13   **DERRICK SHELTON:**  This year.

14   **MS. GAMBALE:**  And so how often did you go to the

15   school for tutoring:

16   **HEARING OFFICER:**  You went to the school for tutoring?

17   **DERRICK SHELTON:**  Yes.

18   **HEARING OFFICER:**  Okay.

19   **DERRICK SHELTON:**  Every, Wednesdays.

20   **MS. GAMBALE:**  And when was the tutoring supposed to

21   be provided?

22   **DERRICK SHELTON:**  It was suppose to be provided on

23   Wednesdays.

24   **MS. GAMBALE:**  From like what time?

1    DERRICK SHELTON: Oh, um, two to four, two to four or

2  was it, I, three to five.

3    MS. GAMBALE: And, um, how were you supposed to keep

4  up with your class work?

5    DERRICK SHELTON: I was supposed to receive work and

6  turn it in I guess.

7    MS. GAMBALE: Did you receive work?

8    DERRICK SHELTON: Only for math and I received history

9  once.

10    MS. GAMBALE: And did you, how often did you show up?

11    DERRICK SHELTON: I showed up every Wednesday.

12    MS. GAMBALE: Was there ever a time that you missed

13  tutoring?

14    DERRICK SHELTON: Yes, not that I missed, there was a

15  time that I was told I could leave, I just received work

16  and she told I could leave, she had something to do.

17    MS. GAMBALE: Was there ever a time that you went and

18  they weren't available to provide tutoring to you?

19    DERRICK SHELTON: Yes.

20    MS. GAMBALE: And when was that?

21    DERRICK SHELTON: I believe they had a party or

22  something and they couldn't get to me.

23    MS. GAMBALE: What do you mean they had a party?

40

1      **DERRICK SHELTON:** I think there was a lunch party

2   going on in the classroom where I was supposed to get

3   tutored at. I just got my work and left.

4      **HEARING OFFICER:** You just what, I'm sorry.

5      **DERRICK SHELTON:** I got my work and left.

6      **HEARING OFFICER:** Okay.

7      **MS. GAMBALE:** And what kind of assistance have you,

8   what kind of vocational program or vocational training were

9   you receiving.

10      **DERRICK SHELTON:** Oh, what do you mean?

11      **MS. GAMBALE:** Like at Maya Angelo what kind of

12   vocational to help you when you graduate from school?

13      **DERRICK SHELTON:** Classes, I forget the name of the

14   class. I forgot.

15      **MS. GAMBALE:** But were you enrolled in a class to

16   help you prepare for when you graduated?

17      **DERRICK SHELTON:** Yes.

18      **MS. GAMBALE:** How many students were in your class at

19   Maya Angelo?

20      **DERRICK SHELTON:** In my classes on a average, 9

21   people, 10, it wasn't a lot of people.

22      **MS. GAMBALE:** And what is it that you are concerned

23   about going to the neighborhood school.

1     **DERRICK SHELTON:**  Maya Angelo credits are different

2     from public schools and I knew that if I go there my

3     credits would be messed up.

4          **MS.  GAMBALE:**  And what is it that you are asking to

5     happen here today?

6          **DERRICK SHELTON:**  I want to be put into a situation

7     where I can graduate from high school on time.

8          **MS.  GAMBALE:**  And what are you willing to do to make

9     that happen?

10         **DERRICK SHELTON:**  Anything.

11         **MS.  GAMBALE:**  Have you ever had a problem with

12    attendance in school?

13         **DERRICK SHELTON:**  Tardiness probably but never not

14    coming.

15         **MS.  GAMBALE:**  Um, I have nothing further.

16         **HEARING OFFICER:**  Ms. Smith, your witness.

17         **MS. SMITH:**  You stated that your tutoring began on

18    January 17?

19         **DERRICK SHELTON:**  Yes.

20         **MS. SMITH:**  Um, did you not go to school on December

21    22nd to get tutoring?

22         **DERRICK SHELTON:**  (clearing throat) Number

23         **MS. SMITH:**  What about December 27th?

24         **DERRICK SHELTON:**  No, it started um on January 17th.

42

1       **MS. SMITH:** And not on January 3rd either.

2       **HEARING OFFICER:** Okay, if you remember better than

3    he, you just --------

4       **MS. SMITH:** Can I

5       **HEARING OFFICER:** No, you just wait, Ms. GAMBALE may

6    call you but don't give him the answers, if you don't know,

7    just say you don't know.

8       **DERRICK SHELTON:** Okay.

9       **HEARING OFFICER:** Alright.

10      **MS. SMITH:** So do you remember or you don't remember.

11      **DERRICK SHELTON:** I mean I vaguely remember but I just

12    started on the 17th is what I remember.

13      **MS. SMITH:** That's your recollection.

14      **DERRICK SHELTON:** Yes.

15      **MS. SMITH:** Um, and you said you were at the MGR

16    meeting on the 19th?

17      **DERRICK SHELTON:** Yes.

18      **MS. SMITH:** And do you remember your evaluations being

19    reviewed that day.

20      **DERRICK SHELTON:** Vaguely.

21      **MS. SMITH:** Um are you familiar with the um program at

22    school called, um, *Kite Runner* Assignment ----- *Sixty Years*

23    of document assignments?

24      **DERRICK SHELTON:** Yes.

1    **MS. SMITH:**  And what subject is that?

2    **DERRICK SHELTON:**  History.

3    **MS. SMITH:**  That's history.  And were you also in

4    English 3 at this time?

5    **DERRICK SHELTON:**  Yes.

6    **MS. SMITH:**  Okay.  I have no further questions.

7    **HEARING OFFICER:**  Did you get a response from Ms.

8    Smith on this motion?

9    **MS.  GAMBALE:**  We withdrew it after the resolution

10   meeting.

11   **HEARING OFFICER:**  Oh you did.

12   **MS.  GAMBALE:**  Uh hum.  But it was after the five

13   days, late, wasn't able to put it in.

14   **HEARING OFFICER:**  Okay, um, any redirect?

15   **MS.  GAMBALE:**  You stated that you reviewed um your

16   evaluation at the meeting.  When were you last evaluated?

17   **MS. SMITH:**  Objection, it's too relevant to the issues

18   in the complaint.

19   **MS.  GAMBALE:**  What are the issues in the complaint?

20   **HEARING OFFICER:**  You all just brought up, so I will

21   allow it, go ahead.  You know the question?

22   **DERRICK SHELTON:**  Um, can you?

23   **MS.  GAMBALE:**  When did they last give you like any

24   kind of testing?

44

1      **DERRICK SHELTON:** I don't recall any testing.

2      **MS. GAMBALE:** Um, and, um, did anybody inform you or

3   who informed you of --------

4      **MS. SMITH:** Objection to Ms. GAMBALE making notes for

5   the student, I don't know that you are writing but -----

6      **MS. GAMBALE:** I'm just writing, writing like-----

7      **MS. SMITH:** I don't know what you are writing but it

8   looks like you are writing notes for him.

9      **MS. GAMBALE:** No, I'm not, you are welcome to look at

10  my notebook.

11     **MS. SMITH:** What's he doing?

12     **HEARING OFFICER:** Go ahead.

13     **MS. GAMBALE:** Um, but um, um in terms of um, who

14  informed you to go to the school receive tutoring?

15     **DERRICK SHELTON:** Um, I vaguely remember but I

16  remember my parents telling me that I was going to be

17  receiving tutoring.

18     **MS. GAMBALE:** Um, and so, um, when was it your

19  understanding that tutoring was supposed to start?

20     **DERRICK SHELTON:** Seventeenth.

21     **MS. GAMBALE:** Um, were you ever advised that tutoring

22  was suppose to start at an earlier date?

23     **DERRICK SHELTON:** No, not that I recall.

1      **MS.  GAMBALE:**  Did you ever receive anything in, or

2    what did you receive in writing, um, to invite you to come

3    in for tutoring?

4      **DERRICK SHELTON:**  I believe, I received a paper

5    stating that I was going to be receiving tutoring.  That's

6    pretty much it.

7      **MS.  GAMBALE:**  And did that letter have a date on it

8    for you to start?

9      **DERRICK SHELTON:**  I don't remember.

10     **MS.  GAMBALE:**  Um, I have nothing further.

11     **HEARING OFFICER:**  Um, who did you receive the tutoring

12   from?

13     **DERRICK SHELTON:**  Ms. West.

14     **HEARING OFFICER:**  Always from Ms. West.

15     **DERRICK SHELTON:**  Yes.

16     **HEARING OFFICER:**  Okay.  Um and she was your math

17   teacher?

18     **DERRICK SHELTON:**  Yes.

19     **HEARING OFFICER:**  Before you were suspended and/or

20   expelled?

21     **DERRICK SHELTON:**  Yes.

22     **HEARING OFFICER:**  Okay.  Um, did you, now, was Ms.

23   West giving you, in addition to the tutoring were you

46

1  getting work or packets or kind of educational materials

2  from the other classes?

3      **DERRICK SHELTON:**  Um, Ms. West told me that Mr. Lucini

4  didn't give her the packets.

5      **HEARING OFFICER:**  Okay, so you never got any packets?

6      **DERRICK SHELTON:**  Only for Math.

7      **HEARING OFFICER:**  Only for Math, so.

8      **DERRICK SHELTON:** And, um, on another occasion I had

9  saw my history teacher and I asked her and talked to her

10  and she gave me some work.  That was the only other

11  occasion I had any other kind of work.

12      **HEARING OFFICER:**  Okay.  What was it that you pointed

13  out to him earlier in this document?

14      **MS. SMITH:**    *Kite Runner Sixty Years*, I didn't know

15  that it was before either, that's why I brought it up, um

16  but it was history assignments, noted a few times in there.

17      **HEARING OFFICER:**  Okay.  So what were you doing the

18  rest of the week when you weren't going for the tutoring?

19  What have you been doing?

20      **DERRICK SHELTON:**  Nothing.

21      **HEARING OFFICER:**  Nothing.

22      **DERRICK SHELTON:**  I'd take my work home and complete

23  it and after that I -------

47

1    **HEARING OFFICER:**  But, if there are four days of the

2    week you are not, you are just sitting home.

3    **DERRICK SHELTON:**  Yes.

4    **HEARING OFFICER:**  Okay.

5    **MS. SMITH:**  Just to clarify, *Kite Runners* is also the

6    English, um it's *Sixty Years, Sixty Years* document

7    assignment is the History.

8    **HEARING OFFICER:**  Mmm umm.

9    **MS. SMITH:**  And the *Kite Runner* is the, um, English

10   assignment, English program.

11   **HEARING OFFICER:**  Mmm umm.  Question, with this, this

12   may, I only have questions for you, give me moment.

13   (Pause)  Okay, let me go back to Mr. Hamilton.  I have a

14   question for you.  What, what, was there something, some

15   documentation that um, okay, you said that they agreed to

16   have the MDT meeting?

17   **MR. HAMILTON:**  Mmm um.

18   **HEARING OFFICER:**  And you testified that they never

19   had that meeting?

20   **MR. HAMILTON:**  Number

21   **HEARING OFFICER:**  Was there any other correspondence

22   that you issued that was perhaps having a record regarding

23   the reconvening of that meeting.

1      **MR. HAMILTON:** No, the letter I sent out on the, the

2  one in January.

3      **HEARING OFFICER:** That was the 18th letter.

4      **MR. HAMILTON:** Mmm huh.

5      **HEARING OFFICER:** When was that again?

6      **MS. SMITH:** I have the letter here -------

7      **MR. HAMILTON:** That letter was sent out in December.

8      **HEARING OFFICER:** What number is that again?

9      **MR. HAMILTON:** 10 and 12.

10     **MS. SMITH:** Um, I think it was 19 or 20.

11     **HEARING OFFICER:** What was it?

12     **MS. SMITH:** 10 and 12.

13     **HEARING OFFICER:** Number 10 and 12.  (Pause, shifting

14 through papers)  Okay, so what was your understanding of

15 whether he was expelled or did you know, was it your

16 understanding he was expelled from the school?

17     **MR. HAMILTON:** After the meeting we found out he was

18 expelled, yes.

19     **HEARING OFFICER:** After the meeting.

20     **MR. HAMILTON:** Mmm huh.

21     **HEARING OFFICER:** And when was that communicated?

22     **MR. HAMILTON:** Um, it was the date of December 19th,

23 that's why I sent the letter on the 19th requesting, um,

24 expulsion hearing.

1       **HEARING OFFICER:**  Okay, so there was no, actually no

2    hearing held, right.  Because that's in your reference or

3    even in your answer that the time lapse for

4       **MS.  GAMBALE:**  We did not get an appeal, a proper

5    appeal of the expulsion.

6       **HEARING OFFICER:**  The expulsion, okay.  um hum

7       **MS.  GAMBALE:**  That was partly because the parent was

8    never or the student advised of their right to expel and

9    parent did not have counsel at that time.  I am told that

10   in the timeframe (interrupted by Ms. Smith)

11      **MS. SMITH:**  Yes you did.

12      **MS.  GAMBALE:**  No they did not.

13      **MS. SMITH:**  You were at the resolution.

14      **MS.  GAMBALE:**  I was, but I wasn't retained, I was

15   retained in December after the 10 days had expired, after

16   there had been no MBR, um, that was

17      {Interruption by Hearing Officer)

18      **HEARING OFFICER:**  Right, but you got there, but then

19   there was the meeting on the 19th which was the MBR, then

20   the letter came out the same date of the same day

21   indicating, or dated the day after, that indicated he was

22   expelled.

23      **MS.  GAMBALE:**  Um,

1    HEARING OFFICER: That was the letter sent directly to

2  the student.

3    MR. HAMILTON: Yep.

4    MS. GAMBALE: But they had sent the letter out

5  expelling the student before that.

6    MS. SMITH: No we did not. We didn't expel the

7  student until after we held the MBR meeting.

8    MS. GAMBALE: Yes you did. Well that was not my

9  understanding because they had sent the letters out on,

10  before that, um, November 22nd. I believe it is in our

11  Exhibit Number um, there's one in Exhibit 20, but there was

12  another, wait a minute.

13    HEARING OFFICER: Were you aware of the letter Mr.

14  Hamilton that was sent to the student that indicated that

15  he was expelled on the 19th, the December 19th letter.

16    MR. HAMILTON: I don't recall that, it was after the

17  meeting.

18    HEARING OFFICER: Just a moment.

19    MR. HAMILTON: After the meeting, I'm not sure.

20    HEARING OFFICER: Yeah, it was after the meeting, yes.

21  Were you aware of the letter, did he show you the letter,

22  did you become aware of the letter that had been sent?

51

1  **MR. HAMILTON:** I can't recall but I'm sure if it's in

2 the file I have but I'm not sure, I can't recall when and

3 what the letter stated.

4  **MS. GAMBALE:** And apparent, and actually in writing

5 um in disciplinary action he asked for an expulsion hearing

6 to address the proposal for --------

7  **HEARING OFFICER:** What document is that?

8  **MS. GAMBALE:** Um, that's Exhibit Number 10.

9  **MS. SMITH:** And that says that Derrick would request a

10 hearing to address the appeal of the expulsion, not that

11 they are requesting a hearing and it states in the, um,

12 procedural manual or the Maya Angelo handbook that

13 expulsion of, um, an appeal of the expulsion must be

14 submitted in writing to the principal with three business

15 days and no appeal in writing was submitted to the

16 principal of Maya Angelo, um.

17  **HEARING OFFICER:** Okay so Derrick was it your

18 understanding that you have been expelled?

19  **DERRICK SHELTON:** Um, no, I was told, I was told

20 verbally that I was suspended.

21  **HEARING OFFICER:** By whom?

22  **DERRICK SHELTON:** It was a phone call, it was by my

23 father, and he told me that I was suspended.

1      **HEARING OFFICER:** Your father told you that you were

2  expended, you were expended?

3      **DERRICK SHELTON:** Yes.

4      **HEARING OFFICER:** I mean suspended. Um, did you get

5  this letter that was to you by, who was that, the

6  principal? Hold on a second, what is that number?

7      **MS. GAMBALE:** The December 19th letter?

8      **HEARING OFFICER:** Um hum. Mmm mmm.

9      **MS. SMITH:** Maya Angelo Document 6.

10     **HEARING OFFICER:** Did you receive this letter from Mr.

11  Pinckard?

12  (shifting of papers, pause)

13     **DERRICK SHELTON:** Yes, I received that letter.

14     **HEARING OFFICER:** You received this letter? Okay.

15     **DERRICK SHELTON:** I didn't receive it, my parents had

16  it.

17     **HEARING OFFICER:** Your parents had it. So you, but

18  you, did you know the contents of the letter, did you

19  understand the letter?

20     **DERRICK SHELTON:** Um yes.

21     **HEARING OFFICER:** What did you understand the letter

22  to say?

23     **DERRICK SHELTON:** That I was being expelled.

24     **HEARING OFFICER:** Yes, okay.

1      **DERRICK SHELTON:**  And I was going to receive tutoring

2   of some sort.  I didn't read the whole thing, I just

3   remember seeing the paper.

4      **HEARING OFFICER:**  Okay, did you understand that you

5   were supposed to go and register at your neighborhood

6   school?

7      **DERRICK SHELTON:**  I didn't really read it, my parents

8   were reading it.

9      **MS.  GAMBALE:**  I object to that because the student

10  should not have had to register in his neighborhood school.

11  Um, basically what Maya Angelo wanted to do is to put -----

12  -------------- and they should not had been put in the

13  position

14     **HEARING OFFICER:**  Ms.  GAMBALE, that's a legal

15  argument, okay, I'm asking him a question.  If you are

16  objecting to the question I am asking him, is that what you

17  are objecting too?

18     **MS.  GAMBALE:**  Um.

19     **HEARING OFFICER:**  Cause I'm asking him did he receive

20  the letter and did he understand, did he understand the

21  letter, you know so, that's a legitimate question.  So what

22  are you objecting too.

23     **DERRICK SHELTON:**  Oh, um, yeah I remember the paper,

24  see ------

54

1    **HEARING OFFICER:** You read the whole letter, you

2    saying now?

3    **DERRICK SHELTON:** I just looked at it, I do remember

4    it.

5    **HEARING OFFICER:** You remember the letter?

6    **DERRICK SHELTON:** Yes.

7    **HEARING OFFICER:** Was it your understanding that you

8    were being expelled from Maya Angelo?

9    **DERRICK SHELTON:** I really, when I had read the paper

10   I just looked over it, my parents pretty much explained to

11   me what was happening.

12   **HEARING OFFICER:** Um huh.

13   **DERRICK SHELTON:** And I just thought I was going to be

14   receiving tutoring till the case got resolved.

15   **HEARING OFFICER:** Until the case got resolved.

16   **DERRICK SHELTON:** Yes.

17   **HEARING OFFICER:** Is that it?  Okay, so did you know

18   that they expected you to go register at your local school?

19   **DERRICK SHELTON:** No, I didn't.

20   **HEARING OFFICER:** You didn't know that (clearing

21   throat).

22   **DERRICK SHELTON:** And uh!

23   **HEARING OFFICER:** Go ahead.

1    **DERRICK SHELTON:** I wanted to state that um we didn't

2    receive any papers for the first three days after the

3    expulsion. We didn't receive any papers, that's why,

4    probably why my father didn't file for a hearing or what

5    not. We, um, waited 10 days because they said I was

6    suspended for 10 days originally and then my father went up

7    to the school and asked them for papers. They didn't have

8    any papers for me, no papers of any sort, they were just

9    telling that stuff verbally.

10    **HEARING OFFICER:** Uh huh.

11    **DERRICK SHELTON:** So that's why my father didn't file

12    any papers on it.

13    **HEARING OFFICER:** For what.

14    **DERRICK SHELTON:** A hearing or whatever.

15    **HEARING OFFICER:** Okay, any other questions for him.

16    **MS. GAMBALE:** No

17    **HEARING OFFICER:** Do you have any questions for him.

18    Okay. Who are you calling next, Ms. GAMBALE.

19    **MS. GAMBALE:** I'm going to call the mother.

20    **HEARING OFFICER:** Okay, turn the mike towards you.

21    Ms. Bobo, right?

22    **MS. BOBO:** Yes.

23    **HEARING OFFICER:** State your name.

24    **MS. BOBO:** My name is Rochelle Bobo.

1    **HEARING OFFICER:** Raise your right hand please. Do

2  you swear and affirm the statements that you make today

3  will be the truth, the whole truth and nothing but the

4  truth.

5    **MS. BOBO:** Yes.

6    **HEARING OFFICER:** Great. Ms. GAMBALE you may

7  proceed.

8    **MS. GAMBALE:** Ms. Bobo what is your relationship to

9  Derrick?

10    **MS. BOBO:** I'm his mother.

11    **MS. GAMBALE:** And where does Derrick reside?

12    **MS. BOBO:** Maya Angelo.

13    **MS. GAMBALE:** Where does he?

14    **MS. BOBO:** Oh, live, 125 Franklin Street, NE.

15    **MS. GAMBALE:** Um, and um do you reside at the same

16  address?

17    **MS. BOBO:** Yes. He live with both parents and he has

18  two brothers.

19    **MS. GAMBALE:** Um, how long has be been enrolled at

20  Maya Angelo?

21    **MS. BOBO:** Since 10th grade.

22    **MS. GAMBALE:** Um, and why did you enroll him in Maya

23  Angelo?

1    **MS. BOBO:**  Because Maya Angelo was a smaller school

2    and that was a better school for Derek.

3    **MS. GAMBALE:**  And was there concerns about his

4    neighborhood school being appropriate for him?

5    **MS. BOBO:**  Yes.

6    **MS. GAMBALE:**  What were those concerns?

7    **MS. BOBO:**  It's too big, it's too large, too many

8    students and I didn't think he would get the proper

9    education by him being in special education.  I didn't

10   think he would get the proper education at his neighborhood

11   school.

12   **MS. GAMBALE:**  um and um how did you learn about

13   Derrick's suspensions from Maya Angelo?

14   **MS. BOBO:**  I think Derrick came home and told me.

15   **MS. GAMBALE:**  And, um, were there other suspensions

16   this school year?

17   **MS. BOBO:**  I know about one other, something about

18   being disrespectful to a teacher, that's one other one I'm

19   aware of.

20   **MS. GAMBALE:**  And has, um, Derrick ever had behavior

21   issues in the past?

22   **MS. BOBO:**  Yes.

23   **MS. GAMBALE:**  And what kind of behavior issues has he

24   had?

1      **MS. BOBO:**  Um, just being disruptive in class and

2  being disrespectful to teachers like that but no fighting

3  or um nothing like that.

4      **MS. GAMBALE:**  And, um, does he receive counseling on

5  his IEP?

6      **MS. BOBO:**  He should, yes.

7      **MS. GAMBALE:**  Um, and did you participate in the MBR

8  meeting.

9      **MS. BOBO:**  Yes.

10      **MS. GAMBALE:**  And what was your position in

11  connection to the incident?

12      **MS. BOBO:**  Um, what happened, what made him get

13  suspended?

14      **MS. GAMBALE:** Um, um.

15      **MS. BOBO:**  I was told that he was hit by a student and

16      **MS. GAMBALE:**  I'm talking about the meeting that you,

17  you participated in on December 19.

18      **MS. BOBO:**  Yes.

19      **MS. GAMBALE:**  And what was your understanding of the

20  purpose of that meeting?

21      **MS. BOBO:**  To discuss um, okay, this is what I

22  thought.  This was to discuss if Derek was going to be

23  staying at Maya Angelo and to go over his IEP and to see if

24  he was going to be staying there.

1      MS. GAMBALE: Um, and did they discuss his IEP at the

2   meeting?

3      MS. BOBO: They did, they discussed the old IEP and

4   then they discussed the different IEP.

5      MS. GAMBALE: And what was your understanding about

6   whether there was to be another meeting?

7      MS. BOBO: I thought it was going to be another

8   meeting.

9      MS. GAMBALE: Um, and as far as tutoring what was

10  your understanding of when tutoring was suppose to start?

11     MS. BOBO: I, myself, got a call from Ms. West around

12  December 22nd, 20th and she said I want to um start tutoring,

13  I think it was around the 20th. She said I'm going to start

14  tutoring Derek, are you aware of it? He's suppose, no she

15  said he's suppose to be in tutoring today and I told her I

16  was not aware of Derek suppose to be in tutoring in

17  December. She said okay. She said well after the vacation

18  he can start which was January 17th.

19     MS. GAMBALE: Um, so um, um, what services were

20  offered between December 19th and January 17th?

21     MS. BOBO: None.

22     MS. GAMBALE: And what services did he receive before

23  December 19th.

24     MS. BOBO: None.

1      **MS. GAMBALE:** And did they give him packets of work?

2      **MS. BOBO:** No and when Derek was first suspended I

3   called up there that first day that Derek came home and

4   told me he was suspended for 10 days and I talked to Mr.

5   Lucini and I asked him well are yall going to be sending

6   Derek some work home because he is in special education,

7   are yall going to send him some work. He said yes.

8      **HEARING OFFICER:** Who did you, who?

9      **MS. BOBO:** Mr. Lu, the Special Ed director. I called

10  him that day Derek came home and said he was suspended for

11  10 days. Are yall going to send Derek some work? The

12  answer was yes but Derek never received any. And I kept

13  stressing he's in Special Ed, it's going to put him behind.

14     **MS. GAMBALE:** Um, and did they even attempt to

15  schedule the manifestation meeting until after you had

16  counsel?

17     **MS. BOBO:** Number--

18     **MS. GAMBALE:** Did anyone talk to them about

19  scheduling a manifestation meeting?

20     **MS. BOBO:** Derek's father did. Derek's father was

21  going up there everyday, every other day and was talking

22  with the, he talked with the principal and he also talked

23  with Mr. Lucini. He spoke with both of them. He was going

24  up there almost every other day.

1      **MS. GAMBALE:** Um, how has this impacted your son?

2      **MS. BOBO:** Derek wants to be back in school. He wanna

3   be back at Maya Angelo because Derek, his grades have

4   improved a lot. Derek was getting failing grades a lot and

5   he really improved, became a honor roll student and he was

6   told by Mr. Lucini that by him bringing up his grades he

7   was going to be put in the 12th. That's why Derek worked so

8   hard to get those A's and B's and get on the honor roll.

9   And then this happened and this just you know. He's at a

10  stand-still.

11      **MS. GAMBALE:** I have nothing further.

12      **HEARING OFFICER:** Ms. Smith, your witness.

13      **MS. SMITH:** You stated that your husband, Derek's

14  father, was going up to the school, um do you recall what

15  dates?

16      **MS. BOBO:** It was the, okay he got suspended on a

17  Friday that Monday he was at the school. I don't know the

18  date but the Friday was the 17th, so it was that following

19  Monday. He was up there.

20      **MS. SMITH:** Was a meeting convened with Mr. Lucini?

21      **MS. BOBO:** He spoke with him. He spoke with him. He

22  also spoke with Mr. Pinckard. (Pause) His father was really

23  almost begging like Derrick is doing so well now, you know,

1  what can yall do.  Yall gonna give him work, yall gonna let

2  him, he was trying to really, cause he had came so far.

3      **MS. SMITH:**  Um, mm.

4      **MS. BOBO:**  So that's why he was talking with the

5  principal and Mr. Lucini.

6      **MS. SMITH:**  Okay.  And is it your testimony that he

7  had been suspended one time prior this school year.

8      **MS. BOBO:**  Far as I know, it was one time prior.  That

9  the teacher

10     **MS. SMITH:**  Are you saying that was for speaking

11 disrespectful to a teacher.

12     **MS. BOBO:**  To a teacher, mmm, mmm.

13     **MS. SMITH:**  And other than that, had you been notified

14 by the school about any behavioral concerns for Derrick?

15     **MS. BOBO:**  Um, um some with Derrick disrupting the

16 class they was sending him home but they weren't calling it

17 a suspension.  They were just sending him home and I went

18 up for there for that cause I'm is he suspended and yall or

19 yall just sending him home.  They were just sending him

20 home.

21     **MS. SMITH:**  And was he

22     **MS. BOBO:**  Go ahead.

23     **MS. SMITH:**  Was he participating in any outside work,

24 internship programs?

1    **Ms. Bobo:**  With the school, yes.  He did. Yes.

2    **MS. SMITH:**  That's all

3    **HEARING OFFICER:**  Any redirect?

4    **MS. GAMBALE:**  Yes, when you said they were sending

5    him home, did they send him home um, do you remember them

6    sending him home during the school year?

7    **MS. BOBO:**  Yes, they did send him home.

8    **MS. GAMBALE:**  And about how many times did they send

9    him home?

10   **MS. BOBO:**  Several times.

11   **MS. GAMBALE:**  And what did you receive in writing

12   about it?

13   **MS. BOBO:**  Nothing.

14   **MS. GAMBALE:**  And how were you notified?

15   **MS. BOBO:**  Derek would call me at home, call me at

16   work and say:  "Mom, I'm going home.  They sending me

17   home."  And I'm like no, you need a letter but they would

18   never give him a letter.

19   **MS. GAMBALE:**  And um what kind of outside programs

20   did Derrick participate in at Maya Angelo?

21   **MS. BOBO:**  I know Derrick, they did a college tour.  I

22   don't know if that's considered an outside program, but

23   they did a college tour.  They went to different colleges.

1    He participated in that and I think he was working on

2    Wednesday's.  Derrick was you working?

3        **DERRICK SHELTON:**  Yes.

4        **MS. BOBO:**  Oh, I'm sorry, he was working.

5        **HEARING OFFICER:**  You can recall him if you want to

6    Ms.  GAMBALE.

7        **MS. BOBO:**  Laughing, okay, oh okay.

8        **HEARING OFFICER:**  If you don't know, say you don't

9    know.

10       **MS. BOBO:**  Okay.

11       **MS. SMITH:**  I have nothing further.

12       **HEARING OFFICER:**  Okay, anything else, Okay Ms. Bobo I

13   have a couple of questions for you.  You say you attended

14   the MDR meeting.

15       **MS. BOBO:**  Yes

16       **HEARING OFFICER:**  The, um, manifestation determination

17   review meeting.  Um, when you left that meeting what was

18   your impression what was going to happen after that?

19       **MS. BOBO:**  I thought we was going to have another

20   meeting.  And I was really a little confused at that

21   meeting because it was some questions being asked but,

22   that's why I wash that meeting was recorded because when

23   they kept coming to me for my answer, I kept saying I don't

24   know, I'm being darn confused that, they kept on, I wasn't

1    ready to answer the question cause it was like I was

2    saying, I was thinking his disability had, it was, let me

3    see, his disability was a result of his actions.  That's

4    what I was trying to state at the meeting.  But it was

5    something that they had in writing worded a little

6    different where I agreed what was on the paper.

7        **HEARING OFFICER:**  Um, mmm, but what was your

8    understanding, you were under the impression you were going

9    to have a meeting afterward?

10       **MS. BOBO:**  Yes

11       **HEARING OFFICER:**  To do what?

12       **MS. BOBO:**  Um, to go over his IEP.

13       **HEARING OFFICER:**  Um, mmm.  Okay.

14       **MS. BOBO:**  And to see if he was staying at Maya

15   Angelo.

16       **HEARING OFFICER:**  Okay, now did you receive a letter

17   from the principal regarding, after that meeting,

18   indicating that he had been expelled?

19       **MS. BOBO:**  Which letter?

20       **HEARING OFFICER:**  The letter that I was just asking

21   Derrick about earlier.  You have it there Mr. Hamilton?

22       **MR. HAMILTON:** Number 6, right?  Here it is.

23   (Pause)

24       **HEARING OFFICER:**  Do you recall that letter?

66

1      **MS. BOBO:**  Ah huh.

2      **HEARING OFFICER:**  You received it?

3      **MS. BOBO:**  Yes.

4      **HEARING OFFICER:**  You did, okay.  What was your

5   understanding of the letter when you received it?

6      **MS. BOBO:**  Um, that um Maya Angelo was going to

7   provide the tutoring but I never, in my mind I'm still not

8   thinking he was expelled because he was still enrolled in

9   that school.  So I didn't never think he was, that he

10  wasn't going there.

11     **HEARING OFFICER:**  Okay.  Did you understand that or

12  did you see the portion of the letter that he needed to go

13  to his neighborhood school?

14     **MS. BOBO:**  I'm sure that I did but I probably didn't

15  pay it any attention.

16     **HEARING OFFICER:**  Okay, so did you know, so did you

17  know that if he was expelled you should have gone to the

18  school.  What is his school Cordoza?

19     **MS. BOBO:**  Cordoza.

20     **HEARING OFFICER:**  Were you aware of that?

21     **MS. BOBO:**  Yeah.

22     **HEARING OFFICER:**  Did you, did you just, you were

23  aware that he should have gone to Cordoza?

1  **MS. BOBO:**  No, because I'm still thinking Derrick,

2 he's enrolled in Maya Angelo.  Like, now today, he's still

3 enrolled in Maya Angelo.

4  **HEARING OFFICER:**  Okay.  Did you discuss with Mr.

5 Hamilton the possibility that he should go to his

6 neighborhood school?

7 Do you recall discussing that with him?

8  **MS. BOBO:**  I don't really recall it because I was

9 always told he's enrolled in Maya Angelo.

10  **HEARING OFFICER:**  Okay, alright.

11  **MS. GAMBALE:**  I object to that line of questioning.

12 The only reason why it raises concerns to me is that um it

13 almost sounds like you're expecting that the parent had an

14 obligation to enroll in the neighborhood school.

15  **HEARING OFFICER:**  You are inferring something from my

16 question, that's not in my question, Ms. GAMBALE.  I'm

17 asking about the letter and whether she understood that

18 part of the letter.

19  **MS. GAMBALE:**  Because like the neighborhood school a

20 change of placement, an expulsion would constitute a change

21 of placement.  um you don't just change a placement and put

22 a child in the neighborhood school.  You convene a

23 placement meeting and a MBT and talk about where it would

24 be appropriate to go.  If the parent objected to what they

1  were proposing or where they were issuing a notice of

2  placement the parent would a right to contest what they're

3  proposing as a placement and litigate the appropriateness

4  of (interrupted by Hearing Officer).

5      **HEARING OFFICER:**  That's a legal argument which you

6  can make to me at the end of the hearing.  But I'm asking

7  her about this matter and her understanding of the letter.

8  You okay.  um okay so with regard to the tutoring was there

9  any agreement that you made with anybody about the tutoring

10  or were you simply told that is what he would receive?

11      **MS. BOBO:**  I was told that he was going to be

12  receiving two hours of tutoring on Wednesday's starting

13  January 17th.

14      **HEARING OFFICER:**  And who told you that again?

15      **MS. BOBO:**  Ms. West, she called me on my cell phone.

16      **HEARING OFFICER:**  She called you and told you that.

17  Was there a discussion about the tutoring at that meeting

18  that you attended?

19      **MS. BOBO:**  I don't recall.

20      **HEARING OFFICER:**  You don't recall.

21      **MS. BOBO:**  I don't recall.

22      **HEARING OFFICER:**  Okay.  Alrighty, um now Ms. West,

23  did she, did you talk to anybody else other than Ms. West

24  about him coming to the school for the tutoring?

1    **MS. BOBO:** Mr. Lucini, I did talk with him about

2  tutoring, when is Derrick's tutoring going to start. He

3  didn't have an answer, he didn't have a date, he didn't

4  know.

5    **HEARING OFFICER:** Was that before or after Ms. West

6  conversation?

7    **MS. BOBO:** It was before Ms. West.

8    **HEARING OFFICER:** Okay.

9    **MS. BOBO:** Um huh.

10    **HEARING OFFICER:** So where did you come up with the

11  tutoring to ask Mr. Lucini about? Am I pronouncing his

12  name right? Okay go ahead.

13    **MS. BOBO:** Okay, I'm assuming Derrick when he was out

14  of school all this time, I mean he needed some type of

15  tutoring or some type of work or something.

16    **HEARING OFFICER:** Okay, cause you made a reference

17  before about

18    **MS. BOBO:** Yeah.

19    **HEARING OFFICER:** Inquiring before it says he was

20  suspended.

21    **MS. BOBO:** Um mmm.

22    **HEARING OFFICER:** um what was going to happen, is that

23  what you are talking about?

24    **MS. BOBO:** Yes.

1    **HEARING OFFICER:** Okay. Um, okay so who, did Ms. West

2    tell you that he was come to the school for tutoring. Who

3    told you that?

4    **MS. BOBO:** I talked to Ms. West, she called me.

5    **HEARING OFFICER:** And she told you when he should

6    start to come and?

7    **MS. BOBO:** And the hours.

8    **HEARING OFFICER:** And that he should come to the

9    school?

10    **MS. BOBO:** Yes.

11    **HEARING OFFICER:** Okay, was there, but you recall

12    this, seeing this letter from Mr. um Pinckard?

13    **MS. BOBO:** I recall seeing that letter.

14    **HEARING OFFICER:** Did you recall the letter, Mr.

15    Pinckard's letter directed that Derrick should not come to

16    the school?

17    **MS. BOBO:** Is that what it's saying there?

18    **HEARING OFFICER:** Do you recall that in the letter or

19    not?

20    **MS. BOBO:** I, yes I recall that.

21    **HEARING OFFICER:** Okay so was it, did that seem

22    strange to you, first they told him not to come to the

23    school and now they tell him to come to school for

24    tutoring.

1       **MS. BOBO:**  It did, it did but

2       **HEARING OFFICER:**  I mean if it didn't, it didn't raise

3    a concern for you.

4       **MS. BOBO:**  It did but I didn't pay it any attention.

5       **HEARING OFFICER:**  Okay, fine if it didn't raise a

6    concern that's fine.

7       **MS. BOBO:**  But his tutoring was to be at the school

8    every Wednesday from three to five and he started January

9    17th up until one day last week.

10      **HEARING OFFICER:**  Okay, good.  Alright anything else

11   for her?  None, okay.  Thank you.  Are you calling anyone

12   else?

13      **MS. GAMBALE:**  I'm going to call the father.  I can

14   reach him by telephone.

15      **MS. BOBO:**  Please call him, yes.

16      **HEARING OFFICER:**  What's the number?

17      **MS. BOBO:**  Um, 202 707

18      **HEARING OFFICER:**  Seven what?

19      **MS. BOBO:**  787-8342.

20      **HEARING OFFICER:**  What's his name?

21      **MS. BOBO:**  Derrick, Derrick Shelton.

22      **MS. GAMBALE:**  Before we being with his testimony, can

23   we (unclear)

24      **HEARING OFFICER:**  We better stop at five then.

1   (Phone Ringing)  Hello.

2       **HEARING OFFICER**: Is this Mr. Shelton.

3       **MR. SHELTON**: Yes.

4       **HEARING OFFICER**: Okay, this is Mr. Ruff, I'm at a

5   hearing for your son, Derrick.

6       **MR. SHELTON**: Uuh huh.

7       **HEARING OFFICER**: And I'm the hearing officer and um

8   the attorney, Ms.  GAMBALE, wants to call you as a witness.

9       **MR. SHELTON**: Okay.

10      **HEARING OFFICER**: Are you prepared to testify now?

11      **MR. SHELTON**: um I'll prepare myself.

12      **HEARING OFFICER**: Okay, we're going to do this over

13  the phone, um what I need you to do first is to give us

14  your name.

15      **MR. SHELTON**: Um, the name is Derrick Lawrence

16  Shelton.  I'm Derrick Shelton's father.

17      **HEARING OFFICER**: I need to put you under oath.  Do

18  you swear or affirm that the statement you make today will

19  be the truth, the whole truth and nothing but the truth?

20      **MR. SHELTON**: I do.

21      **HEARING OFFICER**: Okay, Ms.  GAMBALE is going to ask

22  the questions, then Ms. Smith, who's the attorney for Maya

23  Angelo is going to ask you questions.  We are here in the

73

1  room with um Derrick, Derrick's Mom, Mr. Hamilton, Dr.

2  Grahams and Mr. Lucini.  Alright.

3      **MR. SHELTON:**  Yes.

4      **HEARING OFFICER:**  Okay, Ms.  GAMBALE is going to start

5  first.

6      **MS.  GAMBALE:**  Um, good afternoon Mr. Shelton.  What

7  is your relationship to Derrick?

8      **MR. SHELTON:**  I'm Derrick's father.

9      **MS.  GAMBALE:**  Um, and um where does Derrick reside.

10     **MR. SHELTON:**  He lives at 125 Decatur Street, NE.,

11  Washington, DC with me, his mother and brother.

12     **MS.  GAMBALE:**  Um, and how did he learn about his

13  suspension?

14     **MR. SHELTON:**  Um, Derrick told me about his suspension

15  while I was at work.

16     **MS.  GAMBALE:**  And um did you have any communication

17  with the schools regarding this suspension?

18     **MR. SHELTON:**  Not at that time when he told me.

19     **MS.  GAMBALE:**  And when was the first communication

20  after you found out about the suspension you had with the

21  school?

22     **MR. SHELTON:**  Once I got in contact with you, then

23  they began to give me information and let me know that was

24  going on.

1     **MS. GAMBALE:** Um, but like before, before you got in
2   contact through us, did you talk to anyone at the school?
3     **MR. SHELTON:** No, actually what I did I told Derrick
4   to go back to school and don't come home unless you bring
5   some papers, they need to give you something in writing
6   that telling you, you are suspended or else you are not
7   suspended, and go to school.  I sent him back to school.
8     **MS. GAMBALE:** Um, and did you go to the school with
9   him after that?
10    **MR. SHELTON:** Yes, eventually I did.
11    **MS. GAMBALE:** And did you talk to anybody at the
12  school?
13    **MR. SHELTON:** I spoke with um Mr. GAMBALE, (unclear)
14  you said his name, he's in there, I can't recall the
15  pronunciation of his name, he's a counselor from up the
16  school.  I went and spoke with him and they told me they
17  was putting him out of school.  I told them well you know
18  yall need to put something in writing.  Yall need to give
19  me some papers, yall need to write it down.  They told me
20  that um another young lady was the one who does that and
21  she wasn't there right now.  When she do it they'll send it
22  later and um something to that effect.  Nevertheless, it
23  didn't come.  I went back to the school and asked for the
24  lady.  She wasn't there and they told me I had to wait

1   until the lady come to get the paper.  I never got the

2   paper.  um, so I called you.  um that's pretty much how I

3   remember it going down, as far as I can remember.

4       **MS. GAMBALE:**  Did you ever ask for any class work for

5   Derrick?

6       **MR. SHELTON:**  Maam?

7       **MS. GAMBALE:**  Did you ever ask for any class work for

8   Derrick?

9       **MR. SHELTON:**  Oh yeah, yeah, we asked for class work.

10  Initially, what they were saying was send him to his

11  neighborhood school, we don't have to give him any class

12  work, we don't have to (excuse me, I had to walk out, I'm

13  inside a meeting, I had to step outside of the building

14  because they saying I'm making too much noise, I'm outside

15  now so you probably can hear).   They told me that they did

16  not have to provide him with any homework. They did not

17  have to provide him with another school to go to.  They had

18  no interest in doing it and that I need to enroll my son in

19  school, another school.  It would be the best thing for

20  him, um and that's pretty much it.  They just weren't,

21  weren't cooperating.  I didn't know, still I didn't

22  understand, I tried to talk to them, I tried to talk to, I

23  spoke with the principal also.  He got arrogant; he was

24  smart and he, I told him, I asked him did he talk with

1    Derrick about the incident, that's what it was.  I said did
2    you talk with Derrick about the incident.  He told I didn't
3    have to talk with Derrick, did you talk to Derrick, he's
4    your son.  I'm like, yes I talked to him, but I'd rather
5    you that you speak with him.  I don't need to talk with
6    Derrick, we've made our decision and, um, we don't have to
7    do any of those things.  um, originally my wife talked to
8    his boss and his boss made him apologize for that
9    particular incident.  um, word for word, exactly what
10   happened I don't recall, she called me, relayed the
11   information and told me he didn't have to.  He also kept
12   telling me that they was trying to get Derrick arrested, he
13   had put out a warrant for Derrick's arrest.  I asked him
14   what police station was it at, could you give me a copy of
15   the record that the police give you or whatever he did to
16   get.  He told me he didn't have to, I needed to investigate
17   it myself and I needed to go and find it myself and so it
18   was real, real confusing what was going on.
19        **MS.  GAMBALE:**  And did you.
20        **MR. SHELTON:**  Go ahead Maam.
21        **MS.  GAMBALE:**  Okay, um did you participate in a
22   meeting on the 19th?
23        **MR. SHELTON:**  Say it again.


77

1     **MS. GAMBALE:** Did you participate in a meeting on

2   December 19th?

3     **MR. SHELTON:** I participated in a meeting, yes.

4     **MS. GAMBALE:** And

5     **MR. SHELTON:** I can't recall the exact date but yes.

6     **MS. GAMBALE:** And do you remember what the purpose of

7   the meeting was?

8     **HEARING OFFICER:** Did you hearing the question?

9     **MR. SHELTON:** Yes, I hear the question, but I'm not

10  sure about the date.  I'm not sure about what took place on

11  that date, I've been to several meetings, but I don't

12    **MS. GAMBALE:** But did you participate with a meeting

13  where Mr. Hamilton was with you?

14  **MR. SHELTON:** Yes Maam.

15    **MS. GAMBALE:** And Derrick was with you as well

16  **MR. SHELTON:** Yes.

17    **MS. GAMBALE:** And so was his mother?

18  **MR. SHELTON:** Yes.

19    **MS. GAMBALE:** Um, do you recall that meeting?

20  **MR. SHELTON:** Yes, I do.

21    **MS. GAMBALE:** And was it your, what was your

22  understanding about whether there were going to be any

23  follow up meetings?

78

1       MR. SHELTON: What was my understanding what the

2   follow up meeting was going to be?

3       MS. GAMBALE: Um, mmm.

4   (Pause)

5       MS. GAMBALE: That's correct Mr. Shelton.

6       MR. SHELTON: I can't recall. Hello.

7       MS. GAMBALE: I'm here, I'm here. um do you recall

8   anything about the manifestation determination?

9       MR. SHELTON: Yes.

10      MS. GAMBALE: And, um, did you feel that the behavior

11  was a manifestation of his disability?

12      MR. SHELTON: I do believe that it was, um, a

13  manifestation of his disability, yes.

14      MS. GAMBALE: And why was that?

15      MR. SHELTON: Because um, Derrick's ability to, his

16  emotional ability in a relationship that he was in I don't

17  think he was emotionally stable to understand exactly

18  what's involved, what's going on. um his ability to

19  comprehend the information on what this, it's too much for

20  him at one time. Derrick, too much information for him at

21  one time is a problem. He can't have a bunch of

22  information at one time. I think them being, they were in

23  an ugly relationship, they going through this back and

79

1   forth for a while at the school and he couldn't deal with

2   what was going on.  It was too emotional.

3       **MS. GAMBALE:** Um, and now why was he enrolled in Maya

4   Angelo to begin with?

5       **MR. SHELTON:** Um, he was in, I sent him to Maya Angelo

6   because I was having, a, um hard time finding a school for

7   him and I didn't like the school he was at and I didn't

8   feel that he was learning, that he was progressing, it was

9   too many people in the class, with a lot going on.  It

10  wasn't a lot of control at the school.  When I was

11  searching for schools I found that one on the internet and

12  I went up there and I spoke with to a counselor.  I took

13  Derrick, his mom, we both saw the counselor.  I told him

14  what I needed, he said that hey, this could be the school

15  for Derek you know.  They had the same thing I was looking

16  for.  They had the smaller classes.  They had the

17  counseling and they would work with him.

18      **MS. GAMBALE:** um and, and how do you feel about

19  enrolling him in the neighborhood school?

20      **MR. SHELTON:** Maam.

21      **MS. GAMBALE:** How did you feel about enrolling him in

22  the neighborhood school?

23      **MR. SHELTON:** Aaah, the neighborhood school, for me

24  the neighborhood school is not an option.  It's too much

1   distraction.  Um, we know several people that go to the

2   school.  There is not a lot of control in the classroom.

3   There's too many people in the classroom for one,

4   definitely too many people in the classroom.  And um

5   there's too many people in the building, you know.  And

6   again, he's very intelligent, he's very smart.  But, just a

7   bunch of people distract him.  He doesn't work good with a

8   lot of people around him, a lot of distractions will deter

9   him.  He doesn't need too many things at one time.

10       **MS.  GAMBALE:**  Um, and I have no further questions.

11       **HEARING OFFICER:**  Anything Ms. Smith.

12       **MS. SMITH:**  Yes.  Mr. Shelton, my name is Jessica

13   Smith.  I'm the attorney for Maya Angelo.

14       **MR. SHELTON:**  Uuh ha.

15       **MS. SMITH:**  Um, you stated that you had been to

16   several meetings at Maya Angelo, is that correct?

17       **MR. SHELTON:**  Yes.

18       **MS. SMITH:**  Okay, and after Derrick was put out of

19   school or informed that he was um going to be suspended

20   with a possibility of expulsion, did you go to any meetings

21   at the school?

22       **MR. SHELTON:**  Did I what?

23       **MS. SMITH:**  Did you attend any meetings at the school?

1    **MR. SHELTON:**  I went to the school and a meeting came

2   up because I was there and they spoke with me, but um.

3    **MS. SMITH:**  And who did you have, do you remember who

4   was in that meeting?

5    **MR. SHELTON:**  When I went there to speak with someone,

6   I spoke with the principal.  I went there and spoke with

7   Mr. Lucini also.

8    **MS. SMITH:**  Okay.  And do you recall Mr. Lucini

9   informing you that an MDR meeting had to occur within 10

10   days?

11    **MR. SHELTON:**  I don't recall.

12    **MS. SMITH:**  Okay.  Do you recall requesting that the

13   meeting be postponed until you could find another school

14   for Derrick?

15    **MR. SHELTON:**  Never said that, never happened.

16    **MS. SMITH:**  Now you stated that you um it was your

17   opinion that the behavior incident was a manifestation of

18   his disability, that's correct?

19    **MR. SHELTON:**  Yes.

20    **MS. SMITH:**  And it's correct that he has a learning

21   disability?

22    **MR. SHELTON:**  Yes.

82

1       **MS. SMITH:**  And the emotional relationship you were

2   discussing, um, earlier, was that, um, correct that that

3   was with a girlfriend of Derrick's or an ex-girlfriend?

4       **MR. SHELTON:**  Yes.

5       **MS. SMITH:**  For impeachment purposes, I can't show him

6   this document but this is the letter

7       **HEARING OFFICER:**  Just a minute, okay.

8       **MS. SMITH:**  Um, this is the letter, um, of notes that

9   were taken when he came to the school to meet with Mr.

10  Lucini indicating information that the MDR had to be

11  convened.  This was the meeting that took place November

12  27th um, the student's argument that, and we did not convene

13  a MDR until after they filed their complaint, or after they

14  requested it when this document indicates that we were

15  trying to hold that meeting prior to that time.

16      **MS. GAMBALE:**  I would object to the introduction of

17  any evidence that wasn't disclosed to the counsel for the

18  parents and within the 5 day disclosure.  I have never seen

19  the letter.  We sent out a request for records, asking for

20  access to the records and as part of his record it was

21  never provided.

22      **HEARING OFFICER:**  Is it two page?

23      **MS. SMITH:**  Two separate meetings.

24      **HEARING OFFICER:**  When was the other one?

1    **MS. SMITH:**  The 28th, the next day.

2    **HEARING OFFICER:**  There they are.

3    **MS. SMITH:**  I don't disclose them because they are not

4    part of my, but I'm using them for impeachment purposes

5    now.

6    **HEARING OFFICER:**  Okay, let's wrap up before, just a

7    moment Ms. GAMBALE, will you read those over while we, I

8    want to clarify the questions, I'm not clear that he needs

9    to, that's appropriate at this point.  So I need you to

10   read, ask him the questions so we know what the answer is,

11   about whether that occurred.

12   **MR. SHELTON:**  Are you talking to me?

13   **HEARING OFFICER:**  No not yet.

14   **MR. SHELTON:**  Oh, okay.

15   **MS. GAMBALE:**  About whether the meeting was heard or

16   whether

17   **HEARING OFFICER:**  Just a minute, I'm going to put on

18   mute alright.  Okay, I'm not clear in terms of what

19   questions you asked and whether in the clarity of his

20   response such that I am ready to allow impeachment.

21   **MS. GAMBALE:**  Okay.

22   **HEARING OFFICER:**  So, I mean I heard something about

23   whether or not you waited until he got counsel before

24   **MS. GAMBALE:**  Um--

1      **MS. SMITH:** I can read through that question.

2      **HEARING OFFICER:** Okay, so we need to have that

3   clarified.

4      **MS. SMITH:** Okay, Mr. Shelton.

5      **MR. SHELTON:** Yes.

6      **MS. SMITH:** This is Jessica Smith again. I'm going to

7   ask you a couple more questions and they might be

8   repetitive of what we just went over, okay?

9      **MR. SHELTON:** Yes.

10     **MS. SMITH:** Um, so you stated that you had um attended

11  a meeting, you went up to the school and then when you went

12  up to the school in November a meeting sort of came out of

13  that, a meeting with you and your son and Mr. Lucini and

14  the principal I think.

15     **MR. SHELTON:** Yes, kind of, sort of.

16     **HEARING OFFICER:** Do you recall exactly what happened.

17  Can you tell us when you went up there what happened.

18     **MR. SHELTON:** When I went up there on one particular,

19  meeting, when I took Derrick, when I was telling him that

20  he was going back to school. If they haven't given you any

21  papers, you are not suspended, if they don't give you the

22  papers, your are not suspended, I don't care what they say.

23  I'm going back up there and we're going to go and talk to

24  them. So I went to go and talk to them and he kindly told

1    me, he nicely told me well you know, he's suspended and the

2    lady is not here, you are going to have to come back

3    another day to get the papers for suspension.  I'm like

4    well if he's outside walking up and down the street or

5    anything and he don't have papers and he's not in school,

6    they said uuh don't worry about it, we got it, everything

7    is going to be okay and they pretty just played me off like

8    that.  So I asked, I said um what were yall intention if

9    yall not sending him back into the school and he and the

10   principal no they had no intention on letting him back into

11   the school.  It would be if I take him to the neighborhood

12   school and I was like the neighborhood school is not an

13   option.  Do you have any other ideas of you know a better

14   school, a school that's kind of like this school, a school

15   that may have special classes and stuff with Derrick's

16   special gifts.

17       **HEARING OFFICER:**  And when was that, this is Mr. Ruff.

18   And when was that meeting?

19       **MR. SHELTON:**  I don't have the date, I

20       **HEARING OFFICER:**  I assume after he got suspended the

21   first time, well when he first came home and said he was

22   suspended, how soon after that?

23       **MR. SHELTON:**  Maybe 3 or 4 days.

24       **HEARING OFFICER:**  Okay.

1        **MR. SHELTON:**  And I think what happened, if I'm not,

2    if I'm not --------, if I may correct myself, he was

3    suspended like a Thursday, so Friday I sent him back and it

4    didn't work out.  So we were back up there again the first

5    thing Monday.  It was something like that.  I recall the

6    weekend going by.  Hello.

7        **HEARING OFFICER:**  Okay, I'll be right back with you,

8    okay.

9        **MR. SHELTON:**  Yes.

10       **HEARING OFFICER:**  I'd rather handle this, it's not

11   with this document because you have a witness here, if you

12   have a witness to refute then the document, and Ms.

13   GAMBALE has seen the document, the document would only

14   perhaps serve to bolster your witness's testimony.  So I'd

15   rather handle it but testimony if there's conflict in

16   testimony but I'm not clear that um with what you are after

17   in questioning him with regard to a meeting on the 27th of

18   November.  I would suggest you specifically ask him the

19   question and see what his answer is.  Otherwise, I'm not

20   going to further, because his memory is spotty anyway with

21   regard to dates and I guess there were several meetings, so

22   you need to focus in this is what I'm saying.

23       **MS. SMITH:**  Mmmm.  Um, Mr. Shelton.

24       **MR. SHELTON:**  Yes.

1       MS. SMITH:  Do you recall one of these meetings taking

2  place on November 27th?

3       MR. SHELTON:  Um, I'm not sure of the date.

4       MS. SMITH:  How about November 28th?

5       MR. SHELTON:  I'm not sure of the dates at all.

6       MS. SMITH:  Do you recall if it was at the end of

7  November?

8       MR. SHELTON:  Number

9       HEARING OFFICER:  What about the substance of meetings

10  is important in terms of whether or not you talked about

11  them in the MBR.

12      MS. SMITH:  Mmm  mmm.

13      HEARING OFFICER:  I mean that's what I need you to

14  focus on.

15  (conversing between Hearing Officer and Ms. Smith)

16      MS. SMITH:  Yeah, I'm going to try.  Okay

17      MS. SMITH:  Was that a yes or a no, I'm sorry?

18      MR. SHELTON:  No, I don't recall the dates.

19      HEARING OFFICER:  He said he wasn't sure of the dates.

20      MS. SMITH:  Okay.  Do you recall speaking with Mr.

21  Lucini about the need to convene the manifestation

22  determination review?

23      MR. SHELTON:  They, no, they told me that they did not

24  have to do a review.  They said that they did not have to

88

1    do a manifestation in the beginning. They kept saying they

2    did not do a manifestation, they did not do a review

3    because um some detail under these circumstances we can

4    just put him out. They were telling me that they did not

5    have to do anything. I was over my head with information

6    and that's how I had to get in contact with the lawyer.

7    You know I, and I couldn't argue and dispute what they were

8    saying. The language in what they were telling I didn't

9    know how to respond to it. They were telling me that they

10    did not have to do it because of these particular

11    circumstances and I didn't have the arguments I could say

12    yes you do because of whatever, whatever and that's how I

13    knew that I needed some help. The meeting that you are

14    talking about, whatever date it was, he told me he did not

15    have to do it and he wasn't going too.

16    **HEARING OFFICER:** Who was that?

17    **MR. SHELTON:** Mr. Lucini.

18    **HEARING OFFICER:** Now you mentioned meeting with the

19    principal though, did you not?

20    Mr. Shelton: Yes, yes I did. When I met with him, when I

21    came up there to meet with him I went into his office and

22    um we talked about that but actually I met with the

23    principal and Mr. Lucini on one of those days  When Mr.

24    Lucini was at his desk and the principal came into the

1    room, he also stated that they did not have to do it.

2    Excuse me.  Earlier I was just talking and that's when I

3    asked the principal um about the other school thing, when I

4    was saying what other school would you recommend or what do

5    you think and he was like you would have to do this

6    yourself.  We don't do that, he, he's just not a part of

7    this school anymore and, and I had to just go and take care

8    of it.  And, and that whatever day that was, we were in Mr.

9    Lucini's office, he was sitting at his desk, and me and the

10   principal was just standing at the door.

11       **MS. SMITH:**  I have nothing further.

12       **HEARING OFFICER:**  Anything Ms.  GAMBALE?

13       **MS.  GAMBALE:**  Mr. Shelton was your son with you on

14   any of these occasions?

15       **MR. SHELTON:**  Yes.  My son was sitting there in the

16   room.  We were, all of us were there.

17       **MS.  GAMBALE:**  Um, for, for, okay, nothing further.

18       **HEARING OFFICER:**  Okay, thank you Mr. Shelton, we are

19   done.

20       **MR. SHELTON:**  You're welcome, thank you.

21       **HEARING OFFICER:**  Okay.

22       **MR. SHELTON:**  Alright, bye bye.

23       **HEARING OFFICER:**  Bye bye.

1    **HEARING OFFICER:**  Is that all the witnesses that you

2    have.

3        **MS.  GAMBALE:**  Mmmm Mmmm.

4        **HEARING OFFICER:**  Okay, so we are going to continue so

5    that you can present.

6        **MS. SMITH:**  Yes.

7        **HEARING OFFICER:**  Alright, let's have a conversation

8    outside, the three of us.

9        {Hearing Officer, Ms.  GAMBALE, Ms.  Smith}

10       **HEARING OFFICER:**  Okay, Dr Grahams, could you take

11   that mike please?  Identify yourself please?

12       **DR. GRAHAMS:**  Certainly, Quentin Grahams, do you want

13   me to spell that?

14       **HEARING OFFICER:**  Raise your right hand.  Do you swear

15   and affirm the statements you make today will be the truth,

16   the whole truth and nothing but the truth?

17       **DR. GRAHAMS:**  I do.

18       **HEARING OFFICER:**  Okay.  Your witness.

19       **MS. SMITH:**  Dr. Grahams can you please um state your

20   occupation and position?

21       **DR. GRAHAMS:**  Um my formal title is director of

22   hope services at Maya Angelo Public Charter School and

23   Psychologist there as well.

1      **MS. SMITH:**  And, um, what, can you describe the

2   program at Maya Angelo.

3      **DR. GRAHAMS:**  Certainly, there are a small program for

4   students who have not typically been successful in school

5   programs prior to coming to us.  We offer a variety of

6   services that um, often times, we off them to all of our

7   students that are sometimes, students need special

8   education services or other types of special programs to

9   receive in other schools.  For instance, all of our

10  students are assigned a counselor, um who meets with that

11  student with some regularity, depending upon the level of

12  need, demonstrated um we offer small class sizes, um we

13  have a work program where every student is assigned a job.

14  They work on Wednesday's actually, three Wednesdays' out of

15  the month they work half a day.  Um, in one Wednesday out

16  of the month they work for a full day.  So out of the

17  building in um work settings um regularly.  Um, we offer

18  pretty aggressive um college preparation program.  We help

19  students with getting into colleges. um help them, teach

20  them about savings.  There is some programs that we have,

21  matching programs around dollars that they save, um that

22  they can get a three for one match if they go on to

23  college.  Um, I think that's about it.

1    **MS. SMITH:**  Okay, and are you familiar with Derrick

2    Shelton?

3    **DR. GRAHAMS:**  Yes I am.

4    **MS. SMITH:**  Okay, how so?

5    **DR. GRAHAMS:**  Um, I've know Derrick since he's um been

6    at Maya Angelo actually and I, one of my jobs too, is I

7    supervise the counseling staff there.  So I supervise the

8    counselors in their work with students.

9    **MS. SMITH:**  And were you in attendance at the

10   manifestation determination review meeting on December 19th.

11   **DR. GRAHAMS:**  I was.

12   **MS. SMITH:**  Can you briefly describe what happened at

13   that meeting?

14   **DR. GRAHAMS:**  Um, it was a fairly long meeting.  um we

15   went over um earlier reports, psychological evaluations, I

16   tried to explain them as best I could to all of the people

17   that were there.  um, persons asked questions about it,

18   tried to make sure that they understood what it was we were

19   um, that we were discussing and reviewing.  We reviewed the

20   current IEP, um then after we did that, we answered the

21   questions pertaining to the manifestation of the relation

22   of his disability to the behavior that was um point of

23   discussion.  And, we went around the room, um essentially

24   each person being encouraged to give their opinion as to

1  whether this was a manifestation was connected, the

2  behavior was connected to the disability or not.  um, it

3  took some time.  Um, there was a little

4  disagreements/confusion about exactly what we talking

5  about.  Um, but we ended up with agreement that the

6  behavior was not related to his handicapping condition, um,

7  was the endpoint.

8      **MS. SMITH:**  Okay.  And after that determination at the

9  MDR meeting, um, what happened, what was Maya Angelo's next

10  step with regard to Derrick?

11     **DR. GRAHAMS:**  Well then we um reported back to the

12  school administrator that it had been determined from that

13  meeting that the behavior in question was not a function of

14  his handicapping condition.  It was at that point that the

15  decision was made around expulsion and that letter was sent

16  out.

17     **HEARING OFFICER:**  Sorry, when was this then?

18     **DR. GRAHAMS:**  This was following the um manifestation

19  team meeting that was reported back to the principal of the

20  school that

21     **HEARING OFFICER:**  Who did?

22     **DR. GRAHAMS:**  I'm assuming that Mr. Lucini did, I did

23  not.

24     **HEARING OFFICER:**  Okay.

1       **MS. SMITH:**  Anyway, you were saying that

2       **DR. GRAHAMS:**  Um in that then following that then um

3    the letter around expulsion was sent out.

4       **MS. SMITH:**  Okay, and, um, after that expulsion letter

5    was sent out were you ever informed of an appeal of that

6    expulsion decision?

7       **DR. GRAHAMS:**  No, I was not.

8       **MS. SMITH:**  Did Maya Angelo provide tutoring to the

9    student?

10      **DR. GRAHAMS:**  To my knowledge they did.

11      **MS. SMITH:**  And do you recall um attending any

12   meetings in which tutoring sessions were discussed and

13   talked about prior to them being implemented?

14      **DR. GRAHAMS:**  No, I did not.

15      **MS. SMITH:**  Um, at, at the MDR you stated that um you

16   reviewed the psychological evaluation?

17      **DR. GRAHAMS:**  Yes.

18      **MS. SMITH:**  And, um, did you also review his prior

19   history of behavioral concerns?

20      **DR. GRAHAMS:**  Um, there was some discussion about um

21   prior behavioral concerns but um they mainly had to do with

22   selective response to authority that, that Derrick would

23   not respond in the same way to different people within the

24   school building and that there was some difficulties around

1  responding appropriately to particular staff members.

2  There was no discussion around aggressive behavior,

3  physical altercations or anything of that sort, um, as a

4  part of this program.  Um, nor to my knowledge had there

5  been any discussion about ongoing depression or any sort of

6  major mental health issues either.

7      **MS. SMITH:**  I have no further questions, your Honor.

8      **HEARING OFFICER:**  Any cross examination, Ms.  GAMBALE?

9      **MS.  GAMBALE:**  Yes, I have just a couple of questions.

10  First of all, has Derrick received any kinds of

11  _____ suspension on November 22nd to the best of your

12  knowledge, or on November 17th to the best of your

13  knowledge?

14      **DR. GRAHAMS:**  Not that I'm of, Number

15      **MS.  GAMBALE:**  Um, and, um, isn't it true that the

16  school informed um Mr. Shelton that they were intending to

17  expel um Derrick um before the meeting on the 19th.

18      **DR. GRAHAMSS:**  I believe that there was some mention

19  of that, that that was one of the possible outcomes.

20      **MS.  GAMBALE:**  That that, that they intended to expel

21  him before the meeting on the 19th?

22      **DR. GRAHAMSS:**  That that was one of the

23      **MS.  GAMBALE:**  that was the decision made at the

24  meeting?

1  **DR. GRAHAMS:** Well, no, no, no, I didn't say the

2 decision was made at the meeting. I said the decision made

3 at the meeting was that the behavior was not related to his

4 handicapping condition, that we didn't refer it, that we

5 reported that to the administration and then they, then

6 they imposed the sanctions that they deemed appropriate.

7  **MS. GAMBALE:** Um, would they have discussed before

8 the meeting occurred that they had, that they were going to

9 expel him but, um, at the meeting um the parent and the

10 advocated asked for the MBP meeting reconvene to discuss

11 the IEP. Do you recall that?

12  **DR. GRAHAMS:** I recall the advocate mentioning that he

13 had some problems with the IEP and he would like to

14 reconvene to discuss the IEP. I do remember that part.

15  **MS. GAMBALE:** Um, and that he never reconvened to

16 discuss that, is that correct?

17  **DR. GRAHAMS:** Um, no, as far as I'm aware, he did not.

18  **MS. GAMBALE:** Okay. Um, and um there was no one from

19 his neighborhood school that was present at the MDR

20 meeting, was there?

21  **DR. GRAHAMS:** Number

22  **MS. GAMBALE:** And placement um this ability

23 replacement wasn't really discussed, was it?

24  **DR. GRAHAMS:** Number

1    **MS. GAMBALE:** Um, so there was no mention of, of

2    whether or not they had a vocational program at that

3    neighborhood school?

4    **DR. GRAHAMS:** Not at the MDR meeting, Number

5    **MS. GAMBALE:** So nobody was familiar with the

6    vocational program that they had at, at the neighborhood

7    school.

8    **DR. GRAHAMS:** As I understood our task that wasn't an

9    issue.

10    **MS. GAMBALE:** Um, so the team wasn't meeting there to

11    discuss placement at all?

12    **DR. GRAHAMS:** Number

13    **MS. GAMBALE:** And did the team ever convene to

14    discuss what services the student needed to be put into

15    place for him while he was out of school in order to have

16    him keep up with the curriculum and maintain his credits to

17    graduate and meet his IEP goals?

18    **DR. GRAHAMS:** Uuh, Number

19    **MS. GAMBALE:** Um, I have nothing further.

20    **HEARING OFFICER:** Any redirect?

21    **MS. SMITH:** Uuh, Number

22    **HEARING OFFICER:** Okay, Dr. Grahams I have a couple of

23    questions.

24    **DR. GRAHAMS:** Yes Sir.

1    **HEARING OFFICER:**  What, you made reference to Mr.

2  Hamilton's request to meet about the IEP.  Was there a team

3  decision about whether or not there would be another

4  meeting?

5    **DR. GRAHAMS:**  No, that was not my understanding.  It

6  was a team decision.  They mentioned yet some problems with

7  the IEP.

8    **HEARING OFFICER:**  Yes.

9    **DR. GRAHAMS:**  Um, our position at that point was

10  that's a separate discussion from what we are here today

11  for.  um, but that there was no agreement that we would

12  reconvene to discuss the IEP.

13    **HEARING OFFICER:**  Okay, now who took the notes in the

14  meeting?  Do you remember?

15    **DR. GRAHAMS:**  I believe Mr. Lucini did.

16    **HEARING OFFICER:**  He did, okay.

17  (Pause)

18    **HEARING OFFICER:**  Okay, I don't have anything else.

19    **MS.  GAMBALE:**  I just have one further question.

20    **HEARING OFFICER:**  Yes, what is it?

21    **MS.  GAMBALE:**  Was a functional behavior assessment

22  ever conducted for the student?

23    **DR. GRAHAMS:**  Not that I'm aware.

24    **MS.  GAMBALE:**  I don't have anything else.

1     **HEARING OFFICER:**  Okay, we're done.  You get that in

2     15 minutes.

3         **DR. GRAHAMS:**  Number

4     {laughing}

5         **HEARING OFFICER:**  Okay, well have a good evening.

6     (laughing)  Thank you for staying.

7         **DR. GRAHAMS:**  Sure.

8         **MS.  GAMBALE:**  Thank You.

9         **HEARING OFFICER:**  Alright, Mr. um Lucini.

10        **MR. LUCINI:**  Yep.

11        **HEARING OFFICER:**  State your name please.

12        **MR. LUCINI:**  My name is Michael Lucini and I'm the

13    special education coordinator at Maya Angelo.

14        **HEARING OFFICER:**  Okay, raise your right hand for us

15    please.  Do you swear and affirm the statements you make

16    today will be the truth, whole truth and nothing but the

17    truth?

18        **MR. LUCINI:**  I do.

19        **HEARING OFFICER:**  You may proceed.

20        **MS. SMITH:**  Thank You.  What is your occupation?

21        **MR. LUCINI:**  I'm the director of Special Ed for Maya

22    Angelo Public Chartered Schools.

23        **MS. SMITH:**  And are you familiar with Derrick Shelton?

24        **MR. LUCINI:**  Yes, I am.

1    **MS. SMITH:**  And how are you familiar with him?

2    **MR. LUCINI:**  I case-managed last year and I still

3    serve as primary case-manager for the kids in the school.

4    **MS. SMITH:**  Okay, how was Derrick performing at Maya

5    Angelo this year?

6    **MR. LUCINI:**  This year Derrick, um has actually put it

7    in another gear in terms of his ability to follow through

8    on his assignments, um, he's done better

9    **HEARING OFFICER:**  What did you say: putting another

10   gear?

11   **MR. LUCINI:**  In terms of compared to last year.

12   **HEARING OFFICER:**  Um, hum.

13   **MR. LUCINI:**  This first quarter Derrick has done

14   really well in terms of his ability to advocate for himself

15   in terms of what he needed and also turning in assignments

16   and doing the things that he needed to do to progress.

17   **MS. SMITH:**  How were his grades?

18   **MR. LUCINI:**  Um, first quarter grades, um Derrick was

19   on the B honor roll at Maya Angelo.

20   **MS. SMITH:**  Okay, and did you have any um behavioral

21   concerns with him?

22   **MR. LUCINI:**  No, I did not have any behavioral

23   concerns with Derrick.  Um, we, no I did not, if that's

24   your question, I did not have any concerns with Derrick.

1    **MS. SMITH:**  Okay, how many times was he suspended

2    prior to the expulsion?

3    **MR. LUCINI:**  Derrick was put out of Maya Angelo um

4    prior to expulsion to a number of four times.

5    **MS. SMITH:**  Four different incidences?

6    **MR. LUCINI:**  No, no there were three different

7    incidences, um, one incident required a _____

8    suspension because he had been very, verbally inappropriate

9    with a staff, with his biology teacher and we required the

10   parent to come with Derrick so we could have the

11   discussion.  Um, and the parent did send representation

12   from the family because she could not make it herself.  I

13   met with the family, talked with Mom the morning um I met

14   with the family member and we had a discussion.  Derrick

15   was admitted back in school and the problem solved for the

16   teacher and since then Derrick had not had an altercation

17   with that teacher.

18   **MS. SMITH:**  Okay, and what was the other, you said he

19   was suspended two other days.

20   **MR. LUCINI:**  Yeah, I think for, I don't remember off

21   head.  I don't remember.  I can pull the document but I

22   don't remember off head what he specifically was suspended

23   for.  Um those days um the reason why that stuck out and we

1  wrote the letter, um, was because it was something that was

2  brought to my attention, the suspension.

3      **MS. SMITH:**  Okay, was there any, um, concerns rising

4  to the level that Derrick needed more support than what we

5  currently already have been providing to him.

6      **MR. LUCINI:**  No, there was no concerns at all.

7      **MS. SMITH:**  Um,

8      **HEARING OFFICER:**  Can you back up for a minute.

9      **MS. SMITH:**  Mmm um

10     **HEARING OFFICER:**  Okay, I know there was a two day

11  suspension for that incident with the biology teacher but

12  you indicated that there were four, I heard the number

13  four, then I heard the number three.

14     **MR. LUCINI:**  There are three different incidents.

15     **HEARING OFFICER:**  And is all that in this current

16  school year?

17     **MR. LUCINI:**  Yeah, all four, within this current

18  school year?

19     **HEARING OFFICER:**  Okay, so the September one

20     **MR. LUCINI:**  September 14th I think it was September

21  14th we did send a letter out, it was for the disrespect to

22  the biology teacher.

23     **HEARING OFFICER:**  And that was the two day suspension

24  for that?

1    **MR. LUCINI:**  Yes

2    **HEARING OFFICER:**  What were the others?

3    **MR. LUCINI:**  And the other incident I believe it was

4   just maybe inappropriateness um towards staff again.  um

5    **HEARING OFFICER:**  Do you know when those occurred?

6    **MR. LUCINI:**  They, they were after the 14th, after the

7   14th.

8    **HEARING OFFICER:**  After the September.

9    **MR. LUCINI:**  Yes, after the September.

10    **HEARING OFFICER:**  And how many days did they account?

11    **MR. LUCINI:**  One each.

12    **HEARING OFFICER:**  One day each.  So for the suspension

13   under expulsion for this incident is that, does it mean it

14   was four days that he missed?

15    **MR. LUCINI:**  Just four, four days, yes.

16    **HEARING OFFICER:**  Alright.

17    **MS. SMITH:**  Okay, can you um please describe what

18   happened at the end of November, you said it was November

19   17th, the incident that occurred.

20    **MR. LUCINI:**  Well, I was told about the incident the

21   week, um, after November, I think it was November, the week

22   before Thanksgiving.  Um, I was told about the incident, um

23   and I instructed the _____ student to write a letter

24   specifically deluding what we were going to do, I said you

104

1    know _____ that we are going to a manifestation and

2    Derrick was suspended, um.   The Monday following

3    Thanksgiving I met with Mr. Shelton and his son.   Um, we

4    had a very brief discussion in terms of what had happened.

5    His primary focus at that meeting was to advocate so that

6    the school would take a lesser um punishment with regards

7    to what was to come.   Um, I indicated to um Mr. Shelton

8    that I was not at that position to determine if Derrick

9    would be expelled or not because I told him we had to have

10   the manifestation meeting first.   So it was out of my hands

11   to determine for sure if he was going to be suspended.   Um,

12   I mean expelled.   Um, I advised him that we needed to do,

13   we needed to have a manifestation after he reaches his

14   standard suspension and he said at that point he was

15   focused on, um, finding a school for his child, so he did

16   not have anything in mind but that he was going to call me

17   with a date.   At the end of our meeting he indicated that

18   he wanted to talk to Mr. Pinckard.

19        **MS. SMITH:**   And who is Mr. Pinckard.

20        **MR. LUCINI:**   Mr. Pinckard is the principal for the

21   school.   I told him to come the next day and inform Mr.

22   Pinckard.   Mr. Shelton showed up the next day.   His primary

23   concern at that meeting again was the fact that he

24   understood what Derrick had done was wrong.

105

1  **HEARING OFFICER:** And when was this meeting?

2  **MR. LUCINI:** On the 28th.

3  **HEARING OFFICER:** The 28th, okay.

4  **MR. LUCINI:** Then it was the 27th and the 28th, two

5 days.

6  **HEARING OFFICER:** Uuh huh.

7  **MR. LUCINI:** Um, he understood what Derrick had done

8 and he wanted the school to take, um, use a lesser

9 punishment to get Derrick back in school.

10  **MS. SMITH:** And what did you inform him at that time.

11  **MR. LUCINI:** He left, at that point he and Mr.

12 Pinckard talked and Mr. Pinckard said he was going to get

13 back, it was just a brief, um, conversation. He, I believe

14 the conversation ended up abruptly because Mr. Derrick, um,

15 Mr. Pinckard, the principal, reinforced that, um, we got to

16 follow the process and we left.

17  **MS. SMITH:** So at that November 27th meeting, um you

18 discussed the need for MDR with Mr., with Derrick and his

19 father.

20  **MR. LUCINI:** Yes, yes I did.

21  **MS. SMITH:** And why was there such a delay in getting

22 that meeting?

23  **MR. LUCINI:** Well, the idea was um Mr., Mr., um,

24 Shelton had come and we did the pre-conference on the, um,

106

1    27th and so when he told me that he was distraught and he

2    wanted to find school for his kid, I really did not want to

3    press him on scheduling a meeting.  He didn't have a, he

4    didn't seem like he wanted to schedule a meeting at that

5    point, so I told him to give me a call and then we would

6    schedule the meeting.

7        MS. SMITH:  Okay, and did he call you to schedule the

8    meeting?

9        MR. LUCINI:  Number

10       MS. SMITH:  How did he?

11       MR. LUCINI:  He didn't call me.

12       MS. SMITH:  Um huh, when was the meeting um convened?

13       MR. LUCINI:  The meeting for?

14       MS. SMITH:  The MDR meeting?

15       MR. LUCINI:  It was convened on the 19th of December.

16       MS. SMITH:  Okay, were you in attendance at that

17   meeting?

18       MR. LUCINI:  Yes, I was.

19       MS. SMITH:  And can you discuss what happened at that

20   meeting?

21       MR. LUCINI:  At that meeting we discussed

22   manifestation determination regarding the behavior that

23   Derrick exhibited um during the incident.  Um, I ran the

24   meeting.  Um, everyone was given the opportunity to

1  participate.  Um, we had enough IEP's and re-evals. to go

2  around.  Um, we um discussed it.  I read the con, the

3  issues, the, um, team meeting discussion, discussed the

4  meeting.  Dr. Grahams went over the assessment and he

5  answered questions from the parents and I kept reinforcing

6  that if they had any concerns, Dr. Grahams went over those

7  concerns.  We got to a point in the meeting where we

8  started, we got off task in terms looking at the totality

9  of his behavior since he's been at Maya Angelo and I

10  refocused the team.  Mr. Hamilton was there and we got to a

11  point where we focused on the incident and at that team, we

12  decided as a team that it was not his manifestation of his

13  disability.

14      MS. SMITH:  Okay, and what was the punishment them

15  imposed?

16      MR. LUCINI:  From that meeting, we could not discuss,

17  we didn't want to discuss punishment.

18      MS. SMITH:  Okay, what did you do with that uuh, with

19  that decision that it was a manifestation of his

20  disability, was not a manifestation of his disability, um

21  what happened then?

22      MR. LUCINI:  I, I informed the principal of our

23  decision in the meeting and he referenced the handbook and

24  I think in his letter he referenced the handbook and the

108

1    pages in terms of consequences that goes on when kids

2    assault other people.

3         **HEARING OFFICER:**  What, this was in the meeting?

4         **MR. LUCINI:**  Number

5         **HEARING OFFICER:**  The MDR meeting?

6         **MR. LUCINI:**  No, that's

7         **HEARING OFFICER:**  This was later, after the meeting?

8         **MR. LUCINI:**  Yes.

9         **MS. SMITH:**  Letter.

10        **HEARING OFFICER:**  On, in the letter I'm sorry.

11        **MR. LUCINI:**  Yes.

12        **MS. SMITH:**  Sorry.

13        **MR. LUCINI:**  After the meeting.

14        **HEARING OFFICER:**  That's _____, the um

15   Principal.

16        **MR. LUCINI:** Yes.

17        **MS. SMITH:**  Mmm mmm.

18        **HEARING OFFICER:**  Okay, alright.

19        **MS. SMITH:**  Yes, that's document number 6  and in the

20   parent handbook, pages it represents is document 7.

21        **HEARING OFFICER:**  Okay.

22        **MS. SMITH:**  Okay, um, after the MDR meeting was

23   another meeting convened that same day?

1    **MR. LUCINI:**    Yes, at the urging of um Ms.  GAMBALE

2    because they wanted to start the meeting because she wasn't

3    able to be there and we wanted to have the meeting um, both

4    meetings done.  So we met

5    **MS. SMITH:**  What was the purpose of that second

6    meeting on the 19th?

7    **MR. LUCINI:**  The purpose of the meeting was to, um, we

8    met to see if we could resolve the issues that were in the

9    complaint.

10    **MS. SMITH:**  Um mmm.

11    **MR. LUCINI:**  At that meeting we talked before even

12    went, before we went further in the meeting Ms.  GAMBALE

13    indicated that she, one of her concerns was she wanted

14    Derrick in school.  She wanted him to re-enrolled and at

15    that point everything broke off.

16    **MS. SMITH:**  Did you discuss providing interim services

17    at that meeting?

18    **MR. LUCINI:**  Yes.

19    **MS. SMITH:**  And what was that discussion?

20    **MR. LUCINI:**  The discussion that Ms.  GAMBALE would

21    not agree specifically but it was talked about.  She left

22    the meeting, as I said, with everything we discussed,

23    nothing came to a full agreement.  She agreed that **terms?**

110

1  was warranted but she did not want to agree in terms of

2  number of hours.

3      MS. SMITH:  And what did the school um offer in terms

4  of the number of hours?

5      MR. LUCINI:  The school offered three hours of

6  services.  Um, I called, um, the parent, I left a message

7  for Ms.  GAMBALE, um

8      MS. SMITH:  After the meeting.

9      MR. LUCINI:  After the meeting

10     MS. SMITH:  Later that day?

11     MR. LUCINI:  No, the next day, the next day.  We left

12  a message, um, for Ms.  GAMBALE.  I left a message for the

13  parent indicating that we had offered tutoring services in

14  the amount of three hours a week.

15     MS. SMITH:  And did you receive a response from them?

16     MR. LUCINI:  I did not receive a response.  When I

17  talked to mom  the indication was that I needed to talk to

18  Dr. Gum, I mean Ms.  GAMBALE, that's why I placed a call to

19  Ms.  GAMBALE informing her, um, and then we got a tutor.

20  I, we got a tutor to begin the services.

21     MS. SMITH:  Okay, and during that meeting when the

22  three hours of tutoring was discussed, um, who else was in

23  attendance and involved in that discussion?

1       MR. LUCINI:  Beside, there was no real discussion, it

2   was just our proposal of three hours.

3       MS. SMITH:  Were there any teachers at that meeting?

4       MR. LUCINI:  No, Number  I made a call.

5       MS. SMITH:  No, no, at the, at the meeting on the 19th,

6   not the phone call.

7       MR. LUCINI:  The resolution meeting?

8       MS. SMITH:  Um mmm.

9       MR. LUCINI:  I think all those that stayed, um, I

10  think the entire team stayed with the exception of Mr.

11  Hamilton.

12      MS. SMITH:  {papers being ruffled, Yeah, they kind of

13  switched, Mr. Hamilton . . . Ms.  GAMBALE came in}

14  Okay, um, after you, um, informed the administration, um

15  Mr. Pinckard, the principal of the MDR decision, and he

16  issued his expulsion, um, did you inform DCPS of the

17  expulsion?

18      MR. LUCINI:  Yes.

19      MS. SMITH:  Okay, and, um, please describe what

20  happened.

21      MR. LUCINI:  I informed DCPS of the expulsion, um, on

22  the 19th I talked to Dr. Peigler.  Dr. Peigler informed me,

23  um, we talked about the level of services on the hour, I

24  mean on his IEP in terms of hours and Dr. Peigler, he

112

1   stated that because we had limited hours on an IEP those

2   hours could implemented at his neighborhood school.  She

3   instructed me to go to the neighborhood school, with the

4   documents, and have it delivered and I insisted that I

5   needed a signature from the SEC and that's how come the

6   form was created that she signed and I signed that the

7   documents were delivered and that there was no placement

8   necessary at that meeting.

9        **MS. SMITH:**  And is Dr. Peigler, who is Dr. Peigler?

10       **MR. LUCINI:**  Dr. Peigler, I believe, she's a liaison

11  for the charter school.

12       **MS. SMITH:**  Is she Maya Angelo's SEA representative?

13       **MR. LUCINI:**  Yes, she represents all of the charter

14  schools.

15       **MS. SMITH:**  Okay, after you spoke with Dr. Peigler,

16  did you, um, go to the neighborhood school that was

17  proposed?

18       **MR. LUCINI:**  Yes.

19       **MS. SMITH:**  And, um, what happened there?

20       **MR. LUCINI:**  I went there and met with SEC, she had

21  concerns regarding me dropping the IEP at all and she

22  called Dr. Peigler and insistent of Dr. Peigler because she

23  first was hesitant to take in the documents from me.  When

24  it got cleared up, that's when she signed the paperwork.

113

1    So my understanding at the point was there was no team

2    necessary to, for him to register at his neighborhood

3    school.

4        **MS. SMITH:**  Now during the interim when the expulsion

5    was issued, up until, I think it's recently, what, were any

6    interim services in place for Derrick?

7        **MR. LUCINI:**  We had, what I explained to Mr. Shelton

8    when I first met with him that after the 10 days has

9    lapsed, we will provide services for Derrick.  But, at that

10   point, our tutor, that we use, specifically had resigned

11   and I said as we accrue the hours for Derrick, in terms of

12   the three hours, it would be retroactive to when we were

13   suppose to provide.

14       **MS. SMITH:**  And when did the new tutor come on board?

15       **MR. LUCINI:**  After the meeting with Ms., Ms. West

16   attended the meeting and I talked with her that I wanted

17   her to be Derrick's tutor because she had some relationship

18   with him being his teacher, and so she agreed.

19       **MS. SMITH:**  Mmm mmm

20       **MR. LUCINI:**  And at that point we started documenting

21   him hours, um, that she was providing him.

22       **MS. SMITH:**  Okay, and do you know approximately what

23   the time period was between when he was expelled and then

24   when she started providing tutoring services?

114

1      MR. LUCINI:  I think it's somewhere in here (papers

2   being ruffled)—December 22nd, it's a Friday, that was what

3   she has in her log.

4      MS. SMITH:  Okay.  We'll get more specifics from her

5   later on.  Um, and do you know where the services that she,

6   the tutoring services, where were those services being

7   provided?

8      MR. LUCINI:  The services were being provided at Maya

9   Angelo, um, based

10     MS. SMITH:  Um, were there concerns that the student

11  was going to be in the building at the same time with other

12  students?

13     MR. LUCINI:  There were concerns, um, that's why we

14  decided to do the tutoring after school when all the kids

15  were in their paid entrance service.  That was our

16  rationale for doing it after school on Wednesday.

17     MS. SMITH:  On Wednesday, can you describe what the

18  school day is like at Maya Angelo?

19     MR. LUCINI:  School is over at 12:00, 12:30, kids eat

20  lunch, they go off to work and Derrick is suppose to report

21  to Ms. West at one o'clock and basically the time frame was

22  suppose to be discussed between them.  We set it at three

23  hours.  So as a tutor and tutor having this mentor tutoring

24  relationship sometimes they decide well I want to do it

                              115

1   around one o'clock; he can be there one o'clock to do it,

2   if he wants to be there at two o'clock he will do it, so

3   then

4       **MS. SMITH:**  It's up to them to work out the schedule.

5       **MR. LUCINI:**  It's up to them to work out the schedule.

6   MS. SMITH:  Okay, but there is, at that time there was no

7   other students in the building receiving instructions in

8   the same rooms that he was receiving tutoring?

9       **MR. LUCINI:**  And, as I said, the rationale was to make

10  sure that all the kids that exited the building to go to

11  their entrance-ship?  And, even the kids that were in the

12  building have some work to do.  So, if at all there have

13  been kids in the classroom Ms. West would have told me, um,

14  that there was some disruption or Mr. Shelton would have

15  informed me, um, that he wasn't getting appropriate

16  services at that time and we would have considered that.

17      **MS. SMITH:**  Okay, um, did you see Derrick at all

18  during these Wednesday's?

19      **MR. LUCINI:**  I meant Derrick, um, I saw Derrick on the

20  21st of February.

21      **MS. SMITH:**  Umm mmm.

22      **MR. LUCINI:**  I asked Derrick how things were doing.

23  He said great.  I says is everything okay. He said, I asked

24  him, um, someone told me that you were going to a job

1    corps.  He said no, we did not continue the conversation

2    because he told me to talk to his lawyer.

3        **MS. SMITH:**  Okay.  Now going back from, um, when the

4    amended complaint was filed, um, I believe, do you have the

5    date?

6        **MR. LUCINI:** It is the end of January.

7        **MS. GAMBALE:**  I do have an issue, um, it's now six

8    o'clock, after six o'clock, I do have another appointment

9    this evening, um, and I'm concerned about the time of

10   amount, I'm not sure how much more time, I have to call

11   that I am going to need to recall my client as well. um, so

12   how much more time do you think you have?

13       **MS. SMITH:**  I probably have another five minutes with

14   him and then Ms. West is pretty brief, so.

15       **MS. GAMBALE:**  I don't know that, that by that point,

16   um.

17       **HEARING OFFICER:**  Let's finish up with Mr. Lucini, if

18   we can.

19       **MS. SMITH:**  Okay.  So the amended complaint was filed

20   on January 12th.  Um, and you heard testimony earlier from

21   Mr. Hamilton, um, that he had sent a letter, um, requesting

22   a meeting to be convened.

23       **MR. LUCINI:**  Yep.

117

1    **MS. SMITH:** Um, and that letter was sent January 18th,

2    a few days after the complaint was filed. um, what was

3    your response to that letter, did you make any attempts to

4    convene the meeting, a meeting?

5    **MR. LUCINI:** No, we did not make an attempt to convene

6    the meeting.

7    **MS. SMITH:** Did you not call, make attempts to call

8    Derrick.

9    **MR. LUCINI:** Yeah, we did make an attempt to call but

10   again, um, we got no response, um, from counsel.

11   **MS. SMITH:** How many times did you place phone calls?

12   **MR. LUCINI:** Um, I think there were three separate

13   occasions of placed phone calls, um, to her, one

14   **MS. SMITH:** To who?

15   **MR. LUCINI:** To Ms. GAMBALE (papers being shifted)

16   um, January 13, um, I place a call to Ms. GAMBALE, um,

17   mailbox was full, um.

18   **MS. SMITH:** Okay. When, is it your practice that you

19   keep phone logs of your phone calls?

20   MR. LUCINI: Yes, we do.

21   **MS. SMITH:** The phone log is document number 9. um,

22   so looking at document number 9 then, what was the next

23   time that you tried to contact them?

24   **MR. LUCINI:** Um, January 19th.

1    **MS. SMITH:** And what was the result?

2    **MR. LUCINI:** Um, mailbox was full. I left a message

3  with the receptionist, um, but did not get a return phone

4  call.

5    **MS. SMITH:** Okay, and then what was your next attempt?

6    **MR. LUCINI:** The same day January 19, I left a message

7  for Mr., um, Hamilton, did not get a return phone call

8  either.

9    **MS. SMITH:** Okay, and then finally what was the next,

10  um, the next attempt?

11    **MR. LUCINI:** Um, left a message in the attorney's

12  mailbox.

13    **MS. SMITH:** On what date?

14    **MR. LUCINI:** February 22nd.

15    **MS. SMITH:** Um mmm.

16    **MR. LUCINI:** Um, to schedule a meeting and we did not

17  waive our right, um, to a resolution but did not get a

18  phone call, a return call either.

19    **MS. SMITH:** So you placed calls, um, approximately

20  three days, but four different phone calls to the student's

21  attorney in attempt to convene the meeting.

22    **MR. LUCINI:** Yep.

23    **MS. SMITH:** But you didn't, did not receive any return

24  calls.

119

1    **MR. LUCINI:** Did not receive any return phone calls.

2    **MS. SMITH:** Okay. (Pause) I have no further questions

3    right now.

4    **HEARING OFFICER:** Ms. GAMBALE.

5    **MS. GAMBALE:** Yes, I have, I have some questions.

6    um, first of all, you had stated that you had schedule the

7    meeting, um, that, that you didn't schedule the

8    manifestation meeting with, um, that you spoke to, to Mr.

9    Shelton, Mr. Derrick, Sr.?

10   **MR. LUCINI:** I met with Mr. Shelton, Sr.

11   **MS. GAMBALE:** Uuh huh, and that you didn't schedule

12   the manifestation meeting because the was distraught and

13   wanted to find a school for his son, is that correct?

14   **MR. LUCINI:** He indicated to me that he needed to find

15   a school for his son and that he did not have a date in

16   mind.

17   **MS. GAMBALE:** But isn't Derrick over 18 and so

18   wouldn't you have to notify Derrick and schedule the

19   meeting with Derrick?

20   **MR. LUCINI:** Derrick was part of the meeting.

21   **MS. GAMBALE:** Um, and, and I don't, I don't see

22   anywhere that that Derrick was advised of his rights, um,

23   and the processes explained to Derrick at the time that he

1  met with you, at the time of his suspension, he was not

2  represented by counsel, is that correct?

3      MR. LUCINI:  No he wasn't.

4      MS. GAMBALE:  Um, now in terms of the manifestation

5  meeting, that meeting was filed on, you sent a letter out,

6  the first letter that you sent out was the one that was

7  sent out on December 12th, is that correct?

8      MR. LUCINI:  That's correct.

9      MS. GAMBALE:  Proposing that the, um, MDR meeting be

10  held and a resolution meeting beheld?

11      MR. LUCINI:  I

12      MS. GAMBALE:  On the same date?

13      MR. LUCINI:  I --

14      MS. GAMBALE:  Is that correct?

15      MR. LUCINI:  It was an agreement between you and

16  myself, that the meeting be held the same day.  I stated to

17  you that we needed to hold the meeting because we wanted to

18  have our, um, the manifestation.  But, one of you guys had

19  your appointments where you were going to flip flop with

20  each other and I said why don't we just have the meeting

21  the same day, have both of the meetings if he's going to be

22  free in the morning and you're going to be free in the

23  evening, we should, and that's how we came up with that

24  day.

1    **MS. GAMBALE:** Um, and December 12th was the date that

2    you proposed that day?

3    **MR. LUCINI:** Yeah.

4    **MS. GAMBALE:** Um, and now from your own testimony the

5    student had already, as of the date of the November 17th

6    suspension, the student had already been out of school, um,

7    for at least another five days. Is that correct?

8    **MR. LUCINI:** Four.

9    **MS. GAMBALE:** Four days. Um, so, so really after six

10   days the team should have convened a meeting to discuss

11   manifestation

12   **MR. LUCINI:** Well,

13   **MS. GAMBALE:** Is that correct?

14   **MR. LUCINI:** After six days the team should have

15   convened, within 10 days of the incident, is my

16   understanding. um, my understanding is also that we were

17   required to have a pre-conference with the parent or a pre-

18   conference, at that time you were not retained yet. And so

19   I had a discussion with Mr. Shelton, Sr. and Mr. Shelton,

20   Jr.

21   **MS. GAMBALE:** And you never put anything in writing

22   to either the parent or the student?

23   **MR. LUCINI:** In terms of?

1    **MS. GAMBALE:** In terms of explaining this process and

2    what they needed to do and the fact that you wanted to

3    schedule a manifestation meeting.

4    **MR. LUCINI:** It, it was explained in the November 22nd

5    letter to the parent saying that a manifestation should

6    have been held.

7    **MS. GAMBALE:** Um, and the November 22nd. letter there

8    was no reference to

9    **MR. LUCINI:** There was a letter to the parent

10   indicating that he was suspended and that a manifestation

11   would be held and when he came I informed him of the

12   manifestation meeting again and if a parent is distraught

13   and my only primary concern why he's distraught over his

14   son being accused of such a situation and he understands

15   that I think, at least, him telling me I'm going to call

16   you back to schedule a meeting I think I would give that

17   most dates.

18   **MS. GAMBALE:** Well wasn't the father upset because

19   his son was doing well at Maya Angelo and he didn't want to

20   see his son, um, fall behind.

21   **MR. LUCINI:** Yes.

22   **MS. GAMBALE:** And, um, isn't it true that the program

23   at Maya Angelo is very different from the program that they

24   have at Cordoza?

123

1     **MR. LUCINI:** I would say yes.

2     **MS. GAMBALE:** The classes are smaller at Maya Angelo?

3     **MR. LUCINI:** Yes.

4     **MS. GAMBALE:** Um, the student has more counsel, more

5     interaction with a counselor?

6     **MR. LUCINI:** Yes.

7     **MS. GAMBALE:** He has more vocational, there's a,

8     there's a well-defined vocational program at, um, Maya

9     Angelo?

10    **MR. LUCINI:** There's a well-defined vocational program

11    at Maya Angelo but you also need to understand that Derrick

12    was, had his upside, um, had a position outside of school.

13    Derrick was employed not through the school paid-entrance

14    ship program.  So a lot of the things he was getting were

15    far above the kids we have.

16    **MS. GAMBALE:** Okay.

17    **MR. LUCINI:** So he was on a full-time basis asking me

18    to fax his timecard and so we, at that point, he is far

19    above the need because he understood the way it worked.

20    **MS. GAMBALE:** Well, um, isn't it true though that

21    when it came to, um, he was receiving four hours on his IEP

22    at Maya Angelo?

23    **MR. LUCINI:** Yep.

1    **MS. GAMBALE:** Um, but he was able to receive more

2    individualized attention at Maya Angelo than he would be in

3    the neighborhood high school?

4    **MR. LUCINI:** I would describe it as more

5    individualized support. I would describe it as a program

6    if the student wasn't, didn't have a Special Ed need, there

7    would still access your support.

8    **MS. GAMBALE:** Um, so, um, um now expulsion would

9    constitute a change of placement, is that correct?

10    **MR. LUCINI:** In the sense of the word, yes.

11    **MS. GAMBALE:** And after the expulsion, um, there was

12    never a meeting for the MDT to convene to discuss

13    placement, was there?

14    **MR. LUCINI:** Number

15    **MS. GAMBALE:** Um, and the student wasn't allowed to

16    come back to Maya Angelo?

17    **MR. LUCINI:** To be enrolled in Maya Angelo as you

18    wanted.

19    **MS. GAMBALE:** And the student was not, um, given, was

20    suppose to have been given three hours of tutoring a week?

21    **MR. LUCINI:** That's what we paid our tutor, three

22    hours to tutor him for a week.

23    **MS. GAMBALE:** And, um, there was never an FBA that

24    was drafted, is that correct?

1      MR. LUCINI:  That's correct.

2      MS.  GAMBALE:  And, um, um, the advocate asked for the

3   team to reconvene, um, at the, um, at the MDR meeting, is

4   that correct?

5      MR. LUCINI:  He's, he may have mentioned that we, we

6   should meet.

7      MS.  GAMBALE:  And he gave you proposed dates for that

8   meeting?

9      MR. LUCINI:  Yes he did.

10     MS.  GAMBALE:  Um, and, choo, choo, choo, choo, choo

11     MR. LUCINI:  February

12     MS.  GAMBALE:  He never gave the

13     MR. LUCINI:  What was his proposed dates?

14     MS.  GAMBALE:  Um, it's in the letter, I'm the one

15   asking the questions so I'm not asking you what the dates

16   were.  um, now when it came to, you never gave

17     MR. LUCINI:  Can I, can I answer that question after

18   reading my notes?

19     MS.  GAMBALE:  No, you've already answered it.  um,

20     HEARING OFFICER:  Um, go ahead, what do you want to

21   say?

22     MR. LUCINI:  I just want to look at my notes, the

23   meeting from Corey.

24     MS.  GAMBALE:  Which notes?

1       **HEARING OFFICER:** What is it you don't understand?

2       **MR. LUCINI:** The dates that he send me, um

3       **MS. GAMBALE:** That wasn't the question.

4       **HEARING OFFICER:** The dates that what?

5       **MR. LUCINI:** The dates he sent, I just wanted to read

6    them, **read them, fine.**

7       **MS. GAMBALE:** That wasn't the question, I'd like to

8    move forward.

9       **HEARING OFFICER:** Yes.

10      MS. GAMBALE: Um, you never gave work packets to the

11   student?

12      **MR. LUCINI:** I was not suppose to give work packets to

13   the student.

14      **MS. GAMBALE:** So without work, students, the student

15   wouldn't be able to keep up with his courses, would he?

16      MR. LUCINI: The idea is that a tutor that's hired,

17   um, is suppose to make sure those things happen.

18      **MS. GAMBALE:** Mmm mmm, um, and there was never an

19   agreement, or I guess that the team didn't meet and decide

20   how many hours of tutoring the student needed or what

21   services the student needed to be put into place for him to

22   keep up with his studies, did they?

23      **MR. LUCINI:** The team did not.

1      **MS. GAMBALE:** Um, that was a determination that you

2  made?

3      **MR. LUCINI:** That was a proposal I made.

4      **MS. GAMBALE:** Uuh huh, um, and choo, choo, choo,

5  choo, choo and, um, (pause) I have nothing further.

6      **HEARING OFFICER:** Any redirect?

7      **MS. SMITH:** Yes, please, briefly.

8      **HEARING OFFICER:** Mmm mmm.

9      **MS. SMITH:** um, you stated that an FBA was not done.

10     **MR. LUCINI:** Yep.

11     **MS. SMITH:** Was an FBA appropriate for the student?

12     **MR. LUCINI:** I, it would not have no, no it was not

13  appropriate for the student, um, there, we felt, um, that

14  one of the reasons why we got to the point in the

15  manifestation where we agreed that it was not a

16  manifestation because this was not an ongoing situation for

17  Derrick.  And, there was no data to be collected to put an

18  FBC together.  And, this was, this was a one time incident

19  where

20     **HEARING OFFICER:** Who made that decision?

21     **MR. LUCINI:** We

22     **HEARING OFFICER:** Who are you speaking of now?

23     **MR. LUCINI:** When we discussed it as a team.

1    **HEARING OFFICER:** And that was at the manifestation
2    determination meeting?
3      **MR. LUCINI:** At the manifestation meeting, one of the
4    reasons why the team got to the point where we decided that
5    it was not a manifestation of Derrick's disability was
6    because it was an isolated incident.
7      **MS. SMITH:** Okay, um, now you stated the school
8    proposed three hours of tutoring for him.
9      **MR. LUCINI:** Yes.
10     **MS. SMITH:** Were any teachers that was familiar with
11   Derrick's work in that meeting in agreement with that
12   proposal?
13     **MR. LUCINI:** Yes.
14     **MS. SMITH:** Was conversation held about three hours
15   being appropriate for him?
16     **MR. LUCINI:** At the meeting?
17     **MS. SMITH:** Yes, with the teachers.
18     **MR. LUCINI:** No, with that particular teacher yes.
19     **MS. SMITH:** What do you mean by that?
20     **MR. LUCINI:** Well, when I made the call, I said that
21   when I, when we proposed the tutoring hours, it was a
22   proposal that I made to the family and their attorney and I
23   told Ms. West that this was the number of hours I was going

1    to be giving her to do the tutoring if we got the phone

2    call back from the parent. That is what I

3        MS. SMITH:  Okay.  I have no further questions.

4        HEARING OFFICER:  Anything else?

5        MS.  GAMBALE:  Um, Number

6        HEARING OFFICER:  Okay, you may, okay the IEP.  Were

7    there any specialized instructions in the IEP?

8        MR. LUCINI:  A consultation.

9        HEARING OFFICER:  Just what does that mean?

10        MR. LUCINI:  Consultation means Derrick come to see

11    me, um, for example, Derrick would come by my office, um,

12    to want to fax his timecard, we will have a discussion.

13    Derrick would come by my office to do his assessment, for

14    example, the English or the Science teacher would give me

15    an assessment just to, or me instead of Derrick, he would

16    come by my office and do it.

17        HEARING OFFICER:  Okay, so that consultation was with

18    you.  What about the advisory one hour, uuh huh?

19        MR. LUCINI:  The advisory hours, um, what, what

20    happened to the IEP when we, last year when we developed

21    the IEP, he was in advisory.  So he was getting those hours

22    in advisory.  When we came to the old

23        HEARING OFFICER:  He was an advisor?

1     **MR. LUCINI:**  No, no, he was getting those hours per in

2    advisory.

3     **HEARING OFFICER:**  What does that mean?

4     **MR. LUCINI:**  The advisory is a time where the kids get

5    together, either first period or second period of the day,

6    where announcements are given, um, we do, for example,

7    financial planning with, um, Ms. _____.  He was given

8    that time.  When we got over to the 06-07 school year

9    Derrick was in classes that far out-numbered the hours on

10   the IEP previously.  For example, he was in an, um, he

11   still had the consultation with me, um, he was in an

12   English class that went Monday 84 minutes, Tuesday 84

13   minutes, the total is 5 hours, 43 minutes per week.  And

14   then he was also in a literacy block where he was getting 4

15   hours and 10 minutes.  So the total hours he was getting

16   that were not in his IEP but was over what he was getting

17    **HEARING OFFICER:**  Was these special education hours?

18    **MR. LUCINI:**  It was inclusion, inclusion hours.

19   **HEARING OFFICER:**  It was inclusion hours.  Was it special

20   education teacher there?

21    **MR. LUCINI:**  Yes.

22    **HEARING OFFICER:**  In that classroom?

23    **MR. LUCINI:**  Yes.

1    **HEARING OFFICER:**  Okay, mmm mmm.  So he was getting

2    more hours than the IEP

3        **MR. LUCINI:**  He was getting more service.

4        **HEARING OFFICER:**  Right

5        **MR. LUCINI:**  On his IEP because of the inclusion

6    situation and we did not go back to the table to have a

7    meeting to adjust his hours because we thought any service

8    we provided would be a plus.  So if he's in a classroom

9    getting help, um, getting support from the inclusion

10   teacher.

11       **HEARING OFFICER:**  Mmm mmm, okay.  Now what was the job

12   he had?

13       **MR. LUCINI:**  Derrick worked at, I think he worked at

14   an apartment complex.  My conversation with Derrick was he

15   worked at an apartment complex doing maintenance.

16       **HEARING OFFICER:**  Was this?

17       **MR. LUCINI:**  Grounds keeper.

18       **HEARING OFFICER:**  Was this the job he had through Maya

19   Angelo?

20       **MR. LUCINI:**  Number

21       **HEARING OFFICER:**  Oh, it was, it was an independent

22   job?

23       **MR. LUCINI:**  An independent job, sir.

132

1    **HEARING OFFICER:**  Okay, so what was the one, did he

2    have a job on like Wednesday afternoon through Maya Angelo

3    as well?

4    **MR. LUCINI:**  Number

5    **HEARING OFFICER:**  He did not, okay.  So he just had

6    that one job?

7    **MR. LUCINI:**  That one job.

8    **HEARING OFFICER:**  um, there's three hours.  How did

9    you come up with that three hours?

10    **MR. LUCINI:**  Well it was an unusual proposal, usually

11    you start at a low point where you propose a number of

12    hours to the parents and the advocate and they come back

13    and say no we are not going to do that.  We want more.

14    **HEARING OFFICER:**  Did they come back and say that they

15    wanted more?

16    **MR. LUCINI:**  No, they didn't.

17    **HEARING OFFICER:**  So

18    **MR. LUCINI:**  So because they didn't the assumption was

19    we are going to go with the three hours.  If they had come

20    back, like we got a letter from her, saying Derrick needs

21    two hours more to make up to five.  We would have had a

22    meeting or we would have said okay, I'll give you the two

23    hours additional to what he was getting.  But, we did not

24    get any

133

1    **HEARING OFFICER:** Response

2    **MR. LUCINI:** Response back to adjust the hours.

3    **HEARING OFFICER:** Alright, now what was your

4    understanding -- I'm sorry?

5    **MS. GAMBALE:** We specifically asked for that in

6    writing from him but

7    **MS. SMITH:** What was the date on that, two months

8    later?

9    **MS. GAMBALE:** In, in February we asked for an

10    increase because it wasn't enough

11    **HEARING OFFICER:** More hours, okay. Now what was your

12    understanding that when he was expelled, I heard your

13    testimony about calling Dr. Peigler and going to the school

14    and, where's that, was this, is this considered the

15    receipt?

16    **MR. LUCINI:** Yeah, the receipt is somewhere in here.

17    **HEARING OFFICER:** Which document is that?

18    **MS. SMITH:** Number 8.

19    **HEARING OFFICER:** Okay. Was it your understanding

20    that , what was your understanding with regard to whether

21    or not there was a requirement for a meeting?

22    **MR. LUCINI:** The practice according to what Dr.

23    Peigler told me

24    **HEARING OFFICER:** Mmm mmm.

1    **MR. LUCINI:**  instructing me to do was that because he

2    was getting four hours and hours wasn't enough for her to

3    do a placement with regards to services.  Say, for example,

4    if he was getting 20 hours or he was getting 25, then we

5    are talking about specialty programs that she was going to

6    look into putting him but because the hours to be, um,

7    implemented at his neighborhood school that did not warrant

8    any specific ------- hour, any specific instruction.  She

9    felt that I needed to take it to the neighborhood school

10   and have him enrolled and so when I got to the neighborhood

11   school that was further cleared up, that's why the SEC

12   signed.

13   **HEARING OFFICER:**  SEC signed for the documents, okay.

14   So you did this based on the information Dr. Peigler gave

15   you.

16   **MR. LUCINI:**  Yes.

17   **HEARING OFFICER:**  Okay.  Did you confer with counsel

18   at that point?  Were you engaged

19   **MR. LUCINI:**  Yes.

20   **MS. SMITH:**  Yes.

21   **HEARING OFFICER:**  Did you confer with counsel in terms

22   of that being the proper procedure?

23   **MR. LUCINI:**  Yes, I conferred with counsel.

1    **HEARING OFFICER:**  Okay, um, any other questions of

2    him?

3       **MS.  GAMBALE:**  Not for me.

4       **MS. SMITH:**  None for me.

5    **HEARING OFFICER:**  Okay, so you just wanted to call Ms.

6    West for what purpose?  To clarify what hours had been

7    done.  Okay, I think that's something you all can probably,

8    um, confer on and see if there's a dispute about what he

9    got and what he didn't get.

10       **MS. SMITH:**  You mean us

11    **HEARING OFFICER:**  Mmm mmm, yeah, and if there's a

12    dispute, cause otherwise there's no need for her to

13    testify.

14       **MS. SMITH:**  Okay.

15    **HEARING OFFICER:**  um, then you were going to call

16    Derrick for what purposes?

17       **MS.  GAMBALE:**  I didn't want to recall Derrick because

18    they had testified that there was nobody in the school when

19    he was there.  It's my understanding that there was a

20    classroom of people including (pounding, phone ringing)

21    **HEARING OFFICER:**  During the tutoring?

22       **MS.  GAMBALE:**  During the tutoring.

23    **HEARING OFFICER:**  (Phone ringing and pounding)  I

24    don't see the relevance of it, to me.

136

1    **MS. GAMBALE:** Well, (phone ringing)

2    **HEARING OFFICER:** Excuse me, just a moment. Hello

3    (pause) yeah, we're finishing up now, okay. They'll be

4    down there in a few minutes, okay. Oh, you are. um, yes.

5    Where on the 8th floor are you? What office? (Pause)

6    Okay, come back into the areas where the elevators are and

7    then there's a, um, the hallway goes around to a circle, a

8    square all around just walk around it until you see a room

9    where there's a kitchen and a, um, refrigerator, coke

10   machine. We're in the room next to that. Thank you.

11   **MS. GAMBALE:** And now the thing that they are saying

12   three hours, it was actually two hours because it was

13   between 3:00 and 5:00 on Wednesday's and it's a lot to come

14   too the school.

15   **MS. SMITH:** Well that's what I'm going to have her

16   testify too so that if there is a dispute and

17   **MS. GAMBALE:** Because if you want to talk to her

18   {Ms. GAMBALE & Ms. Smith talking simultaneously)

19   **MS. SMITH:** If you want to look at my document number

20   10 and if you are in dispute with that then I can her. If

21   you are not in dispute with document 10.

22   **MS. GAMBALE:** Mmm mmm

23   **MS. SMITH:** Then we can just rest on document 10.

24   {Speaker Not Known: How you doing?}

1    **HEARING OFFICER:** How are you doing sir? We are

2    almost done, okay. Good, um, yeah, I think that we can

3    clarify that, otherwise, that's the only reason you were

4    going to recall him.

5    **MS. GAMBALE:** Um, that was the only reason.

6    **HEARING OFFICER:** Okay. Then, otherwise, I think we

7    can have a conversation about, um, um, a conference called

8    something to clarify the issue about the hours.

9    **MR. LUCINI:** Mmm mmm, yeah I, I.

10   **HEARING OFFICER:** Okay and see if there is a dispute

11   because if there is not really a dispute on the hours, then

12   **MS. SMITH:** So are we, I want to be clear as to what's

13   going on here.

14   **HEARING OFFICER:** What's going on is we're concluding,

15   what I'm going to do is, I'll, you know, in terms of

16   closing argument and all that we can just, need to do that

17   in writing.

18   **MS. SMITH:** In writing, okay, by what date?

19   **HEARING OFFICER:** But, I specifically, um, want you to

20   address the issues of the procedural issues with regard to

21   the manifestation meeting, with regard to the alternative

22   placement, what was to have occurred, your position as to

23   what was to have occurred at the point of expulsion. This

24   is, you know, much of a legal argument than a factual

1  dispute, I think about what occurred. um, I'm surmising

2  from the dates that I was looking at that, um, the incident

3  occurred on, um, let's see, there seems to be some question

4  as to whether it was a Thursday or a Friday but I don't

5  really think there was really a question about the date.

6  um

7      **MS. SMITH & MS. GAMBALE:** I think it was for the 17th.

8      **MR. LUCINI:** The 17th.

9      **HEARING OFFICER:** 17th which was a Friday.

10     **MS. SMITH:** Then there was, um, Thanksgiving break.

11     **HEARING OFFICER:** Right and then, um, and then Mr.

12  Lucini represented that there was, testified that there was

13  a meeting on the 27th and a meeting on the 28th and then have

14  the letter from Ms. GAMBALE on the 4th.

15     **MS. SMITH:** Okay.

16     **HEARING OFFICER:** And, in which he proposed the

17  meeting date the 19th, 18th, 19th, okay. So, that's what

18  I've gleamed from your testimony and the documents. Now, I

19  know that you are representing that there was a delay, a

20  significant delay, but I'm, but I mean, these are the facts

21  I have with regard to why it did not occur on the 19th.

22     **HEARING OFFICER:** Until the 19th.

23     **MS. SMITH:** Prior to the 19th.

1    **HEARING OFFICER:** Right, prior to the 19th. um, I'm

2    not saying that's justifiable or not, I'm just saying that

3    those, from my review of the testimony and when I reviewed

4    the documents the incident occurred on the 17th. There's a

5    letter that went out from Maya Angelo on the 22nd. The

6    meeting occurred on the 27th, another one on the 28th and

7    then a letter from you on the 4th proposing a date which

8    included the 19th.

9    **MS. GAMBALE:** Well, the meetings that were, took

10   place on the, the dates of the 27th and the 28th

11   **HEARING OFFICER:** Mmm mmm

12   **MS. GAMBALE:** Those were not full meetings, those

13   were meetings where the father went to the school with his

14   son to try and figure out what's going on. They weren't in

15   between meetings. They weren't manifestation meetings.

16   **HEARING OFFICER:** Oh no, I'm not, I know they weren't

17   formal meetings, no, no

18   **MR. LUCINI:** No

19   **MS. SMITH:** Right

20   **HEARING OFFICER:** I don't, it's not my understanding

21   that they were, I'm just saying that those were meetings

22   that

23   occurred and

24   **MR. LUCINI:** They were pre-conference meetings.

140

1    **HEARING OFFICER:** I heard his testimony about when

2    they occurred and then I got your, and then I could see

3    that you wrote a letter on the 4th proposing a date for the

4    19th, that included the 19th.

5    **MS. GAMBALE:** I did include the 19th

6    **HEARING OFFICER:** Alright, so, timeframe

7    **MS. SMITH:** How can we, well how we clear up the

8    **MS. GAMBALE:** They still had an obligation to set it

9    within the 10 days.

10    **MS. SMITH:** How can we clear up whether there's a

11    dispute as to my document number 10, and the number of

12    hours of tutoring that's been provided. Are you in

13    agreement with this or are you in disagreement?

14    **MS. GAMBALE:** No, we are not in agreement with that.

15    um

16    **MS. SMITH:** Then I would need to call my witness, so

17    **MR. LUCINI:** Because

18    **HEARING OFFICER:** Well I, first of all you have opted

19    to hear from her and I don't want you to spend the time

20    doing it now. As to what she thinks he got or didn't get

21    of the three hours of when it was tutoring, was to have

22    started

23    **MS. GAMBALE:** Mmm mmm

1    **HEARING OFFICER:** What he got and he didn't get and

2    what you are of the opinion he got or didn't got, but,

3    whether he got that or not, it's my understanding that

4    she's still maintaining that that wasn't sufficient. That's

5    that you know.

6    **MS. SMITH:** I'm just making sure that if we are

7    concluding now and we are going to submit closing arguments

8    in writing, I don't want to not be able to call a witness

9    to put evidence on the record to dispute, you know to, to

10   show that what was provided.

11   **HEARING OFFICER:** Okay. So first of all we have to

12   determine whether or not there is a dispute about what was

13   provided and what wasn't provided. I don't think there's a

14   dispute right now about that.

15   **MS. SMITH:** I think there is.

16   **MS. GAMBALE:** You know if she wants to send me an

17   affidavit from her client, um, with regards to what her

18   position is in terms of the total hours that she provided,

19   etc., etc. And then I will respond with an affidavit from

20   my client if that's acceptable and then we could just let

21   you and your office

22   **HEARING OFFICER:** That's fine.

23   **MS. SMITH:** That's fine with me. So do we want to have

24   dates by which to exchange, um

142

1    **HEARING OFFICER:**  Yeah, we do.  Today is Monday, can

2    you all get, um, can you all finalize whatever you need to

3    finalize regarding that issue by Wednesday and get to me

4    closing arguments by Friday.

5    **MS. SMITH:**  Isn't this (coughing) when it's going to be

6    around tomorrow or Wednesday.

7    **HEARING OFFICER:**  Yep.

8    **MS. SMITH:**  Okay, so affidavits by Wednesday, closing

9    arguments by

10    **HEARING OFFICER:**  By Friday, if you need a closing, if

11    you need to respond to hers can you do it by Monday, the

12    following Monday.

13    **MS. GAMBALE:**  The following Monday, well if it can,

14    can we get it then early enough on Friday for me to, cause

15    I have to arrange a time to get him to the office to sign

16    an affidavit, if necessary.

17    **HEARING OFFICER:**  I think you are doing that by

18    Wednesday.

19    **MS. GAMBALE:**  Okay, okay we can do that.

20    **HEARING OFFICER:**  The affidavit is just over the

21    tutoring, correct.

22    **MS. GAMBALE:**  Oh you're saying if I need to file a

23    response, then that's not a problem at all.

143

1    **HEARING OFFICER:**  Yeah, if he needs to file a

2    response, so do you want to wait

3        **MS. SMITH:**  It's in my closing.

4        **HEARING OFFICER:**  So do you want to wait for, until

5    Monday on this, if possible.

6        **MS.  GAMBALE:**  Actually, here that's fine.

7        **HEARING OFFICER:**  So in other words, what I'm

8        **MS. SMITH:**  I mean really I should get your closing

9    first and be able to see your closing arguments, file mine

10   and then you can have chance to be able to respond to mine

11   since you are --------- is what my understanding of this.

12       **MS.  GAMBALE:**  Right that doesn't, I mean that doesn't

13   bother me.

14       **HEARING OFFICER:**  Friday?

15       **MS.  GAMBALE:**  What?

16       **HEARING OFFICER:**  So by Wednesday you all are coming

17   to the conclusion about Ms. West and the tutoring.  If you

18   need affidavits filed then, fine; closing arguments by you

19   on Friday, Monday, close of business what you

20       **MS.  GAMBALE:**  Actually, what I wouldn't want is a

21   shorter time frame so that we can wrap this up, um, I could

22       **HEARING OFFICER:**  I, I, I'll wrap it up.  I mean, you,

23   I want to give you enough time to write, so write and I'll

24   then I'll speed up my time.

144

1    **MS. GAMBALE:** Okay, so if I get it to you earlier, um

2    **HEARING OFFICER:** Yeah, if you get it to her before

3    Friday, then fine, then she'll, you know, another, what do

4    you need, a full working day?

5    **MS. SMITH:** Yeah, a day to, because I don't know what

6    day it is if I'm in meetings all day.

7    **MS. GAMBALE:** Can we just say that she'll file her

8    response within a full working day, um, after receiving

9    mine and then I'll file another working day

10   **HEARING OFFICER:** Yeah, but the target dates we are

11   looking for

12   **MS. SMITH:** Friday

13   **HEARING OFFICER:** You settle up, you settle on

14   Wednesday for all the stuff regarding the tutoring and Ms.

15   West.  Friday, let's hear closing arguments close of

16   business Monday, close of business, your arguments and then

17   Tuesday, close of business.  Okay.

18   **MS. SMITH:** I think that sounds fair.

19   **HEARING OFFICER:** That's, that's 7 days from today I

20   can get a decision out in 3 or 4 days after that.

21   **MS. SMITH:** Okay.

22   **HEARING OFFICER:** Alright.

23   **MS. SMITH:** Thank you for your trying not to forget

24   everybody's name.

1      **MS.   GAMBALE:**   Thank you for not forgetting your

2   responsibility too.

3      **HEARING OFFICER:**   Okay, we are adjourned.   Thank You.

4

5                           *** END OF HEARING ***

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24